**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

THE STATE OF COLORADO,

     Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
DEPARTMENT OF DEFENSE,
PETE HEGSETH, in his official capacity as Secretary of Defense,
DEPARTMENT OF THE AIR FORCE, and
TROY MEINK, in his official capacity as Secretary of the Air Force,

     Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

     Plaintiff, the State of Colorado, through its Attorney General, hereby alleges the

following:

**INTRODUCTION**

     1.     President Trump's decision to move U.S. Space Command from Colorado

Springs to punish the State of Colorado for allowing eligible voters to vote by mail is

unconstitutional. When issuing his decision, the President could not have been clearer about his

motivations, announcing that "[t]he problem I have with Colorado" is that "they do mail-in

voting" and that this "played a big factor" in the decision. The Constitution does not permit the

Executive to punish or retaliate against States for lawfully exercising sovereign powers reserved

for the States, as President Trump and the Executive Branch have unlawfully done here.

1

2.      The President has indicated that this action is only the start and that he will order further executive action to coerce Colorado and other States to end mail-in voting. He has demanded that States, like Colorado, that allow mail-in voting "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do."

3.      At the foundation of our republic, the Constitution established a "system of 'dual sovereignty,'" with States retaining "'a residuary and inviolable sovereignty.'" *Printz v. United States*, 521 U.S. 898, 918–19 (1997) (quoting The Federalist No. 39 (James Madison)). These State sovereign powers were reflected directly in the original Constitution and further enshrined through the Tenth Amendment: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

4.      One of the core State sovereign powers is the authority to regulate elections. As the Supreme Court has repeatedly explained, "'the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.'" *Shelby County v. Holder*, 570 U.S. 529, 543 (2013) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 461–462 (1991) and *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)). While the Constitution gives Congress certain authorities to regulate the time and manner for electing Senators and Representatives, U.S. Const. art. I, § 4, cl. 1, the Constitution provides the President and the Executive Branch with no such authority. The States alone have the power to regulate elections for President and state and local offices. The President's decision thus offends the

fundamental design of the Constitution in two ways, violating both federalism and separation-of-powers principles.

5.    Colorado has lawfully exercised its sovereign authority by creating an election system that is the envy of other States, considered the "gold standard" by many experts for free and fair elections. As part of that system, eligible voters are allowed to cast their ballots through the mail, at a drop-off box, or in person. The advantages of this system are well documented, including increased security, lower administrative costs, increased accessibility, higher voter turnout, higher voter satisfaction, and more informed voters. Since the system was put in place in 2013, there is not a shred of evidence that the outcome of any election within Colorado has been altered by fraud. This system has been embraced, implemented, and supported by both Democrats and Republicans in Colorado.

6.    The President's decision to punish Colorado based on Colorado's lawful exercise of its sovereign authority to regulate elections, and his threats to impose further harmful executive action, violate the Tenth Amendment, the Elections Clause, State sovereignty, and separation-of-powers principles. Under the Constitution, the Executive may not directly command Colorado to end mail-in voting. *See, e.g.*, *Murphy v. NCAA*, 584 U.S. 453, 472 (2018) (federal government lacks power to directly compel states); *New York v. United States*, 505 U.S. 144, 166 (1992) (same). Nor may the Executive achieve this same result by punishing Colorado into submission. The Supreme Court has long recognized that the Constitution prohibits the use of retaliation, punishment, or other coercive action in response to the exercise of constitutional right or power. Any other rule would render the Constitution's grants of powers and rights to the

States and the people meaningless. It would allow the Executive to unlawfully seize powers not granted by the Constitution to "'produce a result which (it) could not command directly.'" *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)); *cf. United States v. Goodwin*, 457 U.S. 368, 372 (1982) (an individual "certainly may not be punished for exercising a protected statutory or constitutional right").

7.     In addition to violating the Constitution, the Executive Branch also violated statutory requirements mandating detailed processes and public disclosures through the submission of reports to Congress before taking action to relocate a major military headquarters.

8.     The State of Colorado brings this action seeking a declaration that the President's decision to move U.S. Space Command is unconstitutional and unlawful. Colorado also seeks an injunction against the agency defendants prohibiting them from implementing this unconstitutional and unlawful decision.

## JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff, the State of Colorado, is a sovereign State in the United States of America. A substantial part of the events or omissions giving rise to this complaint occurred and continue to occur within this district. Peterson Space Force Base is located in Colorado Springs, Colorado.

## PARTIES

11.     Plaintiff State of Colorado is a sovereign State in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General is the chief legal representative of the State and is authorized by Colorado Revised Statutes § 24-31-101 to pursue this action.

12.     Defendant Donald J. Trump is President of the United States. President Trump is sued in his official capacity.

13.     Defendant Department of Defense is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

14.     Defendant Pete Hegseth is the Secretary of Defense. The commander of U.S. Space Command reports to the Secretary of Defense. Secretary Hegseth is sued in his official capacity.

15.     Defendant Department of the Air Force is an agency within the Department of Defense and is an agency within the meaning of 5 U.S.C. § 552(f).

16.     Defendant Troy Meink is the Secretary of the U.S. Air Force. The Secretary of the Air Force oversees the Department of the Air Force and carries out varied functions subject to the authority, direction, and control of the Secretary of Defense. Secretary Meink is sued in his official capacity.

17.     Collectively, Defendants Department of Defense, Department of the Air Force, Secretary Hegseth, and Secretary Meink are referred to as "Agency Defendants."

## ALLEGATIONS

**I.    Colorado has lawfully exercised its sovereign authority to regulate elections through the use of mail-in voting.**

18.    In 2013, the Colorado General Assembly passed House Bill 13-1303, the "Voter Access and Modernized Elections Act." Governor Hickenlooper signed the bill into law on May 10, 2013.

19.    Under this Act and accompanying regulations, eligible Colorado voters are permitted to vote in state and federal elections by mailing in their ballot, depositing their ballot at a drop-off location, or voting in-person. *See, e.g.*, Colo. Rev. Stat. § 1-7.5-103.

20.    The law has been a resounding success. For example, a 2016 study by the Pew Charitable Trusts found that the law decreased administrative costs by an average of 40%, decreased the use of provisional ballots by nearly 98%, increased voter turnout, and increased voter satisfaction. In a survey of voters, 95% were satisfied or very satisfied with their voting experience. *Colorado Voting Reforms: Early Results*, Pew Charitable Trs. (Mar. 2016), https://www.pew.org/en/research-and-analysis/issue-briefs/2016/03/colorado-voting-reforms-early-results.

21.    Other studies have shown similarly positive outcomes. One study concluded that Colorado's voting system increased turnout, on average, by eight percentage points. Adam Bonica, et al., *All-mail Voting in Colorado Increases Turnout and Reduces Turnout Inequality*, 72 Electoral Studies, Aug. 2021, https://doi.org/10.1016/j.electstud.2021.102363. This has led Colorado to have one of the highest voter turnout rates in the nation.

6

22.     Colorado's voting system improves accessibility for all groups, including disabled individuals and individuals who cannot easily vote in person on election day due to mobility and other challenges. It also leads to more informed voters because eligible voters receive their ballots and have additional time to research candidates and issues, without the time pressure of the voting booth. In addition to these benefits, security is increased by an all-paper ballot system that is easily audited and more secure than electronic voting.

23.     Nor is this a partisan issue: empirical evidence shows that vote-by-mail systems have no impact on partisan turnout or vote share. *See, e.g.*, Daniel M. Thompson, et al., *Universal Vote-by-Mail Has No Impact on Partisan Turnout or Vote Share*, 117 Proc. of the Nat'l Acad. of Sci. 14052 (2020), https://doi.org/10.1073/pnas.2007249117.

24.     The Act enjoys broad bipartisan support within Colorado. *See, e.g.*, *Consensus on Mail Voting*, The Daily Sentinel, Grand Junction, Colorado (Sept. 24, 2025). The Act has been implemented by Republican and Democratic Secretaries of States alike and by a bipartisan group of clerks across Colorado. As one Republican state House representative and President Trump supporter recently stated: "Coloradans love being able to vote from home . . . . [T]his is what the overwhelming majority of Coloradans want."

25.     A voting system that works for Coloradans is especially important because of the active role Colorado citizens play in their own democratic self-government through the initiative and referendum process. This mail-in voting system is also highly resilient, proving effective through challenging circumstances like the COVID-19 pandemic.

26.     Since the system was put in place in 2013, there is no evidence that the outcome of any election within Colorado has been altered by fraud. To the contrary, Colorado's system ensures secure, free, and fair elections.

27.     Mail-in voting does not entail "massive voter fraud" or "crooked elections," as President Trump has falsely claimed. Nor do States that allow mail-in voting want "dishonest elections." Colorado and other similar States impose strenuous security requirements, with detailed security auditing, to ensure free and fair elections. The President's claims that foreign countries and others print millions of illegal ballots is likewise completely false. President Trump's statements and beliefs on mail-in voting are simply untethered from the facts.

28.     In sum, the well-documented advantages of Colorado's system include increased security, lower administrative costs, increased accessibility, higher voter turnout, higher voter satisfaction, and more informed voters. Colorado's voting system is considered to be the "gold standard" by many policy experts for free and fair elections. Bonica, *supra*, at 1. The system is the envy of other States, and numerous states have attempted to emulate Colorado's system.

29.     Most importantly, Colorado has exercised its sovereign power to create and implement this voting system, as the Constitution expressly provides and as the Framers envisioned. Sovereignty means the freedom to choose, regardless of the President's view about the wisdom, efficacy, or appropriateness of that judgment, so long as that choice does not violate other specific provisions of the Constitution.

II.    **U.S. Space Command is established as a combatant command in Colorado Springs.**

30.    U.S. Space Command was authorized by the 2018 National Defense Authorization Act and was formally established on August 29, 2019. John S. McCain National Defense Authorization Act, Pub. L. 115-232, § 1601, 132 Stat. 1636, 2101–2105 (2018). It is one of eleven combatant commands under the umbrella of the Department of Defense. Its mission is to "plan[], execute[], and integrate[] military spacepower into multi-domain global operations in order to deter aggression, defend national interests, and when necessary, defeat threats." To accomplish its mission, U.S. Space Command "employs joint forces from the U.S. Army, Marine Corps, Navy, Air Force and Space Force."

31.    Since its inception, U.S. Space Command has always been headquartered at Peterson Space Force Base (previously Peterson Air Force Base), in Colorado Springs, Colorado.

32.    Initially, the headquarters were temporary while the Department of Defense underwent a "basing" process to finalize the permanent headquarters location. At one point, in January 2021, the Secretary of the Air Force provisionally recommended relocating Space Command. But the Government Accountability Office ("GAO") and Department of Defense Inspector General ("DOD IG") found significant concerns with the process and recommendation. For example, the GAO concluded that the basing process had suffered from "significant shortfalls in its transparency and credibility." DOD IG likewise made numerous recommendations to improve shortfalls with the process.

33.    The Air Force followed those recommendations and conducted further review. Following that review, on July 31, 2023, the Department of Defense announced that President

Biden selected Peterson Space Force Base as U.S. Space Command's permanent headquarters. A press release explained that Peterson Space Force Base would "ensure[] peak readiness in the space domain" and "enable the command to most effectively plan, execute and integrate military spacepower into multi-domain global operations." President Biden chose Peterson Space Force Base after consulting with the Secretary of Defense and other senior military leaders, and both the Secretary of Defense and the commander of U.S. Space Command supported his decision.

34.     Peterson Space Force Base has remained the permanent headquarters of Space Command headquarters ever since. U.S. Space Command achieved "full operational capability" in December 2023. General Stephen N. Whiting, a four-star general, serves as Commander of U.S. Space Command.

### III.     President Trump announced his decision to move U.S. Space Command to punish Colorado's use of mail-in voting.

35.     On September 2, 2025, President Trump announced his decision to move the U.S. Space Command permanent headquarters from Peterson Space Force Base in Colorado Springs, Colorado.

36.     In making the announcement, President Trump stated that Colorado's state laws authorizing mail-in voting "played a big factor" for his decision:

> "The problem I have with Colorado, one of the big problems, they do mail-in voting. They went to all mail-in voting, so they have automatically crooked elections, and we can't have that. When a State is for mail-in voting, that means they want dishonest elections because that's what that means. So that played a big factor also."

10

*See also, e.g.*, Rebecca Shabad, *Trump Says He's Moving Space Command HQ to Alabama Because of Colorado's Mail-in Voting System*, NBC News (Sep. 2, 2025), https://www.nbcnews.com/politics/white-house/trump-moving-space-command-hq-alabama-colorado-mail-voting-system-rcna228647.

37.     In his announcement, President Trump estimated that his decision would create 30,000 jobs and hundreds of billions in investment elsewhere. The clear implication was that Colorado would lose these jobs and investments, directly harming Colorado's economy and businesses and causing Colorado to lose substantial tax revenue.[1]

38.     Agency Defendants were all present during the announcement and indicated that they were moving forward to implement the President's decision.

39.     On the same day, September 2, 2025, Defendant Department of Defense issued a news release entitled, "Trump Announces Relocation of U.S. Space Command." *See* https://www.war.gov/News/News-Stories/Article/Article/4291622/trump-announces-relocation-of-us-space-command/. The release confirmed the decision to move the U.S. Space Command headquarters and that the "move will result in more than 30,000 jobs for the state of Alabama, as well as hundreds of billions of dollars in investments."

---

[1] As of December 1, 2024, there were 1,308 personnel authorized to work at U.S. Space Command headquarters in the Colorado Springs vicinity, including over 800 authorized civilian employees. U.S. Space Command also had at least 32 service contracts with companies located in Colorado covering countless numbers of civilian contractors.

40. Agency Defendants have confirmed that they are expeditiously moving forward with carrying out the President's decision. Through a spokesperson, Agency Defendants issued a statement to the Denver Post: "U.S. Space Command will expeditiously carry out the direction of the President following last week's announcement of Huntsville, Alabama, as the command's permanent headquarters location, while continuing to execute our vital mission."

41. In addition to harming Colorado's economy and jobs and costing substantial tax revenue, the move will cost federal taxpayers billions of dollars to move a fully operational sophisticated permanent command headquarters. Civilian employees and contractors will also be harmed, either by losing their jobs or upending the lives they built in Colorado to keep their jobs at the new headquarters location.

42. President Trump has indicated that he intends to take further harmful executive action to end mail-in voting, including through a forthcoming executive order. *See, e.g.*, Bart Jansen, *Trump Threatens Executive Order to End Mail-In Voting; Says Putin Agrees*, USA Today (updated Aug. 19, 2025), https://www.usatoday.com/story/news/politics/2025/08/18/trump-mail-in-voting/85707446007/. He has demanded that States, like Colorado, that allow mail-in voting "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do."

43. This is not the first time President Trump has singled out Colorado for threatened or actual punishment. Mere weeks before the Space Command announcement, he threatened "to take harsh measures" against Colorado for the conviction of Tina Peters under Colorado state criminal law, again based on Colorado's exercise of sovereign power protected by the Tenth

12

Amendment. *Oregon v. Ice*, 555 U.S. 160, 168 (2009) (administering criminal justice "among the basic sovereign prerogatives States retain"). As part of that threat, President Trump again negatively referenced "Mail-in Ballot" voting.

   IV.   **President Trump's decision to move U.S. Space Command violates the Constitution.**

44.   President Trump's decision to move U.S. Space Command to punish Colorado for utilizing mail-in voting violates the Constitution.

45.   Federalism, the system of dual sovereignty between the States and the federal government, serves as one of the core structural designs of the Constitution. The Founders viewed federalism and separation of powers as key to protecting liberty and avoiding abuse from centralized power. "[T]he power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people." The Federalist No. 51 (James Madison). As the Supreme Court has emphasized, "the Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *New York*, 505 U.S. at 181. "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory*, 501 U.S. at 458.

13

46.     The Constitution thus reflects that the States retained "certain exclusive and very important portions of sovereign power," The Federalist No. 9 (Alexander Hamilton), "a residuary and inviolable sovereignty," The Federalist No. 39 (James Madison). These State sovereign powers were further enshrined through the Tenth Amendment: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

47.     "'[T]he Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.'" *Shelby Cnty.*, 570 U.S. at 543 (quoting *Gregory*, 501 U.S. at 461–462 and *Sugarman*, 413 U.S. at 647).

48.     The Elections Clause provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. The Constitution thus gives the States the power to regulate elections. While Congress may pass laws to alter State regulations regarding the time and manner for electing Senators and Representatives, the President and the Executive Branch were given no such authority. Further, the States alone have the power to regulate elections for President and state and local offices.

49.     The President's decision to punish Colorado, and his threats to impose further harmful executive action, based on Colorado's lawful exercise of its sovereign authority to regulate elections violate the Tenth Amendment, the Elections Clause, State sovereignty, and separation-of-powers principles. The President lacks any authority under the Constitution to

regulate the manner of elections. That power is reserved exclusively for the States and, in some circumstances, Congress, but never for the President.

50.    The Constitution thus prohibits the President from commanding Colorado to end mail-in voting. *See, e.g.*, *Murphy*, 584 U.S. at 472; *New York*, 506 U.S. at 166. The President may not achieve this same result by punishing Colorado into submission. The Supreme Court has long recognized that the Constitution prohibits the use of retaliation, punishment, or other coercive action in response to the exercise of constitutional right or power. Any other rule would render the Constitution's grants of powers and rights to the States and the people meaningless. That would allow the federal government to unlawfully seize powers not granted by the Constitution to "'produce a result which (it) could not command directly.'" *Perry*, 408 U.S. at 597; *cf. Goodwin*, 457 U.S. at 372 (an individual "certainly may not be punished for exercising a protected statutory or constitutional right").

51.    The Supreme Court has repeatedly upheld "the principle that a government official cannot do indirectly what she is barred from doing directly." *NRA v. Vullo*, 602 U.S. 175, 190 (2024) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–69 (1963)). In the context of constitutionally protected rights, this means that the government cannot use or threaten retaliation to punish or suppress the exercise of a protected right. *See, e.g.*, *NRA*, 602 U.S. at 191 (holding a government official violates the First Amendment when "reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech").

52. The same principle applies equally to a State's exercise of sovereign powers reserved by the Constitution. Indeed, the Supreme Court has emphasized that the federal government can never exceed its authority relative to the States, not even by "consent." *New York*, 505 U.S. at 182. Retaliation and punishment violate the constitutional design by seeking to coerce States to "voluntarily" give up their sovereign powers. The Constitution prohibits such retaliatory conduct.

53. If allowed to stand, the President's action here would fundamentally alter the balance of power between the States and the federal government and the Constitution's foundational structure. Future Presidents, Republican and Democratic alike, could use the same tactics and wield the Executive's vast powers to punish States, for example, for imposing stringent voter identification laws or for not permitting mail-in or early voting or for not redistricting congressional districts to the President's liking.

54. Retaliation is particularly pernicious because it is open-ended. Colorado faces not only this current punishment but also unbounded future "harsh measures" unless and until the State agrees to bend its sovereign authority in a manner directed by the President. The President and the Executive Branch wield vast powers with the capability to impose grave harms. The Constitution prohibits using those powers to try to extract additional authority reserved for the States, other branches of government, or the people, as the President has done here, and as he threatens to do with further "harsh measures" in the future.

16

55.    In sum, the President's decision to move U.S. Space Command to penalize Colorado for exercising sovereign power reserved by the Constitution violates the Tenth Amendment, the Elections Clause, State sovereignty, and separation of powers.

**V.    Agency Defendants violated federal law dictating required processes and notifications before moving a major headquarters location.**

56.    Federal law requires the military to follow certain procedures before taking action to relocate a major headquarters location. Agency Defendants failed to comply with these statutory requirements.

57.    Agency Defendants violated 10 U.S.C. § 483, which imposes detailed processes and congressional notification requirements on decisions regarding the "relocation of a major headquarters."

58.    U.S. Space Command headquarters is a "major headquarters" within the meaning of section 483, because it is "the headquarters of a military unit or command that is the appropriate command of a general officer or flag officer." 10 U.S.C. § 483(f)(2). U.S. Space Command is a unified combatant command currently led by General Stephen N. Whiting.

59.    Agency Defendants were required to provide the congressional defense committees with the notice and analysis required by statute within seven days of: (1) issuing any formal internal guidance initiating the decision-making process for relocating U.S. Space Command headquarters; (2) selecting 2–5 most likely candidate locations for the headquarters; and (3) selecting a preferred location for the headquarters. 10 U.S.C. § 483(b).

60.     Among other information, the required notice must include:

- A description of the manner in which "joint and all-domain training capabilities" were comparatively analyzed among candidate locations;

- A description of the manner in which "airspace and training areas" were comparatively analyzed among candidate locations;

- A description of the manner in which "community support" was comparatively analyzed among candidate locations, "including consultation with appropriate State officials and officials of units of local government . . . regarding matters affecting the local community"; and

- An explanation of how candidate locations scored in reference to the preceding criteria and a summary of any score cards used in choosing the preferred location.

10 U.S.C. § 483(c).

61.     Further, the statute provides that "[n]o irrevocable action may be taken to effect or implement a basing decision" until 14 days have passed from the date the Secretary notified Congress. *Id.* § 483(d).

62.     Upon information and belief, Agency Defendants have failed to follow the statutorily mandated processes, failed to provide the requisite notices to Congress, and have taken and intend to take irrevocable actions to effect or implement the relocation.

## CAUSES OF ACTION

## COUNT ONE

### Violation of the Tenth Amendment, Elections Clause, State Sovereignty, and Separation of Powers

63.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

64.     The President's actions may be reviewed for constitutionality. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U. S. 579 (1952); *Panama Refining Co. v. Ryan*, 293 U. S. 388 (1935).

65.     President Trump's decision to move U.S. Space Command headquarters based on Colorado's use of mail-in voting violates the Tenth Amendment, the Elections Clause, the Constitution's reservation of State sovereign powers, and separation-of-powers principles. President Trump has no lawful authority to regulate elections. President Trump has unlawfully retaliated against Colorado to punish the State for its exercise of sovereign authority to regulate elections. The President's decision and threatened future action undermine and violate the Constitution by singling out Colorado for harmful executive action based on its exercise of sovereign powers.

66.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that President Trump's decision to move U.S. Space Command permanent headquarters is unconstitutional and that the Executive may not retaliate against Colorado to punish the State for its exercise of sovereign authority reserved for the States by the Constitution. Plaintiff is also entitled to an injunction preventing Agency Defendants from effectuating a change in headquarters location based on the unlawful decision.

## COUNT TWO

### Violation of the Administrative Procedure Act
### (Against Agency Defendants)

67.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

68.    Under the Administrative Procedure Act ("APA"), a reviewing court shall hold unlawful and set aside agency action that is contrary to law, in excess of statutory authority or limitation, or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

69.    Agency Defendants have acted contrary to law, in excess of statutory authority or limitation, and without observance of procedure required by law through their actions to relocate U.S. Space Command headquarters without following the requirements of 10 U.S.C. § 483.

70.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Agency Defendants acted contrary to law, in excess of statutory authority or limitation, and without observance of procedure required by law, in violation of the APA, through their actions to relocate U.S. Space Command headquarters without following the requirements of 10 U.S.C. § 483. Plaintiff is also entitled to an injunction preventing Agency Defendants from taking further action to implement the announced change to the headquarters location without first following the requirements of 10 U.S.C. § 483.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

a.    Declare that President Trump's decision to move U.S. Space Command headquarters is unconstitutional and that the Executive may not retaliate against

Colorado to punish the State for its exercise of sovereign authority reserved for the States by the Constitution;

b.  Enjoin Agency Defendants from effectuating a relocation of U.S. Space Command headquarters based on President Trump's unlawful decision;

c.  Declare that Agency Defendants acted contrary to law, in excess of statutory authority or limitation, and without observance of procedure required by law, in violation of the APA, through their actions to move U.S. Space Command headquarters without following the requirements of 10 U.S.C. § 483.

d.  Enjoin Agency Defendants from taking further action to implement the announced change to the U.S. Space Command headquarters location without following the requirements of 10 U.S.C. § 483;

e.  Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

f.  Grant other such relief as this Court may deem proper.


PHILIP J. WEISER
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz
*Deputy Solicitor General*
Talia Kraemer
*Assistant Solicitor General*
Sarah H. Weiss
*Senior Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
talia.kraemer@coag.gov
sarah.weiss@coag.gov

Counsel for the State of Colorado