**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-3428-RBJ

THE STATE OF COLORADO,

      Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
PETE HEGSETH, in his official capacity as Secretary of Defense,
TROY MEINK, in his official capacity as Secretary of the Air Force,
SEAN DUFFY, in his official capacity as Secretary of Transportation,
BROOKE ROLLINS, in her official capacity as Secretary of Agriculture,
CHRIS WRIGHT, in his official capacity as Secretary of Energy,
DOUG BURGUM, in his official capacity as Secretary of the Interior,
KRISTI NOEM, in her official capacity as Secretary of Homeland Security,
KAREN EVANS, in her official capacity as Acting Director of the Federal Emergency
Management Agency,
PAM BONDI, in her official capacity as Attorney General,
BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation,
EXECUTIVE OFFICE OF THE PRESIDENT,
DEPARTMENT OF DEFENSE,
DEPARTMENT OF THE AIR FORCE,
DEPARTMENT OF TRANSPORTATION,
DEPARTMENT OF AGRICULTURE,
DEPARTMENT OF ENERGY,
DEPARTMENT OF THE INTERIOR,
DEPARTMENT OF HOMELAND SECURITY,
FEDERAL EMERGENCY MANAGEMENT AGENCY,
DEPARTMENT OF JUSTICE,
NATIONAL SCIENCE FOUNDATION,

      Defendants.

---

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

    The Department of Agriculture ("USDA") has demanded that Colorado comply with an unlawful, logistically impossible "pilot project." The "pilot project" purports to require Colorado and five counties to recertify eligibility for all Supplemental Nutrition Act Program ("SNAP")

1

households, without exception, within 30 days over the winter holidays, including conducting in-person interviews with more than 100,000 households. Colorado was given no advance warning or time to prepare. And USDA threatens severe sanctions, including potential removal from the SNAP program, if Colorado fails to comply with this unlawful and impossible demand.

This is not a real pilot project where States voluntarily agree to participate in innovative methods to improve a program. Nor did USDA comply with any of the normal procedures. Instead, it was a targeted attack, with threatened draconian sanctions, against Colorado and Minnesota, another jurisdiction being singled out by the Administration. *See* Dkt. 26 ("Am. Compl.") ¶¶ 6, 88–108 (describing the series of actions). This is not the first time Colorado has been threatened with unlawful sanctions. Another district court enjoined USDA's prior unlawful efforts to take away more than $100 million in administrative costs. In fact, Colorado has had to obtain three injunctions against USDA in the past few months, including when USDA unlawfully refused to provide SNAP benefits during the government shutdown. *Id.* ¶ 139 (describing cases).

The "pilot project" is unlawful many times over. It violates at least three procedural requirements, is contrary to law for at least five reasons, is arbitrary and capricious, and violates the Spending Clause. Even if the "pilot project" were lawful, it is logistically impossible to complete the requirements and interview 100,000 households in person within a mere 30 days.

Colorado seeks a preliminary injunction enjoining USDA Defendants and postponing the effective date of the demand pursuant to 5 U.S.C. § 705. Not only is Colorado likely to succeed on the merits, it faces immediate irreparable harm—including substantial unrecoverable costs, immediate harms to Colorado's service programs, and severe sanctions—and the balance of the equities and public interest tip decidedly in Colorado's favor. The Court should therefore grant

the motion and maintain the status quo pending further judicial proceedings. Colorado respectfully requests oral argument for this motion.

The parties held a meaningful conferral prior to the filing of this motion.

## BACKGROUND

### I.    SNAP provides essential food security for millions of Americans.

For more than six decades, the SNAP program (and its predecessors) have provided essential food security benefits to ensure low-income Americans do not go hungry. During fiscal year 2024, an average of 41.7 million individuals in 22.2 million households, or roughly 1 in 8 Americans, received SNAP. Randy Aussenberg & Gene Falk, Cong. Rsh. Serv., R42505, *Supplemental Nutrition Assistance Program (SNAP): A Primer on Eligibility and Benefits* (Sep. 29, 2025), https://coag.gov/app/uploads/2026/01/R42505.36.pdf. In 2024, an average of 594,526 Coloradans received SNAP benefits each month, including over 300,000 children and 114,000 elderly individuals, totaling more than $1.4 billion in SNAP benefits annually. Ex. 1, ("McClelland Decl.") ¶ 9.

The goal of SNAP is simple: "to 'alleviate . . . hunger and malnutrition' by 'increasing [the] food purchasing power' of low-income households." *Hall v. USDA*, 984 F.3d 825, 831 (9th Cir. 2020) (quoting 7 U.S.C. § 2011). To achieve this end, SNAP provides monthly benefits to eligible households that can be used to buy food. *See Hall*, 984 F.3d at 831. To qualify for SNAP, applicants must demonstrate that their household satisfies specified financial requirements, along with other eligibility criteria. McClelland Decl. ¶ 6; *see* 7 C.F.R. § 273.1.

II.     **Colorado administers SNAP on behalf of the USDA and employs robust program integrity efforts that go beyond federal requirements.**

SNAP is overseen at the federal level by USDA's Food and Nutrition Service ("FNS"). 7 C.F.R. § 271.3(a). But the States are responsible for the administration of SNAP, including creating and processing applications for benefits, making eligibility determinations, issuing benefits, and ensuring program integrity. 7. C.F.R. § 271.4(a); *see* 7 U.S.C. § 2020(a)(1). In Colorado, the Colorado Department of Human Services ("CDHS") Office of Economic Security oversees SNAP. Colorado's SNAP program is county implemented and State supervised and administered. McClelland Decl. ¶¶ 8, 10. Colorado's 64 counties determine SNAP eligibility and authorize benefits, while CDHS administers and supervises the SNAP program. *Id.*; *see also* C.R.S. § 26-2-301(1), (2). This model allows Coloradans to work directly with their local county Department of Social/Human Services to apply for SNAP and to recertify ongoing eligibility. McClelland Decl. ¶ 8; 10 C.C.R. 2506-1:4.000.1, 4.201, 4.202. Local county offices determine whether a household qualifies for SNAP by, for example, reviewing financial information from an applicant including income, expenses, and assets. McClelland Decl. ¶¶ 34, 35. Local county offices also verify nonfinancial criteria such as identity of the applicant and household composition. *See* 10 C.C.R. 2506-1:4.300, 4.400.

Successful applications must include an interview with the applicant household that is either face-to-face or by phone. McClelland Decl. ¶ 36; 10 C.C.R. 2506-1:4.204(A). The option to undergo a telephonic interview in lieu of a face-to-face interview is consistent with federal law, which permits States to use telephonic interviews. 7 C.F.R. § 273.2(e)(2). In fact, federal regulation requires that if a household meets hardship criteria and "requests to not have an in-

office interview, the State agency must offer to the household to conduct the interview by telephone." *Id.*

Colorado continues to ensure households remain eligible after initial approval. In fact, Colorado goes above and beyond federal recertification requirements. McClelland Decl. ¶ 37. For most households, USDA requires States to recertify eligibility every 12 months.[1] 7 C.F.R. § 273.10(f). But Colorado has voluntarily chosen to recertify household eligibility generally every six months, twice as often as required. McClelland Decl. ¶ 37; 10 C.C.R. 2506-1:4.208.1(B). Colorado also ensures deceased individuals do not receive SNAP benefits, by checking daily with Social Security data as well as county burial information, and takes numerous steps to ensure SNAP recipients are not receiving benefits in other states. McClelland Decl. ¶¶ 41–42, 47–8.

Colorado's substantial program integrity efforts have resulted in Colorado performing consistently better than the national average in limiting payment errors. McClelland Decl. ¶ 13. Since data has been published following the COVID-19 pandemic, Colorado has performed better than the national average every single year, often in the top 20 performing States. *Id.*

According to the federal government's own studies, "SNAP fraud is rare, according to available data and reports," and error rates generally reflect inadvertent errors, not fraud. Randy Aussenberg, Cong. Rsh. Serv., IF10860, *Supplemental Nutrition Assistance Program: Errors and*

---

[1] For a minority of households containing only disabled and elderly individuals, both federal regulations and Colorado rules provide for recertification on a less frequent basis. 7 C.F.R. § 273.10(f). Under federal regulations, certification is allowed for up to 24 months for a household in which all adult members are elderly or disabled. *Id.* Again, Colorado is more stringent, limiting this 24-month certification only to households where all members are both elderly or disabled adults and have no earned income. 10 C.C.R. 2506-1:4.208.1(A).

*Fraud* (Apr. 7, 2025), https://coag.gov/app/uploads/2026/01/IF10860.pdf. Colorado nevertheless employs robust integrity teams to investigate any potential fraud. McClelland Decl. ¶¶ 43–46. Integrity teams provide direct training to eligibility staff on how to prevent and detect fraud, as well as education on county-specific fraud trends. County integrity staff investigate every fraud referral received. *Id.* These teams conduct extensive investigations, using desk and field research to substantiate the household's actual circumstances. *Id.* These efforts include online databases that validate identity and residency; interviews with outside entities such as employers, landlords, and neighbors; subpoenas for income tax records, bank records; and interviews with the household. *Id.* When evidence supports violations, county staff pursue disqualification and/or refer for prosecution. *Id.*

### III.    USDA orders Colorado to participate in an unlawful and impossible "pilot project" or face severe sanctions.

On December 17, 2025, USDA sent Governor Polis a letter (the "Recertification Letter") requiring Colorado "to participate in a . . . [SNAP] pilot project conducted pursuant to 7 U.S.C. 2026(b)(1)(A)." McClelland Decl. ¶ 14 & Attach. 1. The Recertification Letter ordered Colorado to recertify, within 30 days, during the winter holidays, *all SNAP households* in five of Colorado's largest counties: Adams, Arapahoe, Jefferson, Boulder, and Douglas counties (collectively "Recertification Counties"), including conducting in-person interviews with each household. *Id.* ¶¶ 21–24. The Recertification Letter came without advance warning or time to prepare. *Id.* ¶ 14.

The Recertification Letter threatens that "failure to participate in this pilot project as specified by the USDA will trigger noncompliance procedures as codified in 7 U.S.C. 2020(g). It may also affect Colorado's continued participation in SNAP." McClelland Decl. ¶ 18. Although

the letter does not specify "noncompliance procedure" sanctions, just a few weeks ago USDA unlawfully attempted to take all administrative costs from Colorado, totalling more than $100 million, which was only stopped by a court injunction. *Id.* ¶¶ 19–20. Colorado's understanding is that USDA threatens the same sanctions here, plus removing Colorado from the SNAP program, both of which would have a devastating impact. *Id.* ¶¶ 51–63.

The only basis for the forced pilot project is a vague reference to "ongoing fraud affecting federally funded benefits across the nation" and an unsupported statement that the USDA has made "multiple requests to the State of Colorado to fulfill its administrative responsibilities." McClelland Decl. ¶ 15. Colorado has not received any requests related to fulfilling its duties to certify household eligibility or detect fraud. *Id.* The only request Colorado received was for a large amount of data that it could not lawfully release, and a federal court ultimately enjoined USDA's unlawful actions with respect to that request. *Id.*

While Colorado has participated in state-initiated pilot programs, it has never been required by the USDA to participate in one.  McClelland Decl. ¶ 16. Until this "pilot project," Colorado is not aware of any state being forced to participate in a SNAP demonstration project.

Meeting the mandates in the Recertification Letter is impossible for Colorado to achieve within the allotted time. McLelland Decl. ¶¶ 21–32. To begin with, consistent with federal regulations, Colorado rules do not allow CDHS or the local county offices to require SNAP recipients to report for an in-person interview. 10 C.C.R. 2506-1:4.204(A). Another Colorado rule prohibits denying benefits for failing or refusing to appear for a recertification interview scheduled prior to the last month of the household's certification period. 10 C.C.R. 2506-1:4.209(C). To comply with the Recertification Letter these rules would have to be changed

following the requirements of the Colorado Administrative Procedure Act, but USDA's 30-day deadline does not provide adequate time for Colorado to change its rules. McLelland Decl. ¶ 28.

Leaving that aside, there is no possible way to recertify and conduct in-person interviews for 106,500 SNAP recipient households combined, roughly 36% of the total SNAP households in Colorado. McClelland Decl. ¶ 25, 29–32. Conservatively estimating, compliance with the "pilot-project" would require approximately 7,900 worker hours per day to complete approximately 100,000 interviews. None of the counties have the staff or the resources to complete this requirement. *Id.* ¶¶ 29–32. Each county would need to recertify more than 10 times as many households as during a normal month and more than 20 times as many interviews as during a normal month, all of which would need to be in person. *Id.* ¶ 26. The counties would have to accomplish this colossal task with no advanced planning time and without giving households the requisite notice they are entitled to receive. *Id.*

## LEGAL STANDARD

A party seeking a preliminary injunction must establish: "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1238 (10th Cir. 2024) (citation modified). The first two factors are the most important. *Nken v. Holder*, 556 U.S. 418, 434 (2009). And the third and fourth factors merge where, as here, the United States is the opposing party. *Id*. at 435.

## ARGUMENT

**I.      Plaintiff is likely to succeed on the merits.**

Plaintiff is likely to succeed on the merits because the Recertification Letter violates at least three procedural requirements, is contrary to law for at least five reasons, is arbitrary and capricious, and violates the Spending Clause.

### a.    USDA Defendants committed multiple procedural violations.

Plaintiff is likely to succeed on the merits because Defendants violated three distinct procedural requirements: (1) they failed to comply with notice-and-comment rulemaking requirements; (2) they failed to comply with notice requirements for demonstration projects; and (3) they failed to comply with the Paperwork Reduction Act. The APA requires that a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D). For each of these reasons, the Recertification Letter is "unlawful" because it was issued without following required procedures.

*First*, Defendants failed to comply with the APA's notice-and-comment rulemaking required for legislative rules. 5 U.S.C. § 553. "A rule is legislative when it has the force of law, and creates new law or imposes new rights or duties. Interpretative rules, by contrast, advise the public of the agency's construction of the statutes and rules which it administers. The agency's own label for its action is not dispositive." *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1222–23 (10th Cir. 2009) (citation modified). Because the Recertification Letter has the force of law and imposes new duties on Colorado, the pilot project constitutes a legislative rule. The letter imposes substantial new duties, including requiring recertifying and conducting in-person

interviews for all households within 30 days, that were not previously required.[2] The Recertification Letter likewise carries the force of law, expressly threatening that failure to comply will result in noncompliance sanctions, including potential removal from the SNAP program. McClelland Decl. ¶ 18 & Attach. 1.

Nor does the Recertification Letter qualify as an order, as opposed to a rule, under the APA. Under the APA, an order is formulated through an adjudication. 5 U.S.C. § 552(b)(7). But "an adjudication *must* have retroactive effect, or else it would be considered a rulemaking." *Cath. Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 922 (D.C. Cir. 2013). The Recertification Letter imposes new *prospective* rules for those selected to this "pilot project." Minnesota received a letter imposing identical rules. McClelland Decl. ¶ 17. Defendants cannot get around the rulemaking requirement by imposing new rules through letters to different states. Instead, if they wish to impose new duties with the force of law, they are required to comply with the notice-and-comment rulemaking process. Having failed to do so, Defendants violated the APA.

*Second*, USDA Defendants failed to comply with the specific notice requirements for demonstration projects.[3] USDA regulations require that "[a]t least 30 days prior to the initiation

---

[2] In fact, USDA regulations prohibit these actions. 7 C.F.R. § 273.2(e)(1) ("State agencies may not require households to report for an in-office interview during their certification period.")

[3] A pilot project is a demonstration project. USDA's regulations previously defined "demonstration projects" as "pilot or experimental projects (hereafter called demonstration projects) designed to test program changes that might increase the efficiency of the [SNAP] program and improve the delivery of [SNAP] benefits to eligible households." 43 Fed. Reg. 54215, 54215 (Nov. 21, 1978). In 1996, USDA streamlined its regulations, deleting the definitions section entirely as "duplicative, superfluous, or obsolete" and moving the public notice requirement from 7 C.F.R. § 282.5(a) to the current § 282.1(b). 61 Fed. Reg. 1849, 1851 (Jan. 24, 1996). There is no reason to believe that in streamlining these regulations USDA intended to change the meaning of demonstration project. Notably, the FNA likewise uses demonstration and pilot project interchangeably. *See* 7 U.S.C. § 2026(f) (using "pilot or experimental projects" interchangeably with "demonstration project").

of a demonstration project, FNS shall publish a General Notice in the Federal Register if the demonstration project will likely have a significant impact on the public. The notice shall set forth the specific operational procedures and shall explain the basis and purpose of the demonstration project." 7 C.F.R. § 282.1(b). The Recertification Letter will have a significant impact on the public, requiring vast numbers of households to appear for an in-person interview with no notice, contrary to longstanding requirements. And if the households do not appear, they will lose their benefits, even if they are entitled to them by law. This notice requirement ensures that the public has a chance to comment and point out flaws in projects affecting the public. The regulation provides that "[i]f significant comments are received in response," USDA is to take appropriate action "prior to implementing the project," including making operational changes and additional notices. 7 C.F.R. § 282.1(b). USDA Defendants failed to publish a notice in the Federal Register or comply with any of these requirements.

*Third*, USDA Defendants failed to comply with the requirements of the Paperwork Reduction Act. The Act provides that "[a]n agency shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information" the agency completes various procedural requirements, including completing mandatory agency review, publishing a notice in the Federal Register, providing an opportunity for public comment, obtaining approval from the OMB Director, and obtaining an OMB control number "to be displayed upon the collection of information." 44 U.S.C. §§ 3507(a), 3506(c).

Through the Recertification Letter and "pilot project," USDA is conducting or sponsoring a new or revised collection of information. *See* 44 U.S.C. § 3502(3); 5 C.F.R. § 1320.3(c) (defining "collection of information" broadly to cover any identical reporting and recordkeeping

requirements). No current approved collection of information covers this "pilot project." USDA Defendants purport to require more than 100,000 households in Colorado (and a similar number in Minnesota) to report and provide information at an in-person interview to recertify eligibility. In addition, the "pilot project" imposes new recordkeeping requirements on Colorado, Minnesota, and 9 counties within Colorado and Minnesota. Defendants failed to comply with any of the requirements of the Paperwork Reduction Act. The Recertification Letter contains no OMB control number required to be displayed on the collection. Because Defendants failed to comply with these requirements, the Recertification Letter is "unlawful" under the APA because it was issued "without observance of procedure required by law."[4] 5 U.S.C. § 706(2)(D).

In sum, for each of these three distinct reasons, Colorado is likely to succeed on its APA procedural violation claims.

### b. The Recertification Letter is contrary to law and exceeds statutory authority.

USDA Defendants also violated the APA because the Recertification Letter is contrary to law and in excess of statutory authority for at least five reasons.

*First*, USDA Defendants cannot order participation in a pilot program without the consent of the State. USDA Defendants cite a provision that states the Secretary "may" conduct on a trial basis pilots or experimental projects, 7 U.S.C. § 2026(b)(1)(A), but nothing in the section authorizes the Secretary to compel States to participate in such projects. Instead, section 2026(b)(1)(D)(i) provides for deadlines for the Secretary to respond to "a request for a waiver under subparagraph (A)," because Congress expected that State agencies would be the ones to

---

[4] Agency violations of the Paperwork Reduction Act may be reviewed when challenging final agency actions pursuant to the APA. *Hyatt v. OMB*, 908 F.3d 1165, 1170–72 (9th Cir. 2018).

request to participate in pilot projects through the waiver process. Indeed, it has been USDA's understanding for decades that the statute authorizes *State agencies* to "request approval from FNS to conduct demonstration projects that improve program administration, increase the self-sufficiency of SNAP recipients, test innovative strategies, or allow greater conformity with the rules of other programs." USDA, *Supplemental Nutrition Assistance Program: State Options Report* 26–29 (17th ed. Aug. 2025), https://coag.gov/app/uploads/2026/01/snap-stateOptionsReport-17edition.pdf. As USDA recently explained: "State agencies *voluntarily* conduct demonstration projects that waive any requirements of the Act and any SNAP regulations to test program changes to improve program administration, increase the self-sufficiency of SNAP recipients, or improve the delivery of benefits to eligible households."[5] 89 Fed. Reg. 104,965, 104,965 (Dec. 26, 2024) (emphasis added).

Elsewhere, the statutes likewise make clear that pilot projects must be agreed to by *both* USDA and the participating State agencies. *See, e.g.*, 7 U.S.C. § 2017(f)(2)(A) (authorizing pilot projects "at the request of 1 or more State agencies"); *id.* § 2036d(a) (authorizing pilot projects "on application of eligible entities"); *id.* § 2025(h)(1)(F)(i)(I) (authorizing pilot projects via "cooperative agreements" with State agencies); *id.* § 2021(h)(3)(i)(1)(A) (authorizing pilot projects "to test innovative Federal-State partnerships"). Congress provided specific tools for bringing States into compliance when they maladminister, but none of those tools include forced

---

[5] USDA previously had regulations that specified this voluntary process. *See* 7 C.F.R. §§ 282.2, 282.4 (1995) (attached as Exhibit 2). Those regulations were removed as "duplicative, superfluous, or obsolete" because "Sections 282.2, 3, 4, and 5(c) contain general information and procedures which are repeated in much greater detail in the Notices of Intent published by the Department when it undertakes demonstration, research or evaluation projects." 61 Fed. Reg. 1849, 1851 (Jan. 24, 1996). Again, removing these regulations did not take away that demonstration projects involve voluntary cooperation between USDA and State agencies.

participation in a "pilot project." 7 U.S.C. §§ 2020(g)–(h). For nearly five decades, USDA has never compelled a state to participate in this type of pilot project, nor claimed authority to do so. Its newly claimed authority, apparently hidden for decades, does not exist in the statute.

*Second*, section 2026(b)(1)(A) permits the Secretary only to "waive any requirement" of the FNA for a pilot project. It does not give authority to impose *new* unilateral requirements on a State, such as commanding in-person interviews and off-cycle recertifications at the Secretary's whim.[6] Had Congress wanted to give the Secretary that power, it would have done so, and the Secretary's effort to usurp that authority is contrary to law.

*Third*, the FNA contains specific limitations that prohibit this "pilot project." Congress provided that "[t]he Secretary may not conduct" a pilot project unless "the project is consistent with the goal . . . of providing food assistance to raise levels of nutrition among low-income individuals." 7 U.S.C. § 2026(b)(1)(B)(i)(I). But this project disqualifies eligible existing beneficiaries who cannot be recertified in 30 days, which is inconsistent with those goals. For similar reasons, this is an "impermissible project" because it would "den[y] assistance to an otherwise eligible household or individual" if they cannot be interviewed in person and recertified within 30 days. *See* 7 U.S.C. § 2026(b)(1)(B)(iv)(III)(bb).

Congress prohibited any pilot project unless it "includes an evaluation to determine the effects of the project." 7 U.S.C. § 2026(b)(1)(B)(i)(II). The Recertification Letter contains no provision for such an evaluation.

---

[6] Likewise, nothing in section 2026 suggest that the Secretary could impose new requirements without undergoing notice-and-comment rulemaking that is required to impose new legal duties with the force and effect of law.

14

"Impermissible projects" also include those "inconsistent" with the requirement that State agencies "provide timely, accurate, and fair service" to SNAP applicants and recipients. 7 U.S.C. §§ 2026(b)(1)(B)(iv)(III)(ff), 2020(e)(2)(B)(i). It is the antithesis of fairness to impose significant burdens on recipients that are not provided for by statute or regulation without notice and to retroactively change the rules of the life-sustaining benefits they have already qualified for.

*Fourth*, the Recertification Letter would require Colorado to violate the FNA and implementing regulations. The Recertification Letter does not waive any of those requirements. *Compare* McLelland Decl. Attach. 2 (letter authorizing Colorado pilot project and identifying specific waivers).[7]

USDA's regulations provide that "State agencies may not require households to report for an in-office interview during their certification period" and "may not require households to report en masse for an in-office interview during their certification periods" 7 C.F.R. § 273.2(e)(1). But that is exactly what USDA is requiring Colorado to do. Likewise, USDA regulations require use of telephone interviews for "household hardships," 7 C.F.R. § 273.2(e)(1)–(2), but here USDA requires all in-person interviews, without regard to hardship.

The "pilot project" would also require Colorado to violate notice requirements. USDA regulations provide that the first step in the recertification process is providing a notice of expiration ("NOE"). *See* 7 C.F.R. § 273.14(b)(1)(i). The earliest that State agencies can provide the NOE is "the first day of the next-to-the-last month" in the household's certification period.

---

[7] A comparison to a recent pilot project proposed by Colorado and approved by FNS in August 2025 illustrates the point. There, FNS outlined the specific waivers to the Act that applied to project, those waiver parameters, and the State's responsibilities in communicating the waivers to the public. The pilot project likewise detailed the evaluation methodology and detailed terms and conditions. None of those conditions threatened sanctions for noncompliance.

*Id.* For the vast majority of households, performing the recertification process in the thirty-day window mandated by USDA would require sending NOEs before the date permitted by section 273.14(b)(1)(i). On the other hand, State agencies must provide an NOE "before the first day of the last month of the certification period." 7 C.F.R. § 273.14(b)(1)(i). That is, State agencies are required to give more than one month's notice. That is not possible here, where USDA informed Colorado of this "pilot project" on December 17, 2025 and required the recertifications to be complete by January 16, 2025.

The "pilot project" would further require Colorado to violate its FNS-approved State Plan of operation, in violation of statute and regulation. *See* 7 U.S.C. § 2020(g); 7 C.F.R. § 276.1.

*Fifth*, the Recertification Letter unlawfully threatens existential sanctions to Colorado's SNAP program. McClelland Decl. ¶ 18 & Attach. 1 (citing 7 U.S.C. § 2020(g)). But that section allows sanctions only if "there is a failure by a State agency without good cause to comply with [1] any of the provisions of this chapter, [2] the regulations issued pursuant to this chapter, [3] the State plan of operation submitted pursuant to subsection (d) of this section, [4] the State plan for automated data processing submitted pursuant to subsection (o)(2) of this section, or [5] the requirements established pursuant to section 2032 of this title." *Id.* The Recertification Letter is not part of the provisions of the FNA or the regulations promulgated under it, nor the State plan of operation, nor the State plan for automated data processing, nor the requirements established under 7 U.S.C. § 2023. Nor does any provision authorize the Secretary to remove a State from the program as a sanction. The remedy if a State is not complying with the terms of its approved pilot project are to end the project and any waivers granted to the State, not to impose sanctions under 7 U.S.C. § 2020(g).

### c. The Recertification Letter is arbitrary and capricious.

Colorado is also likely to succeed because the Recertification Letter is arbitrary and capricious. An agency must provide "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). An agency action is arbitrary and capricious if the agency has "relied on factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Bradford v. U.S. Dep't of Labor*, 101 F.4th 707, 730 (10th Cir. 2024) (citation modified) (quoting *State Farm*, 463 U.S. at 43).

First, the Recertification Letter is arbitrary and capricious because it lacks a satisfactory explanation for its action. Defendants' rationale is limited to a glancing reference to "ongoing fraud affecting federally funded benefits across the nation" and alleged "multiple requests to the State of Colorado to fulfill its administrative responsibilities." McClelland Decl. ¶ 15. But these reasons provide no grounds to believe that SNAP fraud is a serious problem in Colorado, nor how unspecified fraud issues elsewhere in the nation require hasty recertification in five specific Colorado counties. Notably, Colorado has not received any requests from Defendants related to fulfilling its duties to certify household eligibility or detect fraud. *Id.*

Similarly, Defendants' actions fail to "articulat[e] a rational connection between the facts found and the decision made" as required under the APA. *Mkt. Synergy Grp., Inc. v. U.S. Dep't of Labor*, 885 F.3d 676, 683 (10th Cir. 2018) (citation omitted). Again, Defendants offered no link

between generalized fraud concerns and the arbitrary recertification they demand in five Colorado counties. Defendants offered no explanation why they decided to require total recertification in these counties to address the issue. Defendants offered no explanation why this program needed to be imposed suddenly with no advance notice or time to plan, which is contrary to their stated goal of improving administration. Any project that was actually intended to discover fraud would entail significant advance planning, training, and guidance. Nor do they explain why this sudden, unplanned recertification would better detect fraud than Colorado's robust existing processes, which already require recertification twice as often as federal law and annually perform above the national average rate of payment errors, McLelland Decl. ¶¶ 13, 37.

USDA's actions were further arbitrary because they "fail to consider important aspects of the problem." *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1290 (10th Cir. 2024) (citation modified). Here, Defendants made no consideration of the fact that compliance is impossible for Colorado and impacted counties. Completing Defendants' arbitrary recertification would require roughly 7,900 worker hours *per day* to complete over 100,000 interviews in only 18 business days. McClelland Decl. ¶ 31. It would also require Colorado to first change its own rules, which comply with current federal and state law, all of which takes time. *Id.* ¶ 28 (explaining that even emergency rule changes require more than 30 days in Colorado). Such a demand is not feasible in the allotted time. Even if it were, it would incur a massive cost to Colorado and the counties while forcing them to cease or divert attention from other mandated functions such as assisting residents with other programs or services. *Id.* ¶¶ 31, 51, 57. USDA's pilot program fails to remotely consider these basic, practical realities and is therefore arbitrary and capricious.

USDA's action is also arbitrary and capricious because if fails to consider "'that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Bradford*, 101 F.4th at 731 (quoting *Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 30 (2020)). Agencies must "provide a more detailed justification . . . when its prior policy has engendered serious reliance interests." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, Defendants failed to account for multiple reliance interests and failed to provide any detailed justification. First, neither Colorado nor the impacted counties have the requisite resources or staff to complete a sudden mass recertification. McClelland Decl. ¶ 30–32. Colorado and the counties structured their operations under the reasonable belief that SNAP would continue to be administered in accordance with statute and regulations. Having done so, they cannot transform those operations to recertify over 100,000 households, with in-person interviews, in mere weeks.

USDA similarly fails to consider the substantial reliance interests of eligible SNAP beneficiaries. First, eligible beneficiaries in the five impacted counties now risk losing their benefits simply because they lacked adequate notice and time to comply with the arbitrary new recertification demands. More broadly, Defendants fail to consider the strong reliance interest of *all* Colorado SNAP beneficiaries across the State, who are now threatened with the loss of crucial benefits. These individuals and families rely on SNAP benefits to meet their most basic needs, and threatening to take them away without even considering the profound impacts of doing so is arbitrary and capricious. *See, e.g.*, *R.I. State Council of Churches v. Rollins*, No. 25-cv-569-JJM-AEM, 2025 WL 3111213, at *8 (D.R.I. Nov. 6, 2025) (USDA acted arbitrary and capriciously in cutting SNAP benefits without considering "the increased harm that will befall

19

these recipients if they are forced to go without food"); *New York v. Trump*, 769 F. Supp. 3d 119, 142 (D.R.I. 2025) (USDA and others acted arbitrarily and capriciously by failing to consider "the catastrophic consequences that flowed" from their actions).

Finally, Defendants' action is arbitrary and capricious because it fails to offer any rational basis, let alone the detailed justification required, to explain why Colorado has been singled out. "A fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007); *see also Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 479 (5th Cir. 2021) ("It is a bedrock principle of administrative law that an agency must 'treat like cases alike.'" (citation omitted)). The threadbare justifications for the Recertification Letter are devoid of factual support, and the demand coincides with other drastic federal actions and political rhetoric against Colorado. *See* Am. Compl., ¶¶ 4–7, 82–108. In reviewing Defendants' unreasoned action in the context of the Administration's repeated singling out of Colorado, this Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (citation omitted). Most importantly, the APA's reasoned decisionmaking requirement mandates that agencies provide detailed justifications for disparate treatment to avoid pretextual actions. Here, USDA's unreasoned decision fails to provide the requisite reasoned justification for singling out Colorado. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990) (agencies must "provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision").

For all of these reasons, the Recertification Letter is arbitrary and capricious.

### d.   USDA Defendants violated the Spending Clause.

"Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). But "[t]he spending power is of course not unlimited." *Id.* at 207. Any conditions must be imposed "unambiguously" to enable "States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). States must be given "clear notice" of any conditions before they accept the award and cannot be "surprise[ed]" with "post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. States are bound only by conditions if they accept them "voluntarily and knowingly." *Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 296 (2006) (citation omitted).

Colorado established its SNAP program and accepted SNAP funds without knowing an impossibly onerous pilot project would be unilaterally imposed on it. As discussed above, nothing in the FNA empowers USDA to command Colorado to participate in this pilot project and certainly does not empower it to impose a pilot project that creates new requirements, undermines SNAP's statutory objectives, violates the FNA, and threatens existential sanctions to Colorado's SNAP program. In the nearly five decades USDA has had pilot project authority, it has never exercised that authority in this manner, nor claimed authority to force States to participate in these projects. Instead, pilot projects have always been voluntary collaboration partnerships between the States and the federal government to test improvements to the program and better provide for vulnerable families across the country. USDA's supposed newfound authority did not "unambiguously" provide notice that this forced pilot project was possible. It follows that Colorado did not "voluntarily and knowingly" accept these conditions and that these

post-acceptance conditions violate the Spending Clause. *See Arlington*, 548 U.S. at 296; *Pennhurst*, 451 U.S at 17.

## II.    Plaintiffs face irreparable harms absent preliminary relief.

Without a preliminary injunction, Colorado faces substantial, immediate irreparable harms. *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018). That harm is "both certain and great," *Colorado v. EPA*, 989 F.3d 874, 884 (10th Cir. 2021) (citation omitted), and without prompt relief from this Court, it will be "difficult or impossible" for Colorado to be "restore[d] [to] the status quo" ex ante. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

*First*, the Recertification Letter would impose enormous, unrecoverable administrative costs on Colorado. Attempting to recertify over 100,000 households in 30 days, including in-person interviews, would be massively burdensome and expensive, creating a dramatic uptick in administrative costs. McClelland Decl. ¶ 31. USDA has not offered to pay these costs, *id.*, nor could Colorado recoup them through litigation, as the federal government enjoys sovereign immunity. *Chamber of Com. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).

*Second*, the pilot project places Colorado under an impossible deadline that invites error. McClelland Decl. ¶ 56. Any errors committed within that high-pressure environment carry long-term consequences for the State: errors equate to assessed penalties in the short term, and they impact the calculation of the State's portion of the cost of SNAP benefits in the long term. *Id.*; *see also* 7 U.S.C. §§ 2013(a)(2)(B)(ii)(I), (a)(1)–(2).

*Third*, should Colorado fail to comply, the Recertification Letter states that USDA "will trigger noncompliance procedures" (i.e., sanctions), including "Colorado's continued

participation in SNAP," a consequence that would yank a vital social security net from vulnerable Coloradans. Colorado would not be able to replace federally funded SNAP benefits with State funds. McClelland Decl. ¶ 53. It would fall upon the State, local governments, and community organizations to address the catastrophic fallout that would result. Health care expenditures would increase as a result, and the state's already overwhelmed food banks would be further strained. McClelland Decl. ¶¶ 60–61.

*Fourth*, as the declaration explains, Colorado has worked hard to overcome social stigmas that impede honest and hardworking individuals from availing themselves of the SNAP benefits to which they are entitled. McClelland Decl. ¶ 64–69. Forcing households to appear for in-person interviews with no notice will, at the very least, undermine trust that Colorado has spent years building with its community. *Id.* ¶ 65 (describing the substantial decrease in SNAP applications and lost trust from the recent suspension of SNAP benefits caused by USDA's unlawful actions). Recipients will not soon forget the experience of being ordered to set aside their lives and obligations, with no advance notice, appear before the government, and rejustify their need. And they will rightfully question whether this arbitrary inquisition will repeat itself. Trust is not easily built, but it can be lost in an instant. The reputational costs and reliance interests of the State cannot be remedied after the fact.

**III.    The balance of the equities and the public interest favor Colorado.**

The final two merged preliminary injunction factors—balance of the equities and the public interest—require the court to "balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief, paying particular regard [to] the public consequences" that would result from its decision. *Winter v. Nat. Res. Def.*

*Council, Inc.*, 555 U.S. 7, 24 (2008) (citation modified). The scale topples decisively in Colorado's favor.

The irreparable injuries described above and in the attached declaration put in stark relief the damage on both a short- and long-term basis that will be wrought on Colorado's SNAP program should it be forced to scramble to comply with the Recertification Letter's edicts. The public interest could not be weightier or more pressing than in a case like this one, where the stakes involve whether or not Colorado's neediest will unexpectedly go hungry.

Worse still, the Recertification Letter finds no basis in the law, and indeed, runs counter to the carefully crafted scheme laid out by statute and in the regulations. There is "a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted). The government, on the other hand, can claim no public interest in "the perpetuation of unlawful agency action." *Id*. If FNS has actual evidence of fraud, it is authorized to recover the funds, including through offsets. 7 C.F.R. § 276.3. But it lacks the authority to take the unlawful action here. All Colorado asks is that this Court maintain the status quo during the pendency of this litigation, and because all the factors for a preliminary injunction are easily satisfied, Colorado is entitled to relief.

**IV.    The Court should not require a security bond.**

In the Tenth Circuit, district courts have "wide discretion under Rule 65(c) in determining whether to require security." *Winnebago Tribe v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (citation modified). In a case of this public gravity, the Court is well justified in waiving the security requirement entirely. *See, e.g.*, *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1132 (D.

Utah 2024); *Ent. Merch. Ass'n v. Henry*, No. CIV-06-675-C, 2006 WL 2927884, at *4 (W.D. Okla. Oct. 11, 2006). Should a security bond be ordered, Colorado respectfully requests a nominal amount only.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion. The Court should enjoin Defendants from implementing or enforcing the Recertification Letter and should postpone its effective date pending the conclusion of these proceedings pursuant to 5 U.S.C. § 705.

Dated: January 12, 2025                     Respectfully submitted,

**PHILIP J. WEISER**
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz, *Deputy Solicitor General*
Talia Kraemer, *Assistant Solicitor General*
Sarah H. Weiss, *Senior Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ David Moskowitz
*Deputy Solicitor General*