## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-03428-RBJ

THE STATE OF COLORADO,

      Plaintiff,

v.

PETE HEGSETH, in his official capacity as Secretary of Defense,
TROY MEINK, in his official capacity as Secretary of the Air Force,
SEAN DUFFY, in his official capacity as Secretary of Transportation,
BROOKE ROLLINS, in her official capacity as Secretary of Agriculture,
CHRIS WRIGHT, in his official capacity as Secretary of Energy,
DOUG BURGUM, in his official capacity as Secretary of the Interior,
KRISTI NOEM, in her official capacity as Secretary of Homeland Security,
KAREN EVANS, in her official capacity as Acting Director of the Federal Emergency
Management Agency,
PAM BONDI, in her official capacity as Attorney General,
BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation,
EXECUTIVE OFFICE OF THE PRESIDENT,
DEPARTMENT OF DEFENSE,
DEPARTMENT OF THE AIR FORCE, DEPARTMENT OF TRANSPORTATION,
DEPARTMENT OF AGRICULTURE,
DEPARTMENT OF ENERGY,
DEPARTMENT OF THE INTERIOR,
DEPARTMENT OF HOMELAND SECURITY,
FEDERAL EMERGENCY MANAGEMENT AGENCY,
DEPARTMENT OF JUSTICE, and
NATIONAL SCIENCE FOUNDATION,

      Defendants.

---

## RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

---

      The Department of Agriculture ("USDA") operates the Supplemental Nutrition Assistance Program ("SNAP"). State agencies administer SNAP day-to-day, and USDA oversees them. Plaintiff State of Colorado is one of ten States that administer SNAP at the county level—the most decentralized level of administration. Given ongoing fraud affecting federally funded benefits

across the nation, concerns unique to states that implement SNAP on a county level, and concerns specific to fraud within Colorado, USDA informed Colorado on December 17, 2025, of a pilot project requiring five of its 64 counties to recertify their eligibility for benefits within 30 days. SNAP households in the five counties would have to recertify anyway, within—at the latest—six months. The USDA's letter invited the State to ask "any questions" about the pilot project and provided contact information. The State did not contact USDA when it received the letter. Instead, it waited 27 days and then filed a motion for preliminary injunction—seeking immediate relief because the 30-day period was "impossible" to comply with and because any sanctions for non-compliance would pose "existential" harm. Colorado's compliance deadline has now passed.

The State has not shown it is entitled to a preliminary injunction. It has not shown immediate irreparable harm. The alleged "emergency" posture is of the State's making because it did nothing to comply. Also, the process required to impose sanctions has not begun, much less concluded—the State has not been sanctioned at all. If a sanction were imposed, the State would be required to exhaust the available remedy process. The State also has not shown it is likely to succeed on the merits. The pilot is authorized by statute, and the State's "consent" was not required. Nor is the project "arbitrary and capricious," given fraud concerns.

## BACKGROUND

### I.    The USDA oversees Colorado's administration of SNAP benefits.

USDA's Food, Nutrition, and Consumer Services ("FNS") operates SNAP under the Food and Nutrition Act of 2008 ("FNA"). *See* 7 U.S.C. § 2011–2036d. To participate in SNAP, households must apply and meet eligibility requirements, including limits on income and resources. *See generally* 7 U.S.C. § 2014; 7 C.F.R. part 273; 7 C.F.R. § 273.2(c)(1)(i).

The day-to-day operation of SNAP is administered by State agencies. *See* 7 U.S.C.

§ 2020(a)(1); Declaration of Abby McClelland ¶ 7, ECF No. 46-1 at 1–17.[1] This administration includes determining eligibility and benefit amounts, issuing benefits, and ensuring program integrity. *See* 7 U.S.C. § 2020; ECF 46-1 ¶ 7. USDA, in turn, oversees the States, including reviewing payment accuracy. 7 U.S.C. § 2020(d), (g); ECF No. 46-1 ¶ 7. Colorado administers SNAP through its Department of Human Services ("CDHS"). ECF No. 46-1 ¶ 2. Colorado is one of only ten States that has delegated implementation of SNAP to counties. *Id.* ¶ 8; Declaration of Sheila Corley, attached as Ex. 1 ¶ 16. Colorado has 64 counties, which, under the delegation, "make initial determinations of SNAP eligibility and authorize benefits, while CDHS administers and supervises the SNAP program." ECF 46-1 ¶ 8.

FNS provides States funding to administer SNAP. Ex. 1 ¶ 7. This funding is separate from, and in addition to, the SNAP benefits that are 100% funded by the federal government. *Id.* As of January 20, 2026, Colorado had $34 million in funding for SNAP administration. *Id.* ¶ 56. States' administrative expenses are reimbursed quarterly; the next reimbursement to Colorado is not scheduled until April 2026. *Id.* ¶ 55.

## II.    Colorado counties recertify each household's eligibility every six months.

USDA regulations require States to certify that households are eligible for SNAP participation. Ex. 1 ¶ 8. A State must conduct certain required verifications for a household. *See* 7 C.F.R. § 273.2(f); ECF No. 46-1 ¶¶ 33–34. A household's SNAP benefits then expire unless the household is recertified before the end of a certification period. *See* 7 C.F.R. § 273.14(a). The State "must establish procedures for notifying households of expiration dates, providing application forms, scheduling interviews, and recertifying eligible households prior to the expiration of certification periods." *Id.* "The vast majority of Colorado households approved to participate in

---

[1] Unless expressly stated otherwise, record page citations refer to the ECF pagination.

SNAP are certified for a six-month period." ECF 46-1 ¶ 37; Ex. 1 ¶ 8.[2]

The standard recertification process requires an application and an interview. *See* 7 C.F.R. §§ 273.14(a), 273.2(e), 273.14(b)(3). The application can be "the same as the initial application, a simplified version, a monthly reporting form, or other method such as annotating changes on the initial application form." *Id.* § 273.14(b)(2). States must grant face-to-face interviews for households requesting one, but may use telephone interviews for certain households. *Id.* § 273.2(e)(2). In Colorado, households approved for six-month certifications undergo recertification interviews with counties every 12 months. ECF No. 46-1 ¶ 38. But some households (like those certified on an expedited basis) must recertify within one month after receiving initial benefits depending on the circumstances. *See* 7 C.F.R. §§ 273.2(i)(4)(iii)-(iv), 273.14(b)(1)(i).

## III. Colorado's delegation of SNAP implementation to counties has led to concerns.

Only ten States (including Colorado) delegate SNAP implementation to counties. Ex. 1 ¶ 16. The remaining States administer SNAP at the State, regional, or district level. *Id.* The more decentralized the administration, the greater the chance of inconsistent application of requirements, and the greater the chance that inconsistencies go undetected. *Id.* FNS's review of data it has gathered in the SNAP Information Database[3] confirms that States with a county-administered program are generally more likely to have higher rates of fraud, waste, and abuse than other States.

---

[2] The only other certification period Colorado uses is 24 months, for households in which all adults are elderly or disabled with no earned income. ECF No. 46-1 ¶ 39; *see* Ex. 1 ¶ 8.

[3] USDA established the SNAP Information Database in June 2025, in accordance with an Executive Order, to ensure SNAP program integrity nationwide by compiling data to be used to "identify and rectify any ineligible, duplicate, or fraudulent SNAP enrollments or transactions." Ex. 1 ¶¶ 17-19 (citing 90 Fed. Reg. 26521, 26522 (June 23, 2025)). In July 2025, the USDA Secretary issued a letter to State agencies regarding the SNAP Information Database and required the collection of SNAP data from State agencies or EBT Processors beginning on July 24, 2025. *Id.* ¶ 19. USDA obtained county-level data from North Carolina, North Dakota, Ohio, and Virginia. *Id.* ¶ 20.

*Id.* ¶ 20. For example, in the county-administered States that submitted data, USDA identified nearly 20,000 instances of intrastate duplication. *Id.*

Colorado has a recent history of integrity concerns. *Id.* ¶ 21. For example, in February 2023, FNS identified a serious (and potentially statewide) integrity issue revealing the State's failure to properly administer SNAP, in Colorado's failure to establish claims against households to collect over-issuances of benefits (amounts exceeding what the household should have received) and disqualification actions. *Id.* ¶ 22. Despite county investigators' thorough, evidence-based substantiation of fraud, county eligibility staff opted not to pursue intentional program violations (IPVs, known as fraud) against households that violated SNAP rules. Most cases FNS reviewed involved a county overpayment of SNAP as a result of the fraud, but the county failed to establish a claim for repayment or disqualification despite being required to do so by regulation. *Id.* ¶¶ 22-23; *see* 7 C.F.R. §§ 273.16(a)(1), 273.18. In Colorado's management evaluation (ME) for 2024, FNS found that Colorado failed to correct the failure to detect and act on errors and fraud, as the same problems found in the 2023 ME continued in 2024. *See* Ex. 1 ¶ 24. By early December 2025, public reports concerning apparently illegal activities in Colorado, including Denver area gang operations and abuse of public benefits, led FNS to consider whether SNAP program integrity should be reevaluated in Colorado. *Id.* ¶ 25.

## IV.    USDA has broad statutory authority to conduct a localized pilot project.

Congress has, in various provisions, given USDA broad authority to carry out different types of pilot projects. Relevant here, the FNA provides that USDA's Secretary "may conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects designed to test program changes that might increase the efficiency of the supplemental nutrition assistance program and improve the delivery of supplemental nutrition assistance program benefits to eligible

households." 7 U.S.C. § 2026(b)(1)(A). Congress broadly defined permissible goals for such projects, including to "improve program administration." *Id.* § 2026(b)(1)(B)(ii)(I).

In carrying out such projects, USDA may waive other statutory and regulatory requirements. *See id.* § 2026(b)(1)(A). Neither the FNA nor its corresponding regulations prescribe a specific mechanism the Secretary must use to waive requirements for a Section 2026(b)(1)(B) project *initiated by the Secretary*. Rather, the Secretary is required to follow specific procedures only when waivers are requested by a *State* under Section 2026(b)(1)(D). Ex. 1 ¶ 26.

## V.    USDA exercised its statutory authority to initiate a limited pilot project in Colorado.

On December 17, 2025, consistent with its statutory authority and concerns identified *supra*, USDA's FNS notified Colorado that it was pursuing a SNAP pilot project involving five of Colorado's 64 counties. *See* ECF No. 26-1 ("Letter"). FNS included Arapahoe County, which typically has a high application processing timeliness rate, based on FNS's assessment that it would provide a good control for evaluating the pilot's effect on other counties.[4] Ex. 1 ¶ 29. FNS did not include the two counties with the largest caseloads—Denver and El Paso—which have caseloads more than double most other Colorado counties. *Id.* ¶ 28. FNS did not include counties such as Pueblo and El Paso because, based on past application processing timeliness, they would likely be incapable of completing this pilot. *Id.* ¶ 29. FNS explained that the pilot project was necessary in light of, *inter alia*, "ongoing fraud affecting federally funded benefits across the nation." ECF No. 26-1 at 1. "More accurate certifications of eligibility for SNAP benefits will ensure that those in need receive assistance, raising levels of nutrition among low-income individuals." *Id.*

---

[4] *See* Colorado Department of Human Services, SNAP Issuance Data, 2025 caseloads by county, available at: https://cdhs.colorado.gov/snap-data.

Under the pilot project, USDA required CDHS to, within 30 days, recertify households in the five counties for SNAP eligibility. FNS directed CDHS to ensure that SNAP households in those counties "meet all eligibility requirements" for SNAP, "including by" accounting for income and conducting in-person interviews. CDHS needed to "make determinations as to eligibility of SNAP benefits" for households in the five counties, and "[d]ocument and preserve" all information relied upon. *See* ECF No. 26-1 (Letter) at 1. The project placed no new substantive requirements on beneficiaries beyond what would be posed by a typical recertification. Ex. 1 ¶¶ 33-35. (For example, the pilot does not impose any additional work, behavioral, or conduct requirement on households. *Id.* ¶ 33.) Per the Letter, USDA expected the counties to conduct recertifications as they normally would, albeit on an expedited basis. *Id.* In-person interviews were thus not required because the standard recertification process includes telephonic interviews. *Id.* ¶¶ 34-35. The 30-deadline was important to identify errors and fraud as quickly as possible, instead of letting them continue undetected and uncorrected. *Id.* ¶ 33.

## VI.    The State has not exhausted any step in the administrative remedy process.

The Letter stated that the State's failure to comply with the pilot project would trigger the statutory process applicable to noncompliance by a State agency with a SNAP-related obligation. ECF No. 26-1 at 2 (citing 7 U.S.C. § 2020(g)).  Before USDA may impose consequences on States for noncompliance with a FNA obligation, regulations (which USDA has not waived) dictate that significant procedures must be followed. Ex. 1 ¶¶ 44-47; *see* 7 C.F.R. §§ 276.4 (suspension/disallowance of administrative funds); 276.5 (injunctive relief).

The exhaustion process includes several steps. USDA must provide the State with notice of the deficiency and an opportunity to correct it, and if the State does not do so, USDA must then provide a Formal Warning that describes the deficiency and nature of the noncompliance. 7 U.S.C.

§ 2020(g); *see* 7 C.F.R. § 276.4(d)(1), (d)(2). The State agency then has 30 days from receipt of the warning to either submit evidence of compliance or submit a corrective action proposal. 7 C.F.R. § 276.4(d)(2)(ii)-(iii).  If the State agency is still deficient after that period, USDA must determine the "appropriate" funds to be suspended or withheld, § 2020(g), and FNS must notify the State. 7 U.S.C. § 2020(g); 7 C.F.R. § 276.4(e). The State agency may generally stay enforcement by seeking an administrative appeal under Section 2023. 7 U.S.C. § 2020(g) (any withholding is "subject to administrative and judicial review under section 2023"), *id.* § 2023(a)(3) ("If such . . . State agency is aggrieved by such action, it may . . . file a written request for an opportunity to submit information in support of its position"). The State may appeal the decision in accordance with procedures at 7 C.F.R. § 276.7. *The filing of a timely appeal automatically stays enforcement of FNS's claims*, except in limited circumstances. 7 C.F.R. § 276.7(e). And a State agency aggrieved by USDA's final determination in that appeal may obtain judicial review in district court. 7 U.S.C. § 2023(a)(13); 7 C.F.R. § 276.7(j). When pursued, exhaustion of these remedies takes months or even years. Ex. 1 ¶ 53.

Since receiving the Letter, Colorado has made no effort to comply. Although the Letter invited the State to submit questions about the project and provided contact information, the State did not contact USDA with questions or concerns regarding the project, nor request any extensions. Ex. 1 ¶ 39. But two counties included in the pilot project—Douglas and Adams—contacted USDA to discuss implementing the project on a different timeline. *Id.* ¶¶ 40-42. USDA indicated its willingness to work with the counties to ensure an accelerated and feasible pilot project. *Id.* ¶ 40.

On January 12, 2026—27 days after receiving the Letter—the State filed the instant preliminary injunction motion. On January 16, 2026, the 30-day compliance period identified in the Letter lapsed. The State does not argue, and there is no evidence to show, that USDA has

initiated noncompliance procedures against it under 7 U.S.C. § 2020(g), as would be necessary to withhold funding from the State. *See* Ex. 1 ¶¶ 48-52, 54 (outlining steps).[5]

## ARGUMENT

### I.      The State must meet a heavy burden to obtain a preliminary injunction.

A court may enter a preliminary injunction, "an extraordinary remedy," only if the movant proves "(1) that [it is] substantially likely to succeed on the merits, (2) that [it will] suffer irreparable injury if the court denies the injunction, (3) that [the] threatened injury (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't adverse to the public interest." *Free the Nipple v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quotations omitted). The movant's right to the injunction must be "clear and unequivocal." *McDonnell v. City & Cnty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018).

### II.     The State has not made a clear showing of imminent, irreparable harm.

A party seeking a preliminary injunction must show that it will "suffer irreparable injury" if the court denies the injunction. *Fort Collins*, 916 F.3d at 797. "[T]he moving party must first demonstrate that such injury is likely before the other requirements will be considered." *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (internal marks omitted). The movant must make a "clear and unequivocal showing it will likely suffer irreparable harm absent *preliminary* relief." *Colo. v. EPA*, 989 F.3d 874, 886 (10th Cir. 2021) (emphasis added).

To satisfy this prong, the State must make three showings. None exists here. *First*, the State must show that the harm is "certain" to happen absent a grant of preliminary relief. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) ("[t]o constitute irreparable harm, an

---

[5] The soonest administrative funding could conceivably be withheld would be April 2026. Ex. 1 ¶ 55. If funds were withheld, Colorado could appeal pursuant to the above-discussed process.

injury must be certain, great, actual and not theoretical" (citation modified)); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008) (reversing a lower court that had held that "a preliminary injunction may be entered based only on a 'possibility' of irreparable harm"). *Second*, the State must show that harm is imminent. *Colorado v. EPA*, 989 F.3d at 886 ("to constitute irreparable harm, an injury must be imminent, certain, actual and not speculative"); *id.* (holding that a state official's declaration that certain obligations "could begin" did not show that the burden would be "immediate"). *Third*, the harm must be "irreparable." *N.M. Dep't of Game & Fish*, 854 F.3d at 1251 (movant "must establish both that harm will occur, and that, when it does, such harm will be irreparable" (citation omitted)). Merely being subjected to proceedings that the movant deems improper does not show irreparable harm. *See Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 753 (10th Cir. 2024) (rejecting a party's argument that its "subjection to administrative proceedings" that are unlawful "alone, constitutes irreparable harm").

The State has not met this burden, in the current posture. The time for the State to comply with the Letter has passed. Any sanction the State might face in the future (assuming USDA initiates non-compliance procedures) is not certain, imminent, or irreparable.

The State argues that it faces irreparable harm because its failure to complete the pilot project might lead to noncompliance procedures, which might lead to sanctions, "including Colorado's continued participation in SNAP." *See* ECF No. 46 at 22–23; ECF No. 46-1 ¶¶ 21–32. But the Letter states that any remedy for noncompliance with the project would be sought pursuant to 7 U.S.C. § 2020(g). Under that provision and the regulations, numerous steps would need to occur before any remedy could be imposed, and none of those steps have yet been taken. Ex. 1 ¶¶ 47-55. The State could respond to those steps in that process. Thus, any harm from such a sanction is premature and speculative. Speculative harm is not "irreparable" and does not justify

interim injunctive relief. *See EPA*, 989 F.3d at 886.

The State also argues that its compliance with the pilot project *would have* caused it to suffer: (1) large administrative costs, (2) errors due to efforts to comply with the 30-day deadline, and (3) adverse effects on SNAP beneficiaries from requiring them to appear for interviews. ECF No. 46 at 22–23. But the State cannot show that those harms are certain to occur, particularly given that the State chose not to comply with the pilot project at all within the 30-day period—a period that has now expired. If USDA exercised its authority under 7 U.S.C. § 2020(g), the State could raise its concerns in those proceedings. For instance, the State may later seek to advance these concerns as evidence of good cause for noncompliance. Moreover, as discussed *supra*, the State agency may generally stay enforcement by seeking an administrative appeal under 7 U.S.C. § 2023. *See* 7 U.S.C. §§ 2020(g), 2023(a)(3); 7 C.F.R. § 276.7. And to the extent the State were to face a sanction of some unknown scope through the administrative process, it could then seek relief through the judicial process. 7 U.S.C. § 2023(a)(13); 7 C.F.R. § 276.7(j). The State does not contend otherwise.[6]

## III.    The State has not shown that it is likely to prevail on the merits.

### A.    Colorado's claims are not ripe because there is no sanction to challenge.

The State seeks an order to prevent USDA from "enforcing" the 30-day pilot project. ECF No. 46 at 25. But as noted above, USDA has not yet taken the steps that are statutorily prescribed before any such enforcement could conceivably occur. *See* Ex. 1 ¶ 55. The State cannot challenge

---

[6] The State's failure to seek relief for 27 days, either with this Court or with the agency, further undercuts its claimed irreparable harm. *See Colo. Motor Carriers Ass'n v. Town of Vail*, 153 F.4th 1052, 1066 (10th Cir. 2025) (no abuse of discretion in district court's decision that a delay undercut claim of irreparable injury); *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) (delay in seeking an injunction can be "an important factor in determining irreparable harm"). Here, the State elected (1) to make no attempt to comply, (2) to seek relief only at the end of the compliance period, and (3) even then, not to request that the Court take action before the period ended.

any such future enforcement at this time.

*First*, to the extent the State contests the enforcement of any potential sanction under the APA, it has not shown a final agency action. In limiting APA review to "final" agency action, Congress restricted "pervasive oversight by federal courts over the manner . . . of agency compliance with . . . congressional directives," which would "inject[] the judge into day-to-day agency management." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004). As non-compliance procedures have not begun yet, let alone concluded with a final determination following the extensive steps outlined above, there is no "final agency action" under the APA.

*Second*, a challenge to any potential sanction is not ripe. Ripeness is a twofold inquiry that requires courts to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Here, the State seeks resolution of a host of legal issues, even though it has not been sanctioned. If USDA were to ultimately impose a sanction, it is unknown what specific legal issues would still be relevant at that time, or what specific evidence USDA would rely on to impose a sanction. In short, the issues the State identifies are not fit for judicial decision yet, and the lack of a sanction—coupled with the State's ability in the future to challenge any *potential* sanction before it ever takes effect—shows no hardship in reserving resolution of these legal questions at this time.

### B.      Even if they were ripe, the State's procedural challenges are unavailing.

The State first argues that the pilot project is contrary to law because it violated various procedural rules. *See* ECF No. 46 at 9–12. Those arguments are unavailing.

### 1.      The Letter is not a legislative rule requiring notice and comment.

The State argues that the Letter was a legislative rule, and that as a result, the Administrative Procedure Act ("APA") required the USDA to proceed through notice and comment. ECF No. 46 at 9–10. Plaintiff is mistaken.

The APA defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). "Agencies make rules when they announce principles of general applicability and future effect." *Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 308 (5th Cir. 2021) (citing *United States v. Fla. E. Coast Ry.*, 410 U.S. 224, 244–45 (1973)). Here, the Letter did not set "generally applicable" standards for States or impose future obligations. Instead, it issued a single, one-time discrete requirement applicable to five specific counties.  USDA thus was not required to proceed through notice and comment. *See Rowell v. Andrus*, 631 F.2d 699, 702 (10th Cir. 1980) (explaining that § 552(a)(1)(D) only "requires each agency to publish in the Federal Register *substantive rules of general applicability* adopted as authorized by law" (emphasis added) (quotation marks omitted)).

The State insists that the Letter was a "legislative rule" because it "imposed new duties." ECF No. 46 at 9. But the State incorrectly presumes that only rules can impose duties. An agency can establish rules of general applicability, but it also can exercise its authority through specific orders, as has been true since well before the APA was ever promulgated. *See Norton*, 542 U.S. at 61–62 (distinguishing "an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy" (rule)" from "a final disposition . . . in a matter other than rule making" (order)"); *Kenai Oil & Gas, Inc. v. Dep't of Interior*, 671 F.2d 383, 387 n.2 (10th Cir. 1982) (holding that an agency official's "exercise of his discretion not to approve a particular proposal . . . is not a rule under the APA" ); *SEC v. Chenery Corp.*, 332 U.S. 194, 201-02 (1947) (explaining that the SEC could take action "in the form of an order" in a particular matter even in the "absence of a general rule or regulation"; requiring the SEC to act only by "formulating" general rules would "stultify the administrative process").

Contrary to Plaintiffs' view, the Letter amounts to an "order" or "the equivalent"; therefore,

USDA was not bound to follow notice and comment when issuing it. *See* 5 U.S.C. §§ 551(6) (defining agency "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing"), 551(13). Courts interpret the term "order" broadly. *See Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1169 (D.C. Cir. 2016) ("[W]e have previously defined 'order' expansively to include any agency action capable of review on the basis of the administrative record." (citation and quotation marks omitted)). An APA "order" has long been understood to apply to a discrete agency action—like this one—directed to a specific party. *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n.7 (1980) (determining that the FTC's issuance of a complaint was "part of a final disposition" and therefore an "order" under the APA, and explaining that such an interpretation was consistent with the APA's legislative history); *Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 284–85 (D.C. Cir. 2020) (concluding that a binding directive issued to a utility by FERC staff qualified as an "order" under 5 U.S.C. § 551(6)); *Sackett v. EPA*, 566 U.S. 120, 125 (2012) (treating EPA directive to landowners to restore a site as an order under the APA). Thus, USDA issued an order when it exercised its statutory authority in the Letter directing a particular party (the State) to take specific, discrete actions within a specific timeframe.

The State contends that an order can be issued only as a result of an "adjudication" under 5 U.S.C. § 551(7). ECF No. 46 at 10. The APA does not require agencies to issue orders only through adjudications. While an agency can employ an "adjudication" under § 551(7) to issue an order, the definition of "order" in § 551(6) is not limited to agency actions that are the result of an adjudication. Moreover, the APA permits agencies to act not only through "order[s]" but also through "the equivalent." *Id.* § 551(13). The Letter *was* an "adjudication" within the meaning of the APA. An adjudication is every final disposition of an agency other than the product of

rulemaking. *See* 5 U.S.C. § 551(6), (7).

### 2.    FNS was not required by regulation to publish notice of the project.

The State next contends that FNS was required to proceed through notice and comment under its own regulations. ECF No. 46 at 10–11. But FNS did not act arbitrarily and capriciously in determining that the project at issue would not impose a "significant impact" on the public; therefore, by statute, notice and comment was not necessary. To the extent this regulation would have required such notice, the requirement was waived by the Secretary, as permitted by statute.

"At least 30 days prior to the initiation of a demonstration project, FNS shall publish a General Notice in the Federal Register if the demonstration project will likely have a significant impact on the public." 7 C.F.R. § 282.1(b). The State contends that FNS was required to determine that the pilot project was likely to have a significant impact on the public because it required recertifications that may lead to unexpected interviews of SNAP recipients, and because some SNAP recipients could lose benefits. ECF No. 46 at 11. Here, though, USDA determined that the pilot project was not likely to have a significant impact on the public (Ex. 1 ¶ 28); that determination satisfies the deferential arbitrary and capricious standard.

The State does not cite (and Defendants have not found) any cases interpreting the phrase "significant impact" in this regulation. But in other contexts, courts have recognized that an agency's determination that an action would not have a significant impact implicates agency expertise and should not be overturned unless the determination was arbitrary and capricious. *Cf. Ctr. for Biological Diversity v. Dep't of the Interior*, 72 F.4th 1166, 1188 (10th Cir. 2023).

FNS had a sound basis for determining, based on its expertise, that this brief, limited, and localized pilot project would not have a significant impact on the public. As explained above, FNS limited the project to just five counties. Ex. 1 ¶ 28. It limited the project to recertifications: it did

not impose new eligibility requirements. *Id.* ¶¶ 28, 33-35. Also, contrary to the State's suggestion (and as discussed *infra*), the Letter required that the State unenroll only those beneficiaries who were determined ineligible, the same requirement that is true for six-month recertifications. *Id.* ¶ 37. These circumstances provide reasonable, non-arbitrary grounds for USDA to conclude that the pilot project would not have a "significant impact" on the public.

In any event, even if the regulation required prior notice to be published, that provision does not warrant setting aside the entire project. In the FNA, Congress expressly permitted USDA to waive such requirements to facilitate the pilot project. 7 U.S.C. § 2026(b)(1)(A). The regulations do not explain how it can be waived, and the Secretary, by issuing the program, can be taken to have implicitly waived the notice requirement.

### 3.    The Paperwork Reduction Act does not apply.

The State next argues that the Letter and the project violated the Paperwork Reduction Act ("PRA"). ECF No. 46 at 11–12. Plaintiff misunderstands the statute. The PRA requires an agency to take certain steps before conducting a new "collection of information" and, if the agency does not comply, prohibits imposing a penalty on a person that does not comply with the collection. 44 U.S.C. §§ 3506, 3507, 3512. Here, the State argues that USDA, by requiring recertifications, is conducting a "collection of information" that is prohibited absent prior approval. ECF No. 46 at 11. It also argues that the Letter imposes new recordkeeping requirements, which are separately a collection of information. *Id.* at 12. It argues that "[n]o current approved collection of information covers the project. *Id.* The State's arguments fail.

First, the Letter is not a new "collection of information" subject to the PRA. Under the PRA, "collection of information" refers to when a federal agency initiates a request for "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on,

ten or more persons." 44 U.S.C. § 3502(3). But USDA is not initiating a new collection. The substantive recertification process is the same; all that is changed is the timing. Ex. 1 ¶ 33. This Letter thus does not create any new collection of information.

Moreover, to the extent the Letter seeks to collect information from, or impose recordkeeping requirements on, the State itself, the PRA does not apply. A "collection of information" excludes a "request for facts . . . addressed to a single person." *Id.* § 1320.3(h)(6); *id.* § 1320.3(k) ("Person means . . . a State"); *Hyatt v. OMB*, 998 F.3d 423, 430 (9th Cir. 2021) (noting the Act's "emphasis on identical requests sent to many people" in concluding that it did not apply to an individualized request to a party; citing 5 C.F.R. § 1320.3(h)(6)). The Letter is directed solely to the State. Thus, the request for the State to keep certain records is not a "collection of information."

Second, the State's invocation of the PRA is both moot and unripe. The PRA provides express remedies for a party when an agency fails to obtain OMB approval before conducting a collection of information. Specifically, it permits a party to "request the [OMB] Director to review any collection of information conducted by or for an agency." 44 U.S.C. § 3517(a). It also permits a party to raise an agency's noncompliance with the Act as a defense to any penalty for failing to comply with the collection. *See id.* § 3512.

The State does not purport to have invoked PRA's remedies here. It did not, for instance, seek review by the OMB Director during the 30-day period in which compliance was required, which has now expired. Because there is no longer an ongoing collection to stop, any attempt to invoke the PRA to stop the collection is now moot. At this point, consideration of the Act's protections under Section 3512 would be premature, given that the State has not yet faced any

administrative process leading to a sanction and thus cannot invoke the defense.[7] The PRA thus does not provide any basis for this Court to grant relief in the current procedural posture.

### C.   The pilot project did not violate the Food and Nutrition Act.

The State argues that the project violates the FNA and exceeds the authority it confers on the Secretary for several reasons. ECF No. 46 at 12–16. None has merit.

*First*, the State claims that USDA "cannot order participation in a pilot program without the consent of the state." *Id.* at 12–14. But the FNA gives the USDA Secretary broad discretion to conduct pilot projects that, among other things, "might increase the efficiency of the supplemental nutrition assistance program" or "improve program administration." 7 U.S.C. § 2026(b)(1)(A)-(B). The statute does contemplate that States *may* affirmatively request waivers of regulatory requirements to conduct pilot projects, but § 2026(b) does not state that the Secretary may conduct pilot projects *only* where a State affirmatively sought a waiver. *See id.* § 2026(b)(1)(D). Nothing in the statutory language limits the Secretary's authority in this manner.

In support of its argument, the State cites unrelated provisions of the FNA that concern *other* types of pilot projects. *See* 7 U.S.C. § 2017(f)(2)(A) (requiring the Secretary to carry out pilot projects at the request of States before implementing alternative methods for calculating allotments for residents of certain group facilities); *id.* § 2036d(a) (authorizing the Secretary to approve up to 10 pilot projects "on application of eligible entities," "to support public-private partnerships that address food insecurity and poverty"); *id.* § 2025(h)(1)(F)(i)(l) ("the Secretary shall carry out pilot projects under which State agencies shall enter into cooperative agreements

---

[7] Nor is it clear the defense would apply, especially where, as here, USDA's authority to conduct the pilot project was authorized by Congress. *Cf. United States v. Ionia Mgmt. S.A.*, 498 F. Supp. 2d 477, 489 (D. Conn. 2007) ("where the requirement 'originates' with Congress, . . . the public protection provision of the PRA cannot apply to bar penalties").

with the Secretary to develop and test methods . . . for employment and training programs and services"); *id.* § 2021(i)[8] ("The Secretary shall carry out . . . pilot projects to test innovative Federal-State partnerships to identify, investigate, and reduce fraud by retail food stores and wholesale food concerns.").

These statutory provisions do not purport to limit the authority set forth in § 2026(b). Moreover, at least two of these statutory provisions *mandate* that the Secretary carry out certain types of pilot projects. 7 U.S.C. § 2025(h)(1)(F)(i)(l); *id.* § 2021(i). Those provisions also broadly allow the Secretary to unilaterally set the terms and conditions of the projects, and do not contain any language suggesting that the only manner in which the Secretary can carry out the pilot projects is to secure voluntary cooperation from a State. Indeed, since the Secretary is *required* to carry out those pilot projects, the Secretary would presumably have to compel States to participate if no state voluntarily agreed to participate.

Colorado also cites a report produced by USDA that explains that "[s]tate agencies can request approval from FNS to conduct demonstration projects." USDA, *Supplemental Nutrition Assistance Program: State Options Report* 26-29, https://coag.gov/app/uploads/2026/01/snap-stateOptionsReport-17edition.pdf (17th ed. 2025). However, the report does not state that this is the *only* manner in which pilot projects are conducted, nor does the report purport to set forth a comprehensive explanation of all pilot projects the Secretary may conduct.

*Second*, the State claims that the Secretary may conduct pilot projects only by waiving existing requirements, but cannot impose new requirements "such as commanding in-person interviews and off-cycle recertifications." ECF No. 46 at 14. Section 2026(b) does not contain any

---

[8] The State's brief cites 7 U.S.C. § 2021(h)(3)(i), which does not exist. It appears that the State intended to cite 7 U.S.C. § 2021(i).

language suggesting that the *only* way the Secretary may conduct a pilot project is through a waiver of existing requirements. Moreover, as explained above, the pilot project here did not impose any new requirements; rather, it simply required that five counties conduct recertifications as they normally would, but on an accelerated timeframe.

*Third*, the State argues that § 2026(b)(1)(B)(i) *prohibits* the project. ECF No. No. 46 at 14-15. Section 2026(b) prohibits pilot projects that are not "consistent with the goal of . . . providing food assistance to raise levels of nutrition among low-income individuals." 7 U.S.C. § 2026(b)(1)(B)(i)(I). The State asserts that the project is inconsistent with this goal because it would deny assistance to those who cannot be interviewed in person and be recertified within 30 days. ECF No. 46 at 14. As explained above, the pilot project does not require in-person interviews beyond those that are normally required during recertifications. Ex. 1 ¶¶ 33-35.

The Letter also does *not* state that the State must unenroll households that are unable to complete the recertification process within the 30 days. Rather, the Letter simply requires the State to unenroll any household that it determines is ineligible, as it would be required to do in the ordinary course of the recertification process. ECF No. 26-1 at 1.

Section 2026(b) also requires that pilot projects include "an evaluation to determine the effects of the project." 7 U.S.C. § 2026(b)(1)(B)(i)(II). The State asserts that the Letter does not expressly provide for such an evaluation. ECF No. 46 at 14. However, the Letter requires the State to "[d]ocument and preserve all information relied upon to demonstrate compliance with this pilot project." ECF No. 26-1 at 1. The purpose of this requirement is to allow the Secretary to evaluate the results of the project once it is completed, and USDA will do so. Ex. 1 ¶ 38.

The State further argues that § 2026(b) prohibits projects that are inconsistent with the requirement that State agencies provide timely, accurate, and fair service to SNAP applicants and

recipients. ECF No. 46 at 15 (citing 7 U.S.C. § 2026(b)(1)(B)(iv)(III)(ff)). Specifically, the State argues that "[i]t is the antithesis of fairness to impose significant burdens on recipients that are not provided for by statute or regulation without notice to retroactively change the rules of the life-sustaining benefits they have already qualified for." *Id.* As explained above, the pilot project does not impose new burdens or rules on beneficiaries. The pilot project also does not "retroactively change the rules" of eligibility; it only requires the State to unenroll ineligible households according to existing eligibility requirements. *See* Ex. 1 ¶¶ 33, 37.

The State next argues that compliance with the pilot project would force it to violate regulations that require it to provide a notice of expiration in the next-to-last-month of the certification period that includes the date the certification period expires and information about the recertification process. ECF No. 46 at 15–16 (citing 7 C.F.R. § 273.14(b)(1)(i)). However, this regulatory provision concerns unenrollment *due to the expiration of the benefit period.* 7 C.F.R. § 273.14(a) ("No household may participate beyond the expiration of the certification period . . . without a determination of eligibility for a new period"). The pilot project here does not accelerate the expiration dates; it just requires recertifications. Moreover, the regulations provide that a State may shorten the certification period if it "receives information that the household has become ineligible." *Id.* § 273.10(f)(4).  That provision explicitly provides that a State *may not* use a notice of expiration to shorten the certification period, except in limited circumstances. *Id.* Instead, a State must issue a notice of adverse action. *Id.* Thus, the requirements concerning notices of expiration do not apply here. And even if they did, the Secretary may waive the requirements to facilitate the pilot project. 7 U.S.C. § 2026(b)(1)(A).

The State also vaguely asserts that the pilot project would require it to violate its FNS-approved state plan of operation. ECF No. No. 46 at 16. But the State does not elaborate on or

support this argument, which appears to be premised on the same arguments addressed above.

*Fourth*, the State argues that the Letter's reference to possible sanctions under 7 U.S.C. § 2020(g) is unlawful. ECF No. 46 at 16. Specifically, the State argues that § 2020(g) allows sanctions only for violations of the FNA, the implementing regulations, the state plan of operation, the state plan for automated data processing, or the requirements in Section 2032 (concerning automated data processing and information retrieval systems). ECF No. 46 at 16. However, the FNA gives the Secretary broad authority to conduct pilot projects. A refusal to participate in a pilot project established pursuant to that authority thus constitutes a violation of the FNA. And, in any event, the State can argue that fact if there is a future administrative process to impose sanctions.

## D.   The pilot project is not arbitrary and capricious.

An agency must provide "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). Here, USDA has satisfied its obligation. As discussed *supra* pp. 4-7, USDA determined when launching the pilot project that it should consider a SNAP program integrity initiative because of "ongoing fraud affecting federally funded benefits across the nation." ECF No. 26-1 at 1. USDA had particular concerns with States that have delegated SNAP implementation to counties, and with the integrity of Colorado's SNAP compliance specifically. Ex. 1 ¶¶ 20-25. Limiting the pilot to five of Colorado's 64 counties was rational for a number of reasons, including reports of illegal activity including public benefit abuse in the area. *Id.* ¶ 25. As to alternatives, USDA excluded other counties that reflected various factors, including inability to comply within the allotted timeframe. *Id.* ¶ 29. USDA's decision was not arbitrary and capricious under governing law. *See Bradford v. U.S. Dep't of Labor*, 101 F.4th 707, 730 (10th Cir. 2024) (action is arbitrary and capricious only if the agency has "relied on

factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" (cleaned up)).[9]

        **E.**        **The pilot project does not violate the Spending Clause.**

Last, Colorado asserts a Spending Clause violation, predicated on its assertion that "Colorado established its SNAP program and accepted SNAP funds without knowing an impossibly onerous pilot project would be unilaterally imposed on it." ECF No. 46 at 21 (citing, *inter alia*, *Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 296 (2006)).

The Spending Clause is inapplicable where, as here, Plaintiff does not allege that the relevant statute (the FNA) is itself unlawful. As several district courts have recently recognized, the Spending Clause is implicated only "when *Congress* imposes a spending or funding condition." *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127, 162 (D.D.C. 2025) (emphasis added), *appeal filed*, No. 25-5277 (D.C. Cir. July 28, 2025); *see id.* (examining Supreme Court Spending-Clause cases to recognize that the doctrine is only applicable where plaintiffs allege that a statute is unlawful). Where plaintiffs—like Plaintiff here—fail to challenge "congressional action," they "cannot state a claim under the Spending Clause." *Id.* at 162–63; *see also Bd. of Educ. for Silver Consol. Schs. v. McMahon*, 791 F. Supp. 3d 1272, 1288 (D.N.M. 2025) (same). In any event, even if the Spending Clause were applicable here—which it is not—Plaintiff's challenge still fails on the merits because, as discussed at length *supra*, the pilot project fully comports with and arises entirely out of the FNA's statutory requirements.

---

[9] Herein, Defendants have already explained why the State's "impossibility" argument (ECF No. 46 at 18–19) is misplaced; so too is the State's resulting contention that USDA "failed to consider" aspects of the problem (*id.* at 17).

**IV. The equities and public interest do not favor an injunction.**

Plaintiff's argument on the equities and public interest largely restates the other elements of their motion for preliminary injunction: the "irreparable injuries" imposed by the project and its alleged unlawfulness. ECF No. 46 at 24. But as discussed herein, Plaintiff's claimed irreparable harm is speculative, and the Letter complies with all applicable law. It does not serve the equities or public interest to interrupt (or, in this case, thwart entirely) an administrative remedy process prescribed by statute and regulation. *See Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1144 (10th Cir. 2012) (explaining that "courts may not invoke equity to craft a remedy inconsistent with the law" and a court's power to assess the "public interest [is] circumscribed to the extent Congress has already made such assessments") (internal marks omitted).

## CONCLUSION

The Court should deny the State's Motion for Preliminary Injunction, ECF No. 46.

Dated: January 22, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

s/ Tyler J. Becker
**_Tyler J. Becker_**
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Tel.: (202) 514-4052
Email: tyler.becker@usdoj.gov

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

MARIANNE KIES
Trial Attorney
Federal Programs Branch

*Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I certify that on January 22, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of the filing to counsel of record.

s/ Tyler J. Becker
U.S. Department of Justice