# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

STATE OF MINNESOTA, *by and
through its Attorney General,
Keith Ellison*,

　　　　　　　　Plaintiff,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE and BROOKE
ROLLINS, *Secretary of the U.S.
Department of Agriculture*,

　　　　　　　　Defendants.

Case No. 25-cv-4767 (LMP/JFD)

**ORDER GRANTING MOTION FOR A
PRELIMINARY INJUNCTION**

Elizabeth C. Kramer, Brian Carter, Joseph Richie, Katherine Bies, Lindsey Middlecamp,
and Peter J. Farrell, **Minnesota Attorney General's Office, St. Paul, MN**, for Plaintiff.

Brian A. Mizoguchi, **United States Department of Agriculture, Washington, D.C.**, and
Adine S. Momoh, **United States Attorney's Office, Minneapolis, MN**; for Defendants.

The Supplemental Nutrition Assistance Program ("SNAP") helps low-income

households meet their basic food and nutrition needs. 7 U.S.C. § 2011. SNAP is funded

and regulated by Defendants United States Department of Agriculture and its Secretary

Brooke Rollins (collectively the "USDA"), but states are responsible for the program's

day-to-day administration. *See generally* 7 U.S.C. §§ 2013(a), 2020.

States are tasked first and foremost with the verification of an applicant's eligibility

to receive benefits and the subsequent recertification of eligible beneficiaries. 7 U.S.C.

§ 2020(a)(1). The way in which states must go about doing so is comprehensively laid out

by federal law and USDA regulations but generally occurs on a rolling basis throughout

the year.  *See* 7 U.S.C. § 2020; 7 C.F.R. §§ 273.1 *et seq.*  Plaintiff State of Minnesota ("Minnesota") participates in SNAP and is therefore responsible for the certification and recertification of SNAP applicants and beneficiaries.  To date, no one disputes that Minnesota's recertification process has—by all accounts—complied with all relevant statutes and regulations.  *See, e.g.*, ECF No. 10 ¶ 10 (noting that the USDA's July 2025 review found that Minnesota was "fulfilling its responsibilities for the administration" of SNAP and was "following applicable regulations and policies").

Nevertheless, on December 16, 2025, Secretary Rollins sent Minnesota a letter requiring that Minnesota recertify all SNAP beneficiaries in certain counties by January 15, 2026.  ECF No. 1-1 (hereinafter the "Recertification Letter").  The USDA justified its demand by citing to the Secretary's authority to implement "pilot projects" under 7 U.S.C. § 2026(b)(1)(A). *Id.*  The USDA warned that if Minnesota fails to comply, the "USDA will trigger noncompliance procedures" and may limit Minnesota's "continued participation in SNAP." *Id.* at 3.

On December 23, 2025, Minnesota filed this action, alleging that the Recertification Letter violates the Administrative Procedure Act ("APA"), the Spending Clause of the United States Constitution, and otherwise exceeds the scope of the USDA's authority.  ECF No. 1 ¶¶ 129–95.  Minnesota seeks a preliminary injunction or a stay pursuant to 5 U.S.C.

2

§ 705 and an order enjoining the USDA from enforcing the Recertification Letter.[1]  ECF No. 5.

On January 14, 2026, just minutes before the Court held a scheduled hearing on Minnesota's motion, the USDA provided Minnesota with a second letter.  ECF No. 40-1 (hereinafter the "Enforcement Letter").  The Enforcement Letter makes good on the threats from the Recertification Letter and informs Minnesota that the USDA is immediately withholding administrative funding the USDA is otherwise required to provide.  *Id.* at 2– 3.  The USDA, as it did with the Recertification Letter, justifies its decision by relying on Section 2026.  *Id.* at 2.  Accordingly, at the hearing, Minnesota requested that the Court also enjoin enforcement of the Enforcement Letter.  Counsel for the USDA conceded that the Secretary's actions in the Enforcement Letter are within the scope of Minnesota's preliminary injunction motion.

For reasons discussed at the hearing, the Court granted Minnesota's preliminary injunction.  ECF No. 38.  As the Court now explains more fully, because Minnesota is likely to succeed on the merits of at least one of its APA claims, and because all other prerequisites for injunctive relief fall in Minnesota's favor, the Court granted the motion

---

[1]     On January 13, 2026, the District of Columbia and the states of Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Michigan, Nevada, New Jersey, New York, Rhode Island, Vermont, Washington, and Wisconsin filed a motion for leave to file an amicus brief in support of Minnesota's request for a preliminary injunction. ECF No. 31.  Without objection from the USDA, the Court granted the motion.  ECF No. 39.  The amicus brief was filed at ECF No. 41.

and enjoined the USDA from taking any action on the Recertification and Enforcement Letters.

## BACKGROUND

I.    **An Overview of SNAP**

A.    **Federal and State Participation and Implementation**

Recognizing that "limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households," Congress created SNAP in 1964 to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011. SNAP functions as a partnership between states and the federal government. The USDA operates the program at the federal level by approving state plans of operation, promulgating regulations, and providing all beneficiary funds to participating states. 7 U.S.C. §§ 2013(a)(1), 2013(c), 2020(d); ECF No. 10 ¶ 5. In return, states are responsible for SNAP's administration and split the administrative costs with the USDA. 7 U.S.C. § 2025(a).

To qualify for SNAP, a state must comply with strict administrative guidelines. 7 C.F.R. § 276.4(a)(2) (noting that the USDA will review compliance and "may determine a State agency's administration of the Program to be inefficient or ineffective if the State agency fails to comply with the SNAP requirements established by the Food and Nutrition Act of 2008, the regulations issued pursuant to the Act, or the [Food and Nutrition Service (FNS)]-approved State Plan of Operation"). Relevant here, a state must first develop a "plan of operation specifying the manner in which such program will be conducted" and

submit such plan of operation for USDA approval.  7 U.S.C. § 2020(d); *see* 7 C.F.R. § 272.2.  The plan of operation, in turn, is a blueprint for how a state runs its SNAP program and outlines how a state will meet federal requirements.  *See generally* 7 U.S.C. § 2020(d), (e); 7 C.F.R. § 272.2.  Relevant to a household's initial application, a state must: (1) allow a household to apply for SNAP benefits the same day that it contacts a SNAP office, 7 U.S.C. § 2020(e)(2)(B)(iii); (2) process that application "promptly" and provide benefits within 30 days of receiving an application, *id.* § 2020(e)(3); and (3) provide "a clear written statement" explaining how a household must cooperate in obtaining verification and otherwise complete the application process, *id.*[2]  A state is not eligible for SNAP benefits until the USDA approves its plan of operation.  *Id.* § 2020(d).

The process of reviewing applications for SNAP benefits is largely governed by USDA regulations.  The overarching principle is that a state must implement a review process to "best serve households" and to "provide timely, accurate, and fair service to applicants."  7 C.F.R. § 273.2(a)(1).  In general, the application and review process has three steps: (1) the application form must be completed and signed; (2) the household or its authorized representative must be interviewed, and (3) certain information on the application must be verified.  7 C.F.R. § 273.2(d)(1).  A household's noncompliance with any of these steps can justify an application's denial.  This is the case only if the household refuses to cooperate, meaning that a household "demonstrate[s] that it will not take actions

---

[2]    For certain households with extremely low incomes, a state must provide benefits no later than seven days after an application.  7 U.S.C. § 2020(e)(9)(A)–(B).

that it can take and that are required to complete the application process." *Id.* A refusal to cooperate must constitute more than "failing to appear for [an] interview." *Id.*

As for the interview itself, regulations generally require "a face-to-face interview . . . at initial certification and at least once every 12 months thereafter." *Id.* § 273.2(e)(1). This interview "may be conducted at the SNAP office or other mutually acceptable location, including a household's residence." *Id.* However, a state "may use a telephone interview instead of the face-to-face interview" in all cases, so long as a state "that chooses to routinely interview households by telephone in lieu of the face-to-face interview . . . specif[ies] this choice in its State plan of operation and describe[s] the types of households that will be routinely offered a telephone interview in lieu of a face-to-face interview." *Id.* § 273.2(e)(2); *see also id.* § 272.2(d)(xvi)(B); ECF No. 23 ¶ 14. A state must schedule such an interview "as promptly as possible to insure eligible households receive an opportunity to participate within 30 days after the application is filed," must notify a household "that misses its interview appointment" that the household is "responsible for rescheduling a missed interview," and must reschedule the interview if the household "contacts the State agency within the 30 day application processing period." 7 C.F.R § 273.2(e)(3).

If a household qualifies for SNAP, a state must certify eligibility for a definite period of time, known as the "certification period." 7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.10(f). Certification periods must be the longest period possible "based on the predictability of the household's circumstances," 7 C.F.R. § 273.10(f), but in general are no less than six months, *id.* § 273.10(f)(3). A state must also notify the household—when a state grants an

application—of "the beginning and ending dates of the certification period," *id.* § 273.10(g)(1)(i)(A), and may not "end a household's certification period earlier than its assigned termination date, unless the State agency receives information that the household has become ineligible," *id.* § 273.10(f)(4).  Further, a state "may not require households to report for an in-office interview during their certification period, though they may request households to do so."  *Id.* § 273.2(e)(1).

A recipient household is required to recertify by the time its certification period ends.  To make sure households are aware of the expiration of a certification period, a state is required to provide notice of the impending deadline "prior to the start of the last month of its certification period" and advise "the household that it must submit a new application in order to renew its eligibility."  7 U.S.C. § 2020(e)(4).  And a state must also "establish procedures for notifying households of expiration dates, providing application forms, scheduling interviews, and recertifying eligible households prior to the expiration of certification periods."  7 C.F.R. § 273.14(a).  Part of the recertification process must include "an interview with a member of the household" conducted under the same procedures as the initial interview.  *Id.* § 273.14(b)(3)(i).  Further, the recertification interview must be scheduled so that "the household has at least 10 days after the interview in which to provide verification before the certification period expires."  *Id.* § 273.14(b)(3)(iii).  Like the original interview, if a household misses the initial recertification interview but requests another, a state is required to reschedule.  *Id.*  If a household submits a timely recertification application, the state must approve or deny that application "by the end of the[] current certification period."  *Id*. § 273.14(d)(2).

7

### B.    USDA Oversight

Although the administration of SNAP largely falls on the states, the USDA maintains significant oversight responsibility. For instance, a state must submit various plans to the USDA before a state is approved to receive SNAP funding. *See, e.g.*, 7 C.F.R. § 272.10 (plans for computerization of benefits); *id.* § 272.2(c)(1) (explaining that states must submit "for approval a Budget Projection Statement and Program Activity Statement"); *id.* § 275.11(a) (requiring state submission of plans for quality control sampling); *see generally id.* § 272.2(d) (listing almost 20 plans that require USDA approval). Further, the USDA must "conduct an annual review of certain functions performed at the State agency level in the administration/operation of the program." *Id.* § 275.3(a). This review "determine[s] the efficiency and effectiveness" of a state's administration of SNAP and, in particular, its payment error rates. *Id.* § 275.23(a)–(b). To assist in the USDA's oversight, states are required to conduct "quality control reviews" on active households in an effort "to determine if households are eligible and receiving the correct allotment of SNAP benefits." *Id.* § 275.10(a).

The USDA also offers, and must approve, a request for waivers to any of the certification and recertification processes outlined in its regulations. 7 C.F.R. § 272.3(c)(1) (providing that the USDA "may authorize waivers to deviate from specific regulatory provisions" where it "determines that the waiver would result in a more effective and efficient administration of the program"). But the USDA may not grant a waiver request that is "inconsistent with the provisions" of the Food and Nutrition Act. *Id.* § 272.3(c)(2)(i). To that end, the USDA has recognized at least "28 SNAP options, demonstration projects,

and waivers" that states may use to help "simplify program administration and operations while promoting priorities such as program access, customer service, effective stewardship of Government resources, and program integrity." U.S. Dep't of Agric., Food & Nutrition Serv., *State Options Report* (17th ed. 2025)[3] at 6 (hereinafter "State Options Report"); *see also id.* at 7–8 (listing out the various options). Relevant here, the USDA has granted Minnesota and 17 other states the option to conduct certification and recertification interviews telephonically "within a specified time period" after the application or reapplication, *id.* at 33; and granted Minnesota and 12 other states the option to take telephonic signatures as long as Minnesota documents the signature in the case file, *id.* at 39.

The USDA may impose penalties on states that demonstrate inefficient or ineffective SNAP programs. *See* 7 U.S.C. § 2020(g); 7 C.F.R. § 276.4(a). For instance, if the USDA determines that a state failed to comply with federal law, a USDA regulation, or the state's own approved plan of operation, the USDA may seek "injunctive relief to compel compliance" or may seek "a suspension or disallowance" of the federal share of the state agency's administrative funds. 7 C.F.R. § 276.1(a)(4). Before the USDA may seek a suspension or disallowance of administrative funds, the USDA must first provide "written advance notification that such action is being considered," and if the state does not satisfactorily respond, the USDA must then "provide the State agency with a formal warning of the possibility of suspension or disallowance action." *Id.* § 276.4(d). The same

---

[3]    Available at https://perma.cc/Q3SD-J5FU.

is true if the USDA desires injunctive relief to require a state to comply with federal law. First, the USDA must "provide the State agency with a specific period of time to correct the deficiency." *Id.* § 276.5(b). If the state does not do so, the USDA may then "refer the matter to the Attorney General with a request that injunctive relief be sought." *Id.*; *see also* 7 U.S.C. § 2020(g) (allowing the USDA to stay administrative funds and seek injunctive relief if the USDA determines "there is a failure by a State agency without good cause to comply," provided that the USDA allowed "a specified period of time for the correction of such failure").

### C.    Pilot Projects

The USDA also may institute "pilot projects" to improve the efficiency and effectiveness of the SNAP program. Some of these pilot projects are mandatory: for instance, the USDA must carry out pilot projects "to test innovative Federal-State partnerships to identify, investigate, and reduce fraud by retail food stores," 7 U.S.C. § 2021(i); must carry out pilot projects "to be sufficient to test the feasibility of determining and issuing allotments" to residents of certain facilities before making changes to those allotments, *id.* § 2017(f)(2)(A); and must carry out pilot projects "under which State agencies shall enter into cooperative agreements with the Secretary to develop and test methods . . . for employment and training programs and services," *id.* § 2025(h)(1)(F)(i)(I).

Other pilot projects can be implemented at the discretion of the USDA. Relevant here, 7 U.S.C. § 2026(b)(1)(A) states:

> The Secretary may conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects designed to test program changes that might increase the efficiency of the supplemental nutrition assistance

10

program and improve the delivery of supplemental nutrition assistance
program benefits to eligible households, and may waive any requirement of
this chapter to the extent necessary for the project to be conducted.

Significantly, such pilot projects (hereinafter a "Section 2026 project")[4] must comply with

certain statutory and regulatory restrictions.  First, the USDA may not conduct a Section

2026 project unless: (1) "the project is consistent with the goal of the supplemental

nutrition assistance program of providing food assistance to raise levels of nutrition among

low-income individuals"; and (2) "the project includes an evaluation to determine the

effects of the project."  *Id.* § 2026(b)(1)(B)(i).  Second, the USDA may not conduct a

Section 2026 project that, among other things, is inconsistent with a state's plan of

operations, the state's requirement "promptly" to process an application within 30 days,

and the USDA and the state's 50-50 split of administrative costs of SNAP under 7 U.S.C.

§ 2025(a).  *See* 7 U.S.C. § 2026(b)(1)(B)(iv)(III).  And third, should the USDA seek to

implement a Section 2026 project, it must publish a General Notice in the Federal Register

if the pilot project "will likely have a significant impact on the public," and must do so at

least 30 days before the pilot project starts.  7 C.F.R. § 282.1(b).  That notice must "set

forth the specific operational procedures and shall explain the basis and purpose" of the

pilot project, and, if "significant comments are received in response to this General Notice,

---

[4]      The parties variously refer to these projects as "pilot projects," "pilots," or
"demonstration projects."  *See e.g.*, ECF No. 6 at 18; ECF No. 22 at 22, 25.  The Court
adopts "Section 2026 project" but all terms refer to the same thing: a project governed by
7 U.S.C. § 2026(b)(1)(A).

the [USDA] will take such action as may be appropriate prior to implementing the project."
*Id.*

Section 2026 also details when the USDA may "waive any requirement." Specifically, not later than 60 days after receiving a waiver request from a Section 2026 pilot project participant, the Secretary shall provide a response that approves the waiver; denies the waiver and describes needed modifications for approval; denies the waiver and provides reasons for denial; or requests clarification of the waiver request. 7 U.S.C. § 2026(b)(1)(D)(i).

## II.    Minnesota's SNAP Administration

SNAP is administered in part by Minnesota's Department of Children, Youth, and Families ("DCYF") and in part by individual counties. Minn. Stat. § 142F.05, subd. 1; ECF No. 10 ¶ 5, ECF No. 7 ¶ 4; *see also* State Options Report at 18 (recognizing that Minnesota and nine other states use a "region, district, or county administered" model). Approximately 440,000 Minnesotans receive SNAP benefits, totaling approximately $75 million each month in benefit payments. ECF No. 10 ¶ 6. The USDA and DCYF split the $160 million annual costs of administering SNAP. *Id.* ¶ 7. The USDA provides all of the beneficiary funding. 7 U.S.C. § 2013(a).

Minnesota counties are largely responsible for processing SNAP applications and recertifications. ECF No. 7 ¶ 4; ECF No. 11 ¶ 7. But DCYF maintains responsibility for informing households about the upcoming expiration of their certification period. ECF No. 10 ¶ 31. DCYF typically sends the notice 45 days before the end of a certification period, as required by 7 C.F.R. § 273.14(b)(1). *Id.* The individual counties schedule

interviews and determine eligibility. *Id.* ¶¶ 32, 34.  Counties overwhelmingly conduct those interviews telephonically, as allowed by USDA regulations.  *Id.*; *see also* ECF No. 8 ¶ 5; ECF No. 11 ¶ 9; ECF No. 16 ¶ 9.  And as required by USDA regulations, the counties schedule those interviews at least 10 days before the end of the certification period.  ECF No. 10 ¶¶ 32–33.  After conducting the interviews and evaluating submitted documentation, the counties determine a household's continuing eligibility for SNAP. *Id.* ¶ 34.

Hennepin County, Ramsey County, Washington County, and Wright County (the "Recertification Counties") are responsible for the yearly recertification of approximately 106,000 households, totaling approximately 191,000 Minnesotans.  ECF No. 10 ¶ 24; ECF No. 11 ¶ 13; ECF No. 7 ¶ 5; ECF No. 8 ¶ 4.  Because a household's typical certification period is 12 months and recertification coincides with the original application date, Minnesota counties recertify households on a rolling-basis throughout the year.  ECF No. 10 ¶ 35; *see also* State Options Report at 90 (recognizing that Minnesota uses 12- and 24-month certification periods); *id.* at 38 (reiterating that "State agencies must assign eligible households a certification period for a finite period of months" and that "State agencies cannot shorten the certification period without a waiver").  In practice, the Recertification Counties certify approximately one-twelfth of eligible households every month. *See generally* ECF No. 11 ¶¶ 13–14; ECF No. 8 ¶¶ 4–5; ECF No. 7 ¶ 7.

DCYF must comply with the USDA's reporting and auditing requirements.  ECF No. 10 ¶ 8.  For example, pursuant to 7 C.F.R. § 275.2(a), DCYF has a "continuing performance reporting system," which involves data collection through management

evaluation reviews and quality control reviews; analysis and evaluation of the data; corrective action planning, implementation, and monitoring; and reporting to the USDA on program performance. ECF No. 10 ¶ 8. DCYF also monitors compliance by the counties with SNAP requirements by conducting management evaluation reviews, and, in July 2025, the USDA conducted a review of Minnesota's management evaluation review processes, procedures, methodology, and corrective action. *Id.* ¶ 10. The USDA's review concluded that Minnesota was fulfilling its responsibilities for the administration of SNAP and was following applicable regulations and policies. *Id.* DCYF also conducts quality control, which involves a review of a statistically valid sample of cases to determine whether households are receiving SNAP benefits to which they are entitled and to determine whether county decisions to deny, suspend, or terminate cases are correct. *Id.* ¶ 11. Finally, DCYF takes various other measures to monitor SNAP administration for fraud, including instituting a fraud prevention investigation program, implementing protections for the use of electronic benefit transfer cards, and ensuring household recertification as required by federal law. *See id.* ¶¶ 12–14. DCYF contends its payment error rates are below the national average and that fraud in the SNAP program is low. *Id.* ¶¶ 16–18; ECF No. 41 at 8, n.10 (noting that "SNAP fraud is rare").

### III.    The USDA's Recertification Letter and the Present Lawsuit

On December 16, 2025, the USDA sent Minnesota a letter purportedly "requiring Minnesota to participate in a [SNAP] pilot project, conducted pursuant to 7 U.S.C. § 2026(b)(1)(A), to increase the efficiency of SNAP and improve the delivery of SNAP

benefits to eligible households." ECF No. 1-1 at 2. The pilot project requires that Minnesota:

1.  Conduct recertifications, within 30 days of receipt of this letter, of all SNAP households in Hennepin, Ramsey, Washington, and Wright counties.

2.  As part of the recertification process, ensure SNAP households in Hennepin, Ramsey, Washington, and Wright counties meet all eligibility requirements for SNAP, including by accounting for the income and resources of any excluded household members, conducting in-person interviews, and using federal eligibility tools like the improved, cost-free Systematic Alien Verification for Entitlements (SAVE) Program database.

3.  Upon review of the information obtained during the recertification process, make determinations as to eligibility of SNAP benefits for each SNAP household in Hennepin, Ramsey, Washington, and Wright counties and unenroll any ineligible households.

4.  Document and preserve all information relied upon to demonstrate compliance with this pilot project and completion of accurate recertifications of eligibility. This includes but is not limited to all documentation pertaining to any excluded household members and recertification determinations. [DCYF] must also preserve all documentation it relied upon for the immediately prior certification related to the SNAP households in question.

ECF No. 1-1 at 2–3. The Recertification Letter further states that Minnesota's "[f]ailure to participate in this pilot project as specified by USDA will trigger noncompliance procedures codified in 7 U.S.C. § 2020(g). It may also affect Minnesota's continued participation in SNAP." *Id.* at 3.

On December 23, 2025, Minnesota brought this action alleging that the USDA's Recertification Letter and the demands therein violate federal law and the United States Constitution. ECF No. 1. Specifically, Minnesota contends that the USDA's actions violate

the APA because: (1) the USDA did not follow APA-mandated procedures in 5 U.S.C. § 553 before sending the Recertification Letter, *id.* ¶¶ 129–38; (2) the USDA's demands are contrary to law and exceed the USDA's authority, *id.* ¶¶ 139–65; and (3) the USDA's actions are arbitrary and capricious, *id.* ¶¶ 166–85. Minnesota further alleges that the USDA's demands violate the Spending Clause of the United States Constitution, *id.* ¶¶ 186–90, and that the USDA otherwise acted beyond the scope of its constitutional and statutory authority, *id.* ¶¶ 191–95.

Not only does Minnesota assert that the USDA's demands violate the law and require *it* to violate the law, but Minnesota also alleges that it is impossible to comply with the Recertification Letter. For example, the SNAP coordinator for Hennepin County declares that Hennepin County has 54,316 active SNAP households and that it typically processes 4,500 to 5,500 recertifications per month. ECF No. 11 ¶¶ 13–14. The Recertification Letter, by contrast, would require Hennepin County to process "roughly 10 times" that many recertifications in a month. *Id.* The same is largely true for the other Recertification Counties. *See, e.g.*, ECF No. 7 ¶ 7 (Ramsey County has 34,000 households and averages 2,800 recertifications per month); ECF No. 8 ¶¶ 7–8 (Washington County has 5,477 households and averages 600 recertifications per month); ECF No. 16 ¶¶ 12–13 (Wright County has 2,861 households and averages 300 recertifications per month). Simply put, those Recertification Counties affirm that it is impossible for them to comply with the Recertification Letter's demands.

As a result of the demands made in the Recertification Letter, and the USDA's threats of potential penalties for noncompliance, on December 29, 2025, Minnesota sought

preliminary injunctive relief.  ECF No. 5 at 1–2.  On December 31, 2025, the Court scheduled a hearing on Minnesota's preliminary injunction motion for January 14, 2026, at 2 p.m. and set forth an expedited briefing schedule.  ECF No. 18.  On January 5, 2026, the Court held a status conference and ordered the parties to meet and confer before the USDA's deadline to file its response.  *Id.*  On January 8, 2026, the USDA filed its opposition brief and argued that the Recertification Letter does not violate any federal law or the Constitution and that Minnesota does not face a threat of irreparable injury.  ECF No. 22.

## IV.    The Enforcement Letter

Minutes before the scheduled January 14, 2026 hearing, the USDA's attorney handed Minnesota's attorney a new letter from Secretary Rollins.  ECF No. 40-1.  The USDA's attorney admitted that he had received the Enforcement Letter just 25 minutes before the hearing started and did not have a full understanding of its content.  The Enforcement Letter purports to establish a "new" pilot project under 7 U.S.C. § 2026(b)(1)(A).  *Id.* at 2.  It goes on to say that under "7 U.S.C. § 2020(g)," the Secretary has the authority to withhold "the Federal government's share of the State's administrative costs" if the Secretary finds "a pattern of lack of compliance by a State agency."  *Id.*  It then explains that "Minnesota's persistent and public indifference to ongoing fraud and an unwillingness to comply with safeguards against fraud" constitutes such a pattern, and that the USDA "immediately withholds the Federal government's portion of Minnesota's administrative costs for the first quarter of calendar year 2026."  *Id.* at 3.

The Enforcement Letter acknowledges that the USDA neither informed Minnesota of any such failure ahead of time nor allowed Minnesota any time to correct the purported

failure, as is required by 7 U.S.C. § 2020(g).  ECF No. 40-1 at 2.  But the USDA says that it can waive those provisions under the "Secretary's authority" in Section 2026, and that "this pilot project modifies these administrative procedures to accelerate corrective action." *Id.*

Because the Enforcement Letter's makes real the threats made in the Recertification Letter, at the preliminary injunction hearing, Minnesota asked the Court to grant a preliminary injunction that covers both the Enforcement Letter and the Recertification Letter.  The USDA's attorney conceded that the Enforcement Letter fell within the scope of Minnesota's preliminary injunction motion.[5]  This Court then granted Minnesota's preliminary injunction and enjoined the USDA and Secretary Brooke Rollins from taking any action against Minnesota based on the letters of December 16, 2025, ECF No. 1-1, and January 14, 2026, ECF No. 40-1, including withholding any portion of the federal government's share of Minnesota's administrative costs for the first quarter of calendar year 2026, ECF No. 38.

The Court ordered the USDA to file the Enforcement Letter by January 15, 2026, *id.*, and the USDA has done so, ECF No. 40-1.  The Court ordered Minnesota to file its plan of operation by January 15, 2026, ECF No. 38, and Minnesota has done so, ECF

---

[5]     The USDA had known for weeks of the emergency request filed by Minnesota, and this Court's schedule was set to ensure it could issue a ruling by the January 15, 2026 deadline stated in the USDA's December 16, 2025 Recertification Letter.  The January 14, 2026 Enforcement Letter surfaced just moments before the start of the preliminary injunction hearing.  In it, the Secretary preemptively took the very action that Minnesota's motion sought to enjoin.  This is deeply troubling to the Court.

No. 43 (providing a link to the website that hosts Minnesota's Combined Manual, which is an operational and instructional tool for counties and Tribal Nations to use in administering SNAP in Minnesota).  With that, this Court now issues its Order to further explain its grant of Minnesota's motion for a preliminary injunction.

## ANALYSIS

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Such relief is designed, primarily, to preserve "the status quo until the district court has an opportunity to grant full effective relief."  *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022).  Section 705 of the APA similarly provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705. Accordingly, while a Court may issue a preliminary injunction under its traditional equitable powers, Section 705 provides an express statutory grant of authority to courts reviewing agency action to provide essentially the same relief.  *See Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *9 (D.C. Cir. Nov. 22, 2025) (describing a Section 705 stay as preserving "the parties' relative positions pending litigation based on a preliminary assessment of the merits").

Because of the overlap between the relief granted by a preliminary injunction and a Section 705 stay, the parties agree that a Section 705 stay is analyzed under the standard that federal courts ordinarily use to analyze preliminary injunction requests.  *Immigrant*

*Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025) (explaining that "the factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction"); *see also B & D Land & Livestock Co. v. Conner*, 534 F. Supp. 2d 891, 905 (N.D. Iowa 2008).

Accordingly, whether framed as a preliminary injunction or a Section 705 stay, Minnesota has the burden to show: (1) a likelihood of success on the merits; (2) that Minnesota is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in Minnesota's favor; and (4) that an injunction is in the public interest. *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (citing *Winter*, 555 U.S. at 20). Each factor supports a preliminary injunction.

## I.    Likelihood of Success on the Merits

Though no one factor for injunctive relief is dispositive, "probability of success" is the most significant factor. *Minn. Chapter of Associated Builders & Contractors, Inc. v. Blissenbach*, 155 F.4th 1015, 1021 (8th Cir. 2025) (citation omitted). Minnesota only needs to establish that it is likely to succeed on the merits of one of its claims to be granted an injunction. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016).

At the outset, the Court observes that the parties use different formulations of this factor: Minnesota states that it must only show a "fair chance of prevailing," ECF No. 6 at 14, while the USDA asserts that Minnesota must show that it is "likely to prevail," ECF No. 22 at 20. In the Eighth Circuit, courts ordinarily are to apply the "fair chance" standard, under which a party need not "prove a greater than fifty per cent likelihood" of succeeding.

20

*Jet Midwest Int'l Co. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044–45 (8th Cir. 2020) (citation omitted). But the Eighth Circuit uses a "more rigorous" standard, one of "likely to prevail," when a party requests an injunction of a "government action based on presumptively reasoned democratic processes." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008).

The Court need not resolve which standard applies here because Minnesota satisfies either standard. Accordingly, the Court applies the standard that is more favorable to the USDA: the "likely to prevail" standard.

### A.    APA Violations

Minnesota first asserts that it is likely to prevail on its APA claims because the Recertification Letter is procedurally and substantively invalid. ECF No. 6 at 14–27. The Court agrees.

The APA "empowers federal courts to 'hold unlawful and set aside agency action, findings, and conclusions' if they fail to conform with any of six specified standards." *Iowa League of Cities v. EPA*, 711 F.3d 844, 855 (8th Cir. 2013) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 375 (1989)).[6] Those six standards provide that agency action may not be:

---

[6]    The APA only makes "final" agency action reviewable by a court. *Union Pac. R.R. Co. v. U.S. R.R. Ret. Bd.*, No. 24-2547, 2025 WL 3639277, at *5 (8th Cir. Dec. 16, 2025) (citation omitted) (explaining that the APA provides for review of a "final agency action for which there is no other adequate remedy in a court"). Agency action is final if it satisfies two conditions: (1) the action must mark the consummation of the agency's decision-making process and not be merely tentative or interlocutory in nature, and (2) "the action must be one by which rights or obligations have been determined, or from which legal

21

(A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)     contrary to constitutional right, power, privilege, or immunity;

(C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)     without observance of procedure required by law;

(E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).  A Section 706(2)(D) challenge is known as a "procedural challenge" and generally requires that certain agency rules comply with the notice and comment procedures of 5 U.S.C. § 553.  *See Iowa League of Cities*, 711 F.3d at 872.  The rest of the Section 706 challenges are referred to as "substantive challenges" because they attack the propriety of the action itself, not only whether it went "through the proper procedural channels." *Id.* at 876.

The Court begins with Minnesota's substantive challenges, which allege that the Recertification Letter is contrary to law or exceeds the scope of the USDA's authority. Minnesota also alleges that the USDA's actions are arbitrary and capricious because the

---

consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The USDA did not address whether the Recertification Letter is "final agency action" in its briefing but conceded during oral argument that it is.  The Court agrees.  The challenged action not only is final but also determines Minnesota's obligations and the consequences flowing from a failure to comply therewith. *See California v. U.S. Dep't of Agric.*, No. 25-cv-06310-MMC, 2025 WL 2939227, at *5 (N.D. Cal. Oct. 15, 2025).

USDA provided no well-reasoned explanation for issuing the Recertification Letter.  *See* ECF No. 6 at 17–27.  The Court agrees on both fronts.

### (i)    Contrary to Law or in Excess of Statutory Authority

Minnesota argues that the Recertification Letter is contrary to law or in excess of the USDA's authority because: (1) the USDA may not force a state to participate in a Section 2026 project; (2) the USDA is not allowed to impose new requirements on states through a Section 2026 project; (3) the Recertification Letter does not detail a valid pilot project; (4) the Recertification Letter requires Minnesota to violate federal laws and regulations; and (5) the USDA may not withhold funds based on Minnesota's failure to participate in a pilot project.  ECF No. 6 at 17–22.  The USDA responds to some, but not all, of Minnesota's arguments.  *See* ECF No. 22 at 15–17.  The Court finds that Minnesota is likely to succeed on its arguments that the Recertification Letter is contrary to the law because the Recertification Letter (and the companion Enforcement Letter) does not establish a valid pilot project, and the USDA acted outside of its authority when it imposed new requirements on Minnesota's recertification of SNAP.[7]

### (a)    The Recertification Letter's Requirements are Contrary to Law

The Court first finds, for at least four independent reasons, that Minnesota is likely to prevail on its claim that the requirements set forth in the Recertification Letter violate the statutory restrictions on Section 2026 projects.

---

[7]    Because the Court finds that Minnesota is likely to succeed on these two grounds, it need not—and does not—weigh in on the remainder of Minnesota's arguments supporting its claim that the Recertification Letter is contrary to law.

*First*, a Section 2026 project must "include[] an evaluation to determine the effects of the project."  7 U.S.C. § 2026(b)(1)(B)(i)(II); *see also* ECF No. 22 at 13 (USDA's briefing acknowledging the same); State Options Report at 26 (the USDA's "statutory authority to approve demonstration projects requires that projects include an evaluation component").  Yet the Recertification Letter includes no such proposal for evaluation, *see generally* ECF No. 1-1, and the USDA makes no claim that it conducted such an evaluation.  That deficiency alone is enough to set aside the Recertification Letter as contrary to law.  *C.f. Stewart v. Azar*, 313 F. Supp. 3d 237, 243 (D.D.C. 2018) (single "omission renders [agency] determination arbitrary and capricious").

*Second*, a Section 2026 project may not be inconsistent with Section 2020(e)(2)(B), *see* 7 U.S.C. § 2026(b)(1)(B)(iv)(III)(ff), which requires a state to "provide timely, accurate, and fair service to applicants" and to "develop an application containing the information necessary to comply" with federal law, *id.* § 2020(e)(2)(B)(i)–(ii).  But the Recertification Letter's demands trample over the statutory and regulatory guardrails that ensure fair, accurate, and timely service to SNAP recipients.  As explained earlier, federal law and the USDA's own regulations require states to provide an eligible applicant with a guaranteed "certification period," 7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.10(f); require states to notify the household at the outset of "the beginning and ending dates of the certification period," 7 C.F.R. § 273.10(g)(1)(i)(A); and prohibit states from ending "a household's certification period earlier than its assigned termination date," *id.* § 273.10(f)(4).  The Recertification Letter violates each of these mandates because the Recertification Letter requires Minnesota to end *every* SNAP recipient's certification

period before its "assigned termination date."[8]  Terminating a SNAP recipient's guaranteed

certification period, for reasons wholly unrelated to the recipient's eligibility or conduct, is

fundamentally unfair because it defeats the recipient's reasonable reliance on the guarantee

of uninterrupted benefits during that period.  *See Sinking-Fund Cases*, 99 U.S. 700, 719

(1878) ("The United States are as much bound by their [agreements] as are individuals.  If

they repudiate their obligations, it is as much repudiation, with all the wrong and reproach

that term implies, as it would be if the repudiator had been a State or a municipality or a

citizen.").

What's more, federal law and the USDA's regulations require a state to provide

notice to a household of the ending of the household's certification period "prior to the start

of the last month of its certification period advising the household that it must submit a

new application in order to renew its eligibility for a new certification period."  7 U.S.C.

§ 2020(e)(4).  This statute "literally requires strict compliance with its provisions."  *Garnett

v. Zeilinger*, 301 F. Supp. 3d 199, 208 (D.D.C. 2018) (citation omitted).  And for good

reason: providing timely and adequate advance notice to SNAP recipients is critical to

ensuring that recipients are aware of an impending termination of critical benefits if they

do not act.  *Cf. Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970) (explaining for the

---

[8]     Of course, the USDA's regulations allow a state to end a household's certification period earlier than its assigned termination date in limited circumstances: when the state "receives information that the household has become ineligible," or when a household fails to comply with various reporting requirements.  7 C.F.R. § 273.10(f)(4).  But the USDA has not demonstrated that any household in Minnesota has become ineligible for SNAP benefits, nor has it demonstrated that any household in Minnesota has failed to comply with SNAP reporting requirements.

administration of welfare benefits that principles of due process "require that a recipient have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend"). But the Recertification Letter's 30-day deadline to interview and recertify *all* SNAP households in the Recertification Counties renders it impossible for Minnesota to provide the required notice at least "prior to the start of the last month" of a recipient's certification period. 7 U.S.C. § 2020(e)(4). Such mandates are aimed squarely at providing fair and timely service to SNAP participants, and because the Recertification Letter directly contradicts those provisions, it is "inconsistent" with Section 2020(e)(2)(B).

*Third*, a Section 2026 project may not be inconsistent with other provisions of Title 7 of the U.S. Code. *See* 7 U.S.C. § 2026(b)(1)(B)(iv)(III)(hh). One of those provisions, Section 2025(a), provides that the USDA pay half of a state's SNAP administrative costs. *See* 7 U.S.C. § 2025(a). But the Recertification Letter threatened to *withhold* the USDA's administrative funds, ECF No. 1-1 at 3, making the remedial nature of the Recertification Letter inconsistent with the USDA's statutory requirement to pay half of the administrative costs. The Enforcement Letter, which purportedly authorized yet another Section 2026 project allowing the USDA to immediately suspend such administrative costs, is an impermissible project for the same reason. ECF No. 40-1.

*Fourth*, and finally, the USDA's own regulations require that Section 2026 projects likely to have "a significant impact on the public" must first be published in the Federal Register at least 30 days prior to the initiation of a pilot project. 7 C.F.R. § 282.1(b). It is undisputed that the USDA did not provide such notice in the Federal Register. And it is

26

implausible that a Section 2026 project that requires Minnesota to recertify over 100,000 households within a month, requires Minnesota to violate USDA regulations to do so, and threatens to impede the SNAP benefits of all Minnesotans does not constitute a "significant impact on the public."  Indeed, the USDA does not even try to argue otherwise.[9]  Again, that regulation is not mere box-checking.  It ensures that when the USDA undertakes a Section 2026 project of significant public importance, the agency hears from those affected by the proposed Section 2026 project and considers whether to "adjust or abandon [its] proposals in light of public comments or internal agency reconsideration."  *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994); *see* 7 C.F.R. § 282.1(b) (explaining that if the USDA receives "significant comments" in response to a proposed Section 2026 project, the USDA "will take such action as may be appropriate prior to implementing the project").  What the USDA may not do, however, is disregard its own regulations.  *Nat'l Env't Dev.*

---

[9]    The USDA's decision to ignore its obligation to provide notice is not insignificant.  As the Eighth Circuit has identified, notice and comment procedures secure the values of government transparency and public participation.  *See Iowa League of Cities*, 711 F.3d at 873.  Indeed, the Amici, representing a diverse coalition of states, have noted that no state could likely perform the impossible task the USDA demanded of Minnesota.  ECF No. 41 at 13 ("Amici States are a diverse group, but no matter how an Amici State is situated, it is highly unlikely that it could perform the impossible task assigned by a similar Recertification Demand.").  Such concerns would surface through a notice-and-comment period.  For example, some of the Amici states provide SNAP benefits to millions of recipients a month; others to less than 150,000 recipients.  *Id.*  Some delegate recertification to counties; others handle recertification at the state level.  *Id.*  Some are geographically small and densely populated; others are expansive and sparsely populated.  *Id.*  Critically, "for different reasons, all Amici states would likely be unable to comply with the Recertification Demand.  Large states or agencies would be overwhelmed trying to process millions of recertification applications and interviews all at once.  Small states or agencies might have a smaller caseload, but they also have less staff and other resources to dedicate to those recertifications."  *Id.*

*Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("It is axiomatic, however, that an agency is bound by its own regulations." (citation modified)); *see also Ratsantiboon v. Noem*, No. 25-cv-1315 (JMB/JFD), 2025 WL 1118645, at *2 (D. Minn. Apr. 15, 2025) ("An agency's unexplained refusal to follow its own regulations effecting individuals' procedural benefits poses a high probability that the agency is not acting in accordance with the APA.").

Accordingly, despite being framed as initiating Section 2026 projects, the Recertification Letter's demands and the Enforcement Letter's actions are contrary to Section 2026's explicit requirements for such projects and therefore are contrary to law. *See California v. U.S. Dep't of Agric.*, 800 F. Supp. 3d 1015, 1026 (N.D. Cal. 2025) (rejecting USDA's authority to demand data from participating states where the demand itself violated Section 2020).

### (b)    The Recertification Letter Is Outside the Scope of the USDA's Authority

Similarly, the Court agrees with Minnesota that it is likely to prevail on its claim that the USDA exceeded its authority in issuing the Recertification Letter because the demands in the Recertification Letter require Minnesota to violate federal laws and regulations that govern the recertification process.  In addition to the regulatory violations discussed above, the Recertification Letter requires Minnesota to conduct "in-person" interviews of each household.  ECF No. 1-1 at 2.  But the USDA identifies no legal authority that allows it to demand that Minnesota conduct in-person interviews of each household—likely because the USDA's own regulations allow a state to conduct interviews

telephonically.   7 C.F.R. § 273.2(e)(2); *see also id.* § 272.2(d)(xvi)(B).   To that end, the USDA requires states who choose to conduct telephonic interviews to inform the USDA in the state's plan of operation that the state will do so.   *Id.* § 273.2(e)(2).   And the USDA recognizes that Minnesota has chosen to do so.   *See* State Options Report at 90–91.

Now, however, the Recertification Letter's requirement of in-person interviews forbids Minnesota from availing itself of an interview process that is explicitly provided for in the USDA's own regulations.   The USDA argues that it may do so because Section 2026 provides it the authority to "waive any requirement of this chapter to the extent necessary for the project to be conducted."   *See* 7 U.S.C. § 2026(b)(1)(A).   But the USDA reads that provision in isolation and out of context, violating the well-established rule that a court interpreting a statute must consider "the specific context in which . . . language is used" and "the broader context of the statute as a whole."   *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (citation omitted).   That much is clear by looking to Section 2026(b)(1)(D)(i), which describes the process for the USDA to respond to a "*request* for a waiver under [7 U.S.C. § 2026(b)(1)(A)]" (emphasis added).   Accordingly, the USDA's authority to "waive any requirement" explicitly refers to waivers *requested by* a state who is participating in a Section 2026 project.   *See* 7 U.S.C. § 2026(b)(1)(D)(i).   It does not, as the USDA purports to read it, allow the USDA to "waive" all statutory provisions relating to SNAP when *creating* a Section 2026 project.   The USDA has, historically, understood as much.   *See, e.g.*, State Options Report at 26 ("State agencies can *request* approval from FNS to conduct demonstration projects" under Section 2026) (emphasis added).

Even if the meaning of "waive" in Section 2026(b)(1)(A) was subject to reasonable doubt, the "major questions" doctrine counsels against adopting the USDA's interpretation. That doctrine of statutory interpretation applies when a "statute at issue is one that confers authority upon an administrative agency," and provides that a court's interpretation must be "shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citation omitted) (internal quotation marks omitted). The doctrine developed through a series of cases in which "agencies assert[ed] highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 724. In general, it suggests that there are "extraordinary cases" in which "the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *Id.* (citation modified).

The USDA's reading of Section 2026(b)(1)(A) is, essentially, that it may amend willy-nilly any statute relating to SNAP—dashed off in a letter—in the name of instituting a "pilot project." That cannot be the case. The Supreme Court has explained that "[e]xtraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices," and that Congress does not "typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *Id.* at 723 (citations omitted) (internal quotation marks omitted). But that is what the USDA requests here. It seeks "unfettered" authority in its administration of SNAP. The scope of the USDA's position is breathtaking. According to the USDA, it

may add new requirements to the recertification process, rewrite its own regulations, and even withdraw all guaranteed SNAP funding from a state, so long as it labels such additions or actions as part of a "pilot project." These projects are, by their nature, meant to be conducted "on a trial basis" to tentatively "test program changes." 7 U.S.C. § 2026(b)(1)(A). The Enforcement Letter further highlights the unfettered sweep of the USDA's position. The Enforcement Letter acknowledges that Congress established an enforcement proceeding that could result in the USDA's withholding of administrative funds. 7 U.S.C. § 2020(g). The Enforcement Letter even acknowledged that Congress provided parameters for such enforcement and that the USDA must: (1) inform a state that it believes the state to be out of compliance with USDA rules, and then (2) give the state a definite period of time to come back into compliance. *Id.* But the Enforcement Letter did neither. Instead, the USDA indicates that it can disregard the congressionally mandated two-step process of Section 2020(g), so long as it cloaks its action as a Section 2026 "pilot project." Additionally, neither party could identify a circumstance where the USDA could unilaterally compel a state to participate in a Section 2026 project. Nor could the Amici. ECF No. 41 at 10 (noting that the Recertification Letter appears to "represent the first time that USDA has attempted to compel a State to participate in a pilot project over its objection and subject to the threat of losing statutorily mandated federal administrative funding"); *id.* at 11 (recognizing "to be sure, the federal government is entitled to disagree with policy choices made by certain States; however, nothing in the text of the statutes governing SNAP allows USDA to force a state to participate in a pilot project"). Under the major questions doctrine, much more in the way of Congressional approval would be required

before the Court could adopt such an expansive reading.[10]  *West Virginia*, 597 U.S. at 723

(quoting *Util. Air.*, 573 U.S. at 324) ("To convince us otherwise, something more than a

merely plausible textual basis for the agency action is necessary.  The agency instead must

point to 'clear congressional authorization' for the power it claims."); *see also Missouri v.*

*Trump*, 128 F.4th 979, 995–96 (8th Cir. 2025) (rejecting an agency's reading of a statute

that would provide it "nearly limitless power to transform federal loans" because

"Congress would have provided clear signs if it authorized such significant power to the

Secretary").  The USDA cannot do so.

### (ii)    Arbitrary and Capricious

Minnesota alternatively asserts that the Recertification Letter violates the APA's

prohibition on arbitrary and capricious agency action under 5 U.S.C. § 706(2)(A) because

it: (1) is unexplained; (2) is based on inappropriate factors; (3) is not rationally connected

to the facts; (4) requires the impossible; (5) ignores Minnesota's reliance interests; and

(6) targets Minnesota for partisan reasons.  ECF No. 6 at 22–27.

---

[10]    The USDA's reading of Section 2026(b)(1)(A) also runs counter to the canon against surplusage, which provides that a statute "ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted).  This canon of interpretation is "strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 386 (2013).  Here, if the Secretary could simply circumvent all of SNAP's substantive statutory provisions by creating a pilot project, then what purpose would those substantive provisions serve?  Indeed, the USDA's interpretation of Section 2026(b)(1)(A) would swallow the entirety of Title 7, Chapter 51 of the United States Code, boiling that chapter down to a single command: the USDA can implement SNAP as it pleases.  Because the USDA's interpretation would render superfluous basically all of SNAP's statutory scheme, that interpretation must be rejected.

An agency action is arbitrary and capricious if:

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Missouri ex rel. Bailey v. U.S. Dep't of Interior, Bureau of Reclamation*, 73 F.4th 570, 576–77 (8th Cir. 2023) (citation omitted).  This ensures that agencies engage in "reasoned decisionmaking," and that the process by which an agency reaches a particular result is "logical and rational."  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (citation omitted).  And an agency may not take "action that is internally inconsistent or not reasonable and reasonably explained."  *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 520 (8th Cir. 2024).  That does not mean, however, that a court may substitute its own policy judgment for that of the agency.  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Instead, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

For at least three independent reasons, the Court finds that the Recertification Letter lacks the "reasoned decisionmaking" demanded of federal agency action.  *Allentown Mack Sales & Serv.*, 522 U.S. at 374.

*First*, the USDA did not offer a "satisfactory explanation" for its action.  *Niobrara River Ranch, L.L.C. v. Huber*, 373 F.3d 881, 884 (8th Cir. 2004).   The only justification for the demands made in the Recertification Letter is that there is "highly publicized and

ongoing fraud affecting federally funded benefits" in Minnesota but referenced only the "Feeding Our Future fraud scheme" that "exploited" the USDA's child nutrition programs. ECF No. 1-1. But as Minnesota points out, and the USDA does not contest, the Feeding Our Future fraud scheme "ended years ago, did not involve SNAP, and exploited the [COVID-19] pandemic." ECF No. 6 at 23 (citing ECF No. 10 ¶ 26). It cannot therefore constitute a reasonable basis for the Recertification Letter's demands as it provides no rational connection between the Feeding Our Future fraud scheme and the potential of fraud within SNAP, an entirely different entitlement program.

In its briefing, the USDA has largely abandoned its principal reliance on the Feeding Our Future fraud scheme, and instead now asserts that its demands "took into consideration MDCYF performance, public reporting, and concerns over the State's administration of SNAP over the course of multiple years." ECF No. 22 at 26. But the USDA provided none of those explanations in the Recertification Letter, so it may not rely on such "post hoc rationalization" now.[11] *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*,

---

[11]    Nor does the USDA offer such explanation in its Enforcement Letter written a month after the initial Recertification Letter. Nonetheless, the USDA offers no evidence to corroborate its claim of fraud in Minnesota's administration of SNAP. The USDA states, in a conclusory manner, that based on its review of data gathered from the SNAP Information Database, it has determined that "States with a county-administered program, like Minnesota, are more likely to have higher rates of fraud, waste, and abuse than States that do not delegate administration of SNAP to the county level." ECF No. 23 ¶ 16. Even if that broad determination is true, the USDA conspicuously fails to make any specific allegation, much less provide evidence, of such "fraud, waste, and abuse" within *any* of the Recertification Counties. The USDA also purports to have developed concerns regarding Minnesota's payment error rate of 8.98% in fiscal year 2024, which exceeds the 6% statutory threshold to trigger a requirement to develop a "corrective action plan." *Id.* ¶ 22. But Minnesota developed a corrective action plan, which the USDA approved, *id.*, and the

95 F.4th 573, 582 (8th Cir. 2024); *see Firearms Regul. Accountability Coal.*, 112 F.4th at 525 n.15 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23 (2020)) ("Agency actions require 'contemporaneous explanations,' and not just post hoc justifications 'raised in court by those appearing on behalf of the agency or by agency officials themselves.'"); *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 129 (D. Mass. 2025) ("Even an indisputably worthy goal, however, does not allow Defendants to change course on decades of federal funding . . . without providing a reasoned explanation.").

*Second*, even if the USDA was able to rely on its now-proffered reasons, it failed entirely to provide a reasoned explanation for how *this* pilot project will help it assess fraud in Minnesota. Take the Recertification Letter's demand that recertification must be completed in 30 days. Why 30 days? Considering the crushing burden that timeline places on the Recertification Counties (as described below), the USDA fails to articulate any satisfactory explanation for why such a compressed timeline is warranted (particularly when recertification ordinarily occurs on a rolling basis throughout the year). *See Motor*

---

USDA does not suggest that Minnesota has failed to comply with that corrective action plan. In fact, in July 2025, the USDA reviewed Minnesota's administration of SNAP and found that Minnesota was "fulfilling its responsibilities for the administration of the program" and was "following applicable regulations and policies." ECF No. 10 ¶ 10. So, what has changed? The USDA does not bother to say. Instead, the USDA evidently believes that it may make sweeping, nonspecific, and unsupported accusations of "fraud, waste, and abuse" and threaten to withhold administrative funding from Minnesota when, if anything, the evidence before this Court—*including from the USDA itself*—undermines those allegations. It should go without saying that this hardly justifies the USDA's post hoc assertions about its purported "concerns over [Minnesota's] administration of SNAP." ECF No. 22 at 26.

*Vehicle Mfrs.*, 463 U.S. at 43 (citation omitted) ("[An] agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (internal quotation marks omitted)).  Nor does it explain why the compressed timeline would increase the efficiency of SNAP and improve the delivery of SNAP benefits to eligible households.

Take also the Recertification Letter's demand that all households in the Recertification Counties be interviewed *in-person*, despite the fact that the USDA's own regulations permit Minnesota to interview households telephonically, *see* 7 C.F.R. § 273.2(e)(2), and that Minnesota counties have long conducted household interviews telephonically, ECF No. 8 ¶ 5; ECF No. 10 ¶¶ 32, 34; ECF No. 11 ¶ 9; ECF No. 16 ¶ 9.  The USDA offers zero explanation for that 180-degree pivot.  Indeed, the Recertification Letter does not even recognize that the agency is making such a pivot, which reveals its arbitrary nature.  *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)) (explaining that when an agency changes its existing position, the agency "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy'").

Nor does it explain why the USDA has selected Hennepin, Ramsey, Washington, and Wright counties to bear the burden of its pilot project.  Does the USDA believe fraud is higher in those counties?  The Recertification Letter provides no answer.  Neither does the USDA's brief.  At the hearing, counsel for the USDA stated that he "knows" those counties to be some of the most populous in Minnesota and that he "knows" those counties to be home to many of the defendants from the Feeding Our Future fraud scheme.  But not

36

only is this impermissible "ad hoc" reasoning, it is plainly insufficient because the USDA again fails to show how even those considerations are in any way tied to the SNAP fraud the USDA purportedly seeks to uncover.  If it is true that the USDA is concerned about SNAP fraud in Minnesota, it must proffer some rationale as to how its specific, heavy-handed demands would help uncover that fraud.  *See Motor Vehicle Mfrs.*, 463 U.S. at 43.

*Third*, the USDA failed to consider, and continues to disregard, the weight of its demands.  Minnesota asserts, and the Court has already concluded, that complying with the Recertification Letter would require Minnesota to violate a number of statutory guidelines and regulations placed on a Section 2026 project.  The USDA, astoundingly, reiterates that the Recertification Letter does not demand any alterations to what Minnesota is already legally required to do.  *See e.g.*, ECF No. 22 at 9 ("The Secretary's pilot involves no change other than to perform, once, an accelerated re-certification of eligibility."); *id.* at 24 ("Minnesota was only asked to promptly complete responsibilities it already had."); *id.* at 29 ("That a subset of Minnesota's counties were asked to accelerate this work is not, as Minnesota exclaimed, imposition of 'entirely new conditions.'").  That the USDA does not even acknowledge the weight of its demands suggests, by itself, that the Recertification Letter is arbitrary and capricious.  *Motor Vehicle Mfrs.*, 463 U.S. at 43 (explaining that agency action is arbitrary when the agency "entirely failed to consider an important aspect of the problem"); *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (citation modified) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests."); *Am. Fed'n of Tchrs. v. Dep't of Educ.*,

779 F. Supp. 3d 584, 616–17 (D. Md. 2025) ("If anything, the government's repeated assertions that the Letter says nothing new indicate that it is still either unaware or unwilling to admit that it has changed positions.").

The USDA also appears not to have considered the crushing operational burden that the Recertification Letter's demands would place on Minnesota. Minnesota and the Recertification Counties put forth evidence that requiring them to comply with the Recertification Letter's demands would be close to impossible, as it would require the four counties to divert nearly all available resources and expend additional resources to even come close to meeting the Recertification Letter's deadline. *See, e.g.*, ECF No. 7 ¶ 7; ECF No. 8 ¶¶ 7–8; ECF No. 11 ¶¶ 13–14, 17–21; ECF No. 16 ¶¶ 13, 19. For example, to meet the USDA's demands, Ramsey County explains that it would need to triple its workforce dedicated to SNAP administration, reassign all of those employees to exclusively perform SNAP recertifications, and complete in-person interviews of 34,000 households—all in the span of 30 days. ECF No. 7 ¶ 7. Wright County similarly explains that to meet the USDA's demands, it would need to reassign all employees trained in SNAP administration to conduct SNAP recertification interviews, and those employees would need to work *twenty hours per day* (including weekends and holidays) to complete all interviews by the Recertification Letter's deadline. ECF No. 16 ¶ 19. That leaves the distinct impression that the USDA has set Minnesota and the Recertification Counties up to fail, a consequence that is about as arbitrary as they come. *See Messina v. U.S. Citizenship & Immig. Servs.*, No. Civ. A. 05CV73409DT, 2006 WL 374564, at *6 (E.D. Mich. Feb. 16, 2006) ("It is arbitrary and capricious to require compliance with a regulation when compliance is

impossible.").  And although the USDA readily responds that Minnesota could simply do whatever it could to comply, ECF No. 22 at 26, the USDA ignores that when a federal agency drastically changes its own policies and practices, it is the agency's burden to "consider the alternatives" that are "within the ambit of the existing" policy.  *Regents of the Univ. of Cal.*, 591 U.S. at 30 (citation modified).  This inquiry must take into account "whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Id.* at 33.

The USDA did none of this.  Instead, it pulled the rug out from under Minnesota without offering any reasoned explanation or one that considered the weight of its new demands.  Minnesota is accordingly likely to prevail on its claim that the Recertification Letter (and the companion Enforcement Letter) is arbitrary and capricious.

### B.    Remaining Claims

Because the Court concludes that Minnesota is likely to prevail on at least one, and likely several, of its substantive APA claims, the Court need not consider Minnesota's procedural APA claims, its constitutional claim, or its *ultra vires* claim.  *See Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1040.  Accordingly, the Court turns to the remaining factors for injunctive relief.

## II.    Irreparable Harm

Minnesota easily demonstrates a likelihood of irreparable harm absent injunctive relief.  To show irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022) (citation omitted).  Irreparable harm

occurs "when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

Minnesota argues that it will suffer two categories of harm if the Recertification Letter remains in full force and effect: (1) "compliance" harms associated with attempting to comply with the Recertification Letter's demands; and (2) "noncompliance" harms if it fails to do so. ECF No. 6 at 28–31. As for compliance harms, Minnesota asserts that meeting the January 15, 2026 deadline would cause it to suffer: (1) economic damage because it and the targeted counties would need to spend hundreds of thousands of dollars in increased employee pay to meet the demand, ECF No. 11 ¶ 21; ECF No. 16 ¶ 19; (2) administrative harm because it would need to divert workers from their usual jobs and responsibilities to meet the new recertification deadline, ECF No. 7 ¶¶ 7–9; ECF No. 8 ¶ 8; ECF No. 10 ¶ 37; ECF No. 11 ¶ 22; and (3) a loss of the trust it has built with its SNAP beneficiaries, ECF No. 10 ¶¶ 51–52. As for noncompliance harms, Minnesota asserts that USDA's threat (and, pursuant to the Enforcement Letter, action) to withhold all or a portion of the $80 million dollars the USDA provides annually in administrative funding, or to remove Minnesota from the SNAP program entirely, "would wreak massive harms" and could not be fully replaced. ECF No. 6 at 30–31; ECF No. 10 ¶¶ 47–50.[12]

---

[12] The Recertification Letter threatened to end "Minnesota's continued participation in SNAP." ECF No. 1-1 at 3. The USDA at the preliminary injunction hearing represented that it would never withdraw beneficiary funds from Minnesota. Whether or not that is true, at this preliminary injunction stage, the Court takes the words of the Recertification

The Court agrees that either attempting to comply, or failing to comply, would inflict harm that is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Dakotans for Health*, 52 F.4th at 392. Minnesota put forth evidence that it would need to spend significant money and divert other tangible and intangible resources to try to recertify SNAP recipients in the Recertification Counties by January 15, 2026. Requiring a state to comply "with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)); *see, e.g.*, *Kansas v. Becerra*, 764 F. Supp. 3d 801, 811 (N.D. Iowa 2025) ("[C]ompliance costs incurred to comply with a potentially invalid regulation . . . may constitute irreparable harm."); *Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025) (holding that the district court did not abuse its discretion when it determined state-plaintiffs would face irreparable harm stemming from having to overhaul verification systems as required by new federal policy); *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (finding irreparable harm where state-plaintiffs alleged that they would be required by federal policy to undertake costly revisions to systems designed to verify eligibility of noncitizens for benefits); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 42 (D.D.C. 2020) ("These harms from the forced diversion of resources are similar to those recognized as irreparable

Letter at face value: noncompliance may result in the complete withholding of SNAP beneficiary funds.

harm in other suits."). Indeed, the USDA describes no mechanism by which Minnesota could recover its sunk compliance costs, and any attempt to recover these costs from the federal government would likely run headlong into sovereign immunity. This "heighten[s]" the need for injunctive relief. *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000).

The USDA does not argue that compliance costs cannot constitute irreparable harm in the abstract but instead asserts that Minnesota cannot cite compliance costs as a basis for irreparable harm because Minnesota has not actually attempted to comply with the January 15, 2026 deadline. ECF No. 21 at 28 (noting that by not acting to comply with the Recertification Letter, "Minnesota elected to ensure its noncompliance and any alleged harm about which it now complains"). There is some merit to this argument: when Minnesota moved for a preliminary injunction on December 29, 2025, ECF No. 5, the substantial compliance costs Minnesota complained about were real and imminent. But now, with the arrival of the January 15, 2026 deadline, it does not appear that any of the compliance costs were borne out. Nor does it appear that the Recertification Letter imparts any continuing obligations on Minnesota, such that these compliance costs would remain at issue moving forward. ECF No. 22 at 24 (the USDA asserting that it "simply called for a one-time acceleration . . . of the work that Minnesota is in all events obligated to perform"). In some respects, then, the issue of compliance harm is moot.

But what remains are the costs of *not* complying. Indeed, the Recertification Letter left Minnesota with two paths: comply with its demand or face the consequences. Attempting to comply would have brought the associated harms discussed above (along

with the very likely possibility that its efforts would have ultimately proven futile).  But now that Minnesota has *not* complied, the Recertification Letter's threat of consequences has arrived.  ECF No. 1-1 at 3.  And what is more, the Enforcement Letter followed through on the harms threatened in the Recertification Letter.  ECF No. 40-1.

In its briefing, the USDA, tellingly, outright ignores Minnesota's assertion that the loss of administrative and beneficiary funding constitutes irreparable harm and, provides no argument as to why the loss of administrative funding would not, legally, constitute such harm.  Nor could it.  "Irreparable harm exists when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Missouri*, 128 F.4th at 996 (citation omitted).  A party has no adequate remedy at law when the damage is "financial loss" from the federal government because of the federal government's sovereign immunity.  *Id.*  Accordingly, there is little doubt that the loss of administrative or SNAP beneficiary funding is, therefore, a sufficient irreparable harm. *See, e.g.*, *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (finding irreparable harm because "the denial of reimbursements and administrative costs are economic injuries for which monetary damages are not available"); *California v. U.S. Dep't of Agric.*, No. 25-cv-06310-MMC, 2025 WL 2939227, at *12 (N.D. Cal. Oct. 15, 2025) (loss of SNAP administrative funding constitutes irreparable harm);[13] *New York v. Trump*, 769 F.

---

[13]    The USDA summarily asserts in a footnote that the Court should not rely on *California* because it dealt with the "recent lapse in appropriations," and that the threat to withhold administrative funding here "is not the same thing as Congress failing to appropriate funds for SNAP."  ECF No. 22 at 28.  The USDA misses the mark.  *California* was not about the appropriations issue, but about a similar letter from the USDA

Supp. 3d 119, 142 (D.R.I. 2025) ("It is so obvious that it almost need not be stated that when money is obligated and therefore expected . . . and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential . . . services stop, and budgets are upended."); *Maine v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 200, 233 (D. Me. 2025) ("Federal Defendants' termination of the State's Title IX funding will harm the beneficiaries and employees of those programs that rely on these funds.").

At the hearing, the USDA asserted that Minnesota could just move money around to cover the costs the USDA is now promising to withhold. He also represented that the loss of $20 million in first-quarter administrative funding was "de minimis." Neither argument holds water. The USDA fails to grapple with the fact that even if Minnesota could move money from another department to cover the loss of administrative funds within Minnesota's DCYF, that is *still* money that Minnesota will lose and cannot recover from the federal government. The other argument is beside the point. Minnesota represented at the hearing that losing the first quarter of administrative funding would significantly impede its ability to administer SNAP in Minnesota. That is not, as the USDA urged, "de minimis" loss. Nor would it help Minnesota uncover fraud to *remove* the funding Minnesota uses to do so.

To be clear, the irreparable harm here does not boil down to mere dollars and cents. Hundreds of thousands of Minnesotans rely on SNAP to sustain their most basic human

---

threatening to withhold administrative funding. *California*, 2025 WL 2939227, at *12. The court in that case concluded that the loss of such funding constitutes irreparable harm, *id.*, a conclusion which this Court finds persuasive.

need for adequate food and nutrition—just as Congress intended.  ECF No. 10 ¶ 6; *see* 7 U.S.C. § 2011 ("It is declared to be the policy of Congress, in order to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households.").  Going without food has long been recognized as an irreparable harm in the American legal tradition, because the "deprivation of nutrition, and the psychological and physical distress attending that deprivation, are quite likely to impose lingering, if not irreversible effects." *District of Columbia*, 444 F. Supp. 3d at 43 (citation omitted).  The USDA's threat to terminate all administrative and beneficiary SNAP funding to Minnesota risks such irreparable harm.

The Court easily concludes that the threatened or real withholding of such monies demonstrates a likelihood of irreparable harm.

## III.    Balance of the Equities

When a party seeks an injunction against the government, the final two preliminary injunction factors merge, and the Court must ask whether "balance of the equities and the public interest also support a preliminary injunction." *Missouri*, 128 F.4th at 996–97.  In analyzing the question, the Court considers whether the moving party's likely harm without a preliminary injunction exceeds the nonmoving party's likely harm with a preliminary injunction in place. *Cigna Corp.*, 103 F.4th at 1347.  Again, the Court has little difficulty concluding that the equities support a preliminary injunction here.

As discussed, the harm Minnesota and its SNAP recipients would suffer in the absence of a preliminary injunction is significant and, given the USDA's Enforcement Letter, guaranteed to occur.  The USDA asserts, as a counter, that an injunction will harm

it and the public because an injunction would "curtail the Federal Government's ability to timely test and discover the extent to which Minnesota is failing to properly administer and enforce SNAP." ECF No. 22 at 25. But even taking the USDA's assertion at face value that a rushed recertification process will help identify fraud, there are two problems with the USDA's argument.

First, as the USDA repeatedly asserts in its briefing, Minnesota is already required to take the recertification steps the USDA demands. *See, e.g.*, *id.* at 32. As a result, if an injunction issues, Minnesota could not avoid the recertification process. It would simply prevent Minnesota from having to do so *right now* and allow Minnesota to continue to do the required recertifications throughout the year, as it always has. To the extent, then, that the recertification process will uncover fraud in Minnesota, that fraud will be exposed in due course, and the USDA would be entitled to claw back any funds that it finds were inappropriately sent out because of fraud or negligence. *See* 7 C.F.R. § 276.3 (specifying that if the USDA "determines that there has been negligence or fraud on the part of the State agency in the certification of applicant households, the State agency shall, upon demand, pay to [the USDA] a sum equal").

Second, as explained above, Minnesota has demonstrated a "strong likelihood of success in showing" the USDA's demands exceed its authority. *Missouri*, 128 F.4th at 997. In such a case, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Id.* (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 n.5 (8th Cir. 2019) (holding equities favored an injunction where the

moving party's "los[s] at trial" was "highly unlikely"). The only harm that the USDA stands to suffer is the requirement to follow the law—which is to say, no harm at all. *See League of Women Voters of S.C. v. Andino*, 497 F. Supp. 3d 59, 78 (D.S.C. 2020) (finding no harm to the government from having to follow the law because it "should be doing that anyway"); *Walter A. v. Berg*, No. 25-cv-4376 (PJS/DLM), 2025 WL 3296278, at *2 (D. Minn. Nov. 26, 2025) ("[T]he public interest is served by ensuring that the Executive Branch follows the law.").

Having satisfied all factors for a preliminary injunction, the Court grants Minnesota's motion.

## IV.    Remaining Issues

Finally, the USDA made two requests in the event that the Court grant an injunction. First, the USDA asked for an order requiring Minnesota to post "an appropriate bond" pursuant to Federal Rule of Civil Procedure 65(c). ECF No. 22 at 26. Second, it asked the Court to stay its injunction pending the disposition of any appeal or, at a minimum, for a period of forty-eight hours to allow the United States to seek an emergency, expedited stay from the court of appeals. *Id.*

As to bond, Rule 65 states that a court may issue a preliminary injunction or a temporary restraining order only if the moving party "gives security in an amount that the court considers proper." Fed. R. Civ. P. 65(c). The USDA did not specify an appropriate dollar amount in its brief, ECF No. 22 at 26, but at the hearing suggested $20 million as an appropriate amount because that is the amount it seeks to withhold from Minnesota in the first quarter of 2026.

The Court disagrees. District courts have wide discretion in implementing Rule 65(c) and may refuse to enter a bond "where the damages resulting from a wrongful issuance of an injunction have not been shown," *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1043. The USDA's failure to request an appropriate dollar amount in briefing could, in some respects, be considered a waiver of its obligation to show the damages it would suffer from a wrongful injunction. *Waxing the City Franchisor LLC v. Katularu*, No. 24-cv-2479 (JMB/DJF), 2024 WL 3887109, at *10 (D. Minn. Aug. 20, 2024) ("The party seeking bond is required to establish a rational basis for the amount of the proposed bond."). Even considering the $20 million the USDA asked for at the hearing, the USDA provided no rational basis on which to conclude that such a number is appropriate beyond hand-waving to the amount it has threatened to withhold. *Powerlift Door Consultants, Inc. v. Shepard*, No. 21-cv-1316 (WMW/ECW), 2021 WL 2911177, at *8 (D. Minn. July 12, 2021) (declining bond where non-moving party sought a "substantial" bond but did not provide a rational basis for such relief). But that the USDA threatened to withhold that amount does not mean that it would be entitled to that amount if the Recertification Letter were later determined to have been inappropriately enjoined. For reasons already discussed, it is likely unlawful for the USDA to withhold administrative funding because of Minnesota's decision not to engage in the proposed Section 2026 project. *See supra* pp. 26. The USDA would instead have to follow 7 U.S.C. § 2020(g). Should the Recertification Letter turn out to be a valid Section 2026 project with which Minnesota should have complied, even then, the withholding of administrative funds is still not likely to be an appropriate remedy. Further, given the USDA's unlikelihood of success on the

merits, a bond is not appropriate here. *See Bixby v. Lifespace Communities, Inc.*, No. 18-cv-817 (JRT/KMM), 2018 WL 3218697, at *7 (D. Minn. July 2, 2018) (concluding bond not necessary where the moving party "demonstrated a high likelihood of success on the merits").

The Court likewise declines to grant a stay pending appeal. A stay pending appeal "has some functional overlap with an injunction, particularly a preliminary one." *Nken v. Holder*, 556 U.S. 418, 428 (2009). And both involve consideration of the same factors: likelihood of success on the merits, irreparable harm absent a stay, the balance of harms, and the public interest. *Id.* at 434. The USDA develops no argument on any of the factors, and for the same reasons that the Court grants Minnesota's motion for a preliminary injunction, the Court concludes that all of the *Nken* factors weigh against a stay of the injunction pending appeal.

## CONCLUSION

The primary function of a preliminary injunction "is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Missouri*, 128 F.4th at 990 (citation omitted). By all accounts, Minnesota has operated its SNAP recertification process in compliance with federal law and with the express blessing of the USDA. The Recertification Letter and Enforcement Letter seek to upend that status quo, and, without any reasoned explanation, demand that Minnesota implement an entirely new process within 30 days. This sort of haphazard decisionmaking is precisely what the APA is intended to prevent and what a preliminary injunction is to remedy. Accordingly, because Minnesota is likely to succeed on at least one of its APA claims, and because all other

49

factors for injunctive relief fall in Minnesota's favor, the Court grants Minnesota's motion for a preliminary injunction.

### ORDER

For the reasons stated above, Minnesota's motion (ECF No. 5) is hereby **GRANTED**, and the USDA is **PRELIMINARILY ENJOINED** from taking any adverse action against Minnesota based on the Recertification Letter, and **PRELIMINARILY ENJOINED** from withholding any of Minnesota's administrative funding for the first quarter of calendar year 2026 as threatened in the Enforcement Letter.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: January 16, 2026                *s/Laura M. Provinzino*
                                                     Laura M. Provinzino
                                                     United States District Judge

50