IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-3428-RBJ

THE STATE OF COLORADO,

    Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
PETE HEGSETH, in his official capacity as Secretary of Defense,
TROY MEINK, in his official capacity as Secretary of the Air Force,
SEAN DUFFY, in his official capacity as Secretary of Transportation,
BROOKE ROLLINS, in her official capacity as Secretary of Agriculture,
CHRIS WRIGHT, in his official capacity as Secretary of Energy,
DOUG BURGUM, in his official capacity as Secretary of the Interior,
KRISTI NOEM, in her official capacity as Secretary of Homeland Security,
KAREN EVANS, in her official capacity as Acting Director of the Federal Emergency Management Agency,
PAM BONDI, in her official capacity as Attorney General,
BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation,
EXECUTIVE OFFICE OF THE PRESIDENT,
DEPARTMENT OF DEFENSE,
DEPARTMENT OF THE AIR FORCE,
DEPARTMENT OF TRANSPORTATION,
DEPARTMENT OF AGRICULTURE,
DEPARTMENT OF ENERGY,
DEPARTMENT OF THE INTERIOR,
DEPARTMENT OF HOMELAND SECURITY,
FEDERAL EMERGENCY MANAGEMENT AGENCY,
DEPARTMENT OF JUSTICE,
NATIONAL SCIENCE FOUNDATION,

    Defendants.

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

    A little over a week ago, a district court in Minnesota enjoined an identical "pilot project." Ex. 3. The court found that USDA acted contrary to law, had no legal authority to create the "pilot project," failed to follow procedural requirements, and acted arbitrarily and

1

capriciously, concluding "[t]his sort of haphazard decisionmaking is precisely what the APA is intended to prevent." *Minnesota v. USDA*, No. 25-cv-4767, 2026 WL 125180 (D. Minn. Jan. 16, 2026). USDA does not acknowledge, let alone rebut the court's lengthy analysis.

Even worse, USDA does not acknowledge that minutes before that hearing, USDA took enforcement action for noncompliance by immediately withholding Minnesota's administrative costs. Ex. 4. It did so without complying with required administrative procedures, contrary to its own declaration from the same declarant, Ex. 5 ¶ 30–31, based on the agency's position that for pilot projects it can waive any statute or regulation. Yet, it claims Colorado cannot pursue its claims here because it is supposedly speculative whether it will take any noncompliance action.

As the *Minnesota* court found, the Recertification Letter is unlawful many times over. Here, USDA does not defend the "pilot project" based on the reasons it provided at the time. Instead, USDA relies on new post hoc justifications in an agency declaration. But "[a]n agency must defend its actions based on the reasons it gave when it acted," not on "post hoc rationalizations" raised in "litigation affidavits." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 23–24 (2020). USDA likewise improperly attempts to alter the "pilot project," which clearly requires "conducting in-person interviews," Dkt. 46-1 Attach. 1. Earlier this month, the same declarant did not dispute that "conducting in-person interviews" is a requirement of the project. *Compare* Ex. 5 with Dkt. 52-1 ¶ 35. Indeed, it had been understood that in-person interviews were supposed to be the new mechanism to detect fraud.

Regardless, none of USDA's attempts to run away from its action can save it. This Court should follow the *Minnesota* decision. Colorado has shown its entitlement to a preliminary injunction and a 5 U.S.C. § 705 stay to prevent irreparable harm from USDA's unlawful action.

# ARGUMENT

I. **Plaintiff is likely to succeed on the merits.**

    a. **There is no ripeness issue.**

USDA claims the case is not ripe because they have not yet issued a sanction. But that is the wrong question. The challenge here is to the Recertification Letter, and Plaintiffs have not disputed that the Recertification Letter is a final agency action subject to judicial review. Indeed, in the Minnesota case, they conceded final agency action. Ex. 6 at 36:15–22. Here, USDA has waived any argument to the contrary by not raising it. Courts "do not require plaintiffs to 'bet the farm . . . by taking the violative action' before 'testing the validity of the [agency action]." *Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490–91 (2010). Indeed, courts have rejected identical arguments from USDA. *E.g.*, *California v. USDA*, No. 3:25-cv-06310-MMC, 2025 WL 2939227, at *4–6 (N.D. Cal. Oct. 15, 2025). There is no ripeness issue in resolving this purely legal challenge to a final agency action.

    b. **USDA Defendants committed multiple procedural violations.**

USDA violated three independent procedural requirements set by statute or regulation.

        **1. Defendants violated USDA regulations requiring notice and comment.**

Defendants concede that USDA's own regulations require notice and comment in the Federal Register for any pilot project "likely [to] have a significant impact on the public." 7 C.F.R. § 282.1(b); Opp. at 15. As the Minnesota district court summarized, "it is implausible that a [pilot] project that requires Minnesota to recertify over 100,000 households within a month, requires Minnesota to violate USDA regulations to do so, and threatens to impede the SNAP benefits of all Minnesotans does not constitute a 'significant impact on the public.'" *Minnesota*, 2026 WL 125180, at *11. USDA imposed an identical "pilot project" with identical rules on

3

Colorado, so the same analysis applies. Yet Defendants did not comply with the requirement.

There is no merit to USDA's claim of no significant public impact. First, and foremost, this argument is premised entirely on a post hoc rationalization from an agency declarant, which the Supreme Court has forbidden. *Regents*, 591 U.S. at 23. When it acted, the agency made no findings of public impact. That is the end of the matter. But the agency's reasoning is also illogical, claiming there is no public impact because it only applies to five counties, yet ignoring that those counties contain over 100,000 SNAP households (36% of all SNAP households in Colorado). Forcing 100,000 households to go through an extra recertification, within a shortened timeframe without required notice or face losing their benefits, contrary to USDA's regulations, is a substantial imposition. *Minnesota*, 2026 WL 125180, at *11. The declaration fails to grapple with the real-world burdens and instead pretends like none exist. There is no basis nor requirement to defer to the agency's illogical, post hoc justifications.

Finally, Defendants also argue that the Secretary implicitly waived the notice-and-comment requirement. Opp. at 16. No statute allows implicit waivers. Again, the agency must rely on its actual reasons, not post hoc rationalizations. Further, the Secretary's waiver authority is expressly limited "to the extent necessary for the project to be conducted." 7 U.S.C. § 2026(b)(1)(A). USDA cannot show this waiver is "necessary for the project to be conducted."

**2. Defendants violated the procedural requirements for legislative rules.**

Defendants also violated the notice-and-comment requirements of 5 U.S.C. § 553 for legislative rules, such as the Recertification Letter. Defendants do not contest that fact but instead erroneously argue that the Recertification Letter is an order that was the product of adjudication. Not so. Under the APA, a rule is broadly defined as "the whole or a part of an agency statement

4

of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."[1] 5 U.S.C. § 551(4); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95 (2015) (rule is "defined broadly" under the APA). The Recertification Letter meets all of these requirements. It is a statement of general or particular applicability, purely of future effect, designed to implement and prescribe new law or policy.[2]

Indeed, the "central distinction" between rulemaking and adjudication is that "rules have legal consequences only for the future." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216–17 (1988) (Scalia, J., concurring); *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973) (noting the "recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other"). "[R]ules generally have only 'future effect' while adjudications immediately bind parties by retroactively applying law to their past actions." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017). This is a rule.

Defendants' primary argument is that because the Recertification Letter is addressed only to Colorado, it must be an adjudication. Not so. As a factual matter, the Recertification Letter imposes binding rules not only on Colorado, but also on five counties and more than 100,000

---

[1] In contrast, an order is defined purely in the negative as any "final disposition . . . in a matter other than rule making." 5 U.S.C. § 551(6). Thus, the focus is whether the Recertification Letter is a rule. Defendants cite various cases about orders, none of which are on point.

[2] Congress specifically required compliance with the notice-and-comment rulemaking for the SNAP program. *See* 7 U.S.C. § 2013(c); H.R. Rep. No. 95-464, 300–01, 1977 U.S.C.C.A.N. 1978, 2236–37 (discussing this "major change in existing law" to prevent USDA from avoiding publication in the Federal Register); 78 Fed. Reg. 33045, 33046 n.1 (June 13, 2013) ("section 4(c) of the Food and Nutrition Act of 2008 requires notice-and-comment rulemaking in accordance with the APA for the Supplemental Nutrition Assistance Program").

households who face immediate requirements to be recertified or lose their benefits, contrary to current statutes and regulations. *See, e.g.*, *Anaconda Co. v. Ruckelshaus*, 482 F.2d 1301, 1306 (10th Cir. 1973) (recognizing rulemaking could apply to one firm where "many other interested parties and groups who are affected"); 1 Admin. L. & Prac. § 2:11 (3d ed. updated May 2025) ("Just as adjudication may affect a large number, rulemaking may only apply to a small number. Indeed, in *Anaconda Co. v. Ruckelshaus*, the Tenth Circuit expressly found it was evaluating rulemaking even though the decision actually affected one firm."). Not only does this Letter impose binding rules of only future effect on many thousands of parties beyond Colorado, it also must be read in tandem with the identical rules imposed on Minnesota. *Compare* Dkt. 46-1 Attach. 1, with Ex. 3. USDA cannot avoid notice-and-comment requirements by imposing identical rules through letters to individual states.

As legal matter, even if the "pilot project" rules only applied to one party, that would not matter. "Of particular importance is the fact that 'rule' includes agency statements not only of general applicability but also those of particular applicability applying either to a class or to a single person. In either case, they must be of *future effect*, implementing or prescribing future law. . . . [T]he entire Act is based upon a dichotomy between rule making and adjudication . . . . Rule making is agency action which regulates the future conduct of either groups of persons or a single person; it is essentially legislative in nature, not only because it operates in the future but also because it is primarily concerned with policy considerations." *Bowen*, 488 U.S. at 218–19 (Scalia, J., concurring) (quoting the AG's Manual on the Administrative Procedure Act at 13–14).

At bottom, USDA was establishing binding regulations of purely future effect for the operation of its "pilot project" affecting hundreds of thousands of people in Colorado and

Minnesota. It adjudicated no disputed facts. Because this was a legislative rule, and not an order resulting from an adjudication, USDA was required to comply with the notice-and-comment requirements of 5 U.S.C. § 553. Having failed to do so, USDA violated the APA.

### 3. Defendants violated Paperwork Reduction Act procedural requirements.

Defendants also failed to follow the requirements of the Paperwork Reduction Act ("PRA"), including obtaining OMB approval and placing an OMB control number on the collection of information in the Recertification Letter, among other failures. Defendants do not contest these facts, instead arguing erroneously that the PRA does not apply.

First, Defendants claim that the PRA only applies to a "new" collection of information and that this is not "new" because USDA has previously required recertifications. But that is just flatly wrong. The PRA applies to any collection of information. 44 U.S.C. § 3507(a) (imposing OMB review "in advance of the adoption or revision of the collection"). At a minimum, the collection is a revision. It imposes different burdens by requiring an extra recertification for most SNAP households, on a shortened timeframe, and it places an enormous burden on Colorado and five counties to complete these extra recertifications in a single month, not to mention new recordkeeping requirements.[3] A key purpose of the PRA is to "minimize the paperwork burden" for individuals and State and local governments, 44 U.S.C. § 3501(1), and to accomplish that goal, it requires agencies to engage in a thoughtful analysis of the burden imposed by each new or revised collection. Yet, USDA fully ignored that here and failed to comply with significant analyses of burden and approval requirements of the PRA. *Id.* §§ 3507(a); 3506(c).

---

[3] In the Recertification Letter, USDA also expressly required "conducting in-person interviews." Dkt 46-1 Attach. 1. Requiring interviews for everyone, in-person or not, is substantially more burdensome than any prior collection.

7

USDA was also required to have "a control number to be displayed upon the collection of information." *Id.* § 3507(a)(3). "[A]n agency shall not conduct or sponsor a collection of information unless: (1) The collection of information displays a currently valid OMB control number." 5 C.F.R. § 1320.5(b). The Recertification Letter contains no valid control number, notwithstanding that even USDA admits it is a collection of information (disputing only that it is new). For this reason alone, USDA acted without observance of procedure required by law.[4]

Defendants are also wrong that the collection's recordkeeping requirements are only imposed on one person. Defendants identify the right regulation, 5 C.F.R. § 1320.3, Opp. at 17, but make two critical mistakes in applying it. First, the regulation requires counting "any independent entities to which the initial addressee may reasonably be expected to transmit the collection of information." *Id.* § 1320.3(c)(4). This collection, at a minimum, would be reasonably expected to be transmitted to the five counties. 44 U.S.C. § 3502(1); 5 C.F.R. § 1320.3(k) (person includes a "local government" or "political subdivision"). Second, the regulation requires counting all collections "within any 12-month period." 5 C.F.R. § 1320.3(c)(4). This ensures that agencies cannot get around the PRA by sending identical

---

[4] Defendants' reliance on a provision allowing parties to file a petition with OMB is a non-sequitur. This is an optional administrative process and made no sense for Colorado since it takes multiple months for a response. Most importantly, it does not relieve the agency of its obligation not to conduct or sponsor a collection of information without following the PRA's requirements. 44 U.S.C. § 3507(a); 5 C.F.R. § 1320.5. No court has held an OMB petition is required. The Supreme Court has held that exhaustion may not be required under the APA unless specific mandated by statute or regulation. *Darby v. Cisneros*, 509 U.S. 137 (1993). USDA's improper attempt to backdoor an exhaustion requirement into an APA claim must be rejected.

Defendants also argue that Colorado can raise a PRA defense in an enforcement action, but courts have rejected this argument that parties must wait, concluding the APA provides a pre-enforcement cause of action. *Hyatt v. OMB*, 908 F.3d 1165, 1173 (9th Cir. 2018). And there is no guarantee that USDA will not "waive" such a proceeding, as it did with Minnesota.

requests through individual letters. Defendants imposed the identical recordkeeping requirements on Minnesota and four of its counties. Ex. 3; Dkt. 46-1 Attach. 1. Thus, Defendants already imposed the same recordkeeping requirements on at least 11 persons (2 states and 9 local governments), and that was only within a one-week period. Defendants were therefore required to follow all of the procedural requirements for this new recordkeeping requirement.

In sum, because USDA violated the PRA's requirements in numerous ways, USDA violated the APA by acting without observance of procedure required by law.[5]

### c. The Recertification Letter is contrary to law and exceeds statutory authority.

USDA also acted contrary to law and in excess of statutory authority in numerous ways.

*First*, as the *Minnesota* court correctly held, USDA's authority to conduct pilot projects does not include the authority to mandate participation, let alone upon the threat of sanctions. Nothing in 7 U.S.C. § 2026(b)(1) grants such authority. USDA erroneously "reads that provision in isolation and out of context, violating the well-established rule that a court interpreting a statute must consider 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Minnesota*, 2026 WL 125180, at *12 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014)). A key part of that context is that this subsection contains a specific mechanism by which the Secretary can issue waivers, but that mechanism is at the request of the States. *Id.* (citing 7 U.S.C. § 2026(b)(1)(D); *see also* Dkt. 46-1 Attach. 2 (pilot project example). Notably, until now, this has also been USDA's own understanding for 50 years.

---

[5] USDA also erroneously claims in a footnote that the PRA does not apply because Congress authorized the pilot project. Leaving aside this pilot project was not authorized, the PRA fully applies to agency sponsored collections of information authorized by statute. *Saco River Cellular, Inc. v. FCC*, 133 F.3d 25, 32 (D.C. Cir. 1998). The exception referenced by USDA is limited to collections that Congress itself mandated through a statutory requirement.

Indeed, USDA has repeatedly stated that position publicly, Dkt. 46 ("Mot.") at 13. Even USDA's counsel could not identify any prior mandated pilot project. Ex. 6 at 8:8-14. As the *Minnesota* court recognized, this type of massive power grab is contrary to the major questions doctrine. *Minnesota*, 2026 WL 125180, at *12–13. It is also contrary to the Spending Clause, which as discussed in Section I.D, necessitates that Congress speak clearly when exercising its spending powers. Nothing in section 2026 unambiguously grants this enormous power to the USDA.

In response, USDA points out that one statute requires the Secretary to carry out pilot projects, 7 U.S.C. § 2025(h)(1)(F)(i)(l), and infers that "presumably" this means the Secretary can compel States to participate. Opp. at 19. But a review of the statute shows the opposite: States are only eligible to participate if they *voluntarily* agree to certain conditions. *Id.* § 2025(h)(1)(F)(ii)(l). And if a State is noncompliant with the pilot project, the penalty is merely to terminate the pilot project. *Id.* § 2025(h)(1)(F)(iii).[6] Thus, far from supporting USDA's position, the statute shows how extremely wrong it is. Even where Congress mandated pilot projects, it recognized that States choose whether to participate, consistent with the overall structure of SNAP, which is supposed to be a federal-state partnership.

*Second*, USDA has no authority to impose new requirements. Section 2026(b)(1) only grants authority to *waive* requirements but not authority to *impose* new ones. The court must apply the plain text of the statute as written. And USDA's claim that it has not imposed any new requirements is false. The Recertification Letter imposes numerous requirements and provides that if Colorado fails to comply with these requirements, it will face noncompliance sanctions.

---

[6] Likewise, 7 U.S.C. § 2021(i)(1)(A) authorizes pilot projects "to test innovative Federal-State partnerships." *Id.* But partnerships donnate voluntary cooperation, not compelled participation. And notably, the statute contains no authority to mandate that State agencies participate.

*Third*, the "pilot project" is prohibited by the FNA. The project violates 7 U.S.C. § 2026(b)(1)(B)(i)(I), (iv)(III)(bb) which makes it an "impermissible project" if would "den[y] assistance to an otherwise eligible household." This project will result in some number of otherwise eligible households losing their benefits if their extra recertifications and interviews are not completed within the allotted time. Defendants do not dispute the prohibitions but claim only ineligible households are required to be removed. Opp. at 20. This argument is both circular and misunderstands recertifications. When a recertification is required, as by the "pilot project," that means a household will become ineligible if it is not recertified. Ex. 7. So, for example, if a household was recertified on December 15 and then ignores a new recertification notice believing it was sent in error, that household will be made ineligible by the lack of recertification through the "pilot project," even if they were otherwise eligible. The Recertification Letter mandates recertifying *all* households without exception. That means households who are otherwise eligible but are not recertified for any reason during the "pilot project" become ineligible. Were that not so, households could just ignore this "pilot project" recertification. But that makes this impermissible under the FNA.

A pilot project, further, must include an evaluation of "the effects of the project," 7 U.S.C. § 2026(b)(1)(B)(i)(II), but this project contains no such evaluation. *Minnesota*, 2026 WL 125180, at *10. Imposing recordkeeping requirements is not an evaluation.

The "pilot project" violates the "timely, accurate, and fair service" prohibition. 7 U.S.C. §§ 2026(b)(1)(B)(iv)(III)(ff), 2020(e)(2)(B)(i). As the *Minnesota* court concluded, "the Recertification Letter's demands trample over the statutory and regulatory guardrails that ensure fair, accurate, and timely service to SNAP recipients." 2026 WL 125180, at *10.

*Fourth*, the "pilot project" would require Colorado to violate the FNA and implementing regulations. *Minnesota*, 2026 WL 125180, at *10–11. This includes violation of various notice provisions that are intended to ensure households have fair notice of their obligations to recertify.[7] *Id.* It also includes violation of other interview requirements, including the timing of such interviews. *Id.* at *12–13. While Defendants now claim the Recertification Letter does not require in-person interviews, that is contrary to the express terms of the Recertification Letter, as the *Minnesota* court recognized. Defendants' belated attempt to amend the Recertification Letter through a litigation declaration is unlawful; if they wish to amend their action, they need to withdraw it and issue a new action. But even if no-in person interviews had been required, that does not resolve the conflicts with timing and notice requirements.

*Fifth*, the Recertification Letter unlawfully threatens sanctions when Defendants have no such statutory authority, let alone authority to deny administrative costs or remove Colorado from the SNAP program. Section 2020(g) does not authorize sanctions for pilot project noncompliance. If a State is not complying with a pilot project, USDA's remedy is to terminate that project. Indeed, even in pilot projects mandated by Congress, that is the remedy. 7 U.S.C. § 2025(h)(1)(F)(iii). And Colorado is not required to wait until Defendants impose sanctions before suit. *California*, 2025 WL 2939227, at *4–6 (rejecting similar arguments).

### d. The Recertification Letter is arbitrary and capricious.

Colorado is also likely to succeed on its arbitrary and capricious claim. USDA fails to

---

[7] When pressed on violating the notice provision in 7 C.F.R. § 273.14, USDA claims that this regulation, entitled "Recertifications," does not apply. Opp. at 21. But under § 273.14(b), the "Recertification process" starts by providing notice on specific mandated timelines that are inconsistent with the pilot project. 7 U.S.C. § 2020(e)(2)(d)(4). Conducting a recertification alters the benefit period, because every benefit period is tied to the last recertification.

address most of Colorado's arguments. Mot. at 17–20. For those unrebutted reasons, the Court should find the Letter is arbitrary and capricious. "This sort of haphazard decisionmaking is precisely what the APA is intended to prevent." *Minnesota*, 2026 WL 125180, at *20.

Rather than relying on the reasons provided in its action, USDA again defends based on post hoc rationalizations, directly contrary to Supreme Court precedent. *Regents*, 591 U.S. at 23–24. These new justifications are irrelevant here. The proper inquiry is whether the Recertification Letter provides a "satisfactory explanation" for the imposition of the "pilot program" on Colorado and the five targeted counties. Because it does not, the Court should not inquire further.

In any event, the pretextual, post hoc justifications only make matters worse. USDA now claims that Colorado's decentralized county-administered system creates a greater risk for fraud because in some other unidentified states, USDA purports to have found people receiving benefits through multiple counties. Dkt. 52-1 ¶ 20. USDA offers no explanation why it did not select those states for a pilot project. Instead, it selected Colorado for a pilot project that has nothing to do with decentralization and would not address the issue found in other states.

To the extent that USDA makes any state-specific claim, it points to audits in 2023 and 2024 finding that a few counties did not always pursue intentional program violations (IPVs).[8] *Id.* ¶ 21–24 & p. 32–33, 55–56. But none of those counties are among the five counties selected. And IPV proceedings are an entirely different issue, concerning *additional* sanctions (i.e., beyond already denying benefits) against individuals, through criminal prosecution or special disqualification proceedings. 7 C.F.R. § 273.16. This has nothing to do with detecting fraud,

---

[8] USDA also makes vague reference to gang activity. But this was not a basis in the Recertification Letter, and it is not clear how this "pilot project" addresses gangs.

which is the supposed issue stated in the Recertification Letter. To the contrary, the document described Denver as a "model" for fraud-detection investigations and commended them for "excellent work." *See* Dkt. 52-1 Ex. B at p. 30. At bottom, the "pilot project" has nothing to do with IPV proceedings or the specific counties and will only arbitrarily harm Colorado's efforts because it will force resources to be shifted away from IPVs to comply with the "pilot project." Ex. 7. There is no rational connection between the facts and the decision.

Finally, USDA does not argue that it considered reliance interests. Opp. at 22; Mot. at 19–20. It likewise conducted no reasoned analysis of the feasibility of the task or any other practical realities. Ex. 7. Its pretextual, post hoc justifications do not explain why Colorado was disparately treated, and there remains every reason to believe that Colorado was singled out for improper reasons, as this "pilot project" was rolled out as part of series of actions within a week by federal agencies against Colorado alone. Dkt. 26 ¶¶ 6, 88–108. Likewise, the Secretary's social media announcement of the identical project in Minnesota evinces clear animus. Ex. 8. The APA requires treating similar parties alike and prohibits this disparate action. Mot. at 20.

For all these reasons and those unrebutted from the motion, the State is likely to succeed on the merits of its arbitrary and capricious claim.

    e.  **USDA Defendants violated the Spending Clause.**

USDA's Spending Clause argument, premised on two district court decisions, fails for two reasons. First, USDA incorrectly asserts that the FNA is not at issue. Opp. at 23. But that is the whole point: 7 U.S.C. § 2026 does not unambiguously give the Secretary authority to impose onerous (or any) pilot projects on States. For 50 years, USDA has not imposed pilot projects on any States, nor claimed authority to do so. "In interpreting language in spending legislation, we

thus insist that Congress speak with a clear voice, recognizing that there can, of course, be no knowing acceptance of the terms of the putative contract if a State is unaware of the conditions imposed by the legislation or is unable to ascertain what is expected of it." *Davis ex. rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) (citation modified) (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). In no way did Congress speak with a clear voice and unambiguously allow mandated pilot projects. USDA's attempt to rely on, at best, ambiguous language in section 2026 to impose onerous pilot projects violates the Spending Clause. This case is thus unlike the two cited district court decisions.

Second, the two cited cases are outliers, and this argument has been rejected by other courts. *Santa Clara v. Noem*, No. 25-CV-08330-WHO, 2025 WL 3251660, at *34 (N.D. Cal. Nov. 21, 2025); *New York v. DOJ*, No. 1:25-CV-00345-MSM-PAS, 2025 WL 2618023, at *20 (D.R.I. Sep. 10, 2025); *New York v. HHS*, 414 F. Supp. 3d 475, 572 (S.D.N.Y. 2019). Any action by USDA is based only on a delegation of Congress' constitutional spending power; the agency itself has no independent spending authority. "An agency may not confer power upon itself," and has "no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also Los Angeles v. Barr*, 929 F.3d 1163, 1175 n.6 (9th Cir. 2019) (explaining there is "no reason why the addition of an agency middleman either expands or contracts Congress's power"). Thus, when an agency acts on Congress's delegated spending authority, it must comply with the same constitutional rules.

## II. Plaintiffs face irreparable harms absent preliminary relief.

USDA barely engages with the State's arguments as to irreparable harm. The case law is clear that the act of requiring a state to comply "with a regulation later held invalid almost

15

*always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring)); *Kan. Health Care Ass'n Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994). USDA cites no law for the suggestion that Colorado must first comply with an illegal agency action to prove the existence of costs that are obvious on their face and supported by undisputed evidence from a declaration.

USDA makes no offer or suggestion that it would cover the additional costs. Indeed, USDA suggests the opposite, pointing to the State's allotted quarterly payment of administrative funding as a source that could have been used. Dkt. 52-1 ¶¶ 55–56. But this funding is for the State's normal administrative operations. Using those dollars just shifts money around; it does not address the increased costs. Ex. 7. Nor does USDA dispute these increased costs would not be recoverable (and are thus irreparable) due to sovereign immunity. Mot. at 22; *Chamber of Com. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).

USDA does not make any real attempt to contest that the "pilot project" is likely to lead to more errors during the rushed recertifications, which will by a new law force Colorado to pay a greater share of SNAP costs (that are unrecoverable), nor does it dispute the reputational and reliance harms for Colorado's SNAP program. Mot. at 22–23. These are unrebutted facts. USDA's argument that the harms are not "certain" because the State has not yet complied is nonsensical. The whole point of a preliminary injunction is to avoid suffering the harm.

As for USDA's argument that its threats regarding noncompliance are speculative, the agency is entitled to little credibility. The Court need only look at USDA's own recent actions in Minnesota. There, even knowing judicial scrutiny would be coming, the agency disregarded its

administrative procedures and sanctioned Minnesota immediately. The Minnesota court found USDA's actions "deeply troubling." *Minnesota*, 2026 WL 125180, at *7 n.5. Indeed, USDA disregarded those procedures even though its same declarant stated they would apply. Ex. 5 ¶¶ 30–31. That USDA failed to even mention this to the Court only underscores the point. USDA refuses to say under oath it does not plan to sanction Colorado. Even after it was enjoined in Minnesota, the agency continues to insist on compliance with the "pilot project."[9] Colorado faces harms that are certain, great, and imminent. It easily meets the irreparable harm standard.

### III.     The balance of the equities and the public interest favor Colorado.

In response to Colorado's strong showing of the damage that would be wrought on Colorado and its neediest citizens if USDA's unlawful actions are not stopped, USDA offers no countervailing interests beyond summarily asserting that Colorado's harm is speculative and the Letter complies with applicable law. Opp. at 24.  USDA's failure to suggest any harm from injunctive relief stands in stark contrast to the significant harms to Colorado and the public.

Dated: January 27, 2025                          Respectfully submitted,

                                                                  **PHILIP J. WEISER**
                                                                  Attorney General of Colorado

                                                                  _____
                                                                  David Moskowitz, *Deputy Solicitor General*
                                                                  Talia Kraemer, *Assistant Solicitor General*
                                                                  Sarah H. Weiss, *Senior Assistant Attorney General*
                                                                  1300 Broadway, 10th Floor
                                                                  Denver, CO 80203
                                                                  (720) 508-6000
                                                                  david.moskowitz@coag.gov

---

[9] USDA's delay argument is meritless. USDA cites to cases where parties waited over a year to act. Colorado did not sit on its rights. It acted within a matter of days, over the holidays, while facing a flurry of unlawful activity from numerous federal agencies.

## CERTIFICATE OF SERVICE

      I hereby certify that on January 27, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

      *Deputy Solicitor General*