IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 1:25-cv-3482-RBJ

THE STATE OF COLORADO,

      Plaintiff,

v.

DONALD J. TRUMP, et al.

      Defendants.

---

## ORDER GRANTING PRELIMINARY INJUNCTION

---

### I.    Introduction

On December 18, 2025, with no advance warning, Colorado Governor Jared Polis received a one-page letter from an undersecretary at the United States Department of Agriculture ("USDA") stating that Colorado ("the State") was being "require[ed]" to participate in a "pilot project" related to the State's administration of the Supplemental Nutrition Assistance Program ("SNAP").

The letter is as astonishing as it is brief. Without identifying any specific allegations, it states that, due to nationwide benefits fraud, including "multiple requests [by USDA] to [Colorado] to fulfill its administrative responsibilities," the

State is directed to recertify the eligibility of "all SNAP households" in five of its most populous counties "within 30 days of the receipt of this letter."

In that timeframe, the letter dictates, Colorado must conduct comprehensive reviews, including in-person interviews, to "ensure" that the households in these counties "meet all eligibility requirements," and "unenroll any ineligible households." For context, pursuant to its USDA-approved administration plan, Colorado typically recertifies SNAP recipients, including the more than 100,000 households in the identified counties, on a rolling, biannual basis. In other words, for those five counties, the letter mandates that the State complete roughly half a year's work in one month, over the winter holidays, with no chance to prepare.

The letter warns that Colorado's "[f]ailure to participate in this pilot project" carries severe consequences for the State and the Coloradans who rely on SNAP. It explains that noncompliance will trigger statutory procedures for imposing financial sanctions, and "may also affect Colorado's continued participation in SNAP."

Confronted with a choice between, in its view, attempting to comply with USDA's impossible and unlawful demands or face devastating and unlawful sanctions, Colorado filed a motion for a preliminary injunction. ECF No. 46. The matter was fully briefed, *see* ECF No. 52, ECF No. 61, and the Court heard oral arguments, *see* ECF No. 63. At the conclusion of the hearing, the Court issued a preliminary injunction, enjoining the letter and the pilot project described therein.

This Order sets out the Court's reasoning in full, but the short answer is this: the pilot project plainly violates the statutes and regulations governing SNAP, the Constitution, and is contrary to reasoned and reasonable agency decision-making. Because the Court agrees with Colorado that the mandatory pilot project is "unlawful many times over," ECF No. 46 at 2, and that the State faces irreparable harm absent court intervention, the preliminary injunction is hereby GRANTED for the reasons that follow.

## II.  **Background**

### A.  **SNAP's Statutory and Regulatory Framework**

In order "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households," Congress established the Food Stamp Program, now known as SNAP.  7 U.S.C. § 2011.  SNAP provides eligible households—generally those with an income at or below 130% of the federal poverty line—monthly benefits through an electronic debit card which may be used to buy approved food items at participating retailers.  *See* § 2014(c)(1)-(2); *see also R.I. State Council of Churches v. Rollins*, 158 F.4th 304, 307 (1st Cir. 2025).

SNAP, in its current form, is part of the 2008 Food and Nutrition Act (FNA), and it operates according to a comprehensive legislative and regulatory scheme, *see* 7 U.S.C. §§ 2011- 2036d, 7 C.F.R. §§ 271-285.  At the federal level, the program is overseen by USDA's Food and Nutrition Service (FNS).  *See* 7 U.S.C. § 2013(a)(1),

(c), (d); 7 C.F.R. § 271.3(a). But the states are responsible for its day-to-day administration, including eligibility determinations, issuing debit cards and benefits, and ensuring program integrity. 7 U.S.C. § 2020(a)(1); 7 C.F.R. §§ 271.4, 274.2, 275.1. While SNAP benefits are entirely federally-funded, the federal government and the states share the program's administrative costs evenly. 7 U.S.C. § 2025(a).

In order to receive SNAP funding, a state must first develop a "plan of operation" specifying how it will fulfill its administrative responsibilities according to federal requirements, and have its plan approved by the FNS. *See* 7 U.S.C. § 2020(d), (e); 7 C.F.R. § 272.2. A state may administer the program at the state, district, or county level, and the state's responsibilities "shall not be affected" by the unit of administration it chooses. 7 U.S.C. § 2020(a)(2).

The state is responsible for conducting the initial certification and regular recertification of applicant households. *See* 7 U.S.C. §§ 2020(e)(2)-(7); 7 C.F.R. § 273.10-14. Initial applicants must complete an application documenting their household's eligibility, swear to its accuracy under the penalty of perjury, and be interviewed by a federally-qualified state official.[1] *See* 7 C.F.R. § 273.2; 7 U.S.C. §§ 2014, 2015 (listing eligibility criteria and disqualifications); 7 C.F.R. § 273.1- 273.11 (same). The state may conduct interviews face-to-face or

---

[1] To qualify for SNAP, applicants must provide information and proof regarding the identity, age, residency, citizenship status, education, employment, income, resources, and expenses of every member of their household. *See, e.g.*, 7 U.S.C. § 2014; 7 C.F.R. §§ 273.1-273.11.

by telephone; and in some cases, it must offer applicants the option of a telephonic interview. *See id.* § 273.2(e)(2). The state may not certify a household to receive SNAP benefits unless these requirements are satisfied and the information in the application is independently verified. *See id.* § 273.2(d)(1), (f).

Once a household is certified, it remains SNAP-eligible for a definite period of time, known as the "certification period." 7 U.S.C. § 2020(e)(4). Subject to certain exceptions, the certification period can be no less than six months and no greater than 12 months. *See* 7 C.F.R. § 273.10(f). After the state grants an application, it must provide written notice to the household of "the beginning and ending dates of the certification period," *id.* § 273.10(g)(1)(i)(A), and may not "end a household's certification period earlier than its assigned termination date" unless the state "receives information that the household has become ineligible." *Id.* § 273.10(f)(4). A state also may not require households to report for an in-person interview during their certification period. *Id.* at 273.2(e)(1).

Recertification is primarily regulated by 7 C.F.R. § 273.14. Prior to the first day of the last month of a household's certification period, but no sooner than the beginning of the next-to-last month, the state "shall insure" that the household receives "a notice of expiration" advising the household of its obligation to timely "submit a new application in order to renew its eligibility for a new certification period." 7 U.S.C. § 2020(e)(4); *see also* 7 C.F.R. 273.14(b)(1)(i). At least 10 days

before certification expires, a member of the household must be reinterviewed in the same format as the initial interview. *Id.* § 273.14(b)(3)(i), (iii). The household must also be given at least 10 days "to provide required verification information." *Id.* at § 273.14(b)(4). Importantly, "[n]o household may participate beyond the expiration of the certification period" without being recertified. *Id.* § 273.14(a), (e).

SNAP contains numerous provisions for the prevention, detection, and elimination of waste, fraud, and abuse. *See, e.g.*, 7 U.S.C. §§ 2014a, 2015, 2016(h)(8)-(12), 2016a, 2020, 2024, 2025, 2036b-2036c; 7 C.F.R. §§ 271.5- 271.8, 272.8-272.18, 273.15-273.18, 275, 276, 277.16-277.17, 278.6-278.7. Indeed, as the foregoing string citation illustrates, much of the FNA and its regulations are directed at protecting the public fisc. For instance, states must conduct "quality control reviews" on active households "to determine if households are eligible and receiving the correct allotment of SNAP benefits," and provide this information to USDA. *Id.* §§ 275.10(a), 275.11. USDA, in turn, performs its own "annual review" to "determine the efficiency and effectiveness" of the states' administration, including payment error rates. *Id.* §§ 275.3(a), 275.23(a)-(b). Under a new federal law, states are financially penalized for error rates above certain thresholds. *See* 7 U.S.C. § 2013(a)(1)-(2).

Furthermore, states may be sanctioned by USDA for noncompliance with SNAP's statutory provisions or regulations, its own plan of operation, its plan for

automated data processing, or the statutory requirements for the same. 7 U.S.C. § 2020(g). If sanctioned, USDA "shall proceed to withhold" the state's allocated federal administrative funds and may pursue injunctive relief against the state. *Id.* If USDA imposes sanctions against a state, it must first provide the state notice, a formal warning, and an opportunity to demonstrate compliance or submit a corrective plan. *See id.*; *see also* 7 C.F.R. §§ 276.4, 276.5. A sanctioned state has the right to administrative appeal and judicial review. *Id.* §§ 276.4, 276.7.

Finally, SNAP allows for, and in some cases, requires, programmatic experimentation.[2] Of central concern here, 7 U.S.C. § 2026(b)(1)(A) provides that:

> The [USDA] Secretary may conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects designed to test programs changes that might increase the efficiency of [SNAP] and improve the delivery of [SNAP] benefits to eligible households, and may waive any requirement of this chapter to the extent necessary for the project to be conducted.

The Secretary's discretionary authority to develop and institute pilot projects under this section, while broad, is not unfettered. The Court details a few of the relevant restrictions.

---

[2] For instance, the Secretary "shall carry out" pilot projects to: (1) "test innovative Federal-State partnerships to identify, investigate, and reduce fraud by retail food stores and wholesale food concerns," 7 U.S.C. § 2021(i); (2) "determine the feasibility of determining and issuing allotments to residents of covered facilities" at the request of one or more states, *id.* § 2017(f)(2)(A); and (3) "develop and test methods … for employment and training programs and services" in cooperative agreement with the states, *id.* § 2025(h)(1)(F)(i)(I). These provisions are not directly at issue, but they are significant insofar as they use compulsory rather than permissive language while still implicitly or explicitly contemplating voluntary participation by the states.

First, any such pilot project must be consistent with SNAP's goal "of providing food assistance to raise levels of nutrition among low-income individuals," and include "an evaluation to determine the effects of the project." *Id.* § 2026(b)(1)(A)(B)(i).

Second, the statute contains a list of "impermissible projects." *Id.* § 2026(b)(1)(A)(B)(iv). These include pilot projects that are "inconsistent" with other parts of the FNA. *Id.* § 2026(b)(1)(A)(B)(iv)(III). At issue here are the prohibitions against projects that, through a waiver, "den[y] assistance to an otherwise eligible household or individual," or that are contrary to the state's obligation to "provide timely, accurate, and fair service" to SNAP applicants and participants. *Id.* § 2026(b)(1)(A)(B)(iv)(III)(bb), (ff).

Third, at least 30 days before "the initiation of a demonstration project, FNS shall publish a General Notice in the Federal Register if the demonstration project will likely have a significant impact on the public."[3] 7 C.F.R. § 282.1(b). The notice must "set forth the specific operational procedures" and "explain the basis and purpose of the demonstration project." *Id.* If the notice receives "significant comments," USDA must "take such action as may be appropriate prior to implementing the project," and if necessary, publish a new notice beforehand. *Id.*

---

[3] The parties treat the terms "demonstration project" and "pilot project" as interchangeable.

Finally, this section includes a provision that details how and when the Secretary will respond to waiver requests from the states for pilot projects. *See* 7 U.S.C. § 2026(b)(1)(D) ("Response to waivers").  No later than 60 days after receiving a waiver request, the Secretary "shall provide a response" approving, modifying, or denying the waiver, or requesting clarification.  *Id.*

## B.    SNAP in Colorado

Colorado utilizes a state-county model to oversee and administer SNAP to approximately 600,000 low-income residents, including 300,000 children and 114,000 elderly individuals.  ECF No. 46-1, McClelland Decl., at ¶¶ 8-9.  Colorado's Department of Human Services ("CDHS") supervises the program at the state level, while staff in the State's 64 counties process initial applications, authorize benefits, and recertify ongoing eligibility.  *Id.* at ¶¶ 2, 8.  Last fiscal year, Colorado received $100 million in federal funding to cover half of its administrative costs.  *Id.* at ¶ 11.

Pursuant to 7 U.S.C. § 2020(d), Colorado's plan of operation has been approved by USDA and thus meets all federal requirements.  Colorado has codified its plan and other rules and regulations governing SNAP in state law.  *See* Colo. Rev. Stat. Ann. §§ 26-2-101 to 26-2-111; 26-2-301 to 26-2-310; 10 Code Colo. Regs., 2506-1:4.000 to 2506-1:4.905 (SNAP Rule Manual). Consistent with federal law, except when requested or necessary, Colorado does not require SNAP applicants to be interviewed in person.  10 C.C.R. § 2506-1:4.204(A).

In several notable ways, Colorado's SNAP administration is more stringent than what federal law requires. Colorado has elected to recertify most SNAP households every six months instead of once a year. *See* 10 C.C.R. § 2506-2:4:208.1(B). Additionally, while federal law permits states to recertify households where all adult members are elderly or disabled on a 24-month basis, *see* 7 C.F.R. § 273.10(f)(1), Colorado limits this extended certification period to households that meet this criteria *and* have no earned income. 10 C.C.R. § 2506-1:4.208.1(A).

Colorado also maintains robust systems to prevent waste, fraud, and abuse. *See* ECF No. 46-1 at ¶¶ 35, 40-50. For instance, Colorado employs measures to stop interstate and intrastate dual participation in SNAP. *See id.* at ¶¶ 40-42; ECF No. 61-5 at ¶ 7. Importantly here, Colorado's statewide database automatically flags and denies benefits to households that apply for SNAP in more than one county. ECF No. 61-5 at ¶ 70. Additionally, the counties use federally-available databases to verify eligibility information, receive daily reports to remove deceased individuals from the program, and have dedicated integrity teams to investigate suspected fraud and take appropriate action, including terminating benefits, instituting claims for repayment, and pursuing disqualification and prosecution. ECF No. 46-1 at ¶¶ 43-47. Colorado's payment error rate has been below the national average every year that such data has been kept and is usually among the top 20 states. *Id.* at ¶ 13.

Furthermore, Colorado has voluntarily participated in pilot projects with USDA to improve SNAP administration and benefit recipients. In 2020, for instance, Colorado agreed to participate in the Online Purchasing Pilot, which made changes to the electronic benefits transfer system, point-of-sale processing rules, and recordkeeping requirements. ECF No. 61-5, McClelland Supp. Decl., at ¶ 27.

More recently, in August 2025, USDA approved Colorado's proposed pilot project to remove "soft drinks" from the items that SNAP recipients can purchase "for home consumption." *See* ECF No. 46-1 at 22-41. In the approval letter, USDA Secretary Brooke Rollins detailed the specific provisions of the FNA and regulations she was waiving at Colorado's request, the terms and conditions of the pilot project, and the timeline and criteria for evaluating the program's impact and efficacy. *Id.* Notably, in the letter, Secretary Rollins stated that USDA "will continue to collaborate with the State" to finalize the project parameters and evaluation methods, and she asked the "appropriate State official" to "submit written acceptance of this approval and the terms and conditions" to begin the project. *Id.* at 22.

Despite this record of cooperation, Colorado and USDA have also had recent conflict over USDA's effort to collect from the states personally identifying information for SNAP applicants and recipients. *See, e.g.*, ECF No. 46-1 at ¶¶ 19-20. Colorado, along with 22 other states, sued USDA in federal court, contending that such demand, and the accompanying threat of sanctions for noncompliance,

were illegal.  *See California, et al. v. USDA, et al.*, 25-cv-06310-MMC, 2025 WL 2939227 (C.D. Cal. Oct. 15, 2025).  On October 15, 2025, a district court granted the states' request for a preliminary injunction, finding that the directive was likely contrary to the FNA, and enjoining USDA from disallowing SNAP funding or otherwise penalizing the states for failing to comply with the demand.[4]  *Id.*

### C. The Recertification Letter

#### 1. <u>The Colorado Letter</u>

On December 17, 2025, USDA sent the letter ("Recertification Letter") at issue in this case to Governor Polis.  Its text, albeit brief, is important, and the Court reproduces it, in relevant part, below:

> Amid ongoing fraud affecting federally funded benefits across the nation, including [FNS'] multiple requests to the State of Colorado to fulfill its administrative responsibilities, USDA is hereby requiring Colorado to participate in a [SNAP] pilot project, conducted pursuant to 7 U.S.C. § 2026(b)(1)(A), to increase the efficiency of SNAP and improve the delivery of SNAP benefits to eligible households.  More accurate certifications of eligibility for SNAP benefits will ensure that those in need receive assistance, raising levels of nutrition among low-income individuals.

> Pursuant to this pilot project, which will be run on a trial basis, [CDHS] is hereby required to perform the following actions:

> 1. Conduct recertifications, within 30 days of receipt of this letter, of all SNAP households in Arapahoe, Adams, Jefferson, Boulder, and Douglas counties ("the Counties").

---

[4] The district court has since enjoined renewed demands to the states to provide the protected information on threat of sanctions.  *See California, et al. v. USDA, et al.*, ---F.Supp.3d----, No. 25-cv-06310-MMC, 2026 WL 534417 (N.D. Cal. Feb. 26, 2026).

2. As part of the recertification process, ensure SNAP households in [the Counties] meet all eligibility requirements for SNAP, including by accounting for the income and resources of any excluded household members, conducting in-person interviews, and using federal eligibility tools like the improved, cost-free Systematic Alien Verification for Entitlements (SAVE) Program database.

3. Upon review of the information obtained during the recertification process, make determinations as to eligibility of SNAP benefits for each SNAP household in [the Counties] and unenroll any ineligible households.

4. Document and preserve all information relied upon to demonstrate compliance with this pilot project and completion of accurate recertifications of eligibility. This includes but is not limited to all documentation pertaining to any excluded household members and recertification determinations. CDHS must also preserve all documentation it relied upon for the immediately prior certification related to the SNAP households in question.

Failure to participate in this pilot as specified by USDA will trigger noncompliance procedures codified in 7 U.S.C. 2020(g). It may also affect Colorado's continued participation in SNAP.

The Counties, all located in metropolitan Denver, include approximately 106,500 SNAP households, 36% of the State's overall total. *See* ECF No. 46-1 at ¶ 25. On average, the Counties recertify a combined 9,931 households and conduct 4,089 interviews in a 30-day period.[5] *See id.* at ¶ 26. Before sending the Recertification

---

[5] The State explains that the monthly average is significantly less than one-sixth of all SNAP households because some number of households—those where all adults are elderly or disabled and have no earned income—are recertified on a biennial basis. 10 C.C.R. § 2506-1:4.208.1(A).

13

Letter, USDA did not publish a notice in the Federal Register or otherwise inform Colorado or the general public that the pilot project was coming.

Although Colorado was not forewarned, the Recertification Letter did not arrive in a vacuum. On December 11th, President Trump announced that he had pardoned former Mesa County Clerk and Recorder Tina Peters for her convictions of state crimes related to her efforts to breach Colorado voting machines and election data. Later that week, at an Oval Office media event, the President attacked "weak and pathetic" Governor Polis for not releasing Ms. Peters. ECF No. 26 at ¶¶ 85-86.

The following week, the Trump Administration launched a barrage of threats and actions designed, by all appearances, to punish Colorado: terminating $109 million in Department of Transportation funds, signaling the cancellation of $615 million in Department of Energy funds, announcing a plan to dismantle the National Center for Atmospheric Research in Boulder, and denying two requests from the State for disaster relief assistance. *Id.* at ¶¶ 89-104. The December 17th Recertification Letter directing Colorado to participate in the pilot project arrived amid this flurry. *See id.* at ¶ 98.

## 2. **The Minnesota Letter**

At the same time, USDA sent a nearly-identical letter to Minnesota Governor Tim Walz. *See* ECF No. 61-1 ("Minnesota Letter"). The Minnesota Letter, like the one here, directs the state to recertify approximately 106,000 households across four

of its most populous counties (all in metropolitan Minneapolis) in 30 days under the same threat of sanctions. *Id.* Apart from the names of the counties and the state agency, the only difference between the letters is a reference in the Minnesota Letter to a highly-publicized investigation into a large-scale fraud in the state involving USDA's child nutrition program during the Covid-19 pandemic. *Id.*

On the social media platform "X," Secretary Rollins announced the Minnesota pilot project by posting "@GovTimWalz, there is nothing you can do NOW that changes the fact you stood idly by as criminals stole MILLIONS from the American taxpayer and hungry families. The attached requires you to verify SNAP participants in the next 30 days. Tick. Tock. [Clock Emoji]." ECF No. 61-6.

To date, Colorado and Minnesota are the only states that USDA has attempted to force to participate in this pilot project or any other. *See* ECF No. 46-1 at ¶ 17.

On January 14, 2026, following a hearing, a federal district court granted Minnesota's request for a preliminary injunction, finding that the pilot project directed by the Minnesota Letter was likely "procedurally and substantively" invalid under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C). *Minnesota v. USDA*, Case No. 25-cv-4767 (LMP/JFD), 2026 WL 125180, at * 8 (D. Minn. Jan. 16, 2026). The district court also found that, absent injunctive relief, Minnesota faced irreparable harm in attempting to comply with the letter, or, in failing to comply and facing the threatened sanctions. *Id.* at *16-18.

Nor were the sanctions an empty threat. Minutes before the hearing, Secretary Rollins issued another letter ("Enforcement Letter") informing Minnesota that USDA was immediately withholding the state's administrative costs for SNAP for the first quarter of the fiscal year. *See* ECF No. 61-2. The Secretary stated that such action was justified by "Minnesota's persistent and public indifference to ongoing fraud and an unwillingness to comply with safeguards against fraud." *Id.* Citing her pilot project waiver authority under § 2026(b)(1)(A), the Secretary stated that she was waiving the normal § 2020(g) provisions requiring that a noncomplying state be given formal notice, a chance to take corrective action, and additional administrative process before imposing sanctions. *Id.*

USDA agreed that the Enforcement Letter was the proper subject of the state's preliminary injunction motion. *Minnesota*, 2026 WL 125180, at *3. The district court therefore enjoined the Enforcement Letter as well. *Id.* at *3-4.

## D. <u>The Instant Proceedings</u>

On January 12, 2026, Colorado filed the instant motion for a preliminary injunction, challenging the Recertification Letter on four grounds. The State contends that, in mandating the pilot project, USDA: (1) exceeded its statutory authority, *see* 5 U.S.C. § 706(2)(C); (2) violated mandatory procedural requirements, *see id.* § 706(2)(D); (3) acted arbitrarily and capriciously, *see id.* § 706(2)(A); and (4) violated the Spending Clause, *see* U.S. Const. Art. I, § 8. ECF No. 46 at 2.

16

USDA responded on January 22, 2026, arguing that the project is authorized by the Secretary's broad authority under § 2026(b)(1)(A) and coinciding waiver power, and that Colorado's other grounds are unavailing. ECF No. 52. The agency further contends that Colorado cannot show irreparable harm where it has neither complied with the pilot project nor been sanctioned for noncompliance. *Id.* at 9-11.

Several aspects of USDA's response bear discussion at this juncture.

First, USDA asserts that Colorado misunderstood the Recertification Letter to require in-person interviews. *Id.* at 7. In a declaration, the agency maintains that in-person interviews are listed in the letter merely as an illustrative example—not a mandate. *See* ECF No. 52-1, Corley Decl., ¶ 3. The project imposes "no new substantive requirements," it claims, and the Counties are expected to follow their normal recertification process, "albeit on an expedited basis." ECF No. 52 at 9.

The Court rejects USDA's attempts to rewrite the plain terms of the pilot project through a litigation declaration. USDA's contention that in-person interviews are merely illustrative is difficult to square with the other verification measures mentioned in the same sentence—which are unquestionably mandatory under SNAP regulations. *See* 7 C.F.R. § 273.2(f)(10) (requiring states to utilize the SAVE database); *id.* § 273.11(c) (requiring states to account for the income and resources of ineligible household members). USDA has declined to withdraw the

letter or issue an official clarification, and it is not clear that Colorado could safely rely upon USDA's litigation representation were it forced to comply with the project.

Moreover, as discussed, the Minnesota Letter contains identical verbiage, and in that case, USDA did not dispute that the pilot project requires the state to conduct in-person interviews. *See Minnesota v. USDA*, Civ. No. 25-cv-04767-LMP-JFD, ECF. No. 22 at 30 (defendant's brief acknowledging that the pilot project calls for in-person interviews for households, though not for every individual). The district court there likewise recognized that the letter's plain language requires in-person interviews contrary to the regulations and Minnesota's approved plan of operation. *Minnesota*, 2026 WL 125180, at *28-29. The Court therefore declines to adopt USDA's unnatural reading of its own letter pressed here.

Second, USDA's response provides several rationales for compelling Colorado's participation that were not articulated in the Recertification Letter.

Initially, the agency claims that Colorado was selected, in part, because it is one of ten states that administer SNAP at the county level. *See* ECF No. 52-1 at ¶¶ 16-20. Based on data collected from four of those states (North Carolina, North Dakota, Ohio, and Virginia), USDA concluded that "county-administered program[s] are generally more likely to have higher rates of fraud, waste, and abuse than States that do not delegate administration of SNAP at the county level." *Id.* at ¶ 20. This conclusion, it states, prompted the mandatory pilot project in Colorado.

USDA next indicates that the project responds to "a recent history of integrity concerns" in Colorado. *Id.* at ¶ 21. It cites two FNS reports finding that several counties failed to pursue administrative disqualification or prosecution in every case of suspected intentional program violation ("IPV").[6] *Id.* at ¶¶ 21-24. Specifically, in 2023, FNS determined that although Denver County was a "model" for investigating and documenting suspected fraud, it failed in some unspecified number of cases to initiate the required disciplinary proceedings for alleged IPVs. *See* ECF No. 52-1 at 32-33, 37-38. In 2024, FNS made the same finding with respect to nine cases in Larimer County, one in El Paso County, and one in Montezuma County. *Id.* at 54-55. USDA does not dispute that Colorado has since taken adequate, agency-approved steps to address and correct these findings. *See* ECF No. 61-5 at ¶ 11.

Finally, USDA represents that, beginning in early December 2025, "public reports concerning apparently illegal activities in Colorado, including Denver area gang operations, and abuse of public benefits" drove the agency to devise the mandatory pilot project. ECF No. 52-1 at ¶ 25. Yet USDA provides neither a description nor a citation to the public reports upon which it purportedly relied.

---

[6] These annual program reviews are a required part of SNAP's quality control efforts, and must be conducted by every state. *See* 7 C.F.R. § 275.5. Notably, in both the 2023 and 2024 reports, FNS commended "the level of understanding and knowledge displayed by staff concerning SNAP policies and regulations" evincing a "commitment to program integrity" by both State and county office staff. *See* ECF No. 52-1 at 23, 43.

At the hearing, USDA acknowledged it has no direct evidence that SNAP fraud in Colorado is going undetected. *See* ECF No. 64, Hr. Tr. at 52. Rather, counsel stated that the agency "can't even investigate fraud currently in Colorado" because it does not have its state-level data. *Id.* at 52: 20-21. Counsel further represented that USDA's "primary reason" for instituting this mandatory pilot was its belief, based on data from *other* states, that Colorado is more susceptible to fraud because parts of its program are administered at the county level. *Id.* at 61: 12.

## III.  Analysis

Colorado, as the party seeking a preliminary injunction, must demonstrate that: (1) it is likely to succeed on the merits; (2) it will likely suffer irreparable harm absent the preliminary relief; (3) the balance of equities tips in its favor; and (4) that the injunction is in the public interest.[7] *See RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1208 (10th Cir. 2009). Here, where the government is the nonmoving party, the third and fourth factors merge. *Nken v. Holder*, 566 U.S.418, 435 (2009).

For the reasons set forth below, Colorado has met its burden with respect to each factor, and its right to relief is "clear and unequivocal." *Beltronics USA, Inc. v. Midwest Invent. Distrib., LLC,* 562 F.3d 1067, 1070 (10th Cir. 2009).

---

[7] While a preliminary injunction is "an extraordinary remedy never awarded as of right," *DTC Energy Grp., Inc. v. Hirschfield*, 912 F.3d 1263, 1269 (10th Cir. 2009), Colorado does not need to meet the heightened standard required where the requested relief would alter rather than preserve the status quo. *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1252 (10th Cir. 2018).

### 1.  Colorado Is Likely to Prevail on the Merits

Before turning to the merits, the Court briefly addresses USDA's ripeness argument.  ECF No. 52 at 11-12.  The matter is ripe for review under the APA because the Recertification Letter constitutes final agency action.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (final agency action (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) determines "rights or obligations" from which "legal consequences will flow") (internal quotation marks and citations omitted).  By its unequivocal terms, Colorado is "required" to participate in the pilot project, and failure to do so "will trigger noncompliance procedures."  ECF No. 46-1.  There is nothing "tentative or interlocutory" about the agency's position that Colorado must comply with these new obligations or face the legal consequences.  *Spear*, 520 U.S. at 178.  Indeed, in the Minnesota case, USDA conceded that the identical letter constituted final agency action.  *See* ECF No. 61-4 at 3.  The agency has offered no reason for adopting a different view here.

USDA's argument that the matter is not ripe because Colorado has not been sanctioned yet is unavailing.  Colorado "does not have to await the consummation of threatened injury to obtain preventive relief."  *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010) (parties challenging agency action are not normally required "to bet the farm" before testing the action's validity).  USDA does

not claim that exhaustion is statutorily required, and there is no reason to delay adjudication of the Recertification Letter in deference to the agency's sanction procedures. *See Abbott Labs v. Gardner*, 387 U.S. 136 (1967) (holding that pre-enforcement challenge to agency action was ripe for judicial decision).

Accordingly, the Court now turns to the merits and finds that Colorado is likely to succeed in showing that the Recertification Letter (1) is contrary to the FNA, (2) flouts procedural requirements, (3) is arbitrary and capricious, and (4) violates the Spending Clause. *See Atchison, T. and S.F. Ry. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981) (plaintiffs seeking a preliminary injunction need only show a "reasonable probability of success" not an "overwhelming likelihood").

**A. The pilot project is contrary to statutory authority, 5 U.S.C. § 706(2)(C).**

Initially, Colorado argues that the Recertification Letter is contrary to law and exceeds the scope of the Secretary's authority under the FNA. The Court agrees.

1. The Secretary cannot compel Colorado to participate in a pilot project.

"As with all statutory interpretation cases, we begin with the language of the statute." *U.S. v. Burkholder*, 816 F.3d 607, 614 (10th Cir. 2016) (internal citation omitted). Section 2026(b)(1)(A) states, in relevant part, that "[t]he Secretary may conduct on a trial basis, … pilot or experimental projects designed to test program changes that might increase efficiency of [SNAP] and improve the delivery of [SNAP] benefits to eligible households[.]" Congress therefore gave the Secretary

discretionary authority to conduct pilot projects, but the statute says nothing about *mandating* states to participate in them. These are two very different things. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477 (2023) (rejecting Department of Education's position that the Secretary's authority to "waive or modify any statutory or regulatory provision" related to federal financial aid programs included the power to cancel student loans). There is no express textual authority for this separate power that the agency asserts, and the Court declines to rewrite the statute to include it.

The Court's conclusion that the FNA does not permit the Secretary to compel states to participate in a § 2026(b)(1)(A) pilot project is reinforced by reading this provision "in [its] context and with a view to [its] place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 474 (2015) (internal quotation marks and citation omitted). First, although this provision states that the Secretary "may waive any requirement of [the FNA] to the extent necessary for the project to be conducted," it goes on to detail the options and timeframe for the Secretary to respond to waiver *requests* from the states, underscoring that Congress intended pilot projects to be a collaborative endeavor. § 2026(b)(1)(D). USDA argues that this subsection does not limit the Secretary's pilot project authority to *only* those instances where a state signals their voluntary participation by requesting a waiver. ECF No. 52 at 18. However, the statute contains no other provision describing how or when the Secretary may exercise her waiver power, suggesting that the state-

initiated process was intended as the exclusive means. *See Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1087-88 (10th Cir. 2025) ("the enumeration of certain things in statute suggests that the legislature had no intent of including things not listed or embraced") (internal quotation marks and citation omitted).

Second, the FNA's other pilot project provisions, which are framed in mandatory rather than discretionary terms, cast further doubt on the agency's interpretation of § 2026(b)(1)(A). *See* 7 U.S.C. § 2021(i)(1)(A) ("The Secretary *shall* carry out … pilot project to test innovative *Federal-State partnerships*…") (emphasis added); *id.* § 2025(h)(1)(F)(i)(I) ("The Secretary *shall* carry out pilot projects under which State agencies *shall* enter into *cooperative agreements* with the Secretary …") (emphasis added); *id.* § 2017(f)(2)(A) ("…the Secretary *shall* carry out, at the *request of 1 or more State agencies*…") (emphasis added). Even in these sections, where the Secretary has a mandate to carry out pilot projects, she must nonetheless secure state cooperation. Therefore, it cannot be the case that in the one pilot project provision where the Secretary has no duty to act, she may simultaneously compel states to participate.[8]

Third, § 2026 contains no provision for addressing noncompliance by a state, reaffirming that participation in pilot projects conducted under this section is

---

[8] USDA argues that § 2021(i) and § 2025(h)(1)(F)(i)(1) "do not contain any language suggesting that the only manner in which the Secretary can carry out the pilot projects is to secure voluntary cooperation from a State," but its reading of these statutes is misguided.  ECF No. 52 at 19.  Aside

voluntary. The agency claims that the Secretary's general authority to initiate sanction proceedings against states under § 2020(g) extends to enforcing pilot projects. ECF No. 52 at 22. However, this section limits sanctions to noncompliance with the FNA, the regulations, a state's plan of operations, and certain data processing requirements—none of which apply here. USDA's argument that refusal to participate in a pilot project is itself a violation of the FNA is circular: it presupposes that participation is mandatory. *Id.* Section 2020(g) permits sanctions for noncompliance with existing statutory duties; it does not create new ones.[9]

Even if § 2026(b)(1)(A)'s text was ambiguous, the major questions doctrine precludes finding that the FNA grants the Secretary the "extraordinary power" asserted here. *See Learning Resources, Inc. v. Trump*, 607 U.S. ----, 2026 WL 477534, at *7-8 (Feb. 20, 2026). "Concisely put, under this doctrine, a court should not sustain an agency action that involves regulation of major questions—those of great economic and political significance—unless the agency

---

from the fact that "Federal-State partnerships" necessarily connotes cooperation, among the "[s]election criteria" under § 2021(i)(2) is a "commitment of the participant State [ ] to follow Federal rules and procedures [of the pilot project]." Clearly, a state's commitment to follow program rules is a matter within its control, and participation must therefore be voluntary. Likewise, § 2025(h)(1)(F) projects are referred to as "cooperative agreements," and include "[q]ualifying criteria" that require the state to "agree" or "commit" to certain conditions, again reflecting that the Secretary may not force projects on unwilling states.

[9] The agency does not advance any legal basis for the Recertification Letter's threat to "Colorado's continued participation in SNAP" as a consequence for noncompliance, which is not an available sanction under § 2020(g) or the implementing regulations, *see* 7 C.F.R. §§ 276.4-276.5.

can point to clear Congressional authorization for such an action." *Dolan v. FEMA*, 794 F.Supp.3d 951, 996 (D.N.M. 2025) (citing *West Virgina v. EPA*, 507 U.S. 697, 720-24 (2022)) (cleaned up). Said another way, when "executive branch officials claim Congress has granted them an extraordinary power, they must identify clear statutory authority for it." *See Learning Resources, Inc.*, 2026 WL 477534, at *16 (Gorsuch, J., concurring).

Here, the agency claims the Secretary has the extraordinary power to effectively rewrite the whole of the FNA through the vehicle of compulsory § 2026(b)(1)(A) pilot projects. *See Nebraska*, 600 U.S. at 502 (holding that Secretary's authority to "waive or modify" student loan obligations under the HEROES Act was not license "to rewrite that statute from the ground up"). If the Secretary can compel states to take part in a pilot project, and in the process, "waive any requirement" of the FNA, Congress' careful statutory scheme simply becomes a backdrop against which the Secretary legislates. Approximately one-in-eight Americans rely on SNAP for food, including 14 million children and eight million elderly individuals. *R.I. State Council*, 158 F.4th at 307. Allowing the Secretary to redesign the program at will is undeniably a decision of great "economic and political significance." *Nebraska*, 600 U.S. at 502-03. Yet the only statutory language USDA points to for this vast accretion of power in the Secretary's hands is the use of the word "may" in § 2026(b)(1)(2)(A). The major questions doctrine

prohibits resting "such a sweeping and consequential authority" on such a "wafer-thin reed." *West Virginia*, 597 U.S. at 721.

Finally, the agency's "longstanding practice" of treating § 2026 pilot projects as cooperative endeavors "inform[s]" the Court's "determination of 'what the law is.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024). Prior to the Colorado and Minnesota letters, USDA had never sought to compel a state to participate in a pilot project. ECF No. 64 at 65: 9-12. Indeed, the agency's 2025 SNAP State Options Report explains that states "may request approval from FNS to conduct demonstration projects" while saying nothing about *forcing* states to participate in them.[10] The agency's long track record and lack of explanation for changing course are telling. *See Nebraska*, 600 U.S. at 519 (Barrett, J., concurring) ("A longstanding want of assertion of power by those who presumably would be alert to exercise it may provide some clue that the power was never conferred."). The Court rejects USDA's assertion of this previously "unheralded power" in "a long-extant statute." *West Virginia*, 597 U.S. at 724.

For these reasons, the Court finds that § 2026 does not authorize the Secretary to force Colorado to participate in any pilot project.

---

[10] USDA, *Supplemental Nutrition Assistance Program: State Options Report* 26, 26-40 (17th ed. Aug. 2025), https://coag.gov/app/uploads/2026/01/snap-stateOptionsReport-17edition.pdf.

2.  <u>The pilot project unlawfully imposes new and conflicting rules on Colorado.</u>

Additionally, the Recertification Letter is contrary to law because it both requires Colorado to comply with *new* recertification requirements not found in the FNA or its implementing regulations and to violate *existing* ones.

Nothing in § 2026 or the wider FNA gives the Secretary the power to impose new recertification requirements as part of a pilot project. But this is exactly what the Recertification Letter does: it directs households in the Counties to appear for in-person interviews and recertify outside of their normal certification periods. Even accepting USDA's position that the Counties may "conduct recertifications as they normally would," demanding that they do so "on an accelerated timeframe" is in fact a new substantive requirement. ECF No. 52 at 20. Recertifying households on a rolling six-month or 24-month schedule is different than conducting mass recertifications on a shorter timeframe.

At the same time, the pilot project would require Colorado to violate existing regulations. Among other things, the regulations permit telephonic recertification interviews, *see* 7 C.F.R. § 272.2(e)(2), (d)(xvi)(B); prohibit in-person reporting during the certification period or ending the certification period early, *see id.* §§ 273.2(e)(1), 273.10(f)(4); require more than one month's notice before recertification, *see* 7 U.S.C. § 2020(e)(4), 7 C.F.R. § 273.14(b)(1)(i); and mandate that interviews be scheduled at least 10 days before the end of the expiration period

to allow households time to submit necessary verification, *id.* § 274.14(b)(3)(iii), (4). The pilot project would necessarily violate all of these rules.

The agency contends that, to the extent that the pilot project conflicts with these and any other provisions, the Secretary has waived them. ECF No. 52 at 21; ECF No. 64: 20-25, 65: 1-2. There are at least two problems with this argument. First, nothing in the Recertification Letter or the record indicates that the Secretary has, in fact, waived any part of the FNA or implementing regulations. *See Nebraska*, 600 U.S. at 497 ("the Secretary does not identify any provision that he is actually waiving"). Second, even assuming the Secretary can and has waived conflicting federal requirements with the pilot project *sub silentio*, Colorado has incorporated these requirements in its plan of operations and state law. The Secretary's statutory authority to waive any provision of the FNA to conduct a § 2026 pilot project plainly does not extend to nullifying *any* state law that conflicts with her design.

3. The pilot project violates the evaluation requirement.

Furthermore, the pilot project fails to comply with the statutory requirement that it include "an evaluation to determine the effects of the project." § 2026(b)(1)(B)(i)(II). The Recertification Letter says nothing about whether and how USDA plans to evaluate the effects of the project. Compare this to Colorado's pilot project to remove sugary drinks from SNAP-eligible food items. ECF No. 46-

1 at 22.  There, USDA's approval letter detailed exactly how the project would be evaluated.  *Id.* at 22-29.  The Recertification Letter does nothing of the sort.

The agency conflates the statutory evaluation requirement with the Recertification Letter's recordkeeping mandate.  ECF No. 46-1 at 1 (requiring the State to "[d]ocument and preserve all information" related to compliance with the pilot project and recertifications); ECF No. 52 at 20.  Although recordkeeping may facilitate evaluation, they are distinct activities.  The Court cannot simply accept the agency's assurances that it will evaluate the pilot project when the sole document establishing the parameters of the program makes no provision for it.

4. <u>The pilot project is contrary to the goals of SNAP.</u>

The Recertification Letter also violates three related provisions that prohibit pilot projects that are inconsistent with SNAP's fundamental purposes.

First, the pilot project contravenes SNAP's core objective of "providing food assistance to raise levels of nutrition among low-income individuals." § 2026(b)(1)(B)(i).  As Colorado explains, conducting recertifications on short notice for 100,000 households in 30 days—with or without in-person interviews—will invariably cause eligible households to lose benefits, either due to administrative error or because applicants are unable to comply with these demands on a compressed timeframe.  *See* ECF No. 46-1 at ¶¶ 56-58.

The agency responds that the pilot project merely requires Colorado to disenroll *ineligible* households, not those unable to complete recertification on time. ECF No. 52 at 20. This answer fundamentally misunderstands the relationship between eligibility and recertification. Except in limited circumstances, households that are not recertified within 30 days are ineligible to receive benefits. *See* 7 C.F.R. §§ 273.10, 273.14(a), (e). In any event, the agency does not address how a project that all but guarantees eligible households will lose benefits on account of the administrative challenges involved comports with § 2026(b)(1)(B)(i).

Second, the pilot project is inconsistent with the requirement that Colorado "provide timely, accurate, and fair service" to SNAP participants, and is therefore unlawful. §§ 2026(b)(1)(B)(iv)(III)(ff), 2020(e)(2)(B)(i). Congress established a statutory and regulatory framework to provide households with an orderly, predictable, and fundamentally fair process for periodically demonstrating their continued eligibility for SNAP, including by prescribing a definite certification period, ensuring adequate notice, and permitting telephonic interviews.[11] The Recertification Letter runs roughshod over these safeguards. *See Minnesota*, 2026 WL 125180, at *10-11.

---

[11] At the same time, Congress calibrated this framework to account for the twin goal of program integrity. In addition to regularly recertifying, SNAP households are subject to ongoing reporting requirements, *see* 7 C.F.R. § 273.12, and the state may or, in some cases, must terminate or reduce benefits if it "receives information that the household has become ineligible" during the certification period or the household does not report as required. 7 C.F.R. § 273.10(4).

31

The agency refuses to acknowledge this reality, clinging to its refrain that "the pilot project does not impose new burdens or rules on beneficiaries."  ECF No. 52 at 21.  But requiring individuals and families to recertify on short notice outside of their recertification cycle is both new and burdensome.  Some households will have just completed their last recertification; others will have been preparing to do theirs in the coming months.  The pilot project promises to generate confusion, disruption, and erroneous terminations—the very "antithesis" of the "timely, accurate, and fair service" that the government must provide.  ECF No. 46 at 15.

Third, and finally, as the pilot project will predictably lead to recipients losing benefits despite not failing "to comply with any work, behavioral or other conduct requirement[s]," it runs afoul of a separate statutory prohibition on program waivers that would "den[y] assistance to an otherwise eligible household or individual." § 2026(b)(1)(B)(iv).  Therefore, the pilot project is unlawful on this ground as well.

For the above reasons, the Recertification Letter is contrary to statutory authority.

**B. The pilot project violates procedural requirements, 5 U.S.C. § 706(2)(D).**

Colorado is also likely to prevail on its claims that the issuance of the Recertification Letter violates the notice-and-comment requirements found in the APA, *see* 5 U.S.C. § 533, and the SNAP regulations, *see* 7 C.F.R. § 282.1(b).[12]

1. The pilot project violates the APA's notice-and-comment procedures.

Prior to promulgating a legislative rule, an agency must comply with the notice-and-comment requirements set forth in the APA.  5 U.S.C. § 533.  A rule is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).  Furthermore, "[a] rule is legislative when it has the force of law and creates new law or imposes new rights or duties." *Sorenson Comms., Inc. v. FCC,* 567 F.3d 1215, 1222 (10th Cir. 2009).  An order, by contrast, is generally formulated through an adjudication, *see* 5 U.S.C. § 551(7), and "must have retroactive effect, or else it would be considered a rulemaking." *Cath. Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 922 (D.C. Cir. 2013).  An agency's own label for its actions is not dispositive. *Sorensen Comms., Inc.*, 567 F.3d at 1223.

---

[12] Because Colorado is likely to succeed in showing that the Recertification Letter is unlawful on other grounds, the Court does not reach the parties' arguments about whether the pilot project violates the procedural requirements of the Paperwork Reduction Act, and if so, should be set aside on that basis.  *See* ECF No. 46 at 11-12; ECF No. 52 at 16-18; ECF No. 61 at 7-9.

The Recertification Letter unquestionably constitutes a legislative rule. It is an agency statement of "particular applicability and future effect" intended to implement or prescribe a specific policy. 5 U.S.C. § 551(4). It imposes new duties on Colorado and SNAP recipients through a mandatory pilot project that—backed by the threat of sanctions—carries the force of law.

The Court rejects USDA's efforts to recast the Recertification Letter as an order. ECF No. 52 at 12-15. The Recertification Letter does not purport to bind Colorado "by retroactively applying law to [its] past actions." *Safari Club Intl. v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017). It does not "adjudicate disputed facts" in an existing controversy. *U.S. v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Instead, it is purely future-oriented, the hallmark of a legislative rule. *See Safari Club Intl.*, 878 F.3d at 333.

Therefore, USDA violated the APA by promulgating the Recertification Letter without observing the required notice-and-comment procedures.

2.  <u>The pilot project violates the regulations' notice-and-comment procedures.</u>

 Separately, the Recertification Letter violates the FNA's implementing regulations, which require USDA to follow notice-and-comment procedures for any project that "will likely have a significant impact on the public." 7 C.F.R. § 282.1(b).

With or without in-person interviews, requiring Colorado to notify and recertify more than one-third of all SNAP households in 30 days—compressing

more than six months of work into one—indubitably meets this standard. As described by counsel for Colorado, the recertification process is akin to completing a "tax return form on steroids" with an automatic "audit on top of it." ECF No. 64 at 14: 10-11; *see also* ECF No. 46-1 at 94-108 (Colorado's SNAP Renewal Form). USDA did not give CDHS, the Counties, or the families any time to prepare for this unanticipated burden. Nor did it offer Colorado any additional resources to meet this mandate or cover the associated costs. On top of this, the agency threatens "existential sanctions" for noncompliance. ECF No. 46 at 16.

The agency's claim that the Secretary determined that this project would not likely "have a significant impact on the public" is simply not credible. ECF No. 52 at 15-16. The fact that the pilot project is limited to five counties is immaterial in light of the total number of people affected and the strain on the State's resources.

Moreover, the claim that the project is unlikely to have a significant impact on the public is directly at odds with the agency's assertion that the project's purpose is to uncover substantial benefits fraud. It can't be both. If the project is significant enough to expose widespread fraud, and important enough to enforce with sanctions, it is necessarily significant enough to require notice to stakeholders and the public. USDA's contrary conclusion, as well as its contention that the Secretary may simply

waive this regulation, reflects not a reasoned determination, but an attempt to evade its notice-and-comment obligations altogether.

Accordingly, the Recertification Letter violates two separate procedural mandates requiring notice-and-comment, and must be set aside on those bases.

### C. The pilot project is arbitrary and capricious, 5 U.S.C. § 706(2)(A)

Additionally, the pilot project violates the APA's prohibition against arbitrary and capricious agency action, and must be set aside on that basis as well. *See Motor Vehicles Manufacturers Ass'n v. State Farm*, 463 U.S. 29 (1983).

At its core, the arbitrary-and-capricious standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

USDA's directive compelling Colorado to recertify 100,000 SNAP households in 30 days with no advance warning fails even under this deferential standard of review. *See Prometheus*, 592 U.S. at 423.

As an initial matter, "judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents*

*of Univ. of Calif.,* 591 U.S. 1, 65 (2020). Accordingly, the Court must evaluate USDA's action solely on the rationales offered in the Recertification Letter, which states only that the pilot project is being required "[a]mid ongoing fraud affecting federally funded benefits across the nation, including [FNS'] multiple requests to the State of Colorado to fulfill its administrative responsibilities." ECF No. 46-1 at 1.

This explanation suffers from at least four fatal defects.

*First*, it is so vague as to be functionally meaningless. While courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," that is impossible on this record. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023) (internal citation omitted). The Recertification Letter grounds neither the agency's concerns about nationwide fraud nor its "multiple requests" to Colorado in specific examples, much less articulates any connection between the two or the directive imposed here. The agency's failure to "cogently explain why it has exercised its discretion in a given manner" renders this action arbitrary and capricious. *State Farm*, 463 U.S. at 48.

*Second*, the Recertification Letter reflects that USDA failed "to consider important aspects of the problem," specifically, whether Colorado could legally and practically comply with the pilot project. *Id.* at 43. As discussed, *supra*, the pilot project would require Colorado to violate numerous federal and state regulations, as well as its plan of operations, including by prematurely ending certification

periods, sending notices of expiration out of time, and mandating in-person interviews. While the agency claims that the Secretary has implicitly waived the federal requirements, they concede she has no power to override Colorado's duly enacted laws. *See* ECF No. 64 at 67: 9-12. Even in an expedited process, Colorado would need at least 30 days to amend its own regulations. *See* ECF No. 46-1 at ¶ 28. USDA's only response is that it would be "odd" if states could cite their own laws to resist a mandatory pilot project, ECF No. 64 at 67: 3-8, and therefore, Colorado must "figure out a way to deal with those regulations." *Id.* at 66: 15-16. The more likely answer is that this conflict is yet another indication that the Secretary does not have the unilateral authority she asserts under the statute. At a minimum, the failure to give any thought to this problem reflects a lack of reasoned decisionmaking.

Legal impediments aside, the Recertification Letter does not acknowledge the enormous practical challenges involved. Colorado's chief SNAP administrator estimates that completing the recertifications would require approximately 7,900 worker hours per day for 18 business days. *See* ECF No. 46-1 at ¶ 31. Colorado simply does not have enough trained eligibility workers state-wide to complete the pilot on the mandated timeline.[13] *Id.* at ¶ 32. The project remains infeasible even if

---

[13] By regulation, "workers performing eligibility determinations and interviews must be merit personnel and employed in accordance with section 208 of the Intergovernmental Personnel Act of 1970." ECF No. 46-1 at ¶ 32 (citing 7 C.F.R. § 272.4). In other words, the State cannot legally

in-person interviews are not required. *See* ECF No. 61-5 at ¶¶ 18-21. Attempting to comply with the project would also be extremely costly for the State, requiring it to divert funds from other public services, creating a budgetary shortfall that USDA has not offered to reimburse. *Id.* at ¶ 22. The Recertification Letter does not address these legitimate concerns at all.

*Third*, the Recertification Letter fails to consider how the pilot project violates "serious reliance interests that must be taken into account." *Regents*, 591 U.S. at 30 (internal quotation makes and citation omitted). USDA does not contend with the burden on SNAP households who are suddenly required to recertify or else lose their benefits. The agency bizarrely claims that Colorado does not have to "unenroll households that are unable to complete their recertification process within the 30 days," ECF No. 52 at 20, but the State cannot legally issue benefits to households that are not recertified. *See* 7 U.S.C. § 273.14(a). The agency's failure to appreciate this straightforward consequence of its action underscores the lack of reasoned analysis.[14] *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (an

---

redeploy other county staff or recruit volunteers to do the pilot project. USDA would presumably respond that the Secretary has implicitly waived this requirement, too, but conscripting untrained and unqualified workers to quickly complete 100,000 recertifications poses an obvious contradiction to the agency's stated goal of detecting and eliminating waste, fraud, and abuse.

[14] At the same time, the agency seems to ignore or be oblivious to the implication of its position: if Colorado may continue issuing benefits to households that are not recertified because their eligibility periods have not expired, then households have no reason to comply with the onerous demands of recertification on short notice, making the pilot project a pointless exercise.

agency must "display awareness" of consequences and provide "a reasoned explanation" for departing from prior policy). Nor does USDA reckon with the long term impact on trust in the SNAP program and Colorado's social services among families in need if their lives can be disrupted in this way at any time.

*Fourth*, and most fundamentally, the Recertification Letter fails to articulate "a rational connection between the facts found and the choices made." *State Farm*, 463 U.S. at 43. The agency never explains why requiring Colorado to recertify 100,000 households in 30 days will address its alleged fraud concerns. The closest it comes is asserting that it is "important to identify errors and fraud as quickly as possible, instead of letting them continue undetected and uncorrected." ECF No. 52 at 7. But this answer does nothing to explain *why* the agency believes that conducting a mass recertification in five counties, on a compressed timeline and with no chance to prepare, will uncover fraud more effectively than existing procedures and improve payment accuracy—a counterintuitive proposition, at best. Absent any explanation for its chosen solution to the alleged problem, the Court cannot conclude that the agency acted "within the bounds of reasoned decisionmaking." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019).

Even if the Court were to consider the rationales provided in USDA's brief and accompanying declaration, the result would be the same.

The agency leans heavily on the fact that Colorado partly administers at the county level and that, in reviewing data from four other county-administered states, it identified nearly 20,000 previously undetected instances of individuals receiving benefits in more than one county. *See* ECF No. 52-1 at ¶ 20. But this figure is presented without the context necessary to evaluate its significance, such as the baseline error rates for those states, how these instances were distributed across the four states, or comparisons to the error rates of more centrally-administered states. Devoid of any meaningful context, this raw figure does not constitute "substantial evidence" supporting the agency's decision. *Mkt. Synergy Grp., Inc. v. U.S. Dep't of Labor*, 885 F.3d 676, 683 (10th Cir. 2018).

There are other significant gaps in the agency's reasoning. For instance, USDA does not indicate whether, like Colorado, the other county-administered states have statewide databases to catch and prevent intrastate duplication. Nor does it explain why, if duplicate participation within Colorado is the concern, requiring recertification in just five of the State's 64 counties would meaningfully address it.

Finally, this rationale violates the "bedrock principle" that agencies "must treat like cases alike." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 479 (5th Cir. 2021). USDA asserts that its review of data from North Carolina, North Dakota, Ohio, and Virginia revealed systemic vulnerabilities associated with county-level SNAP administration, yet it

has only compelled Colorado and Minnesota to conduct this pilot project. At oral argument, counsel for the agency represented that USDA is "working" with these other states, but that only heightens the contradiction: why do they get the carrot while Colorado gets the stick? ECF No. 64 at 54: 4-6. This "[u]nexplained inconsistency" is itself a hallmark of arbitrary and capricious agency action. *Natl. Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

The agency's reliance on the FNS reports likewise does not withstand scrutiny. Again, USDA fails to provide a "rational connection between the facts found"—that, in 2023 and 2024, four counties failed to refer all suspected IPVs for appropriate disciplinary proceedings—"and the choice made"—five different counties must recertify all SNAP households in 30 days. *State Farm*, 463 U.S. at 43 (internal citation omitted). The claim that these reports justified the pilot project is further belied by FNS' own statements praising state and county staff for the quality of their fraud investigations, *see* ECF No. 52-1 at 30, and the fact that USDA indicated that it was satisfied with Colorado's corrective actions. *See* ECF No. 61-5 at ¶¶ 11, 13.

The last rationale presented by the agency—an inscrutable reference to "public reports" of "apparently illegal activities in Colorado" involving gangs and affecting public benefits—may be easily dismissed. ECF No. 52-1 at ¶ 25. Resting the pilot project on such a vague and conclusory basis cannot "be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

In sum, the Court "cannot ignore the disconnect between the decision made and the explanation[s] given." *New York*, 588 U.S. at 785. That disconnect is glaring here because, as Colorado argues, this is not a "real pilot project." ECF No. 26 at ¶ 99. Comparing the Recertification Letter to the Secretary's approval of Colorado's proposed pilot project five months earlier crystallizes the difference. *See* ECF No. 46-1 at 22-41. In approving the project, the agency worked cooperatively with the State, established defined objectives and methodologies, addressed requested waivers, and set forth evaluation criteria and timelines, all consistent with the statutory framework. *Id.* The Recertification Letter does none of that. Instead, it imposes an immediate, sweeping mandate untethered to any discernible experimental design or evaluation plan, makes no provision for waiving conflicting statutory and regulatory requirements, and threatens harsh sanctions for noncompliance, including removing Colorado from SNAP altogether.

The Court also need not turn a blind eye to the fact that the Recertification Letter arrived during a week of apparent punishments and threats aimed at Colorado, nor that the identical Minnesota Letter was accompanied by a taunting social media post from the Secretary. *See New York*, 588 U.S. at 785 (courts, in reviewing agency action, are "not required to exhibit a naiveté from which ordinary citizens are free"). This larger context gives the game away; the pilot project seems to be about punishment and nothing more. Under the APA, agencies must "offer genuine

justifications for important decisions" so that they "can be scrutinized by the courts and the interested public." *Id.* Instead, USDA presents "contrived reasons" that the Court cannot accept for the reasons explained above. *Id.*; *see also R.I. State Council of Churches v. Rollins*, ---F.Supp.3d---, 2025 WL 311213, at *10 (D.R.I. Nov. 6, 2025) (rejecting USDA's rationale for refusing to issue SNAP benefits during government shutdown as "pretextual" and "incongruent with what the record reveals about the agency's priorities and decisionmaking process") (internal quotations and citation omitted).

The Court therefore concludes that the Recertification Letter is arbitrary and capricious within the meaning of § 706(2)(A).

**D. The pilot project violates the Spending Clause of the U.S. Constitution**

Finally, at the time Colorado agreed to participate in SNAP, it was not and could not have been aware that USDA would reserve the right to unilaterally impose participation in onerous pilot projects. Therefore, the Recertification Letter violates the Spending Clause. U.S. Const. art. I, § 8, cl. 1.

Under the spending power, Congress may "further broad policy objectives by conditioning receipt of federal monies upon compliance by the recipient [states] with federal statutory and administrative directives." *Fullilove v. Klutznick,* 448 U.S. 448, 474 (1980). However, "if Congress desires to condition the states' receipt of federal funds, it must do so unambiguously … enabling the states to exercise their choice

knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (cleaned up). States may not be surprised "with post acceptance or retroactive conditions." *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17 (1981). These limits apply to agencies tasked with administering federal programs as well as Congress itself. *See Los Angeles v. Barr*, 929 F.3d 1163, 1176 n. 6 (9th Cir. 2019).

Here, USDA violated the Spending Clause because Colorado did not receive clear notice that compulsory participation in future pilot projects was a condition of accepting SNAP funds. *See Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy,* 548 U.S. 291, 296 (2006) (when presented with a Spending Clause challenge, courts must ask whether a state official "engaged in the process of deciding" whether to receive federal funds and the obligations that go with them, could have understood that the challenged condition was one of those obligations). Nothing in the FNA or the regulations alerted the State to that possibility because the Act does not confer that authority on the Secretary. *See supra* Section III.I.A. The agency's assertion that it may fundamentally alter the State's administrative responsibilities under the program at will through a § 2026(b)(1)(A) pilot project "accomplishes a shift in kind, not merely degree." *N.F.I.B. v. Sebelius*, 567 U.S. 519, 583 (2012).

Therefore, Colorado is likely to succeed on its Spending Clause challenge.

### 2. Colorado Faces Irreparable Harm

To establish irreparable harm, a party seeking a preliminary injunction must show that the harm is "both certain and great," and "of such imminence that there is clear and present need for equitable relief." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). Colorado has made this showing.

Colorado identifies two broad categories of irreparable harm from the Recertification Letter: harms that it would suffer from complying with the pilot project, and harms it would suffer from not complying. *See* ECF No. 46 at 22-23.

In the former category, the compliance harms, Colorado identifies three concrete injuries: (1) the "enormous, unrecoverable administrative costs" that it would incur in recertifying over 100,000 households in 30 days; (2) the risk of errors in the recertification process from attempting to meet this deadline; and (3) the loss of trust in the State's social service programs, and SNAP specifically, among the population it serves by requiring sudden, mass recertifications. *See id*.

These injuries constitute irreparable harm. They are certain, great, imminent, and there is a "significant risk" that the State cannot be adequately "compensated after the fact by money damages." *New Mexico Dept. of Game and Fish v. U.S. Dept. of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017).

USDA has neither provided Colorado with funds beyond its ordinary administrative allotment to comply with the pilot project nor offered to reimburse

the State for its costs.[15]  *See* ECF No. 61-5 at ¶ 22.  Additionally, if Colorado makes recertification errors during the pilot project—a virtual certainty due to the compressed timeframe and inability to prepare—it will lose administrative funds in future cycles.  *See* 7 U.S.C. § 2013(a)(2).  Colorado cannot recover these financial losses because the federal government is shielded by sovereign immunity, which it has not waived.  *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring) (forcing a state to comply "with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs").

There is also the harm to Colorado families who, as a result of this pilot project, will go without food.  "Going without food is an irreparable harm."  *Dist. of Columbia v. USDA*, 444 F.Supp.3d 1, 43 (D.D.C. 2020).  Whether these families are denied benefits in error during a hurried recertification process, are unable to recertify on short notice, or simply conclude that they cannot rely on a program that changes the rules on them midstream, and choose not to apply, the effects from "deprivation of nutrition, and the psychological and physical distress attending that deprivation" are of the kind that "back payments cannot erase."  *Id.*

---

[15] While USDA asserts that Colorado has $34 million in unspent administrative funds, they do not dispute that these funds represent the State's regular operating budget for SNAP (the vast majority of which are earmarked for the current fiscal quarter).  *See* ECF No. 52-1 at ¶ 56.  If Colorado used these funds for the pilot, it would create a deficit or funding gap in SNAP or somewhere else.

The agency does not meaningfully deny any of the injuries that Colorado asserts would flow from compliance. *See* ECF No. 52 at 9-11. Instead, it hinges its argument for irreparable harm on the fact that Colorado has *not* complied, and therefore, none of these harms will come to pass. *See id.* However, that still leaves the irreparable harm from *non-compliance*. This harm is spelled out plainly in the Recertification Letter: USDA "will" initiate "noncompliance procedures" against Colorado to withhold or disallow administrative funds, and potentially bar its "continued participation in SNAP." ECF No. 46-1 at 20.

There is no question that the loss of Colorado's administrative funds—up to $100 million annually—represents irreparable harm, to say nothing of terminating Colorado's participation in SNAP. *See Minnesota*, 2026 WL 125180, at *17; *see also Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (finding irreparable harm because "the denial of reimbursements and administrative costs are economic injuries for which monetary damages are not available"). Without these essential funds, Colorado "will have to cut staff and programs that are critical to supporting the SNAP program or divert resources from other important services." ECF No. 46-1 at ¶ 51. In other words, however Colorado tries to manage the shortfall, irreparable harm will ensue.

USDA responds that there is no irreparable harm because the agency has not imposed any sanctions—yet. *See* ECF No. 52 at 10-11. But the agency can't have

it both ways—reserving for itself the right to sanction the State for noncompliance while insisting that the harm is not certain, great, or imminent because it will be dispensed at a time and in a manner of its choosing.

The agency relatedly claims that Colorado does not face irreparable harm because, per the Recertification Letter, the sanctions will be imposed pursuant to 7 U.S.C. § 2020(g), which entitles the State to substantial administrative and judicial process. *Id.* Another federal court recently rejected this argument, and this Court does the same. *California, et al.*, 2025 WL 2939227, at *11-12.

Initially, this argument is circular. Under § 2020(g) and the corresponding regulations, in order to avoid sanctions, Colorado would have to demonstrate compliance with the pilot project to the agency's satisfaction, thereby incurring the irreparable compliance harms. *See* § 2020(g) (providing that the Secretary must give the state notice of the deficiency and "a specified period of time for the correction of such failure"); 7 C.F.R. § 276.4(d)(2) (30 days after a formal warning, states must "submit evidence that it is in compliance or submit a corrective action proposal").

Moreover, if sanctions are imposed and upheld by the agency's appellate board, Colorado's recourse would be to seek a stay before a federal court upon "a showing that irreparable injury will occur … and that the State is likely to prevail on the merits," in other words, the very showing it has made here. *Id.* § 276.7(j). Administrative exhaustion is not statutorily required, and the Court perceives no

49

reason to compel Colorado to submit to this process in lieu of granting the relief to which it is amply entitled.[16]  *See California, et al.*, 2025 WL 2939227, at *12 (states threatened with § 2020(g) sanctions were not required to exhaust administrative remedies); *see also Darby v. Cisneros*, 509 U.S. 137, 146-47 (1993) (APA claims must be administratively exhausted only where "statute or rule clearly mandates").

Finally, and critically, Colorado faces irreparable harm because, under the agency's view of 7 U.S.C. § 2026(b)(1)(A), the Secretary could decide to waive all process and impose sanctions at any time.  USDA claims that the Secretary has not waived these provisions and has no plans to do so, *see* ECF No. 52-1 at ¶ 46, but it certainly has not disclaimed that she possesses this power.

Colorado's skepticism of USDA's assurances is warranted.  Indeed, the ink was hardly dry on the agency's declaration in the Minnesota case, in which it likewise asserted that any sanctions would be imposed pursuant to § 2020(g), before the Secretary dashed off another letter declaring that she had exercised her unilateral authority under § 2026(b)(1)(A) to waive that statutory process and withhold Minnesota's first quarter funds *immediately*.  *See Minnesota*, 2026 WL 125180, at

---

[16] USDA's citation to *Leachco, Inc. v. Consumer Product Safety Comm.*, 103 F.4th 748 (10th Cir. 2024) is inapposite.  *See* ECF No. 52 at 10.  In that case, the Tenth Circuit found that the plaintiff's sole claim of irreparable harm—being required to appear before an agency whose officials he claimed enjoyed unconstitutional protection from removal—was insufficient, in large part, because he was likely incorrect on his constitutional claim.  *Leachco*, 103 F.4th at 759-765.  *Leachco* does not stand for the broad proposition that a party cannot demonstrate irreparable harm in the face of unlawful agency action so long as that agency provides some administrative process.

*7; *see also* ECF No. 61-2. Given the agency's position on the statute, there is no principled reason why the Secretary could or would not decide to do the same here. Accordingly, the existence of additional process on paper does nothing to abate the certainty, gravity, or imminence of the harm that Colorado faces.

For the above reasons, Colorado has demonstrated irreparable harm.

### 3. Balance of the Equities

Lastly, the balance of the equities strongly favors granting the requested relief. As explained above, the threatened harms to Colorado and to SNAP recipients across the State without an injunction are substantial and imminent. By contrast, USDA has demonstrated no concrete harm it will suffer from a preliminary injunction that simply maintains the status quo. Colorado will continue administering SNAP in full compliance with the FNA, its implementing regulations, and its USDA-approved plan of operations.

Although the public unquestionably has an interest in protecting federal taxpayers and preventing waste, fraud, and abuse, the agency has made no showing that Colorado's administration of SNAP presents a serious fraud problem—let alone that this pilot project is tailored to address one. Finally, the public has no interest "in the perpetuation of unlawful agency action." *Minnesota*, 2026 WL 125180, at *19 (internal quotation marks and citation omitted). The equities and the public interest therefore align squarely in favor of an injunction.

Having satisfied all factors for a preliminary injunction, the Court grants Colorado's motion.[17]

## ORDER

For the reasons stated above, Colorado's Motion for Preliminary Injunction, ECF No. 46, is hereby GRANTED, and USDA is PRELIMINIARILY ENJOINED from compelling Colorado's participation in the pilot project or taking any adverse action against Colorado for its refusal to comply with any of the demands of the Recertification Letter.

SO ORDERED this 16th day of March, 2026.

By the Court:

_____
R. Brooke Jackson
Senior United States District Judge

---

[17] Defendants have not requested, and the Court will not require, Colorado to pay a bond under Rule 65(c) of the Federal Rules of Civil Procedure. *See Cont. Oil Co. v. Front. Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964) (district court has "wide discretion in the matter of requiring security" for preliminary relief, and where there is no "likelihood of harm" to the adverse party, "no bond is required").
.