**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-3428-RBJ

THE STATE OF COLORADO,

      Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
PETE HEGSETH, in his official capacity as Secretary of Defense,
TROY MEINK, in his official capacity as Secretary of the Air Force,
SEAN DUFFY, in his official capacity as Secretary of Transportation,
BROOKE ROLLINS, in her official capacity as Secretary of Agriculture,
CHRIS WRIGHT, in his official capacity as Secretary of Energy,
DOUG BURGUM, in his official capacity as Secretary of the Interior,
MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,
KAREN EVANS, in her official capacity as Acting Director of the Federal Emergency Management Agency,
BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation,
EXECUTIVE OFFICE OF THE PRESIDENT,
DEPARTMENT OF DEFENSE,
DEPARTMENT OF THE AIR FORCE,
DEPARTMENT OF TRANSPORTATION,
DEPARTMENT OF AGRICULTURE,
DEPARTMENT OF ENERGY,
DEPARTMENT OF THE INTERIOR,
DEPARTMENT OF HOMELAND SECURITY,
FEDERAL EMERGENCY MANAGEMENT AGENCY,
NATIONAL SCIENCE FOUNDATION,

      Defendants.

---

**SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

---

Plaintiff, the State of Colorado, through its Attorney General, hereby alleges the following:

**INTRODUCTION**

1.      President Trump and his Administration continue to engage in a widespread campaign of retribution against entities and individuals across the country. Even the President's Chief of Staff acknowledges that "when there's an opportunity [for retribution], he will go for it." This civil action concerns the Trump Administration's campaign to unlawfully punish the State of Colorado for its exercise of sovereign powers reserved for the States under the Constitution. The President and his Administration are displeased that Colorado has exercised its sovereign authority to regulate elections by allowing mail-in voting and has exercised its sovereign authority to prosecute those who violate Colorado laws in order to undermine election integrity. In response, the Trump Administration has unleashed an array of threatened and actual punishments against Colorado, all in violation of the Constitution and federal law.

2.      This case initially began when President Trump decided to remove U.S. Space Command Headquarters from the City of Colorado Springs to punish the State of Colorado for allowing eligible voters to vote by mail. In issuing his decision, the President was clear about his motivations, announcing that "[t]he problem I have with Colorado" is that "they do mail-in voting" and that this "played a big factor" in the decision. That decision was unconstitutional because the Constitution does not permit the Executive to punish or retaliate against States for lawfully exercising sovereign powers reserved for the States.

3.      The President has threatened other executive action to coerce Colorado and other States to end mail-in voting. He has demanded that States, like Colorado, that allow mail-in

voting "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do."

4. The President likewise threatened to punish Colorado for the way it exercised its sovereign authority to administer criminal justice. *Oregon v. Ice*, 555 U.S. 160, 168 (2009) (administering criminal justice "among the basic sovereign prerogatives States retain"). Mere weeks before the Space Command Headquarters announcement, the President threatened "to take harsh measures" against Colorado for the conviction and imprisonment under Colorado law of former Mesa County Clerk and Recorder Tina Peters for her attempt to undermine election integrity. As part of his threat, President Trump again negatively referenced "Mail-in Ballot" voting. The President has ordered the Department of Justice to "take all necessary action" to secure Ms. Peters' release. He has repeatedly demanded that Colorado "FREE TINA!"

5. The President then announced on December 11 that he had issued a full pardon to Ms. Peters. But the President's pardon power applies to federal offenses, not Ms. Peters' state convictions. When Colorado refused to release Ms. Peters, the President attacked Governor Polis on December 15, referring to him as "pathetic" and complaining that the Governor would not "allow our wonderful Tina" to be released from her prison sentence.

6. The next day, on December 16, the Trump Administration instituted a weeklong series of punishments and threats targeted against Colorado:

- On December 16, the Trump Administration revealed through the press that it was terminating $109 million in transportation funds for Colorado. The Trump Administration directed this action solely against Colorado. No funding for any other

States was terminated, even though many other States are participants in the same programs.

- The same day, the Trump Administration revealed through a reporter that it planned to terminate $615 million in Department of Energy funds earmarked only for Colorado. Both President Trump and Office of Management and Budget ("OMB") Director Russell Vought reposted this media report.

- The same day, the Trump Administration revealed through the press that it planned to dismantle the National Center for Atmospheric Research ("NCAR") in Boulder, Colorado. A White House official directly tied this threat to Governor Polis's refusal to cooperate, stating: "Maybe if Colorado had a governor who actually wanted to work with President Trump, his constituents would be better served."

- Two days later, on December 18, the Department of Agriculture ("USDA") ordered Colorado to recertify eligibility and conduct in-person interviews for more than 100,000 Colorado households receiving Supplemental Nutrition Assistance Program ("SNAP") benefits in five counties within a mere 30 days, all during the winter holidays. If Colorado failed to complete this impossible and unlawful task, USDA threatened sanctions, including the potential removal of Colorado from the SNAP program. This unlawful order was directed only against Colorado and Minnesota, another State that is the recipient of recent and repeated attacks by the Trump Administration.

- Two days later, on December 20, late on a Saturday night, the Federal Emergency Management Agency ("FEMA") denied two disaster relief assistance requests from Colorado related to devastating wildfires and flooding.

- Three days after that, on December 23, DOT announced the results of the fiscal year 2025 Safe Streets and Roads for All competitive grant program. Colorado was one of only two states whose communities did not receive any awards.

This series of events, and its timing, reveal a clear and unmistakable campaign of punishment and threats against Colorado in response to Colorado's lawful exercise of sovereign powers.

7.      Worse yet, Colorado faces unbounded future "harsh measures" unless and until the State agrees to bend its sovereign authority in a manner directed by the President. Already, documents provided to the press indicate that the Trump Administration has ordered the Department of the Interior to compile a list of all grants going to Colorado, its instrumentalities, and political subdivisions for possible termination, totaling more than $100 million. And the President continues to affirm his displeasure with Colorado's unwillingness to conform to his demands, attacking Colorado's public officials—"wish[ing] them only the worst" and that they "rot in Hell"—all because of Colorado's "Mail In Ballot System" and refusal to release Tina Peters from her prison sentence.

8.      President Trump confirmed the direct link between the prosecution of Tina Peters and the Administration's targeting of Colorado, proclaiming "they're suffering a big price, Colorado" for Tina Peters and further threatened that "they better let her out fast." Interview:

5

Dan Bongino Interviews Donald Trump on His Podcast - February 2, 2026, https://f2.link/dt260202a.

9. At the foundation of our republic, the Constitution established a "system of 'dual sovereignty,'" with States retaining "'a residuary and inviolable sovereignty.'" *Printz v. United States*, 521 U.S. 898, 918–19 (1997) (quoting The Federalist No. 39 (James Madison)). These State sovereign powers were reflected directly in the original Constitution and further enshrined through the Tenth Amendment: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

10. One of the core State sovereign powers is the authority to regulate elections. As the Supreme Court has repeatedly explained, "the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections." *Shelby County v. Holder*, 570 U.S. 529, 543 (2013) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 461–462 (1991) and *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)). While the Constitution gives Congress certain authorities to regulate the time and manner for electing Senators and Representatives, U.S. Const. art. I, § 4, cl. 1, the Constitution provides the President and the Executive Branch with no such authority. The States alone have the power to regulate elections for President and state and local offices. The President's decision to move U.S. Space Command Headquarters in retaliation for Colorado's use of mail-in voting thus offends the fundamental design of the Constitution in two ways, violating both federalism and separation-of-powers principles.

11.     Colorado has lawfully exercised its sovereign authority by creating an election system that is the envy of other States, considered the "gold standard" by many experts for free and fair elections. As part of that system, eligible voters are allowed to cast their ballots through the mail, at a drop-off box, or in person. The advantages of this system are well documented, including increased security, lower administrative costs, increased accessibility, higher voter turnout, higher voter satisfaction, and more informed voters. Since the system was put in place in 2013, there is not a shred of evidence that the outcome of any election within Colorado has been altered by fraud. This system has been embraced, implemented, administered, and supported by both Democratic and Republican Colorado public officials.

12.     Another core State sovereign power is the authority to administer criminal justice. "[T]he States' 'powers to undertake criminal prosecutions'" trace their roots to the "authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment." *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 (2016) (quoting *Heath v. Alabama*, 474 U.S. 82, 89 (1985)). "State prosecutions therefore have their most ancient roots in an 'inherent sovereignty' unconnected to, and indeed pre-existing, the U.S. Congress." *Id.* As part of this sovereign power, States retain the sole sovereign authority to pardon state offenses. The President and the Executive Branch have no authority to direct or control how a State exercises these sovereign powers that are expressly reserved for the States by the Constitution.

13.     Colorado lawfully exercised its sovereign authority to prosecute Tina Peters for violating Colorado state criminal laws that uphold election integrity. Her prosecution was entirely apolitical, focused only on the facts and the law. Ms. Peters was prosecuted by a

Republican District Attorney and was convicted, after receiving a fair trial and due process, by a unanimous jury of her peers in Mesa County. A bipartisan group of elected Colorado county clerks and recorders affirmed that Ms. Peters' actions were "deliberate violations of Colorado law" and that her convictions were "the result of a lawful judicial process rooted in factual evidence and decided by the community she served." The Executive's actions to punish Colorado for lawfully administering criminal justice by prosecuting those who violate Colorado laws in order to undermine election integrity violates the Constitution, offending fundamental principles of federalism.

14.     The Executive's actions and threats to punish Colorado based on Colorado's lawful exercise of its sovereign powers violate the Tenth Amendment, the Elections Clause, State sovereignty, and separation-of-powers principles. Under the Constitution, the Executive may not directly command Colorado as to the exercise of its sovereign powers. *See, e.g.*, *Murphy v. NCAA*, 584 U.S. 453, 472 (2018) (discussing how the federal government lacks power to directly compel states); *New York v. United States*, 505 U.S. 144, 166 (1992) (same). Nor may the Executive achieve this same result by punishing Colorado into submission. The Supreme Court has long recognized that the Constitution prohibits the use of retaliation, punishment, or other coercive action in response to the exercise of constitutional right or power. Any other rule would render the Constitution's grants of powers and rights to the States and the people meaningless. It would allow the Executive to unlawfully seize powers not granted by the Constitution to "produce a result which (it) could not command directly." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)); *cf. United*

8

*States v. Goodwin*, 457 U.S. 368, 372 (1982) (an individual "certainly may not be punished for exercising a protected statutory or constitutional right").

15.     The President and the Executive Branch wield vast powers with the capability to impose grave harms. The Constitution prohibits using those powers to try to extract additional authority reserved for the States, as the Trump Administration has done here. If allowed to stand, the Trump Administration's actions here would fundamentally alter the balance of power between the States and the federal government, upsetting the Constitution's foundational structure. Future Presidents, Republican and Democratic alike, could use the same tactics and wield the Executive's vast powers to punish States, for example, for imposing stringent voter identification laws, or for not redistricting congressional districts to the President's liking, or for prosecuting or not prosecuting individuals according to the President's demands.

16.     For similar reasons, the Executive's actions also contravene the principle of equal sovereignty. "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty' among the States." *Shelby Cnty.*, 570 U.S. at 544 (quoting *Nw. Austin Mun. Util. Dist. V. Holder*, 557 U.S. 193, 203 (2009)). The principle of equal sovereignty serves to bar unjustified disparate treatment among the States in "sensitive areas of state and local policymaking" reserved by the Constitution for the States, such as the power to regulate elections and administer criminal justice. *See, e.g.*, *id.*; *Nw. Austin*, 557 U.S. at 203. The Executive's actions, and threatened future action, undermine and violate equal sovereignty by singling out Colorado for harmful action because the Trump Administration dislikes how Colorado exercises sovereign powers reserved to it by the Constitution. The

Constitution does not permit the Executive to single out States for punishment based on their exercise of core sovereign powers. And yet, that is exactly what President Trump and his Administration have done.

17.     In addition to violating the Constitution, the Executive Branch's actions also violate numerous federal laws. For example, with respect to the relocation of Space Command Headquarters, Defendants violated statutory requirements mandating detailed processes and public disclosures through the submission of reports to Congress before taking action to relocate a major military headquarters. Likewise, USDA's SNAP order was issued without lawful authority, violates numerous substantive and procedural requirements, unlawfully creates new reporting and recordkeeping requirements contrary to the Paperwork Reduction Act, and is arbitrary and capricious. Similarly, the Department of Transportation's ("DOT") funding termination decision violates the Administrative Procedure Act ("APA") because it is arbitrary and capricious. Accordingly, Colorado seeks relief pursuant to the APA for the numerous unlawful agency actions that are contrary to law, arbitrary and capricious, in excess of statutory authority or limitation, and/or without observance of procedure required by law.

18.     The State of Colorado brings this action seeking a declaration that the Executive's actions to punish Colorado based on Colorado's lawful exercise of its sovereign powers, and threats to impose further harmful action, are unconstitutional and unlawful. Colorado also seeks injunctive relief prohibiting the agency defendants from implementing these unconstitutional and unlawful actions. Finally, Colorado seeks relief under the APA to vacate and set aside, and to stay enforcement of, unlawful agency actions.

**JURISDICTION AND VENUE**

19.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

20.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff, the State of Colorado, is a sovereign State in the United States of America. A substantial part of the events or omissions giving rise to this Amended Complaint occurred and continue to occur within this district.

**PARTIES**

21.     Plaintiff State of Colorado is a sovereign State in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General is the chief legal representative of the State and is authorized by Colorado Revised Statutes § 24-31-101 to pursue this action on behalf of the State of Colorado.

22.     Defendant Donald J. Trump is President of the United States. President Trump is sued in his official capacity.

23.     Defendant Department of Defense is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

24.     Defendant Pete Hegseth is the Secretary of Defense. The commander of U.S. Space Command reports to the Secretary of Defense. Secretary Hegseth is sued in his official capacity.

25. Defendant Department of the Air Force is an agency within the Department of Defense and is an agency within the meaning of 5 U.S.C. § 552(f).

26. Defendant Troy Meink is the Secretary of the U.S. Air Force. The Secretary of the Air Force oversees the Department of the Air Force and carries out varied functions subject to the authority, direction, and control of the Secretary of Defense. Secretary Meink is sued in his official capacity.

27. Collectively, Defendants Department of Defense, Department of the Air Force, Secretary Hegseth, and Secretary Meink are referred to as "DOD Defendants."

28. Defendant Executive Office of the President is an agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f). The Executive Office of the President employs the White House staff and agencies, including OMB, and coordinates actions across U.S. government agencies.

29. Defendant Department of Transportation is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

30. Defendant Sean Duffy is the Secretary of Transportation. Secretary Duffy is sued in his official capacity.

31. Collectively, Defendants DOT and Secretary Duffy are referred to as "DOT Defendants."

32. Defendant Department of Agriculture is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

33.     Defendant Brooke Rollins is the Secretary of Agriculture. Secretary Rollins is sued in her official capacity.

34.     Collectively, Defendants USDA and Secretary Rollins are referred to as "USDA Defendants."

35.     Defendant National Science Foundation ("NSF") is an agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

36.     Defendant Brian Stone is currently performing the duties of the Director of the National Science Foundation. He is sued in his official capacity.

37.     Defendant Department of Homeland Security ("DHS") is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

38.     Defendant Markwayne Mullin is the Secretary of Homeland Security. Secretary Mullin is sued in his official capacity.

39.     Defendant Federal Emergency Management Agency ("FEMA") is an agency within the Department of Homeland Security and is an agency within the meaning of 5 U.S.C. § 552(f).

40.     Defendant Karen Evans is currently performing the duties of the Director of the Federal Emergency Management Agency. She is sued in her official capacity.

41.    Defendant Department of Energy ("DOE") is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

42.    Defendant Chris Wright is Secretary of Energy. Secretary Wright is sued in his official capacity.

43.    Defendant Department of the Interior is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

44.    Defendant Doug Burgum is the Secretary of the Interior. Secretary Burgum is sued in his official capacity.

45.    Collectively, all Defendants other than President Trump are referred to as "Agency Defendants."

**ALLEGATIONS**

I.    **The Constitution reserves certain sovereign powers for the States and prohibits the Executive from punishing States for lawfully exercising those sovereign powers.**

46.    Federalism, the system of dual sovereignty between the States and the federal government, serves as one of the core structural designs of the Constitution. The Founders viewed federalism and separation of powers as key to protecting liberty and avoiding abuse from centralized power. "[T]he power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people." The Federalist No. 51 (James Madison). As the Supreme Court has emphasized, "the Constitution divides authority

14

between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'" *New York*, 505 U.S. at 181 (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991)). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory*, 501 U.S. at 458.

47. The Constitution thus reflects that the States retained "certain exclusive and very important portions of sovereign power," The Federalist No. 9 (Alexander Hamilton), "a residuary and inviolable sovereignty," The Federalist No. 39 (James Madison). These State sovereign powers were further enshrined through the Tenth Amendment: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

48. "[T]he Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections." *Shelby Cnty.*, 570 U.S. at 543 (quoting *Gregory*, 501 U.S. at 461–462 and *Sugarman*, 413 U.S. at 647). The Elections Clause provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. The Constitution thus gives the States the power to regulate elections. While Congress may pass laws to alter State regulations regarding the time

and manner for electing Senators and Representatives, the President and the Executive Branch were given no such authority. Further, the States alone have the power to regulate elections for President and state and local offices.

49.    Another core State sovereign power is the authority to administer criminal justice. "[T]he States' 'powers to undertake criminal prosecutions'" trace their roots to the "authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment." *Sanchez Valle*, 579 U.S. at 69 (quoting *Heath*, 474 U.S. at 89). As a result, "[p]rior to forming the Union, the States possessed 'separate and independent sources of power and authority,' which they continue to draw upon in enacting and enforcing criminal laws." *Id.*. "State prosecutions therefore have their most ancient roots in an 'inherent sovereignty' unconnected to, and indeed pre-existing, the U.S. Congress." *Id.* As part of this sovereign power, States retain the sole sovereign authority to pardon state offenses. While Congress may override state criminal laws in certain circumstances through the Supremacy Clause, the President and the Executive Branch have no authority to direct or control how a State exercises these sovereign powers that are expressly reserved by the Constitution for the States.

50.    The Constitution prohibits the Executive from commanding the States as to their exercise of these core sovereign powers. *See, e.g.*, *Murphy*, 584 U.S. at 472; *New York*, 505 U.S. at 166. The Executive may not achieve this same result by punishing a State into submission. The Supreme Court has long recognized that the Constitution prohibits the use of retaliation, punishment, or other coercive action in response to the lawful exercise of a constitutional right or power. Any other rule would render the Constitution's grants of powers and rights to the States

16

and the people meaningless. That would allow the federal government to unlawfully seize powers not granted by the Constitution to "'produce a result which (it) could not command directly.'" *Perry*, 408 U.S. at 597 (quoting *Speiser*, 357 U.S. at 526); *cf. Goodwin*, 457 U.S. at 372 (an individual "certainly may not be punished for exercising a protected statutory or constitutional right").

51.     The Supreme Court has repeatedly upheld "the principle that a government official cannot do indirectly what she is barred from doing directly." *NRA v. Vullo*, 602 U.S. 175, 190 (2024) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–69 (1963)). In the context of constitutionally protected rights, this means that the government cannot use or threaten retaliation to punish or suppress the exercise of a protected right. *See, e.g.*, *NRA*, 602 U.S. at 191 (holding a government official violates the First Amendment when "reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech").

52.     The same principle applies equally to a State's exercise of sovereign powers reserved by the Constitution. Indeed, the Supreme Court has emphasized that the federal government can never exceed its authority relative to the States, not even by "consent." *New York*, 505 U.S. at 182. Retaliation and punishment violate the constitutional design by seeking to coerce States to "voluntarily" give up their sovereign powers.

53.     The Executive similarly may not single out States based on their exercise of core sovereign powers under the principle of equal sovereignty. "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty'

among the States." *Shelby Cnty.*, 570 U.S. at 544. Our Nation "was and is a union of States, equal in power, dignity, and authority." *Coyle v. Smith*, 221 U.S. 559, 567 (1911). The principle of equal sovereignty serves to bar unjustified disparate treatment among the States in "sensitive areas of state and local policymaking" reserved by the Constitution for the States, such as the power to regulate elections. *See, e.g.*, *Shelby Cnty.*, 570 U.S. at 544 (quoting *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999)); *Nw. Austin*, 557 U.S. at 203.

54.     Just as the Constitution does not permit singling out States for additional scrutiny in how they regulate elections absent exceptional conditions, *Shelby Cnty.*, 570 U.S. at 544, 555–57, the Constitution forbids the Executive from singling out States for punishment based on their lawful exercise of core sovereign powers. Were it not so, the Executive could achieve the same results prohibited in *Shelby County* by taking or threatening harmful executive actions to coerce States into "voluntarily" submitting to the preclearance requirements struck down by the Supreme Court. The Constitution does not permit such an end-run and does not permit the Executive to single out States for punishment based on their exercise of sovereign powers. Such unjustified disparate treatments, targeted at disfavored exercise of sovereign powers reserved to the States, violates the principle of equal sovereignty.

**II.     Colorado has lawfully exercised its sovereign authority to regulate elections through the use of mail-in voting.**

55.     In 2013, the Colorado General Assembly enacted House Bill 13-1303, the "Voter Access and Modernized Elections Act." Governor Hickenlooper signed the bill into law on May 10, 2013. H.B. 13-1303, 69th Gen. Assem., 1st Reg. Sess. (Colo. 2013).

56.     Under this Act and accompanying regulations, eligible Colorado voters are permitted to vote in state and federal elections by mailing in their ballot, depositing their ballot at a drop-off location, or voting in person. *See, e.g.*, C.R.S. § 1-7.5-103.

57.     The law has been a resounding success. For example, a 2016 study by the Pew Charitable Trusts found that the law decreased administrative costs by an average of 40%, decreased the use of provisional ballots by nearly 98%, increased voter turnout, and increased voter satisfaction. In a survey of voters, 95% were satisfied or very satisfied with their voting experience. Pew Charitable Trs., *Colorado Voting Reforms: Early Results* (Mar. 2016), https://www.pew.org/en/research-and-analysis/issue-briefs/2016/03/colorado-voting-reforms-early-results.

58.     Other studies have shown similarly positive outcomes. One study concluded that Colorado's voting system increased turnout, on average, by eight percentage points. Adam Bonica, et al., *All-mail Voting in Colorado Increases Turnout and Reduces Turnout Inequality*, 72 Electoral Studies (Aug. 2021), https://doi.org/10.1016/j.electstud.2021.102363. This has led Colorado to have one of the highest voter turnout rates in the nation.

59.     Colorado's voting system improves accessibility for all groups, including persons with disabilities and individuals who cannot easily vote in person on Election Day due to mobility or other challenges. It also leads to more informed voters because eligible voters receive their ballots and have additional time to research candidates and issues, without the time pressure of the voting booth. In addition to these benefits, security is increased by an all-paper ballot system that is easily audited and more secure than electronic voting.

60.     Nor is this a partisan issue: empirical evidence shows that vote-by-mail systems have no impact on partisan turnout or vote share. *See, e.g.*, Daniel M. Thompson, et al., *Universal Vote-by-Mail Has No Impact on Partisan Turnout or Vote Share*, 117 Procs. of the Nat'l Acad. of Sci. 14052 (2020), https://doi.org/10.1073/pnas.2007249117.

61.     The Act enjoys broad bipartisan support within Colorado. *See, e.g.*, *Consensus on Mail Voting*, The Daily Sentinel, Grand Junction, Colorado (Sept. 24, 2025). The Act has been implemented by Republican and Democratic Secretaries of States alike and by a bipartisan group of clerks across Colorado. As one Republican state House representative and President Trump supporter recently stated: "Coloradans love being able to vote from home . . . . [T]his is what the overwhelming majority of Coloradans want."

62.     A voting system that works for Coloradans is especially important because of the active role Colorado citizens play in their own democratic self-government through the initiative and referendum process. This mail-in voting system is also highly resilient, proving effective through challenging circumstances like the COVID-19 pandemic.

63.     Since the system was put in place in 2013, there is no evidence that the outcome of any election within Colorado has been altered by fraud. To the contrary, Colorado's system ensures secure, free, and fair elections.

64.     The facts in Colorado do not bear out the claim that mail-in voting entails "massive voter fraud" or "crooked elections," as President Trump has falsely claimed. Nor do States that allow mail-in voting want "dishonest elections." Colorado and other similar States impose strenuous security requirements, with detailed security auditing, to ensure free and fair

elections. The President's claim that foreign countries and others print millions of illegal ballots is likewise completely false. President Trump's statements and beliefs on mail-in voting, particularly Colorado's mail-in voting, are simply untethered from the facts.

65.     In sum, the well-documented advantages of Colorado's system include increased security, lower administrative costs, increased accessibility, higher voter turnout, higher voter satisfaction, and more informed voters. Colorado's voting system is considered to be the "gold standard" by many policy experts for free and fair elections. Bonica, *supra*, at 1. The system is the envy of other States, and numerous States have attempted to emulate Colorado's system.

66.     Most importantly, Colorado has exercised its sovereign power to create and implement this voting system through duly enacted legislation, as the Constitution expressly provides and as the Framers envisioned. Sovereignty means the freedom to choose, regardless of the President's view about the wisdom, efficacy, or appropriateness of that judgment, so long as that choice does not violate other specific provisions of the Constitution.

**III.     Colorado has lawfully exercised its sovereign authority to prosecute those who violate Colorado laws in order to undermine election integrity.**

67.     Colorado takes election integrity seriously. Though election-related crimes are rare, Colorado prosecutes any individuals, regardless of political party, who may violate Colorado law to undermine election integrity.

68.     Tina Peters was the Mesa County Clerk and Recorder. As an elected public official, a core function of her duties was to administer elections and uphold election integrity and security. In reality, she did the opposite. Ms. Peters was prosecuted by the Mesa County

District Attorney after evidence revealed that she sought to defeat election security protocols through misuse of her official position, arranging for an unauthorized individual to unlawfully gain access to and copy election equipment through false pretenses, and then covering up her involvement in the crime.

69.    Colorado elections are managed with a computer server called the election management system or EMS. The system software is updated every other year through a confidential and secure process called the "trusted build" ("Build") that is regulated and administered by the Colorado Secretary of State. During the Build, staff from the Secretary of State's Office upload an updated and certified version of the software to each county's server. Prior election records must be backed up before the Build; the vendor provides instructions to the counties through the Secretary of State on how to do this backup of records. Paper ballots for each election are also retained under seal for 25 months.

70.    Ms. Peters and her office were investigated after video and still images of Mesa County's 2021 Build were posted online. The investigation revealed, among other things, that, contrary to Secretary of State requirements, Ms. Peters arranged for an unauthorized individual to gain access to the Mesa County election equipment so that he could make forensic images of the election server both before and after the Build and also witness the Build. Without the Secretary of State's awareness or authorization, Ms. Peters surreptitiously recorded the Build with her iPhone and also had the forensic images and her video recording sent to this individual and/or his associates. Ms. Peters repeatedly deceived public servants about the true identity of this unauthorized individual, falsely misrepresenting to the Secretary of State's Office that the

unauthorized individual was a county employee, to a Mesa County IT employee that he was a state employee who needed system access, and to her own staff that he was a new county employee. Ms. Peters sought to cover her trail by, among other things, directing that security cameras be turned off in the room with the election equipment and directing her staff not to comply with the investigation or talk to police and to purchase "burner phones."

71.    Ms. Peters was found guilty by a jury of three counts of attempting to influence a public servant in violation of C.R.S. § 18-8-306, in relation to repeatedly deceiving public servants to get them to provide the unauthorized individual with access to the elections server and Build. She was also found guilty of one count each of: conspiracy to commit criminal impersonation in violation of C.R.S. §§ 18-5-113(1)(b)(I) and 18-2-201, first-degree official misconduct in violation of C.R.S. §18-8-404(1), violation of duty in violation of C.R.S. §1-13-107, and failure to comply with Secretary of State requirements in violation of C.R.S. §1-13-114(1). The trial court sentenced Ms. Peters to a total term of eight years and nine months imprisonment, though she will be eligible for parole at an earlier date, beginning in 2028. In reaching this sentence, the trial court found that Ms. Peters had done "immeasurable damage" to local elections and trust in the electoral process and lacked remorse for her conduct. The Colorado Court of Appeals affirmed Ms. Peters' convictions on April 2, 2026 but remanded for resentencing.

72.    The prosecution of Ms. Peters was apolitical. No court has ever found any evidence of prosecutorial impropriety or bias. Ms. Peters was prosecuted by a Republican District Attorney. She was convicted, after receiving a fair trial and due process, by a unanimous

jury of her peers in Mesa County, a politically conservative county that voted overwhelmingly for President Trump. A bipartisan group of elected Colorado county clerks and recorders affirmed that Ms. Peters' actions were "deliberate violations of Colorado law" and that her convictions were "the result of a lawful judicial process rooted in factual evidence and decided by the community she served."

73.     It is fully within Colorado's lawful sovereign authority to prosecute individuals, like Ms. Peters, who violate Colorado criminal laws. Her actions undermined election integrity through her attempt to circumvent election security protocols. Colorado administers criminal justice through its court system, providing full due process and numerous layers of appeal, which Ms. Peters is currently exercising. It is likewise fully within Colorado's lawful sovereign authority—delegated by the Colorado Constitution, art. IV, section 7, to the Governor, subject to regulation by the General Assembly—to determine whether to grant a pardon for offenses against the State of Colorado.

**IV.     President Trump and his Administration have repeatedly threatened and punished Colorado based on its exercise of sovereign powers.**

74.     Colorado has faced increasing threats from President Trump and his Administration because the President dislikes how Colorado has exercised its sovereign powers to regulate elections by allowing mail-in voting and to prosecute those who violate Colorado laws to undermine election integrity. Those threats have become increasingly pointed. The purpose is clear: to coerce Colorado to end mail-in voting and to release Tina Peters from prison. When the threats alone did not work, the Trump Administration followed through, employing various punishments against Colorado for its exercise of sovereign powers. The threats continue,

24

and statements reported in the media by Administration officials suggest that the Trump Administration continues to evaluate additional ways to punish Colorado.

75.     Beginning in late spring, the President issued various threats against Colorado for the prosecution of Ms. Peters to coerce state officials to release her. On May 5, 2025, President Trump demanded that Colorado free Ms. Peters and directed DOJ to "take all necessary action" to secure her release. The President posted: "Tina is an innocent Political Prisoner being horribly and unjustly punished in the form of Cruel and Unusual Punishment . . . . Colorado must end this unjust incarceration of an innocent American. I am hereby directing the Department of Justice to take all necessary action to help secure the release of this 'hostage' being held in a Colorado prison by the Democrats, for political reasons. FREE TINA PETERS, NOW!"



**Donald J. Trump** ✔️ 
@realDonaldTrump

Radical Left Colorado Attorney General Phil Weiser ignores Illegals committing Violent Crimes like Rape and Murder in his State and, instead, jailed Tina Peters, a 69-year-old Gold Star mother who worked to expose and document Democrat Election Fraud. Tina is an innocent Political Prisoner being horribly and unjustly punished in the form of Cruel and Unusual Punishment. This is a Communist persecution by the Radical Left Democrats to cover up their Election crimes and misdeeds in 2020. The same Democrat Party that flies to El Salvador to try to free an MS-13 Terrorist, is cruelly imprisoning, perhaps for life, a grandmother whose brave and heroic son gave his life for America. Colorado must end this unjust incarceration of an innocent American. I am hereby directing the Department of Justice to take all necessary action to help secure the release of this "hostage" being held in a Colorado prison by the Democrats, for political reasons. FREE TINA PETERS, NOW!

**7.75k** ReTruths   **21.7k** Likes                    May 05, 2025, 6:12 PM

76.    By August, the President's threats became extremely overt: "If [Tina Peters] is not released, I am going to take harsh measures!!!" The President further tied this threat to Colorado's use of mail-in voting.



**Donald J. Trump** ✓ ▶
@realDonaldTrump

FREE TINA PETERS, a brave and innocent Patriot who has been tortured by Crooked Colorado politicians, including the big Mail-In Ballot supporting the governor of the State. Let Tina Peters out of jail, RIGHT NOW. She did nothing wrong, except catching the Democrats cheat in the  Election. She is an old woman, and very sick. If she is not released, I am going to take harsh measures!!!

**15.7k** ReTruths  **53.7k** Likes                    Aug 21, 2025, 6:07 AM

77.    Around the same time, on August 18, 2025, the President threatened to take executive action to coerce Colorado and other States to end mail-in voting. He demanded that States, like Colorado, that allow mail-in voting "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do."

78.    When this threat yielded no results, the President took a first action to punish Colorado. On September 2, 2025, President Trump announced that he was relocating U.S. Space Command permanent headquarters from Peterson Space Force Base in Colorado Springs, Colorado. When issuing his decision, the President announced that "[t]he problem I have with Colorado" is that "they do mail-in voting" and that this "played a big factor" in the decision.

79.    U.S. Space Command is one of eleven combatant commands within the Department of Defense. The loss of U.S. Space Command Headquarters will cost Colorado thousands of jobs, harm to its economy, loss of tax revenue, and uproot the lives of hundreds of

Colorado civilians and their families from their homes and communities in El Paso County, Colorado. President Trump estimated that his decision would create 30,000 jobs and hundreds of billions in investment for the new location, diverting those jobs and investment from Colorado.

80.     Of course, mail-in voting and the manner by which a State regulates its elections has nothing to do with where a major military headquarters should strategically be located. But President Trump made clear that this was a "big factor" in the decision in order to coerce Colorado to end mail-in voting.

81.     In the fall, the President and his Administration continued their focus on Tina Peters, escalating attacks against Colorado.

82.     On November 12, 2025, Defendant DOJ, through the Bureau of Prisons, sent Colorado a letter requesting that Tina Peters be released into federal custody. Ed Martin, DOJ Pardon Attorney, explained in an interview that DOJ's efforts to release Ms. Peters were being led at the highest levels by Deputy Attorney General Todd Blanche and were intended to exert "the right kind of pressure on them." He continued: "If you're Colorado . . . if the feds say we want something, you change your tune."

83.     When that pressure failed to work, President Trump and his Administration again escalated the attacks. On December 3, 2025, the President again demanded that Colorado "FREE TINA" and attacked Colorado Governor Polis as the "SLEAZEBAG Governor of Colorado" for not bending to his wishes to release her from prison.

84.     On December 11, 2025, the President announced that he had issued a full pardon for Ms. Peters: "Tina is sitting in a Colorado prison for the 'crime' of demanding Honest

Elections. Today I am granting Tina a full pardon for her attempts to expose Voter Fraud in the Rigged 2020 Presidential Election!" Several days later, Defendant DOJ released a copy of the official pardon, indicating that it was issued (though not announced) on December 5, 2025.

85.    Under the Constitution, the President's pardon power extends only to offenses against the United States (i.e., federal crimes). Colorado, through its Governor, retains exclusive sovereign authority to issue pardons for state crimes. As a result, the President's pardon had no effect on Ms. Peters' state convictions.

86.    Days later, on December 15, 2025, after Colorado refused to release Ms. Peters from prison based on the pardon, the President escalated his rhetoric again. He attacked Governor Polis in an Oval Office media event, describing him as "weak and pathetic" and complaining that Governor Polis would not "allow our wonderful Tina to come out of a jail."

87.    The next day, on December 16, 2025, the Trump Administration instituted a weeklong series of punishments and threats targeted against Colorado.

**December 16: DOT cuts $109 million in transportation funding only for Colorado.**

88.    The first action began on December 16, 2025, when the Trump Administration announced through the press that it was terminating $109 million in transportation funding for Colorado. The Trump Administration directed this action solely against Colorado. No funding terminations for any other States were announced at that time, even though many other States were participants in the same programs. The fact pattern appears to match a common one from the Trump Administration, in which federal agencies are tasked with identifying and mass terminating funding for a targeted entity, here the State of Colorado.

28

89.     The evidence shows Colorado was singled out. For example, Congress appropriated specific funding to repair or replace nonoperational electric vehicle chargers. DOT issued dozens of awards pursuant to this appropriation, yet only Colorado's award was singled out for termination in this action. Similarly, DOT administers the BUILD/RAISE grant program, which provides grants for surface transportation infrastructure projects with significant local or regional impact. DOT has issued hundreds of these grants, yet it terminated funding only for one award to build a transit station in Fort Collins, Colorado. Likewise, DOT has issued billions of dollars of awards under the Consolidated Rail Infrastructure and Safety Improvements ("CRISI") program, yet it chose to terminate only two awards in this action, both in Colorado.

90.     The funding termination did not follow normal procedures. Colorado officials learned about their lost funding not from any notice from the agency, but through the press. When Colorado officials contacted DOT following the press report to ask if the funding was being cut, DOT staff were unaware of any decision. Later documentation from DOT failed to provide any details or reasoned justification for the decision.

**December 16: The Trump Administrations reveals to a reporter that DOE is threatening to cut $615 million in funding for Colorado.**

91.     Also on December 16, the Trump Administration communicated to a reporter its plans to terminate $615 million in DOE funds earmarked only for Colorado. Like the DOT funding cuts, the DOE cuts are directly targeted at Colorado. DOE has not yet formalized these cuts into any final action, and they remain a threat hanging over Colorado.

92.     But tellingly, both President Trump and OMB Director Russell Vought reposted on social media information about these cuts, evidencing the Administration's desire to publicize the threatened cuts to harm Colorado.



**December 16: The Trump Administration threatens to dismantle the National Center for Atmospheric Research in Boulder.**

93.     The same day, the Trump Administration announced through the press that it planned to dismantle National Center for Atmospheric Research in Boulder, Colorado. OMB Director Vought further announced that "any vital activities such as weather research" that might survive the dismantling "will be moved to another entity or location" (i.e., not Colorado). A White House official directly tied this threat to Governor Polis's refusal to cooperate with President Trump's demands, stating: "Maybe if Colorado had a governor who actually wanted to work with President Trump, his constituents would be better served."

94.    NCAR was established in 1960 by the National Science Foundation as the first federally funded research and development center. For more than six decades, across administrations from both parties, NCAR has served as "a world-class research center leading, promoting and facilitating innovation in the atmospheric and related Earth and Sun systems science." NCAR employs over 800 scientists, engineers, and support staff engaging in cutting-edge atmospheric research and developing advanced tools, data, and resources used by scientists around the country and the globe.

95.    If NCAR were dismantled, it would cause immeasurable damage to scientific advancement, harming everyday Americans who regularly benefit from NCAR's many breakthrough discoveries. But it would also cause significant economic damage to Colorado, including the loss of jobs, contracts, and tax revenue.

96.    Since that time, the Trump Administration has taken numerous steps towards completing the dismantling of NCAR, including issuing a "Dear Colleague" letter seeking proposals related to the dismantling of NCAR and divesting the stewardship and operations of a supercomputing center. The Administration has thus begun to carry out its threat against Colorado, with every reason to believe it will fully carry through.

**December 18: USDA unlawfully orders Colorado to participate in a SNAP "pilot project" requiring it to recertify and conduct in-person interviews with over 100,000 households within 30 days or face severe consequences.**

97.    Two days later, on December 18, USDA arbitrarily ordered Colorado to comply with an unlawful SNAP "pilot project." The "pilot project" purports to require Colorado and five Colorado counties to recertify eligibility for all SNAP households, without exception, within 30

days over the winter holidays, including conducting in-person interviews with more than 100,000 households. Colorado was given no advance warning or time to prepare.

98.    This was not a real "pilot project" where States voluntarily agree to participate in innovative methods to improve a program. Instead, it was a targeted attack against Colorado and Minnesota, another jurisdiction being singled out by the Administration. To remove any doubt about animus, the USDA released a social media post from Secretary Rollins, making clear the intent of the "pilot project" was just to punish disfavored jurisdictions.



Secretary Brooke Rollins ✔
@SecRollins                                          ...

.@GovTimWalz, there is nothing you can do NOW that changes the fact you stood idly by as criminals stole MILLIONS from the American taxpayer and hungry families. The attached requires you to verify SNAP participants in the next 30 days.

Tick. Tock. ⏰

99.    The "pilot project" itself is unlawful, violating numerous statutes and regulations. But it also makes no sense for USDA to select Colorado other than to punish the State. Colorado already recertifies most households every six months, twice the rate required by federal regulations and more often than many other States. USDA's own analyses likewise show that Colorado consistently performs better than the national average with regard to payment errors, often in the top 20 performing States.

100.    Even if the "pilot project" were lawful, it is logistically impossible to complete the requirements and interview 100,000 households in person within a mere 30 days, an insurmountable requirement that USDA is undoubtedly aware of. Yet, USDA threatens to

impose severe sanctions against Colorado, including the possible sanction of removing Colorado from the SNAP program, if Colorado fails to comply with the illegal and impossible demand.

**December 20: The Trump Administration denies Colorado disaster relief.**

101.     Two days later, on December 20, FEMA denied two disaster relief assistance requests from Colorado related to devastating wildfires and flooding. Last August, Colorado suffered two catastrophic wildfires in Rio Blanco County causing roughly $27 million in damage, including harm to critical electric infrastructure. Separately, in October, Colorado suffered record-breaking severe flooding in three counties, causing at least $13 million in damage, including to drinking water and wastewater infrastructure.

102.     FEMA has long applied guidelines and indicators for disaster relief requests to ensure States are treated fairly and consistently. The two Colorado requests were well within those guidelines and exceeded financial impact indicators. Indeed, in more than three decades, Colorado has not had any request that exceeded financial impact indicators denied.

103.     Late on a Saturday night during the week of retribution, however, FEMA denied both of Colorado's requests. FEMA offered no explanation as to how the requests did not meet guidelines or indicators. Issuing these denials near midnight on a weekend is highly abnormal, further indicating that the action was issued outside typical protocols and decisionmaking processes.

104.     Colorado appealed the two denials of disaster relief on January 16, 2026. FEMA denied both appeals on April 10, 2026.

**December 23: Colorado was denied DOT safe streets funding.**

105. Three days later, DOT took additional retributive action against Colorado, this time in the form of denying funding.

106. The Safe Streets and Roads for All Program ("SS4A") is a competitive grant program intended to improve safety on American roadways that has been funded since fiscal year 2022. In every previous funding cycle, Colorado communities received awards. Yet, on December 23, when DOT announced the awards for fiscal year 2025, Colorado was one of only two States to receive no awards. Follow-up meetings with DOT indicated that many of Colorado's applications received the highest recommendation by DOT staff, but political appointees denied all awards to Colorado. DOT's decision to deny SS4A funding to Colorado is unrelated to the program's goals and instead presents further evidence of retaliation against the State.

**The Administration's retribution campaign continues with threat of more to come.**

107. This series of events and its timing reveal a clear and unmistakable coordinated campaign of retaliation and punishment through official federal government actions by Defendants against Colorado in direct response to Colorado's lawful exercise of sovereign powers. The President has made clear his demand, and his Administration is following through on his threat to take "harsh measures."

108. There is no evidence to suggest these punishments will stop. In fact, the continued messages to the press and via social media from the President and senior Administration officials make clear that the retribution will continue against Colorado. Retaliation is particularly

pernicious because it is open-ended. Colorado faces not only the current punishments but also unbounded future "harsh measures" unless and until the State concedes and bends its sovereign authority in a manner directed by the President. Indeed, the President remains fixated on Colorado and its public officials for their refusal to concede to his coercion and pressure. Just one week ago, the President stated that he wished the District Attorney who prosecuted Ms. Peters and the Governor "only the worst" and that "they rot in Hell"—all because of Colorado's "Mail In Ballot System" and refusal to release Tina Peters from her prison sentence.



Donald J. Trump
@realDonaldTrump

God Bless Tina Peters, who is now, for two years out of nine, sitting in a Colorado Maximum Security Prison, at the age of 73, and sick, for the "crime" of trying to stop the massive voter fraud that goes on in her State (where people are leaving in record numbers!). Hard to wish her a Happy New Year, but to the Scumbag Governor, and the disgusting "Republican" (RINO!) DA, who did this to her (nothing happens to the Dems and their phony Mail In Ballot System that makes it impossible for a Republican to win an otherwise very winnable State!), I wish them only the worst. May they rot in Hell. FREE TINA PETERS!

**7.46k** ReTruths  **24.7k** Likes                    Dec 31, 2025, 10:27 AM

109.    Documents provided to the press indicate that the Trump Administration has already ordered the Department of the Interior to compile a list of all grants earmarked for Colorado, its instrumentalities, and political subdivisions for possible termination. This would total more than $100 million in additional losses for Colorado.

**The punishment and threats against Colorado are unconstitutional.**

110. The Executive's punishments and threats against Colorado are unconstitutional. The President and the Executive Branch wield vast federal powers with the capability to impose grave harms. The Constitution prohibits using those powers to extract additional authority reserved by the Constitution for the States, as the President has done here, and as he threatens to continue to do with further "harsh measures" in the future. The Constitution likewise prohibits singling out States based on their lawful exercise of sovereign authority. The President has no constitutional authority to directly command Colorado to end mail-in voting or to release Tina Peters from her prison sentence. Nor may he indirectly try to compel Colorado to bend to his wishes through threats and punishment.

111. If allowed to stand, the President's actions would fundamentally alter the balance of power between the States and the federal government and the Constitution's foundational structure. Future Presidents, Republican and Democratic alike, could use the same tactics and wield the Executive's vast powers to punish States for exercising their sovereign authority to the President's liking. Once that door is opened and a precedent is set, there is no reason to believe that such coercive tactics could not or will not recur with future Presidents in their interactions with States.

**V. In punishing Colorado, the Trump Administration has also violated numerous federal statutes.**

112. Many of the Trump Administration's unconstitutional retaliatory actions also violate federal law in other ways. The relocation of Space Command Headquarters violates legal mandates for providing advance disclosures and reasoned analysis to Congress. USDA's arbitrary and capricious SNAP order was issued without lawful authority and violates numerous

substantive and procedural requirements, as well as the Spending Clause. And DOT's funding termination decision violates the APA because it is arbitrary and capricious.[1]

> ### A. The President decides to relocate U.S. Space Command because Colorado utilizes mail-in voting while DOD Defendants violate statutory requirements for moving a major headquarters.

113. After numerous threatened attacks, the Trump Administration's first punishment directed against Colorado for exercising its sovereign authority was the President's decision to relocate U.S. Space Command Headquarters out of Colorado Springs, Colorado. The President's decision made clear his motivations, announcing that "[t]he problem I have with Colorado" is that "they do mail-in voting" and that this "played a big factor" in the decision.

114. Underscoring the unconstitutional processes and motivations driving this decision, DOD Defendants violated numerous statutory directives regarding the process for moving a major headquarters.

> ### 1. U.S. Space Command is established as a combatant command with a permanent headquarters in Colorado Springs.

115. U.S. Space Command was authorized by the 2018 National Defense Authorization Act and was formally established on August 29, 2019. John S. McCain National Defense Authorization Act, Pub. L. 115-232, § 1601, 132 Stat. 1636, 2101–2105 (2018). It is one

---

[1] Many of the allegations described earlier remain threats not yet acted upon or are otherwise nonfinal and, therefore, are not ripe for challenge under the APA. If the Administration were to follow through on those threats or finalize those actions, Colorado reserves its rights to amend the complaint or to file separate civil actions challenging any future actions.

of eleven combatant commands under the umbrella of the Department of Defense. Its mission is to "plan[], execute[], and integrate[] military spacepower into multi-domain global operations in order to deter aggression, defend national interests, and when necessary, defeat threats." To accomplish its mission, U.S. Space Command "employs joint forces from the U.S. Army, Marine Corps, Navy, Air Force and Space Force."

116.    Since its inception, U.S. Space Command has always been headquartered—both provisionally and then permanently—at Peterson Space Force Base (previously Peterson Air Force Base), in Colorado Springs, Colorado.

117.    Initially, the headquarters were temporary while the Department of Defense underwent a "basing" process to finalize the permanent headquarters location. At one point, in January 2021, the Secretary of the Air Force provisionally recommended relocating Space Command. But the Government Accountability Office ("GAO") and Department of Defense Inspector General ("DOD IG") found significant concerns with the process and recommendation. For example, the GAO concluded that the basing process had suffered from "significant shortfalls in its transparency and credibility."  DOD IG likewise made numerous recommendations to improve shortfalls with the process.

118.    The Air Force followed those recommendations and conducted further review. Following that review, on July 31, 2023, the Department of Defense announced that President Biden selected Peterson Space Force Base as U.S. Space Command's permanent headquarters. A press release explained that Peterson Space Force Base would "ensure[] peak readiness in the space domain" and "enable the command to most effectively plan, execute and integrate military

spacepower into multi-domain global operations." President Biden chose Peterson Space Force Base after consulting with the Secretary of Defense and other senior military leaders, and both the Secretary of Defense and the commander of U.S. Space Command supported his decision.

119.    Peterson Space Force Base has remained the permanent headquarters of Space Command headquarters ever since. Space Command achieved "full operational capability" in December 2023. General Stephen N. Whiting, a four-star general, serves as Commander of U.S. Space Command.

### 2.    President Trump announced his decision to move U.S. Space Command to punish Colorado's use of mail-in voting.

120.    On September 2, 2025, President Trump announced his decision to move the U.S. Space Command permanent headquarters from Peterson Space Force Base in Colorado Springs, Colorado.

121.    In making the announcement, President Trump stated that Colorado's state laws authorizing mail-in voting "played a big factor" for his decision:

> "The problem I have with Colorado, one of the big problems, they do mail-in voting. They went to all mail-in voting, so they have automatically crooked elections, and we can't have that. When a State is for mail-in voting, that means they want dishonest elections because that's what that means. So that played a big factor also."

*See also, e.g.*, Rebecca Shabad, *Trump Says He's Moving Space Command HQ to Alabama Because of Colorado's Mail-in Voting System*, NBC News (Sep. 2, 2025), https://www.nbcnews.com/politics/white-house/trump-moving-space-command-hq-alabama-colorado-mail-voting-system-rcna228647.

122.    In his announcement, President Trump estimated that his decision would create 30,000 jobs and hundreds of billions in investment elsewhere. The clear implication was that Colorado would lose these jobs and investments, directly harming Colorado's citizens, economy, and businesses and causing Colorado to lose substantial tax revenue.[2]

123.    DOD Defendants were all present during the announcement and indicated that they were moving forward to implement the President's decision.

124.    On the same day, September 2, 2025, Defendant Department of Defense issued a news release entitled, "Trump Announces Relocation of U.S. Space Command." *See* https://www.war.gov/News/News-Stories/Article/Article/4291622/trump-announces-relocation-of-us-space-command/. The release confirmed the decision to move the U.S. Space Command headquarters and that the "move will result in more than 30,000 jobs for the state of Alabama, as well as hundreds of billions of dollars in investments."

125.    DOD Defendants have confirmed that they are moving forward with carrying out the President's decision. Through a spokesperson, DOD Defendants issued a statement to the Denver Post: "U.S. Space Command will expeditiously carry out the direction of the President following last week's announcement of Huntsville, Alabama, as the command's permanent headquarters location, while continuing to execute our vital mission."

---

[2] As of December 1, 2024, there were 1,308 personnel authorized to work at U.S. Space Command headquarters in the Colorado Springs vicinity, including over 800 authorized civilian employees. U.S. Space Command also had at least 32 service contracts with companies located in Colorado covering countless numbers of civilian contractors.

126.    DOD Defendants conducted a "groundbreaking" ceremony on December 12, 2025, as part of their efforts to carry out the President's decision. At the ceremony, Secretary Hegseth announced the Department of Defense was "deadly serious" about accelerating construction.

127.    Since then, the Administration has established a transition team to ensure the move is conducted as expeditiously as possible; it has relocated hundreds of personnel to Alabama; and General Whiting held an event to unveil a conceptual rendering of the new building for local politicians in Huntsville.

128.    In addition to harming Colorado's economy and jobs and costing substantial tax revenue, the move will cost federal taxpayers billions of dollars to move a fully operational and highly sophisticated permanent command headquarters. Civilian employees and contractors will also be harmed, either by losing their jobs or upending the lives they have built in Colorado to keep their jobs at the new headquarters' location.

129.    President Trump has indicated that he intends to take further harmful executive action to end mail-in voting, including through a forthcoming executive order. *See, e.g.*, Bart Jansen, *Trump Threatens Executive Order to End Mail-In Voting; Says Putin Agrees*, USA Today (updated Aug. 19, 2025), https://www.usatoday.com/story/news/politics/2025/08/18/ trump-mail-in-voting/85707446007/. He has demanded that States, like Colorado, that allow mail-in voting "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do." Continuing on this unlawful attack, President Trump issued another Executive Order on March 31, 2026 that

unconstitutionally interferes with the ability of Colorado (and other States) to conduct free and fair elections through mail-in voting.

### 3. President Trump's decision to move U.S. Space Command Headquarters violates the Constitution.

130.    President Trump's decision to move U.S. Space Command Headquarters to punish Colorado for utilizing mail-in voting violates the Constitution. For the reasons explained earlier, the President's decision to punish Colorado, and his threats to impose further harmful executive action, based on Colorado's lawful exercise of its sovereign authority to regulate elections violate the Tenth Amendment, the Elections Clause, State sovereignty, separation of powers, and equal sovereignty principles. The President lacks any authority under the Constitution to regulate the manner of elections. That power is reserved exclusively for the States and, in some circumstances, Congress, but never for the President.

### 4. DOD Defendants violated federal law dictating required processes and notifications before moving a major headquarters location.

131.    DOD Defendants' actions to carry out the relocation also violate federal law. Federal law requires the military to follow certain procedures before taking action to relocate a major headquarters location. DOD Defendants failed to comply with these statutory requirements, underscoring the unconstitutional processes and motivations that underly Space Command's relocation.

132.    DOD Defendants violated 10 U.S.C. § 483, which imposes detailed processes and congressional notification requirements on decisions regarding the "relocation of a major headquarters."

133.    U.S. Space Command headquarters is a "major headquarters" within the meaning of section 483, because it is "the headquarters of a military unit or command that is the appropriate command of a general officer or flag officer." 10 U.S.C. § 483(f)(2). U.S. Space Command is a unified combatant command currently led by General Stephen N. Whiting.

134.    DOD Defendants were required to provide the congressional defense committees with certain notice and analysis required by statute within seven days of: (1) issuing any formal internal guidance initiating the decision-making process for relocating U.S. Space Command headquarters; (2) selecting 2–5 most likely candidate locations for the headquarters; and (3) selecting a preferred location for the headquarters. 10 U.S.C. § 483(b).

135.    Among other information, the required notice must include:

- A description of the manner in which "joint and all-domain training capabilities" were comparatively analyzed among candidate locations;

- A description of the manner in which "airspace and training areas" were comparatively analyzed among candidate locations;

- A description of the manner in which "community support" was comparatively analyzed among candidate locations, "including consultation with appropriate State officials and officials of units of local government . . . regarding matters affecting the local community"; and

- An explanation of how candidate locations scored in reference to the preceding criteria and a summary of any score cards used in choosing the preferred location.

10 U.S.C. § 483(c).

136.    Further, the statute provides that "[n]o irrevocable action may be taken to effect or implement a basing decision" until 14 days have passed from the date the Secretary notified Congress. *Id.* § 483(d).

137.    Upon information and belief, DOD Defendants have failed to follow the statutorily mandated processes, failed to provide the requisite notices to Congress, and have taken and intend to take irrevocable actions to effect or implement the relocation.

**B.    USDA singles out Colorado, ordering the State to comply with new unlawful and impossible requirements or face removal from the SNAP program.**

138.    On December 18, USDA arbitrarily ordered Colorado to comply with an unlawful "pilot project" purporting to require the State and five selected counties to recertify SNAP eligibility for 100% of its households, without exception, within 30 days over the winter holidays, including conducting in-person interviews for more than 100,000 Colorado households. Colorado was given no advance warning or time to prepare.

139.    The Trump Administration only directed this "pilot project" at Colorado and Minnesota, another jurisdiction being singled out for attack by the Administration.

140.    Not only did this action unconstitutionally target Colorado for punishment, the purported "pilot project" itself is unlawful many times over, as detailed below. It is also logistically impossible for Colorado to comply with these demands within the 30 days allotted.

Yet, USDA threatens to impose severe sanctions against Colorado, including potentially removing it from the SNAP program, if Colorado fails to comply with the illegal and impossible demand.

141.   That USDA is willing to engage in unlawful action to punish Colorado is unsurprising. This action follows an unprecedented series of unlawful actions taken by USDA in recent months with respect to the SNAP program. Federal courts have repeatedly enjoined those unlawful actions.

   a.   First, USDA unlawfully demanded highly sensitive data and threatened Colorado and 20 other States with severe sanctions for failing to provide this data. A federal district court granted a preliminary injunction, finding "the SNAP Act prohibits [the States] from disclosing to USDA the information demanded" and that USDA was violating the law in other ways. *California v. USDA*, No. 3:25-cv-06310-MMC, 2025 WL 2939227, at *10 (N.D. Cal. Oct. 15, 2025).

   b.   Second, USDA unlawfully withheld SNAP benefits during the government shutdown, notwithstanding that it had billions of dollars in contingency funds available, and the agency had for decades recognized that those funds were to be used during a government shutdown. Multiple district courts enjoined this purposefully callous and unlawful action aimed at harming American citizens across the country. *Massachusetts v. USDA*, No. 1:25-cv-13165-IT, 2025 WL 3040441, at *5–7 (D. Mass. Oct. 31, 2025); *R.I. State Council of Churches v.*

*Rollins*, No. 25-cv-569-JJM-AEM, 2025 WL 3050100, at \*1–2 (D.R.I. Nov. 1, 2025).

c.  Finally, USDA issued unlawful guidance related to the One Big Beautiful Bill Act. USDA then compounded that error by unlawfully purporting to require the States to fully comply with the flawed guidance by the next day, notwithstanding that USDA's own regulations provide a 120-day exclusionary period that is intended to provide States with reasonable time to implement new changes in the law or guidance. Yet again, a federal district court enjoined USDA from enforcing its unlawful action. *New York v. Rollins*, No. 6:25-cv-02186-MTK (D. Or. Dec. 15, 2025) (minute order granting Motion for Preliminary Injunction), Dkt. 64.

### 1.  SNAP provides essential food security for millions of Americans.

142.  For more than six decades, the United States has embraced a simple and enduring idea: that it has a continuing responsibility to ensure low-income Americans do not go hungry.

143.  Beginning in 1939, the United States government delivered its first Food Stamp Program to under-nourished Americans. In 1964, Congress enacted the "Food Stamp Act," making the Food Stamp Program permanent. *See* Pub. L. No. 88-525, 78 Stat. 703. In 2008, Congress changed the name from the Food Stamp Program to the Supplemental Nutrition Assistance Program and replaced the Food Stamp Act of 1977 with the Food and Nutrition Act of 2008 ("FNA"). *See* Pub. L. No. 110-234, 122 Stat. 1092; *see generally* Food and Nutrition Service, *A Short History of SNAP*, https://www.fns.usda.gov/snap/history.

144.    Finding that the limited food purchasing power of low-income households contributes to hunger and malnutrition of Americans, Congress established SNAP "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011.

145.    The goal of SNAP is "to 'alleviate . . . hunger and malnutrition' by 'increasing [the] food purchasing power' of low-income households." *Hall v. USDA*, 984 F.3d 825, 831 (9th Cir. 2020) (quoting 7 U.S.C. § 2011). To achieve this end, SNAP provides monthly benefits to eligible households that can be used to buy food. *See Hall*, 984 F.3d at 831.

146.    To qualify for SNAP, applicants must demonstrate that their household satisfies specified financial requirements, along with other eligibility criteria. *See* 7 C.F.R. § 273.1.

147.    During fiscal year 2024, an average of 41.7 million individuals in 22.2 million households, or roughly 1 in 8 Americans, receive SNAP. In 2023, 35% of SNAP recipients were children. Drew Desilver, Pew Rsch. Ctr., *What the data says about food stamps in the U.S.* (Nov. 14, 2025), https://www.pewresearch.org/short-reads/2025/11/14/what-the-data-says-about-food-stamps-in-the-us/.

148.    In 2024, an average of 594,526 Coloradans received SNAP benefits each month, including over 300,000 children and 114,000 elderly individuals, totaling more than $1.4 billion in SNAP benefits annually.

**2.      Colorado administers SNAP on behalf of USDA
and undertakes robust program integrity efforts
that go beyond federal requirements.**

149.     At the federal level, SNAP is overseen by USDA's Food and Nutrition Service.
7 C.F.R. § 271.3(a). But the States are responsible for the administration of SNAP, including
creating and processing applications for benefits, making eligibility determinations, issuing
benefits, and ensuring program integrity. 7 C.F.R. § 271.4(a); *see* 7 U.S.C. § 2020(a)(1).

150.     In Colorado, the Colorado Department of Human Services' ("CDHS") Office of
Economic Security administers SNAP. Colorado's SNAP program is county implemented and
state supervised and administered. Colorado's 64 counties determine SNAP eligibility and
authorized benefits, while CDHS administers and supervises the SNAP program. C.R.S.
§ 26-2-301(1), (2). This model allows Coloradans to work directly with their local county
Department of Social/Human Services to apply for SNAP and to recertify ongoing eligibility.
10 C.C.R. 2506-1:4.000.1, 4.201, 4.202.

151.     Local county offices determine whether a household qualifies for SNAP by
reviewing financial information from an applicant including income, expenses, and assets. Local
county offices also verify nonfinancial criteria such as identity of the applicant and household
composition. *See* 10 C.C.R. 2506-1:4.300, 4.400. Colorado counties are not permitted to apply
additional conditions or processing requirements beyond those set forth under the state's SNAP
rules. 10 C.C.R. 2506-1:4.201(A).

152.     Successful applications for SNAP benefits must include an interview of the
applicant household that is either face-to-face or by phone. 10 C.C.R. 2506-1:4.204(A). The

option to undergo a telephonic interview in lieu of a face-to-face interview is consistent with federal law, which permits states to use telephonic interviews. 7 C.F.R. § 273.2(e)(2). In fact, federal regulations *require* that if a household meets hardship criteria and "requests to not have an in-office interview, the State agency must offer to the household to conduct the interview by telephone." *Id.*

153.     Colorado continues to ensure households remain eligible after initial approval. In fact, Colorado goes above and beyond federal recertification requirements. For most households, USDA requires States to recertify eligibility every 12 months. 7 C.F.R. § 273.10(f). But Colorado has voluntarily chosen to recertify household eligibility generally every six months, twice as often as required. 10 C.C.R. 2506-1:4.208.1(B). Colorado rules require that these households be interviewed at least every twelve months. 10 C.C.R. 2506-1:4.209(C).

154.     For a minority of households containing only disabled and elderly individuals, both federal regulations and Colorado rules provide for recertification on a less frequent basis. 7 C.F.R. § 273.10(f). Under federal regulations, certification is allowed for up to 24 months for a household in which all adult members are elderly or disabled. *Id*. Again, Colorado is more stringent, limiting this 24-month certification only to households where all members are both elderly or disabled adults and have no earned income. 10 C.C.R. 2506-1:4.208.1(A).

155.     Colorado also ensures deceased individuals do not receive SNAP benefits. The Colorado Benefits Management System interfaces with the Social Security Administration's Death Master File on a daily basis. When a match is made, Colorado takes steps to verify if a

SNAP recipient is deceased and, if so, to discontinue benefits. County Burial Assistance programs also provide death information that the counties act on to discontinue benefits.

156. Colorado also takes numerous steps to ensure that SNAP recipients are not receiving benefits in other states.

157. The federal government's own studies concluded that SNAP fraud is rare. For example, the Congressional Research Service concluded in an April 2025 report that "SNAP fraud is rare, according to available data and reports" and that error rates generally reflect inadvertent errors in calculating eligibility and benefit levels, not fraud.

158. Colorado's substantial program integrity efforts have resulted in Colorado performing consistently better than the national average in limiting payment errors. Since data has been published following the COVID-19 pandemic, Colorado has performed better than the national average every single year, often in the top twenty performing States.

159. Colorado nevertheless employs robust integrity teams to investigate any potential fraud. Integrity teams provide direct training to eligibility staff on how to prevent and detect fraud, as well as education on county-specific fraud trends. If an eligibility staff member suspects a household is fraudulently representing their circumstances but is unable to substantiate the suspicion through available databases or verification requests, they are expected to make a fraud referral for further investigation by county integrity staff.

160. County integrity staff investigate every fraud referral received. These teams conduct extensive investigations, using desk and field research to substantiate the household's actual circumstances. These efforts include online databases that validate identity and residency;

interviews with outside entities such as employers, landlords, and neighbors; subpoenas for income, tax, and bank records; and interviews with the household. When evidence supports intentional violations, county staff pursue disqualification and/or refer for prosecution.

161. Even if there is insufficient evidence, integrity staff still deliver the results of the investigation to eligibility staff so cases can be processed with the information discovered in the investigation, with case closures and/or claims created for any benefits incorrectly paid to the household.

162. Colorado also utilizes all federally required fraud prevention and detection systems.

### 3. USDA orders Colorado to participate in an unlawful and illogical "pilot project" or face severe sanctions.

163. On December 17, 2025, USDA sent Governor Polis a letter (the "Recertification Letter") requiring Colorado "to participate in a . . . [SNAP] pilot project conducted pursuant to 7 U.S.C. 2026(b)(1)(A), to increase the efficiency of SNAP and improve the delivery of SNAP benefits to eligible households" or face noncompliance procedures. Ex. 1.

164. The Recertification Letter came without any warning. The "pilot project" was created without any reasoned decisionmaking. USDA published no notice nor requested any comment from the public. It did not issue operational procedures or guidance or an evaluation plan or criteria.

165. The only stated basis for the forced pilot project is a vague reference to "ongoing fraud affecting federally funded benefits across the nation," and an unsupported statement that

51

USDA has made "multiple requests to the State of Colorado to fulfill its administrative responsibilities." *Id.*

166.    USDA ordered Colorado to recertify, within 30 days, during the winter holidays, all SNAP households in five of Colorado's largest counties: Adams, Arapahoe, Jefferson, Boulder, and Douglas counties (collectively "Recertification Counties").

167.    USDA threatened in the letter that "[f]ailure to participate in this pilot project as specified by USDA will trigger noncompliance procedures codified in 7 U.S.C. 2020(g). It may also affect Colorado's continued participation in SNAP." Ex. 1.

168.    It is unclear what "ongoing fraud" USDA is referring to and how Colorado may be involved. USDA has not previously issued any letters or warnings to Colorado regarding SNAP beneficiary fraud. The USDA letter likewise does not explain how a "pilot project" directed at two states, and specifically Colorado, will address fraud "across the nation."

169.    Further, contrary to the letter's statement, Colorado has not received "multiple requests" for the State "to fulfill its administrative responsibilities." The only request that Colorado has received from the Trump Administration was a request for a large amount of sensitive participant data in July 2025. Colorado repeatedly wrote letters to the Administration that it could not lawfully release such data without a mutually agreed upon data and security protocol required by the SNAP statute. USDA Defendants completely ignored those letters and issued a warning letter. A federal court ultimately enjoined USDA's unlawful actions. *See California*, 2025 WL 2939227.

170.    Colorado has not received any requests related to fulfilling its duties to certify household eligibility or detect fraud.

### 4.    The "pilot project" is unlawful.

171.    The purported "pilot project" violates the law in many ways. In particular, USDA Defendants have violated numerous procedural requirements and statutory limitations, and the Recertification Letter is the quintessential arbitrary and capricious agency action prohibited by the APA.

172.    USDA Defendants failed to meet numerous procedural requirements before implementing the "pilot project." First, USDA Defendants were required to engage in notice-and-comment rulemaking because the Recertification Letter constitutes a legislative rule. Second, USDA regulations require certain notice requirements must be met for demonstration projects that impact the public. Third, USDA was required to comply with the Paperwork Reduction Act, which prohibits agencies from conducting or sponsoring a new or revised collection of information, such as here, without first completing numerous procedural requirements, including an internal analysis of the burden, publishing the proposed collection in the Federal Register, providing an opportunity for public comment, obtaining approval from the Director of OMB, and obtaining an OMB control number to be displayed on the collection request. 44 U.S.C. §§ 3507, 3506. USDA Defendants failed to comply with any of these requirements.

173.    USDA Defendants also violated substantive law in creating the "pilot project." First, USDA Defendants have no lawful authority to mandate pilot project participation by an

unwilling state. The FNA only permits pilot projects agreed to by both USDA and the participating State agencies or other eligible entities. *See, e.g.*, 7 U.S.C. § 2017(f)(2)(A) (authorizing pilot projects "at the request of 1 or more State agencies"). Second, USDA Defendants cannot unilaterally impose new duties and obligations upon participants in pilot projects. Congress gave the Secretary the authority only to "waive any requirement" of the FNA in connection with a pilot project, not to impose new ones. 7 U.S.C. § 2026(b)(1)(A). Third, the "pilot project" violates various statutory restrictions imposed by Congress for the types of allowable SNAP demonstration projects. Fourth, the "pilot project" would require Colorado to violate several provisions of the FNA and its implementing regulations, and USDA has not waived any of those requirements. Finally, USDA Defendants lack authority to take the remedial measures threatened in the Recertification Letter.

174.    USDA Defendants also violated the APA's reasoned decisionmaking requirements. The Recertification Letter is arbitrary and capricious because the reasons for imposing the "pilot project" upon Colorado are unsupported, irrational, and pretextual; because USDA Defendants rely on factors that Congress has not intended for USDA to consider; because the proposed "pilot project" would not remedy the recipient fraud it supposedly targets; because it fails to consider the harms and costs it would impose on Colorado, the Recertification Counties, SNAP recipients and applicants, and recipients of other state services who would be harmed while all resources are redirected toward recertification; because it fails to consider the significant reliance interests of those same groups; because it fails to consider important aspects of the problem, including the impossibility of complying with the demands; and because the

USDA Defendants imposed the "pilot project" as part of the Trump Administration's retribution campaign against Colorado.

### 5. Complying with the "pilot project" would force Colorado to violate numerous federal and state regulations.

175. Requiring household members in Recertification Counties to report in-person for a recertification interview violates numerous federal and state regulations. Through the Recertification Letter, USDA has not waived any statutory or regulatory requirements.

176. USDA's regulations provide that "State agencies may not require households to report for an in-office interview during their certification period." 7 C.F.R. § 273.2(e)(1). "For example, State agencies may not require households to report en masse for an in-office interview during their certification periods simply to review their case files, or for any other reason." *Id.* Home visits are not a lawful option either. In addition to requiring significantly more resources, USDA's regulations prohibit home-based interviews unless a household meets specified hardship criteria and requests an in-home interview. 7 C.F.R. §§ 273.2(e)(2), 273.14(b)(3).

177. Consistent with these regulations, Colorado rules do not allow CDHS or the local counties offices to require SNAP recipients to report for an in-person interview. 7 C.F.R. § 273.2(e)(1), 10 C.C.R. 2506-1:4.204(A). Another Colorado rule prohibits denying benefits for failing or refusing to appear for a recertification interview scheduled prior to the last month of the household's certification period. 10 C.C.R. 2506-1:4.209(C). To comply with USDA's December directive, these rules would have to be changed following the requirements of the

Colorado Administrative Procedure Act, but USDA's 30-day deadline provides no adequate time for Colorado to change its rules.

178. Federal and state regulations likewise require advance notice to SNAP recipients and time following the visit to provide documentation. USDA requires Colorado to provide at least one month's notice before recertifications, 7 C.F.R. § 273.14(b)(1)(i), which is not possible within the timeframes required by the Recertification Letter.

179. USDA regulations also require Colorado to schedule interviews so that a household has at least 10 days following the interview to provide verification documents for the recertification. 7 C.F.R. § 273.14(b)(3)(iii); *see also* 10 C.C.R. 2506-1:4.209(C). In other words, to complete recertifications by January 16, 2026, an interview would need to take place on or before January 6.

### 6. The "pilot project's" demands are logistically impossible to comply with.

180. Setting aside the impossibility of completing the task consistent with federal and state regulations, there is no logistical or practical way to meet the demand. Approximately 106,500 households receive SNAP benefits in the Recertification Counties, constituting about 32% of SNAP households statewide. It is impossible to recertify them all within 30 days of receipt of the Recertification Letter when using the normal recertification process required by 7 C.F.R. § 273.14.

181. But that process is made significantly more burdensome through the imposition of a new requirement: in-person interviews. USDA's regulations recognize that in-person interviews often impose unnecessary burdens. See 7 C.F.R. § 273.2(e)(2). USDA therefore

encourages State agencies to permit telephone interviews, *see id.* § 273.14(b)(1)(iii), and it requires State agencies to permit telephone interviews in cases of "household hardship," which must include, at a minimum, "illness, transportation difficulties, care of a household member, hardships due to residency in a rural area, prolonged severe weather, or work or training hours that prevent the household from participating in an in-office interview." *Id.* §§ 273.14(b)(3), 273.2(e)(2).

182.   Recertification Counties routinely permit telephone interviews for SNAP recipients for reasons that include, but are not limited to, hardships associated with reduced public transportation in rural areas, lack of a vehicle, presence of a disability, lack of childcare, or challenges presented by work schedules.

183.   Adding to the difficulty, the thirty-day period from December 17, 2025 to January 16, 2026 includes multiple major holidays. This period includes some of the most important holidays of the year for many Coloradans, often involving travel, planned time away from work, school and daycare closures, and important family obligations, limiting the availability of both employees and recipients to complete the recertifications.

184.   In reality, the time allotted by USDA for completing over 100,000 interviews is significantly shorter than thirty days because interviews cannot begin immediately upon receipt of the letter on December 17 but can only be scheduled over time with significant effort by county staff and voluntary cooperation by recipients. County staff would need to assign an interview time, mail a letter to each recipient with notice of the assigned time, and correspond with individual recipients in the event the recipient needed to reschedule. And as noted above,

57

the interview would need to be completed to give the households at least ten days to provide verification documents after it ended.

185.    It is estimated that an experienced eligibility worker could complete approximately six recertifications each day if also completing in-person interviews. This means it would take approximately 7,900 worker hours *each day* in order to complete more than 100,000 interviews in 18 business days, at an enormous cost to Colorado.

186.    None of the Recertification Counties have close to the requisite number of workers needed to perform the required tasks. Each county would need to perform more than ten times as many recertifications as occur during a normal month. All of this would have to be completed with no preparation time and no notice to SNAP recipients.

187.    None of the five counties have adequate staff levels with the necessary expertise to perform an in-person interview and recertification of every household within 30 days, not only because of the high volume, but because staff will still need to perform at least some of their regular duties.

188.    Additionally, the Recertification Counties lack adequate physical space for the number of in-person interviews required by the Recertification Letter. Privacy and confidentiality would both be compromised. *See* 7 C.F.R. § 273.2(3)(1) ("Facilities must be adequate to preserve the privacy and confidentiality of the interview."). The Recertification Counties do not have the space or the resources to complete this burdensome task, especially with no advance time for planning.

189.    Attempting to complete this colossal process in the timeframe provided would cause substantial harm to county residents who need assistance with other programs or services because all available staff would be required to work exclusively on SNAP recertifications.

190.    The Recertification Counties would experience significant human resources and labor relations issues by attempting to demand that their staff complete this logistically impossible task.

191.    Further, future recertifications must occur on a regular cadence. See 7 C.F.R. §§ 273.10(f), 273.14(a). Currently, those recertifications are spaced throughout the year. But recertifying all existing households within a single thirty-day period creates a recurring glut of recertifications at regular intervals for years to come. The Recertifying Counties would likely need to hire additional staff to repeat those recertifications despite the fact that those additional staff would be unnecessary most of the year.

### 7.    The "pilot project" would undermine Colorado's efforts to identify SNAP fraud.

192.    There is no reason to believe the proposed "pilot project" would be successful in uncovering SNAP fraud. USDA offers no evidence of SNAP fraud among any of Colorado's SNAP recipients, or that the fraud would be uncovered through a mass recertification on an unworkable timeline.

193.    SNAP households in Colorado are already generally recertified at regular six-month intervals, exceeding federal requirements. There is no reason to believe USDA's "pilot project" would discover fraud that would not be uncovered at a household's next scheduled recertification or through the State's ongoing fraud detection and prevention efforts.

194.    USDA has also not provided any information to support a belief that in-person interviews are more effective at detecting fraud than telephone interviews.

195.    In fact, conducting recertifications at the frenzied pace USDA has demanded would be less effective at detecting fraud than conducting recertifications as they come due, when employees have the time and resources necessary to complete them thoroughly.

196.    The "pilot project" would require the Recertification Counties to recertify even those households that were recently recertified. For instance, a household that was recertified on December 16 would need to be recertified again sometime between December 17 and January 16. Repeating that same process is exceedingly unlikely to detect fraud and is a poor use of resources.

197.    In fact, the "pilot project" is likely to harm Colorado's ability to detect SNAP beneficiary fraud. In an effort to comply with this impossible request, CDHS and the Recertification Counties would be forced to divert resources to recertification efforts at the expense of the fraud prevention programs and other tools that are more useful for discovering fraud than recertifications.

**8.    Colorado faces substantial harm from USDA's unlawful action.**

198.    The Recertification Letter imposes substantial and immediate harm on Colorado.

199.    First, the Recertification Letter imposes enormous, unrecoverable administrative costs. Attempting to certify over 100,000 households in 30 days, including in-person interviews, would be massively burdensome and expensive, creating a dramatic uptick in administrative

costs and resulting in sustained expenditures. USDA has not offered to pay these costs, nor could Colorado recoup them through litigation, as the federal government enjoys sovereign immunity.

200.    Second, USDA's "pilot project" will have the inhumane and devastating result of eligible families being dropped from SNAP benefits—not because they are not eligible, but simply because they were unable to complete the recertification process or in-person interview on such a logistically impossible timeline or because county staff were unable to complete their recertifications.

201.    Removing these vulnerable and needy households from SNAP transfers the cost to Colorado, its local governments, and Colorado community organizations. Reduced SNAP enrollment will result in an increased reliance on emergency services and public safety net programs, and overall deterioration of Coloradans' health.

202.    Community resources like food banks are already strained because USDA cut $500 million in food deliveries this year. *See* Tami Luhy, *Food Banks Scramble After USDA Halts $500 Million in Deliveries*, CNN (Mar. 22, 2025), https://www.cnn.com/2025/03 /22/politics/food-banks-usda-delivery-halt. For one of Colorado's critical regional food banks, these cuts equated to about 4 million meals lost and $1.35 million less in purchasing power for that food bank alone. *See* Havalin Haskell & Olivia Bagan, *Empty Shelves, Growing Lines: Colorado Food Banks Adjust to a Decrease in Supply and an Increase in Demand*, CPR News (Aug. 27, 2025), https://www.cpr.org/2025/08/27/colorado-food-banks-decrease-in-supply-demand-high/.

203.    The decline in food access will harm Colorado's public health and wellbeing, including by increasing hunger and malnutrition. Children experiencing hunger and food insecurity are less able to learn and concentrate. Lack of access to appropriate nutrient-rich foods impacts children's developing brains and has "been linked to nutrient deficiencies leading to learning and developmental deficits amongst the most vulnerable, infants and toddlers." Francisco J. Rosales et. al., *Understanding the Role of Nutrition in the Brain & Behavioral Development of Toddlers and Preschool Children: Identifying and Overcoming Methodological Barriers*, 12 Nutritional Neurosci. 190 (Oct. 2009) (manuscript available at https://coag.gov/app/uploads/2026/01/Rosales-Nutrition-and-Brain-Development.pdf).

204.    The resulting fallout from the "pilot project" would force Colorado to devote funds and resources it does not have in an attempt to address these health and educational problems. Higher healthcare costs, including emergency room visits, hospitalizations, and related costs, as well as increased need for State funding to Colorado's healthcare systems and programs are the inevitable downstream effects of this harmful demand.

205.    Third, forcing all of these households to suddenly appear for in-person interview with no notice will undermine the trust that Colorado has built with SNAP participants. Many of these individuals do not have jobs allowing them to take leave with no advance notice, as USDA purports to require here.

206.    Those that need food assistance are often reluctant to enroll in SNAP in the first instance. USDA found that in fiscal year 2020, only 78% of eligible people received SNAP

benefits. Colorado has worked hard to build public trust in its SNAP program to increase participation by eligible households and to reduce hunger.

207.   Imposing an arbitrary recertification process that involves new interview requirements, even if a household recently received approval or recertification for SNAP benefits erodes trust between SNAP recipients and Colorado. Recipients will be left to wonder what new, onerous, and invasive conditions will be imposed on them in the future. And worse, because it will be Colorado's pilot counties implementing the new conditions, SNAP recipients are likely to form the belief that it is Colorado, as opposed to USDA, imposing these new conditions.

208.   Fourth, attempting to comply with the impossible deadlines in the Recertification Letter will lead to more payment errors, which in turn will lead to significant financial consequences for Colorado. Under a new federal law, this increased error rate will require the State to pay a larger portion of the cost of SNAP benefits. *See* 7 U.S.C. § 2013(a)(1)–(2). Errors made during the current fiscal year bear on the assessed penalties. *Id.* § 2013(a)(2)(B)(ii)(I). Implementing a rushed certification, as the "pilot project" requires, will inevitably lead to errors in eligibility determinations and payment calculations. In turn, Colorado's payment error rate would increase, which will have substantial financial consequences.

209.   Finally, Colorado faces substantial irreparable harm from the threatened sanctions in the Recertification Letter. As detailed above, Colorado cannot logistically comply with the Recertification Letter. Colorado would therefore be subject to the sanctions Defendants threaten, which includes the loss of SNAP administrative funding and continued participation in SNAP.

63

Ex. 1. Threatening Colorado's ability to continue participating in SNAP—a consequence not authorized in law—would be devastating to Colorado, drastically magnifying each of the harms discussed above. The loss of substantial administrative funding would also result in dire consequences, as numerous federal courts have recently recognized.

**C.**      **DOT singles out Colorado for termination of $109 million in funding and denies otherwise meritorious award applications.**

210.     On December 16, 2025, the day after the President attacked Governor Polis in an Oval Office media event for not releasing Tina Peters following his pardon, the Trump Administration announced through the press that it was terminating $109 million in transportation funding for Colorado and its instrumentalities and political subdivisions. This decision (the "Termination Decision") was based on singling out Colorado. No funding to other States was terminated as part of this decision, notwithstanding that many other States participated in the same programs with projects intended to serve similar objectives.

**1.**      **The terminated funding was part of four DOT programs for projects that were similar to projects in other States that were not cancelled.**

211.     Colorado's terminated funding came from four grant programs. Each project was well within the bounds set by Congress for the funds and was similar to projects in other States that were not cancelled, providing further evidence that DOT specifically targeted Colorado for unfavorable treatment.

212.     <u>The Electric Vehicle Charger Reliability and Accessibility Accelerator ("EVC-RAA") Program</u>: The National Electric Vehicle Infrastructure ("NEVI") Program was

established as part of the Bipartisan Infrastructure Law, often referred to as the IIJA, to facilitate the deployment of publicly accessible electric vehicle ("EV") charging stations across the United States. Pub. L. No. 117-58, 135 Stat. 429, 1421–22. The IIJA was passed in 2021 in an overwhelmingly bipartisan manner, including a filibuster-proof majority, and reflected a number of Congressional priorities related to the nation's transportation infrastructure, including significant investments in the repair and improvement of America's interstate railways, as well as substantial investments in modern infrastructure related to electric- and hydrogen-powered vehicles.

213. While most NEVI funding is awarded to States based on a statutory formula, the IIJA directed that 10% of the appropriated funds be set aside for "grants to States or localities that require additional assistance to strategically deploy [EV] charging infrastructure" and directed that "the Secretary shall establish a grant program to administer" the set-aside funds. 135 Stat. at 1425.

214. In 2023, DOT created the Electric Vehicle Charger Reliability and Accessibility Accelerator ("EVC-RAA") Program. The program focuses on repairing or replacing non-operational EV chargers. Using the 10% set-aside from the FY2022 and FY2023 NEVI appropriations, DOT awarded $148.8 million to 24 state and local entities in January 2024.

215. Among the announced awardees was the Colorado Department of Transportation ("CDOT"), which was awarded roughly $8.3 million to repair 363 EV charging ports.

216. Colorado's EVC-RAA Project aligned with the statutory selection process and project criteria outlined by Congress in the IIJA and the relevant appropriations statutes. Indeed,

65

all the awarded projects were focused on repairing or replacing nonoperational EV chargers, which was the sole purpose of Colorado's award. Despite the similarity in the projects, on information and belief, DOT only terminated Colorado's award.

217.    The Consolidated Rail and Safety Improvements ("CRISI") Program: America's interstate railways has been a priority of national import and subject to a long history of both federal funding and federal regulation. More recently, Congress established the CRISI Program as part of the 2015 passage of the Fixing America's Surface Transportation ("FAST") Act. Pub. L. No. 114-94, 129 Stat. 1312, 1644–48 (codified as amended at 49 U.S.C. §§ 22907, 22407). Recent funding for the CRISI Program was made available by the 2023 and 2024 Consolidated Appropriations Acts, and through advanced appropriations provided by the IIJA.

218.    The CRISI Program invests in a wide range of projects designed to improve railroad safety, efficiency, and reliability across the United States. CRISI-funded projects work to mitigate congestion at both passenger and freight rail chokepoints; support more efficient travel of goods and passengers; enhance multimodal connections; and invest in new and improved Intercity Passenger Rail Transportation corridors. Eligible recipients include States and State agencies, universities, political subdivisions, Amtrak, and other rail carriers.

219.    In March 2024, the DOT announced a Notice of Funding Opportunity for over $2.4 billion in CRISI Program funds. Awardees were announced on or around October 29, 2024, including two awards to Colorado instrumentalities.

220.    First, DOT awarded roughly $66.4 million to CDOT to fund a project entitled "Modernizing Rail on the Front Range – PTC Installation, Siding, and Grade Crossing Safety

and Operational Improvements" (the "Front Range Modernization Project"). The Front Range Modernization Project provides for positive train control ("PTC") installation and the installation of new siding to upgrade a major freight rail line that runs between Denver and Longmont, Colorado. This project also improves five grade crossings in a corridor that has experienced a history of derailments, train collisions, and other safety hazards. As part of the Front Range Modernization Project, CDOT committed a 30 percent match to the federal funding, worth over $27 million.

221.    Second, DOT awarded roughly $11.7 million to Colorado State University's Pueblo campus for a project entitled "Safety Assessment, Testing, and Workforce Development for Hydrogen/Natural Gas Motive Power" (the "CSU-Pueblo Project"). That project was selected as a nonconstruction research project to conduct safety experiments and testing for rail vehicles powered by compressed hydrogen and renewable natural gas. The CSU-Pueblo Project is primarily located at the university's industry-leading Transportation Technology Center and partners with the University of Hawaii and a private company who are together contributing a 36 percent nonfederal match. The CSU-Pueblo Project also qualifies for CRISI's statutory set-aside for projects located in rural areas.

222.    Both projects were operating under the pre-obligation phase of the grants' lifecycles. During this phase, the parties finalize terms of track- and project-specific modifications and engage in the final planning, environmental, engineering, and stakeholder processes. Even so, the CRISI Program establishes a procedure for submitting Pre-Authorization

Authority ("PAA") requests to fund steps that must be taken during this early phase of the grant lifecycle.

223.    Pursuant to the PAA process, CDOT and CSU-Pueblo were actively engaged in fulfilling their responsibilities under the pre-obligation phase of their grants' lifecycles. For example, both CDOT and CSU-Pueblo timely submitted NEPA/Environmental Resource Approach plans in or around April 2025.

224.    In November 2025, CSU-Pueblo also submitted its first PAA request in order to purchase initial engineering and downpayments on long-lead equipment orders that would be needed to complete the objectives of its grant on the project timeline.

225.    In other words, CDOT and CSU-Pueblo acted in reliance on the advice provided by DOT at the time awards were announced. The awardees expended time and funds to engage in final planning, to complete environmental assessments, and to set up state- and private-level funding matches following announcement of their awards.

226.    Both the Front Range Modernization Project and the CSU-Pueblo Project align with the statutory selection process and project criteria outlined by Congress in the FAST Act, the IIJA, and the relevant appropriations statutes, and DOT has never suggested otherwise.

227.    On information and belief, no other CRISI projects besides CDOT and CSU-Pueblo's awards were terminated as part of this action. CRISI awards that funded similar projects to those of CDOT's and CSU-Pueblo's in other States were unaffected.

228.    DOT's decision provides no reasoned justification and does not explain how the Front Range Modernization Project—which is an investment in safety infrastructure for a major

freight line—fails to meet the statutory objectives set forth by Congress when it allotted funds for CRISI awards under the FAST Act, the IIJA, and the relevant appropriations statutes. Nor could it. Safety and infrastructure investments are quintessential objectives listed in all these laws.

229.    The same is true for CSU-Pueblo's grant. For example, a non-disfavored State instrumentality was awarded a similar hydrogen-powered research grant, and on information and belief, that funding was not terminated.

230.    Taken together, these facts and the timing of DOT's actions demonstrate that the Front Range Modernization Project and the CSU-Pueblo Project were targeted specifically as part of the Administration's campaign to punish the State of Colorado for the lawful exercise of its sovereign authority.

231.    The RAISE/BUILD Program: As part of the bipartisan American Recovery and Reinvestment Act of 2009, DOT first established the Rebuilding American Infrastructure with Sustainability and Equity ("RAISE") grant program. Pub. L. No. 111-5, 123 Stat. 115, 203–04. The RAISE program operated under annual appropriations acts through November 2021. Thereafter, the RAISE program became part of the Better Utilizing Investments to Leverage Development ("BUILD") grant program, which provides grants for surface transportation infrastructure projects with significant local or regional impact. *See* 49 U.S.C. § 6702 (codifying the program). Congress required that the Secretary "shall establish and carry out" the program. 49 U.S.C. § 6702(b)(1).

232.    On or around June 28, 2023, DOT announced an award of $10,713,570 to fund the construction of a new Foothills Transit Station in Fort Collins. As part of that FY2023 funding round, DOT awarded over $2.2 billion to more than 150 projects. This was one of numerous projects to build a local transit station/hub. Over the years, DOT has awarded nearly 1,000 grants in the BUILD/RAISE program, many of which involve local transit stations/hubs.

233.    The Foothills Transit Project was a long-conceived project intended to connect Colorado State University's main and foothills campuses, a growing area with many residents and jobs. It is also designed to encourage safe walking, biking, and other multimodal trips in a densely populated area that currently does not have a transit hub.

234.    The Foothills Transit Station project is aligned with the statutory selection process and project criteria outlined by Congress. It was the product of considerable time, effort, and project management and had engendered reliance interests. The project had received prior federal award funding, further demonstrating merit and viability.

235.    On information and belief, the Foothills Transit Station was the only BUILD/RAISE grant terminated as part of the Termination Decision, notwithstanding that DOT had awarded numerous other similar projects in other States.

236.    Strengthening Mobility and Revolutionizing Transportation (SMART) Grants Program: Another grant program established through the IIJA is the SMART Grants Program. The SMART program was established to provide grants to eligible public sector agencies to conduct demonstration projects focused on advanced smart community technologies and systems in order to improve transportation efficiency and safety. Congress appropriated $100 million

annually to DOT for fiscal years 2022–2026 to this program. 135 Stat. at 840–44. SMART is a two-stage program with only Stage 1 awardees eligible to expand their projects during the Stage 2 application process.

237.    On or around March 21, 2023, DOT awarded slightly over $1 million to Fort Collins to demonstrate a smart grid EV charge management solution for the City's EV fleet.

238.    On or about December 16, 2024, DOT announced its first round of SMART Stage 2 awardees, which was only awarded to those Stage 1 grantees whose projects proved sufficiently successful and meritorious for Stage 2 further funding.

239.    Fort Collins received a Stage 2 award intended to significantly expand the City's EV charging infrastructure and integration into a smart grid EV charge management solution. With this grant, the City planned to rapidly expand its fleet of EVs in alignment with its 2030 emissions targets while simultaneously providing benefits to the electric grid and the entire community of Fort Collins.

240.    The project aligned with the statutory selection process and project criteria outlined by Congress. On information and belief, no other SMART grants were terminated as part of the action. Presently, the City of Fort Collins SMART grant is the only one listed on the DOT's website of "Stage 2 Implementation Grants by State" as "Under Departmental Review."

### 2.    The Termination Decision was unreasoned and far outside the normal course.

241.    The Termination Decision was issued far outside the normal course. It was announced through a newspaper report that Colorado was targeted for $109 million in transportation funding cuts. Prior to this news report, no awardees had any advance notice.

71

242.    When Colorado officials contacted DOT following the press report to ask if the funding was being cut, DOT staff were initially unaware of any decision.

243.    The Termination Decision was directed solely at Colorado and involved no reasoned decisionmaking. No funding for any other State was terminated as part the announced action, even though many other States were participants in the same programs, for projects intended to serve similar objectives.

244.    DOT attempted to paper the Termination Decision after-the-fact through nearly identical form notices. The notices state identically that the projects "do[] not align with the current Administration's priorities" with no analysis or explanation. In one case, where a grant agreement had existed, it similarly states the grant was terminated because it "no longer effectuates . . . agency priorities."  The notices do not explain what those priorities are or why the projects do not align. In fact, these boilerplate statements are pretextual and the true reason for the Termination Decision was to target Colorado for punishment.

### 3.    DOT denies Colorado Safe Streets funding for reasons unrelated to the program's goals.

245.    The IIJA also funded a competitive grant program administered by DOT called the Safe Streets and Roads for All Program ("SS4A"). The SS4A is open to applications from local governments, municipalities, regional entities, and federally recognized Tribal governments to support planning, infrastructure, and behavioral and operational initiatives designed to prevent fatalities and serious injuries on America's roadways. The SS4A has been funded on an annual basis since fiscal year 2022, with a final year of funding in fiscal year 2027.

246.    In every previous funding cycle (fiscal years 2022, 2023, and 2024), applicants in Colorado, including its counties and municipalities, achieved significant success in pursuing SS4A funding. Colorado communities received 20, 13, and 21 awards in fiscal years 2022, 2023, and 2024, respectively.

247.    However, on December 23, 2025, when DOT announced the fiscal year 2025 SS4A awards, only Colorado and one other State (Vermont) were left out entirely.

248.    For that year's funding cycle, at least nine applications were submitted by Colorado communities, to include multiple counties and towns in both rural and more urban centers. Despite a previous track record of success, no Colorado communities received funding.

249.    The 2025 notice of funding opportunity outlined that unsuccessful applicants could request a debrief meeting with DOT staff to learn more about why their applications were denied and to receive input and recommendations for future applications. Several of Colorado's unsuccessful applicants took advantage of that opportunity.

250.    During the debrief meetings, which were held with multiple DOT staff, the parties walked through program specifics as well as criteria that had been used to evaluate their applications at the merit review stage. Through this review, at least four unsuccessful Colorado applicants learned that their applications were rated "High/Highly recommended," the highest staff-level rating. In other words, when adjudged by DOT staff, the applications were of the highest merit rating available. But once these applications reached the political appointees, Colorado was denied all funding. Ultimate award decisions rested with the Secretary of DOT.

251.    DOT used this opportunity to further punish Colorado's communities. Despite the high merit of the denied applications, DOT denied awards based on retaliatory animus, at the direction of the Administration, rather than for any legitimate reason related to the SS4A's program goals.

## CAUSES OF ACTION

## COUNT ONE

**Violation of the Tenth Amendment, Elections Clause, State Sovereignty,
and Separation of Powers
(All Defendants)**

252.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

253.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

254.    The President's actions may be reviewed for constitutionality. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).

255.    Defendants' actions and threats to punish Colorado based on Colorado's lawful exercise of its sovereign authority violates the Tenth Amendment, the Elections Clause, State sovereignty, and separation-of-powers principles. Defendants have unlawfully retaliated against Colorado to punish the State for lawfully exercising its sovereign authority to regulate elections by allowing mail-in voting and its sovereign authority to prosecute those who violate Colorado laws in order to undermine election integrity. Defendants' pattern of actions and threatened

future actions undermine and violate the Constitution by singling out Colorado for harmful executive action based on its exercise of sovereign powers.

256.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Defendants' actions and threats to punish Colorado—including the President's decision to relocate U.S. Space Command Headquarters, DOT's Termination Decision, USDA's Recertification Letter, and the various other threats and punishments—based on Colorado's lawful exercise of its sovereign powers are unconstitutional and that the Executive may not retaliate against Colorado based on its exercise of sovereign authority reserved for the States by the Constitution. Plaintiff is also entitled to injunctive relief preventing Agency Defendants from implementing or effectuating the retaliatory actions and threats or from engaging in future retaliatory conduct based on Colorado's lawful exercise of its sovereign authority.

## COUNT TWO

### Violation of Equal Sovereignty
### (All Defendants)

257.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

258.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

259.    The President's actions may be reviewed for constitutionality. *Franklin*, 505 U.S. at 801; *Youngstown Sheet & Tube Co.*, 343 U.S. 579; *Panama Refining Co.*, 293 U.S. 388.

260.    Defendants' actions and threats singling out Colorado for disfavored treatment based on Colorado's lawful exercise of its sovereign authority to regulate elections and administer criminal justice violate the equal sovereignty principle. Defendants' actions and

threatened future action undermine and violate the Constitution by singling out Colorado for harmful executive action based on its exercise of these core sovereign powers.

261.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Defendants' actions and threats against Colorado—including the President's decision to relocate U.S. Space Command Headquarters, DOT's Termination Decision, USDA's Recertification Letter, and the various other threats and punishments—based on Colorado's lawful exercise of its core sovereign powers are unconstitutional and that the Executive may not single out Colorado for disparate treatment based on its exercise of core sovereign power reserved for the States by the Constitution. Plaintiff is also entitled to injunctive relief preventing Agency Defendants from implementing or effectuating the retaliatory actions and threats or from engaging in future retaliatory conduct based on Colorado's lawful exercise of its sovereign authority.

## COUNT THREE

### Violation of the Administrative Procedure Act
### (Against DOD Defendants)

262.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

263.    Under the APA, a reviewing court shall hold unlawful and set aside agency action that is contrary to law, in excess of statutory authority or limitation, or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

264.    DOD Defendants have acted contrary to law, in excess of statutory authority or limitation, and without observance of procedure required by law through their actions to relocate U.S. Space Command headquarters without following the requirements of 10 U.S.C. § 483.

265.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that DOD Defendants acted contrary to law, in excess of statutory authority or limitation, and without observance of procedure required by law, in violation of the APA, through their actions to relocate U.S. Space Command Headquarters without following the requirements of 10 U.S.C. § 483. Plaintiff is also entitled to an injunction preventing DOD Defendants from taking further action to implement the announced change to the headquarters location without first following the requirements of 10 U.S.C. § 483.

### COUNT FOUR

**Violation of the Administrative Procedure Act**
**(Against USDA Defendants)**

266.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

267.    Under the APA, a reviewing court shall hold unlawful and set aside agency action that is contrary to law, in excess of statutory authority or limitation, arbitrary or capricious, or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

268.    The Recertification Letter is a final agency action because it marks the consummation of USDA's decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

269.    The Recertification Letter violates the APA many times over.

### Procedural Violations

270.    The Recertification Letter was issued without observance of procedure required by law for at least three reasons.

271.     First, USDA Defendants failed to follow the notice-and-comment requirements that apply to legislative rules.

272.     The Recertification Letter constitutes a legislative rule because it "has the force of law, and creates new law or imposes new rights or duties" *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1222 (10th Cir. 2009) (quoting *FDIC v. Schuchmann*, 235 F.3d 1217, 1222 (10th Cir. 2000); *see also N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (discussing how a legislative rule "'assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself'"); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (discussing how legislative rules "purport[] to impose legally binding obligations or prohibitions"). The Recertification Letter imposes new duties and is contrary to existing law and regulation.

273.     The APA's notice-and-comment procedures apply to legislative rules. *See* 5 U.S.C. § 553. Those procedures require advanced notice of proposed rulemaking followed by an opportunity to participate by interested persons. *Id.* §§ 553(b)–(c).

274.     When an agency promulgates a final rule, it must include "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c).

275.     Unless an exception applies, a substantive rule must be published or served at least 30 days before its effective date. 5 U.S.C. § 553(d).

276.     USDA Defendants failed to follow any of these requirements. USDA Defendants did not provide notice of proposed rulemaking to Colorado, the Recertification Counties, or any interested person. USDA Defendants did not provide any opportunity to participate or comment.

USDA Defendants did not provide a concise statement of the rule's basis and purpose. USDA Defendants made the rule effective immediately, without waiting 30 days after providing final notice.

277.   Second, USDA regulations require that "[a]t least 30 days prior to the initiation of a demonstration project, FNS shall publish a General Notice in the Federal Register if the demonstration project will likely have a significant impact on the public. The notice shall set forth the specific operational procedures and shall explain the basis and purpose of the demonstration project." 7 C.F.R. § 282.1(b). The Recertification Letter will have a significant impact on the public, requiring vast numbers of households to appear for an in-person interview with no notice, contrary to longstanding requirements. And if the households do not appear, they will lose their benefits, even if they are entitled to them by law.

278.   This notice requirement ensures that the public has a chance to comment and point out flaws in projects affecting the public. The regulation provides that "[i]f significant comments are received in response," USDA is to take appropriate action "prior to implementing the project," including making operational changes and additional notices. 7 C.F.R. § 282.1(b).

279.   USDA Defendants failed to comply with this regulatory requirement.

280.   Third, USDA Defendants failed to comply with the requirements of the Paperwork Reduction Act. The Paperwork Reduction Act prohibits agencies from conducting or sponsoring a new or revised collection of information unless in advance it complies with numerous procedural requirements, including completing mandatory agency evaluations, publishing the proposed collection in the Federal Register, providing an opportunity for public

comment, obtaining approval from the Director of OMB, and obtaining an OMB control number to be displayed on the collection. 44 U.S.C. §§ 3507, 3506.

281.    Through the Recertification Letter and "pilot project," USDA is conducting or sponsoring a new or revised collection of information. No current approved collection of information covers this "pilot project." USDA Defendants purport to require more than 100,000 households in Colorado (and a similar number in Minnesota) to report and provide information at an in-person interview to be conducted within 30 days to recertify eligibility. In addition, the "pilot project" imposes new recordkeeping requirements on Colorado, Minnesota, and 9 counties within Colorado and Minnesota.

282.    USDA Defendants did not complete any of these requirements before sponsoring a new or revised collection of information. USDA Defendants did not obtain an OMB control number, and the Recertification Letter does not display a valid OMB control number.

**Contrary-to-Law Violations**

283.    The Recertification Letter is also not in accordance with law and in excess of Defendants' statutory authority for several reasons.

284.    First, USDA Defendants cannot mandate pilot project participation by an unwilling state. The FNA only permits pilot projects agreed to by both USDA and the participating State agencies or other eligible entities. *See, e.g.*, 7 U.S.C. § 2017(f)(2)(A) (authorizing pilot projects "at the request of 1 or more State agencies"); *id.* § 2036d(a) (authorizing pilot projects "on application of eligible entities"); *id.* § 2025(h)(1)(F)(i)(I) (authorizing pilot projects via "cooperative agreements" with State agencies); *id.*

§ 2021(h)(3)(i)(1)(A) (authorizing pilot projects "to test innovative Federal-State partnerships"). Nothing in the FNA gives Defendants authority to mandate participation in a pilot project by an unwilling participant. Indeed, Congress gave Defendants tools for taking actions against States it believes are maladministering SNAP. *See* 7 U.S.C. §§ 2020(g)–(h). But forced participation in pilot projects was not among them.

285.    Second, USDA Defendants cannot unilaterally impose new duties and obligations upon participants in pilot projects. Congress gave the Secretary the authority only to "waive any requirement" of the FNA in connection with a pilot project. 7 U.S.C. § 2026(b)(1)(A). Congress did not give her authority to invent new obligations, like requiring recertifications that have not yet come due or requiring States to perform in-person interviews. USDA Defendants have not, in fact, waived any requirement as part of this purported "pilot project."

286.    Third, the "pilot project" violates various statutory restrictions imposed by Congress for SNAP demonstration projects.

287.    Congress provided that "[t]he Secretary may not conduct" a pilot project unless "the project is consistent with the goal . . . of providing food assistance to raise levels of nutrition among low-income individuals." 7 U.S.C. § 2026(b)(1)(B)(i)(I). The Recertification Letter asserts that "[m]ore accurate certifications of eligibility for SNAP benefits will ensure that those in need receive assistance, raising levels of nutrition among low-income individuals." Disqualifying existing beneficiaries due to an arbitrary deadline does nothing to help those in need of assistance. And by redirecting all available resources to recertification, this program

would affirmatively harm those in need. For example, staff resources would be diverted from processing new applications to recertifying existing beneficiaries.

288.    Congress also prohibited the Secretary from conducting a pilot project under 7 U.S.C. § 2026(b)(1)(A) unless "the project includes an evaluation to determine the effects of the project." 7 U.S.C. § 2026(b)(1)(B)(i)(II). The Recertification Letter contains no provision for an evaluation.

289.    Congress provided that "[i]mpermissible projects" include those that "den[y] assistance to an otherwise eligible household or individual" who has complied with SNAP's requirements. 7 U.S.C. § 2026(b)(1)(B)(iv)(III)(bb). This is an "impermissible project" because it would deny assistance to eligible households or individuals who cannot be interviewed in person and recertified in thirty days—requirements Defendants are attempting to impose beyond what is required by statute and regulation, and which recipients may not be able to comply with, through no fault of their own.

290.    Congress provided that "[i]mpermissible projects" also include those "inconsistent" with the requirement that each State agency "provide timely, accurate, and fair service" to SNAP applicants and recipients. 7 U.S.C. §§ 2026(b)(1)(B)(iv)(III)(ff), 2020(e)(2)(B)(i). It is the antithesis of fairness to impose significant burdens on recipients that are not provided for by statute or regulation without notice and to retroactively change the rules of the life-sustaining benefits they have already qualified for.

291.    Congress further restricted "[p]ermissible projects" to those intended to "improve program administration," "increase the self-sufficiency of [SNAP] recipients;" "test innovative

82

welfare reform strategies," or "allow greater conformity with the rules of other programs than would be allowed but for this paragraph." 7 U.S.C. §§ 2026(b)(1)(B)(ii)(I)–(IV). This "project" is none of these. Forcing the Recertification Counties to abandon all other SNAP-related work (e.g., processing applications, changes, and appeals) and require all households to be recertified within 30 days, with no reason to believe it will catch more fraud than performing recertifications on their usual timeline does not "improve program administration." It harms it tremendously.

292.    Fourth, the "pilot project" would require Colorado to violate several provisions of the FNA and its implementing regulations. USDA has not waived any of these requirements.

293.    USDA's regulations provide that "State agencies may not require households to report for an in-office interview during their certification period." 7 C.F.R. § 273.2(e)(1). "For example, State agencies may not require households to report en masse for an in-office interview during their certification periods simply to review their case files, or for any other reason." *Id.* But that is exactly what USDA is purporting to require Colorado to do.

294.    Because Colorado cannot compel in-office interviews, home-based interviews would be another potential method of conducting in-person interviews (albeit one requiring significantly more resources). But USDA regulations prohibit home-based interviews unless a household meets specified hardship criteria and requests an in-home interview. 7 C.F.R. § 273.2(e)(2).

295.    Regulations permit and encourage State agencies to conduct all recertification interviews by telephone, and State agencies must use telephone interviews in cases of

"household hardship," which must include, at a minimum, "illness, transportation difficulties, care of a household member, hardships due to residency in a rural area, prolonged severe weather, or work or training hours that prevent the household from participating in an in-office interview." 7 C.F.R. § 273.2(e)(2). But here Defendants are purporting to require face-to-face interviews for all households, regardless of hardship.

296.    USDA generally prohibits Colorado from "end[ing] a household's certification period earlier than its assigned termination date." 7 C.F.R. § 273.10(f)(4). But the "pilot project" would require Colorado to end certification periods for households who are unable to complete the recertification process and in-person interviews, even if Colorado did not receive any information suggesting the household had become ineligible.

297.    The "pilot project" would also require Colorado to violate notice requirements. USDA regulations provide that the first step in the recertification process is providing a notice of expiration ("NOE"). See 7 C.F.R. § 273.14(b)(1)(i). The earliest that State agencies can provide the NOE is "the first day of the next-to-the-last month" in the household's certification period. *Id.* For the vast majority of households, performing the recertification process in the thirty-day window mandated by USDA would require sending NOEs before the date permitted by § 273.14(b)(1)(i).

298.    On the other hand, State agencies must provide an NOE "before the first day of the last month of the certification period." 7 C.F.R. § 273.14(b)(1)(i). That is, State agencies are required to give more than one month's notice. That is not possible here, where USDA informed

Colorado of this "pilot project" on December 17, 2025 and required the recertifications to be complete by January 16, 2025.

299.    The "pilot project" would further require Colorado to violate its FNS-approved State Plan of operation, in violation of statute and regulation. *See* 7 U.S.C. § 2020(g); 7 C.F.R. § 276.1.

300.    Fifth, USDA Defendants lack authority to take the remedial measures threatened in the Recertification Letter if Colorado fails to comply with their demands.

301.    The letter threatens "[f]ailure to participate in this pilot project as specified by USDA will trigger noncompliance procedures codified in 7 U.S.C. § 2020(g). It may also affect Colorado's continued participation in SNAP." Ex. 1.

302.    7 U.S.C. § 2020(g) provides that if "there is a failure by a State agency without good cause to comply with any of the provisions of this chapter, the regulations issued pursuant to this chapter, the State plan of operation submitted pursuant to subsection (d) of this section, the State plan for automated data processing submitted pursuant to subsection (o)(2) of this section, or the requirements established pursuant to section 2032 of this title," then the Secretary "shall immediately inform such State agency of such failure" and provide "a specified period of time for the correction of such failure." *Id.* If the State agency does not correct the failure within the specified period, the Secretary may seek injunctive relief and "shall proceed to withhold" administrative funds "as the Secretary determines to be appropriate, subject to administrative and judicial review." *Id.*

303.    7 U.S.C. § 2020(g) does not authorize the Secretary to take any action against Colorado for failure to comply with the Recertification Letter. The Recertification Letter is not part of the provisions of the FNA or the regulations promulgated under it, the State plan of operation, the State plan for automated data processing, or the requirements established under 7 U.S.C. § 2023.

**Arbitrary-and-Capricious Violations**

304.    The Recertification Letter is further unlawful because it is arbitrary and capricious.

305.    An agency action is arbitrary and capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

306.    The Recertification Letter is arbitrary and capricious because the reasons for imposing the "pilot project" upon Colorado are unsupported and irrational; because USDA Defendants rely on factors that Congress has not intended for USDA to consider; because the proposed "pilot project" would not remedy the recipient fraud it supposedly targets; because it

fails to consider the harms and costs it would impose on Colorado, the Recertification Counties, SNAP recipients and applicants, and recipients of other state services who would be harmed while all resources are redirected toward recertification; because it fails to consider the significant reliance interests of those same groups; because it fails to consider important aspects of the problem, including the impossibility of complying with the demands; and because the USDA Defendants imposed the "pilot project" as part of the Trump Administration's retribution campaign against Colorado.

307.   Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that USDA's Recertification Letter is contrary to law, in excess of statutory authority or limitation, arbitrary and capricious, and without observance of procedure required by law, in violation of the APA. Plaintiff is also entitled to a stay of the effective date of the Recertification Letter pending judicial review, to set aside and vacate the Recertification Letter, and to injunctive relief barring its implementation. *See* 7 U.S.C. §§ 705–06.

**COUNT FIVE**

**Spending Clause Violation**
**(Against USDA Defendants)**

308.   Plaintiff realleges and incorporates by reference the allegations set forth above.

309.   "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). However, any conditions must be imposed "unambiguously" to enable "States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

87

310.    Defendants are threatening to withhold Colorado's SNAP administrative funding and to disallow its participation in SNAP altogether unless Colorado completes the impossibly onerous tasks they have demanded. This violates the constitutional limitations on the federal government's spending power because Colorado did not have "clear notice" of this condition when it elected to participate in SNAP. *See Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 296 (2006).

311.    "Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. That is, not even Congress could impose these new conditions upon Colorado, and certainly not Defendants acting without—and in fact contrary to—congressional authority.

312.    Plaintiff is entitled to preliminary and permanent injunctions barring implementation of the Recertification Letter and, pursuant to 28 U.S.C. § 2201, to a declaration that the Recertification Letter and its implementation violate the Spending Clause.

## COUNT SIX

### Violation of the Administrative Procedure Act
### (Against DOT Defendants)

313.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

314.    The DOT Termination Decision is final agency action because it marks the consummation of DOT's decision-making process and determines rights or obligations from which legal consequences will flow. *See Bennett*, 520 U.S. at 177–78.

88

315.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

316.    An agency is action is arbitrary and capricious where it is not "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. An agency must provide "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

317.    The DOT's Termination Decision is not reasonable or reasonably explained. The decision lacks any satisfactory explanation for its action, let alone a rational connection between the facts found and the choices made. DOT fails to identify what its priorities are, what they were previously; how they have ostensibly changed; and why the awardees' projects do not fit those priorities. This leaves the awardees with no genuine justification for the DOT's Termination Decision, let alone a justification that can be scrutinized by the court and the public. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

318.    Instead, the DOT Defendants' bald explanation, its targeting only of Colorado funding, and the timing and manner of the Termination Decision—after Colorado's Governor refused to take actions demanded by the President—show that the termination letters are the

DOT Defendants' attempt to paper over a decision made for another reason, namely to punish Colorado for failing to bend its sovereignty to the President's will. Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com.*, 588 U.S. at 785.

319.    By terminating Colorado's funding to retaliate and punish the State for its exercise of sovereign authority, the agency relied upon a factor that Congress had not intended it to consider. Similarly, treating Colorado disparately from other States without a valid explained reason also renders the action arbitrary and capricious.

320.    The DOT Defendants also failed to account for several important aspects of the problem before them, including, (i) Plaintiffs' reliance interest in awarded grants; (ii) the need for awardees to have clear, unambiguous notice of the circumstances in which their already awarded funding may be withdrawn or terminated; (iii) whether any statutes or regulations permit DOT Defendants to withdraw or terminate grants without advance warning based on a change in agency priorities; (iv) whether any statutes or regulations permit DOT Defendants to terminate discretionary grant programs, even where Congress has directed them to fund those programs; and (v) whether grantees should be given notice of any new agency priorities and an opportunity to modify their grant proposals prior to termination.

321.    Likewise, the DOT Defendants failed to consider the substantial reliance interest of the awardees who committed state funds to these projects as part of the selection process.

322.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that DOT's Termination Decision was arbitrary and capricious in violation of the

APA. Plaintiff is also entitled to a stay of the effective date of the Termination Decision pending judicial review, to set aside and vacate the Termination Decision, and to injunctive relief barring implementation of the Termination Decision and preliminarily preserving the availability of terminated funds. *See* 7 U.S.C. §§ 705–06.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

a.  Declare that Defendants' actions and threats to punish or single out Colorado—including the President's decision to relocate U.S. Space Command Headquarters, DOT's Termination Decision and SS4A denial, USDA's Recertification Letter, FEMA's disaster relief denials, and the various other alleged threats and punishments—based on Colorado's lawful exercise of its sovereign powers are unconstitutional and that the Executive may not retaliate against or single out Colorado based on its exercise of sovereign authority reserved for the States by the Constitution;

b.  Enjoin Agency Defendants from implementing or effectuating retaliatory actions and threats or from engaging in future retaliatory conduct based on Colorado's lawful exercise of its sovereign authority;

c.  Enjoin DOD Defendants from effectuating a relocation of U.S. Space Command Headquarters based on President Trump's unlawful decision;

d.  Declare that DOD Defendants acted contrary to law, in excess of statutory authority or limitation, and without observance of procedure required by law, in violation of the APA, through their actions to move U.S. Space Command Headquarters without following the requirements of 10 U.S.C. § 483;

e.  Enjoin DOD Defendants from taking further action to implement the announced change to the U.S. Space Command Headquarters location without following the requirements of 10 U.S.C. § 483;

f.  Declare that USDA's Recertification Letter is contrary to law, in excess of statutory authority or limitation, arbitrary and capricious, and without observance of procedure required by law, in violation of the APA;

g.  Set aside and vacate the Recertification Letter and stay the effective date pending judicial review;

h.   Enjoin USDA Defendants from implementing the Recertification Letter, including any action to sanction or punish based on failure to comply with the Recertification Letter;

i.   Declare that DOT's Termination Decision was arbitrary and capricious in violation of the APA;

j.   Set aside and vacate the Termination Decision and stay the effective date pending judicial review;

k.   Enjoin DOT Defendants from implementing the Termination Decision and grant preliminary injunctive relief to maintain the availability of terminated funds;

l.   Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

m.   Grant other such relief as this Court may deem proper.


**PHILIP J. WEISER**
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz
*Deputy Solicitor General*
Talia Kraemer
*Assistant Solicitor General*
Sarah H. Weiss
*Senior Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
talia.kraemer@coag.gov
sarah.weiss@coag.gov

Counsel for the State of Colorado

92

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ David Moskowitz
*Deputy Solicitor General*