**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-3428-RBJ

THE STATE OF COLORADO,

     Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al*.,

     Defendants.

---

**RESPONSE TO DEFENDANTS' PARTIAL MOTION TO DISMISS [ECF NO. 82]**

---

This case challenges the Trump Administration's unprecedented campaign of retaliation, wielding the federal government to punish, threaten, and coerce Colorado for its exercise of core sovereign powers. The President has been clear as to his motives, bragging that Colorado is "suffering a big price." These actions and threats violate the Constitution, which reserves for the States "certain exclusive and very important portions of sovereign power," The Federalist No. 9 (Alexander Hamilton), including the power to regulate elections and administer criminal justice. The Constitution prohibits commandeering these core sovereign powers, and it equally prohibits indirectly achieving the same results by punishing a State into submission. The allegations, taken as true, support each of Colorado's constitutional and APA claims.

**BACKGROUND**

This action arises from a coordinated campaign of retaliation by the President and his Administration against Colorado because of Colorado's sovereign decisions, including allowing mail-in voting and prosecuting former Mesa County Clerk Tina Peters for violating state

election-security laws. ECF No. 78, Second Amended Complaint ("SAC") ¶¶ 1–8. Federal

officials, including the President himself, repeatedly linked retaliatory federal actions against

Colorado to exercise of its core sovereign powers:

| Date | Threat/Action |
|---|---|
| May 5, 2025 | President demands Colorado "FREE TINA PETERS, NOW!" and directs DOJ to "take all necessary action" to secure her release. SAC ¶ 75. |
| August 18 | President threatens executive action forcing Colorado and other states to end mail-in voting, saying such states "must do what the Federal Government . . . tells them . . . to do." SAC ¶ 77. |
| August 21 | President escalates threat: "If [Tina Peters] is not released, I am going to take harsh measures!!!" and ties threat to Colorado's mail-in voting. SAC ¶ 76. |
| September 2 | President announces relocation of U.S. Space Command to Alabama, stating Colorado's mail-in voting "played a big factor." SAC ¶¶ 78, 120–122. |
| September and onward | DOD begins implementing relocation: public announcement, transition team, groundbreaking ceremony, and personnel relocations. SAC ¶¶ 123–128. |
| November 12 | DOJ requests Colorado transfer Peters to federal custody, characterizing its efforts as applying "pressure on them" and explaining "If you're Colorado . . . if the feds say we want something, you change your tune." SAC ¶ 82. |
| December 3 | President calls Colorado's Governor a "SLEAZEBAG" for not bending to his request to release Peters. SAC ¶ 83. |
| December 5 & 11 | President issues and publicizes a purported "pardon" for Peters (which has no effect on the state conviction), and attacks Colorado for not releasing her. SAC ¶¶ 84–86. |
| December 15 | President attacks Colorado's Governor, calling him "weak and pathetic" for not allowing "our wonderful Tina to come out of a jail." SAC ¶ 86. |
| December 16 | Administration announces it is terminating $109 million in transportation funding for Colorado; no other states are similarly targeted. SAC ¶¶ 88–90. |
| December 16 | DOE threatens to cut $615 million in Colorado energy funding, which was retweeted by both the President and OMB Director Vought. SAC ¶¶ 6, 91–92. |
| December 16 | Administration announces plan to dismantle NCAR and ties plan to Governor's refusal to "work with President Trump." SAC ¶¶ 93–96. |
| December 18 | USDA imposes SNAP "pilot project" requiring recertification and in-person interviews for 100,000+ households within 39 days, threatening sanctions including possible removal from SNAP. SAC ¶¶ 97–100, 138–41. |

| December 20 | Defendants deny two Colorado disaster-relief requests that met FEMA criteria—denials unprecedented in prior three decades. SAC ¶¶ 101–04. |
| December 23 | DOT denies all Safe Streets awards to Colorado despite several "Highly recommended" applications. SAC ¶¶ 105–06, 245–51. |
| December 31 | Referencing mail-in voting and Tina Peters, President "wishes [Colorado officials] only the worst. May they rot in Hell." SAC ¶¶ 7–8, 108–09. |
| December and onward | DOI ordered to compile list of $100M+ Colorado grants for possible termination. SAC ¶¶ 7, 109. |
| Feb. 2, 2026 | President confirmed the link between Tina Peters and the targeting of Colorado, proclaiming "they're suffering a big price, Colorado" for Tina Peters and further threatening "they better let her out fast." SAC ¶ 8. |

Colorado asserts six claims arising from Defendants' retaliatory campaign. *See* SAC ¶¶ 252–322. Defendants' Motion is limited to Counts I–III and VI.

## ARGUMENT

**I.    The Executive's campaign to punish and coerce Colorado for lawfully exercising its sovereign powers violates the Constitution (Count I).**

Defendants' motion is premised on the breathtaking argument that the Constitution imposes no limits on the Executive weaponizing the federal government to coerce the States to give up their sovereign powers. Defendants do not argue that the allegations here fail to cross a required threshold or that the Administration was not attempting to coerce Colorado. Defendants simply argue that no claim is ever cognizable under the Constitution. But "the federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far." *United States v. Lopez*, 514 U.S. 549, 578 (1995) (Kennedy, J. concurring).

The Framers envisioned federalism, the dual-sovereignty system, as a core structural protection, securing liberty and avoiding abuse from centralized power. *Gregory v. Ashcroft*, 501

U.S. 452, 458 (1991). The Constitution created a limited federal government with "few and defined" enumerated powers. The Federalist No. 45 (James Madison). This constitutional structure was further enshrined through the Tenth Amendment, providing that the "powers not delegated to the United States" are "reserved to the States." These include the core sovereign powers to regulate elections, *Shelby County v. Holder*, 570 U.S. 529, 543 (2013); U.S. Const. art. I, § 4, cl. 1, and administer criminal justice, *Oregon v. Ice*, 555 U.S. 160, 168 (2009). *See also* SAC ¶¶ 9–15, 46–54. The Court has issued numerous decisions to protect these sovereign powers from encroachment by the federal government. For example, the federal government may not directly command a State as to the exercise of its sovereign powers. *See Murphy v. NCAA*, 584 U.S. 453, 472 (2018). The Constitution also prohibits the use of retaliation, punishment, or other coercive action in response to the exercise of a constitutional right or power. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Put differently, the Constitution equally prohibits "directly command[ing]" or "indirectly coerc[ing] a State." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012) ("*NFIB*"). This makes sense because "a government official cannot do indirectly what she is barred from doing directly." *NRA v. Vullo*, 602 U.S. 175, 190 (2024).

Here, the President is operating in an area where the Constitution grants him no power: the President has no authority as to whether Colorado utilizes mail-in voting and no authority as to whether Colorado prosecutes (or pardons) individuals for violating its election-security laws. SAC ¶¶ 46–73. Lacking any direct authority, the President and his Administration have engaged in a widespread campaign of threats and retribution to indirectly coerce Colorado, including terminating unrelated funding (e.g., transportation funds), denying or threatening to terminate

other unrelated funding (e.g., disaster relief, energy, and interior funds), imposing fake pilot programs, moving military headquarters out of Colorado, and dismantling a major Colorado climate research center. *Id.* ¶¶ 74–111. The Constitution prohibits such retaliatory actions in an attempt to indirectly coerce Colorado to give up its sovereign authority. *NFIB*, 567 U.S. at 580 (holding unlawful "threats to terminate other significant independent grants" as a "means of pressuring the States"). This campaign of retribution violates the Tenth Amendment, the Elections Clause, State sovereignty, and separation-of-powers principles. *Id.* ¶ 255.[1]

None of Defendants' arguments in response have merit. First, Defendants argue that they were merely "consider[ing] political factors when making funding and programmatic decisions." ECF No. 82, ("Mot.") at 6–7. Defendants are free to tell their side of the story at trial, but on a motion to dismiss, all allegations are taken as true and inferences drawn in favor of Plaintiff. Colorado's allegations more than plausibly allege retaliatory conduct that is expressly intended to coerce Colorado with respect to its core sovereign activities. And Defendants' analogy to "earmarks" and "pork barrel" spending is particularly inapt because this horse-trading over pet projects occurs pursuant to Congress's express spending power and generally does not implicate

---

[1] Defendants characterize this as a "hodgepodge" of constitutional provisions. Mot. at 6. But they are doctrinally related, including with respect to Count I, in the manners referenced herein and as detailed in the complaint. SAC ¶¶ 9–15, 46–54. For example, Defendants state "it is difficult to fathom how the Executive Branch could violate" the Elections Clause, Mot. at 7, yet courts have repeatedly found the President violated the Elections Clause by attempting to regulate elections, including mail-in voting, through Executive Orders. *See, e.g.*, *California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025). So too here, the President seeks to unlawfully regulate elections indirectly through punishment, threats, and coercion. For similar reasons, these actions violate separation of powers because the Elections Clause grants powers to the States and to Congress, but not to the President, yet he has unlawfully tried to extract such powers from both.

state sovereignty. Where Congress's spending power implicates state sovereignty, the Supreme Court has stepped in, for example, prohibiting grant conditions that are not related to the purpose of the expenditure, *New York v. United States*, 505 U.S. 144, 167 (1992), and prohibiting indirectly coercing States, *NFIB*, 567 U.S. at 577–78. In other words, had Congress conditioned Colorado's transportation, energy, interior, and disaster-relief funding on releasing Tina Peters, that would be unconstitutional. The same holds true for the Executive.

Next, Defendants complain that Colorado has not offered a "limiting principle" for where a "funding dispute" becomes unconstitutional federal coercion. Mot. at 8. But the complaint alleges facts going well beyond a routine funding dispute. At this stage, Colorado need only state a plausible claim. *NFIB*, 567 U.S. at 577–85 (holding that the federal government may not coerce states, finding such coercion based on the facts of the case, but declining to "fix a line").

Finally, Defendants suggest that the Constitution only protects individuals—not States— from federal retaliation that affects their constitutional rights. Mot. at 8. But the only authority Defendants cite for that counterintuitive proposition is *South Carolina v. Katzenbach*, which reflects only that a state is not a "person" and cannot assert a due process claim under the Fifth Amendment. 383 U.S. 301, 323–24 (1966). That case offers no support, and there is no logical reason to believe, that the Constitution's deeply ingrained federalism principles are actually so weak and unimportant that they allow the Executive to coerce States to give up sovereign power.

**II.      This scheme also violates the principle of equal sovereignty (Count II).**

For similar reasons, Plaintiff has stated a plausible claim that the Administration's scheme also violates equal sovereignty. "[T]he fundamental principle of equal sovereignty

remains highly pertinent in assessing . . . disparate treatment of States." *Shelby County*, 570 U.S. at 544. It bars the unjustified disparate treatment among the States in "sensitive areas of state and local policymaking" reserved by the Constitution for the States, such as the core sovereign powers to regulate elections and administer criminal justice. *Id.* at 544–45 (citation omitted).

Defendants argue that Colorado fails to state a claim because equal sovereignty only "applies to federal *statutes*," not to executive actions. Mot. at 9. In other words, they claim Congress could not pass a law singling out Colorado as to how it regulates elections or administers criminal justice, but the Executive is free to do so without limits. Equal sovereignty is a "fundamental principle" of the Constitution, not a limitation restricted to Congress in Article I. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009). It arises from principles that apply equally to all branches of government: "[T]he constitutional equality of the states is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith*, 221 U.S. 559, 580 (1911). Were it not so, the Executive could achieve the same results prohibited in *Shelby County* by taking or threatening harmful executive actions to coerce States into "voluntarily" submitting to the preclearance requirements struck down. There is no logic to Defendants' argument. Thus, for example, a court found that National Guard deployments by the Executive into Oregon violated Oregon's "equal sovereignty among the States." *Oregon v. Trump*, 809 F. Supp. 3d 1193, 1234 (D. Or. 2025) (citation omitted); *see also Roe v. Michelin North America, Inc.*, 637 F. Supp. 2d 995, 1001 (M.D. Ala. 2009) (invoking equal sovereignty and *Northwest Austin* in rejecting an amount-in-controversy argument that would treat one state differently in wrongful death cases). None of the cases cited by Defendants

involve circumstances like here, where the Executive seeks to single out a State based on its exercise of core state sovereign powers regulating elections or administering criminal justice. This is exactly the circumstance to which this fundamental constitutional principle applies.

### III. Defendants' ripeness arguments lack merit.

Defendants argue that Counts I and II are unripe with respect to DOE, DOI and NSF, arguing they have not yet carried through on their threats.[2] Mot. at 10. But the threats themselves constitute actionable retaliation for Colorado's constitutional claims. *See, e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66–68 (1963); *NFIB*, 567 U.S. at 580, 581 (holding unlawful "threats to terminate other significant independent grants" where Secretary was authorized, but not required, to withhold funds and no threat had materialized); *Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011) (recognizing valid claim for retaliation where a public official uses threatening speech intimating that adverse regulatory action will imminently follow).

Moreover, here the Court must assess these threats as part of a coordinated scheme orchestrated by the Administration. After all, all executive power is vested in the President, and each of these agencies and officials are merely acting as subordinates at the direction of the President. *Trump v. Slaughter*, No. 25-332, 2026 WL 1855612 (2026). An effective form of retaliation is to take harmful actions and threaten that even more is on the way. These threats cannot be viewed in isolation. Even if the threats themselves were not actionable alone, they are nevertheless a quintessential part of the scheme, involve relevant evidence, and may be a basis

---

[2] Notably, this Court already rejected a ripeness argument with respect to NSF. *Univ. Corp. for Atmospheric Research v. NSF*, No. 1:26-cv-01061-RBJ (June 1, 2026) (ECF No. 47).

for prospective relief. As this Court has already recognized, "Colorado 'does not have to await the consummation of threatened injury to obtain preventive relief.'" ECF No. 68, Order at 21 (*quoting Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)).

Colorado's allegations, including those about the timing of the actions and Defendants' public statements highlighting them, support the reasonable inference that Defendants' actions—including those threatened by DOE, DOI, and NSF—were intended to coerce Colorado to take the President's preferred actions. This coordinated scheme is all part of the same claim, and ripeness is determined on a claim-by-claim basis, not as to individual parties. *See Pennenvironment v. PPG Indus., Inc.*, Case No. 12-342, 2018 WL 5312778, at \*5–6 (W.D. Pa. Oct. 26, 2018); *United States v. Denka Performance Elastomer, LLC*, Case No. 23-735, 2023 WL 5333200, at \*3–4 (E.D. La. Aug. 18, 2023). Counts I and II are ripe as to all parties.

Finally, because of limitations on the availability of relief against the President, each subordinate agency and official is properly named as a defendant for the additional purpose of ensuring Colorado can obtain declaratory and injunctive relief relating to its claims. *See Cook v. Trump*, 804 F. Supp. 3d 14, 45 (D.D.C. 2025), *aff'd* 609 U.S. ---, 2026 WL 1855613 (2026); *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992).

### IV.    DHS and FEMA are proper parties.

In Counts I and II, Colorado alleges that, as part of Defendants' coordinated retaliatory campaign, FEMA denied two disaster relief assistance requests from Colorado to punish the State for exercising its sovereign powers. SAC ¶¶ 101–04. Defendants argue that neither DHS nor FEMA are properly named because the President has final authority to declare a disaster.

9

Mot. at 12.[3] But this is a non sequitur. Defendants do not dispute FEMA's core involvement in these decisions or its critical duties with leading and implementing the federal response to natural disasters and major-disaster declarations. *See* 6 U.S.C. § 314(a) & (a)(8); 44 C.F.R. § 206.33. And FEMA conducts these operations within DHS, which oversees FEMA's operations. *See* 42 U.S.C. § 5195. Colorado therefore properly named FEMA and DHS for their role in the coordinated scheme to retaliate and punish Colorado. Defendants are unable to point to any cases where federal agencies with such involvement have been dismissed. Moreover, courts routinely award relief against subordinate agencies and officials in cases involving presidential actions, recognizing limitations on availability of relief against the President directly. *See, e.g.*, *Cook*, 804 F. Supp. 3d at 45, *aff'd* 609 U.S. ---, 2026 WL 1855613; *Franklin*, 505 U.S. at 803.

### V.    Count III states a valid APA claim.

Before making a major basing decision, such as moving Space Command Headquarters, DOD Defendants are required to engage in a specified decision-making process with specific decision points, including consulting with State and local officials and providing notices and analyses at each stage to Congress. 10 U.S.C. § 483(a), (b), (c)(3). If they fail to do so, § 483(d) prohibits them from "effect[ing] or implement[ing] a basing decision." *Id.* Ignoring this entirely, DOD Defendants "failed to follow the statutorily mandated processes, failed to provide the

---

[3] Defendants take the opposite stance in their responses to Colorado's written discovery requests: first, not identifying that the President had any involvement in the challenged decisions; and second, refusing to answer on behalf of the President or Executive Office of the President, stating that Colorado must instead seek discovery from agency defendants. Ex. 1, Defendants' Objections and Responses to Plaintiff's First Set of Interrogatories at 2–3, 13–14.

requisite notices to Congress, and have taken and intend to take irrevocable actions to effect or implement the relocation." SAC ¶ 137; *see also id.* ¶¶ 113–14, 131–37.

Defendants summarily argue that "Count Three fails because Section 483 does not apply to final basing decisions." Mot. at 13. But that is false—§ 483 identifies which final basing decisions it applies to (subsection a), proscribes required "decision points" and processes in making that decision (subsections b and c), and prohibits implementing or effecting the final decision until 14 days after the last required notification is submitted (subsection d). Defendants' argument that they can avoid complying by simply skipping to a final decision is meritless.

Defendants' zone-of-interests argument is equally unavailing. Mot. at 12. The zone-of-interest bar is extremely low for APA claims. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). A plaintiff is outside the zone of interests only if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (citation omitted). Colorado is plainly within the zone of interests for § 483 given its requirement to consult "with appropriate State officials and officials of units of local government in which each installation is located regarding matters affecting the local community." 10 U.S.C. § 483(c)(3).

Defendants' reliance on *NRDC, Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988) and *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998), is misplaced. Those cases address only whether courts can address the adequacy of reports submitted to Congress (i.e., claims seeking a *better* report). *Hodel*, 865 F.2d at 318–19; *Guerrero,* 157 F.3d at 1194–95. They do not address the situation here where Colorado's challenge is that that DOD Defendants failed

11

*entirely* to engage in required decision points or to provide required analyses or reports to Congress. SAC ¶¶ 113–14, 131–37; *Hodel*, 865 F.2d at 318 (not addressing whether claims that the agency "failed entirely" to submit required reports); *Guerrero*, 157 F.3d at 1194 (same). Courts reviewing challenges more similar to Colorado's have declined to extend *Hodel* and *Guerrero. See New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 643–47 (S.D.N.Y. 2019)[4]; *Ctr. for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1125 (N.D. Cal. 2007).[5]

## VI.    Count VI is not barred by the Tucker Act and asserts a valid APA claim.

As part of its coordinated scheme, the Trump Administration announced a policy decision to terminate $109 million in transportation funding for Colorado in retaliation for not releasing Tina Peters from her prison sentence. SAC ¶¶ 210, 241–44. Count VI alleges that this

---

[4] The Supreme Court later affirmed in part and reversed in part this decision. As most relevant, the Court assumed without deciding that the reporting claim was judicially reviewable. *U.S. Dep't of Com. v. New York*, 588 U.S. 752, 779 (2019).

[5] Amici (but not Defendants) argue that claims involving Space Command raise nonjusticiable political questions. ECF No. 84-1. The Court need not reach issues raised only by amici. *See Corder v. Lewis Palmer Sch. Dist.*, 566 F.3d 1219, 1230 n.6 (10th Cir. 2009). In any event, it is "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). The political question doctrine is a "narrow exception" to this judicial responsibility. *Zivotofsky ex rel. Zivotosfky v. Clinton*, 566 U.S. 189, 194–95 (2012) (quotation omitted). Courts have recognized that the political question doctrine does not bar all claims related to military bases. In *Center for Biological Diversity v. Mattis*, 868 F.3d 803, 821–30 (9th Cir. 2017), the court held that the political question doctrine did not bar claims relating to government's alleged failure to comply with National Historic Preservation Act in approving construction of a new military base. Central to the court's conclusion was that the claims required the court to engage in the "'familiar judicial exercise' of reading and applying a statute," not to supplant foreign policy decisions. *Id.* at 823–24, 827–28. Likewise, Colorado's claims here do not ask this Court to re-weigh any political questions, but rather to review whether DOD Defendants' conduct violated applicable statutory and constitutional provisions. *See* Counts I–III. Such claims are "emphatically the province" of this Court.

policy decision was arbitrary and capricious, in violation of the APA. *Id.* ¶¶ 313–22. Rather than address the claim pleaded, Defendants erroneously try to break this policy decision into pieces.

Defendants first argue that the Tucker Act precludes jurisdiction for part of this claim with respect to a single grant where there was a grant agreement. Mot. at 13–14. Not so. Again, Count VI challenges the policy decision to attack Colorado, not a breach-of-contract claim under the Tucker Act. Whether an action is "founded . . . upon any express or implied contract with the United States" under the Tucker Act, depends on two factors: (1) the source of the rights upon which a plaintiff bases its claims, and (2) the type of relief sought. *Normandy Apts. v. U.S. Dep't. of Hous. and Urb. Dev.*, 554 F.3d 1290, 1299 (10th Cir. 2009). Both factors show that this is not a breach-of-contract claim under the Tucker Act.

First, Count VI arises under the APA, not any contract. *Normandy Apts.*, 554 F.3d at 1299–1300 (Tucker Act does not apply where "source of rights asserted is constitutional, statutory, or regulatory in nature"). Plaintiff challenges the policy decision targeting Colorado. That claim does not depend on any term of any contract or even whether any contract exists. This type of policy challenge is within the district court's jurisdiction. *NIH v. Am. Pub. Health Assoc.*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) (agreeing with four justices that agency policies can be challenged in district court); *Illinois v. Vought*, 825 F. Supp. 3d 721, 729 (N.D. Ill. 2026) (holding challenges to agency "policies targeting states" are not contractual and fall outside the Tucker Act); *New York v. Trump*, 117 F.4th 1, 27–28 (1st Cir. 2026) (Tucker Act did not prevent injunction prohibiting federal government from implementing unlawful funding freeze policy). That Plaintiff's claim is based on Defendants' unlawful policy decision, and not

based in contract, is underscored by the fact that the termination of all funding arose from a single policy decision by the Administration, yet Defendants argue this Court lacks jurisdiction over Plaintiff's claim as to only a small portion of those funds.

Second, Colorado does not seek contractual relief; rather, it seeks review of final agency action and declaratory and injunctive relief. Following *NIH*, courts have distinguished between claims seeking an order directing payments and claims seeking to vacate or enjoin unlawful policies. *See, e.g.*, *Washington v. U.S. Dep't of Educ.*, 161 F.4th 1136, 1140 (9th Cir. 2025) (distinguishing *NIH* because in that case, "plaintiffs explicitly sought, and the district courts ordered, the immediate payment of past-due grant obligations and the continued payment of ongoing obligations"). Here, Colorado does not seek any payments at all. In fact, the grant program at issue has been suspended for more than a year. Ex. 2, Kay Decl. ¶ 4. Colorado seeks prospective relief that if the program is restarted, it will not be excluded from the program by this unlawful policy decision.[6] *Id.* ¶ 5. That is not a claim for payment of obligations.

With regard to the remaining funding, Defendants argue DOT's actions were supposedly "committed to agency discretion by law." Mot. at 14. But contrary to Defendants' assertions, Colorado is not just a "disappointed applicant" challenging a "decision *not* to enter into a grant agreement with a particular applicant." S*ee id*. Instead, Colorado alleges that the agency adopted an unlawful policy to retaliate against the State. *See* SAC ¶¶ 317–21. Such a policy decision is

---

[6] In any event, "a district court's jurisdiction is not barred by the possibility that an order setting aside an agency's action may result in the disbursement of funds." *California v. Dep't of Educ.,* 604 U.S. 650, 651 (2025) (citation modified).

not within the "very narrow exception" of cases committed to agency discretion by law. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). Had DOT adopted that policy at the front-end, making Colorado ineligible for transportation funding to retaliate for Tina Peters, that undoubtedly would be subject to judicial review. *See, e.g.*, *California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316 (D.R.I. 2025) (reviewing funding conditions limiting eligibility for grants). DOT likewise cannot insulate its policy decision from judicial review by implementing it on the backend. Defendants' arbitrary and capricious policy decision to punish Colorado for lawfully exercising its sovereign power is not committed to agency discretion by law.

## CONCLUSION

The Court should deny Defendants' Motion.

Dated: July 22, 2026

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz, *Deputy Solicitor General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

Counsel for the State of Colorado