# EXHIBIT A

**BRIEF OF CALIFORNIA, MINNESOTA, NEW YORK, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, NEVADA, NEW JERSEY, NEW MEXICO, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-3428-RBJ

**THE STATE OF COLORADO**,

　　　　　　*Plaintiff*,

v.

**DONALD J. TRUMP, et al.**,

　　　　　　*Defendants.*

---

**BRIEF OF CALIFORNIA, MINNESOTA, NEW YORK, CONNECTICUT,
DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS,
MICHIGAN, NEVADA, NEW JERSEY, NEW MEXICO, OREGON, RHODE ISLAND,
VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA AS *AMICI
CURIAE* IN SUPPORT OF PLAINTIFFS**

---

## STATEMENT OF INTEREST OF *AMICI CURIAE*

The *Amici* States of California, Minnesota, New York, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont, and Washington, as well as the District of Columbia (collectively, "*Amici* States") , submit this *amicus* brief in support of Plaintiff State of Colorado to provide broader context—based largely on experience—about the alarming degree to which the Administration of President Donald Trump has sought to exact retribution against States that lawfully exercise their fundamental sovereign prerogatives in ways that President Trump, as the head of the federal Executive branch, dislikes.

In this lawsuit, Plaintiff Colorado alleges that the President and certain federal agencies or officials sought retribution against Colorado (or its state officials) for exercising their own sovereign powers—that is, declining to end mail-in voting and declining to pardon Tina Peters, a Colorado county clerk prosecuted and convicted of election-related state crimes. *See* Compl. ¶¶ 1-7. These retributive actions include relocating the U.S. Space Command permanent headquarters out of Colorado; terminating massive amounts of federal funding for the State; ordering the State to recertify SNAP eligibility and conduct in-person interviews with over 100,000 households within 30 days; and denying the State disaster relief related to severe wildfires and flooding.

As detailed further below, the Trump Administration's efforts to seek such retribution are not unique to Colorado.  The Administration has also sought to subject *Amici* States to harsh punishment based on their own exercise of their core sovereign powers reserved to them by the Constitution. These types of actions pose grave threats to *Amici* States' sovereign authority to decide for themselves, for example, how best to conduct fair elections and administer criminal justice within their own jurisdictions.  More broadly, the Administration's retributive actions

2

threaten *Amici* States' ability to execute the policies chosen by their residents, and cause great harm to *Amici* States.

**ARGUMENT**

In the *Amici* States' experience, the Trump Administration has repeatedly targeted States with extraordinary and harsh actions to try to coerce them into exercising their key sovereign powers in ways that President Trump wants, or to punish them for declining to do so.  Below, the *Amici* States principally focus on the Administration's coercive and retaliatory actions against States that have exercised their core sovereign powers in designing their elections policies or determining how they treat immigrants living within their jurisdictions.  More broadly, the Administration's retributive tactics are antithetical to a republican form of government and the founders' vision of dual sovereignty.  The Administration's actions taken against Colorado exemplify this retaliatory and dangerous pattern.

I.    **THE TRUMP ADMINISTRATION SEEKS RETRIBUTION AGAINST STATES FOR THEIR EXERCISE OF KEY STATE SOVEREIGN POWERS.**

The Trump Administration has retaliated against multiple States, among them Colorado, for making certain decisions well within the bounds of those States' core sovereign interests.  Two examples of the Administration's intrusion upon the States' sovereign powers include the Administration's retribution against States for their choices about administering federal elections in their respective jurisdictions, and against States for their choices about the treatment of immigrants living within their jurisdictions.  Contrary to the arguments of Alabama and other *amici* for Defendants, these coercive and retributive actions do not constitute politics as usual.  *See Colorado v. Trump*, No. 1:25-cv-03428-RBJ, Dkt. No. 84-1 at 1, 8-9 [Brief of Alabama as *Amicus Curiae* In Support of Federal Defendants' Partial Motion to Dismiss] (D. Colo. Jun. 24, 2026). Rather, they are part of a broader, unlawful campaign to try to force States to undertake state

3

policies that the Executive Branch has no authority to direct and to exact retribution when States

decline to bend to the Trump Administration's demands.

### A. THE TRUMP ADMINISTRATION HAS RETALIATED AGAINST STATES FOR THEIR ADMINISTRATION OF FEDERAL ELECTIONS, A KEY STATE POWER UNDER THE CONSTITUTION.

Since January 2025, the Trump Administration has repeatedly used unlawful executive

orders, litigation, and threats of criminal prosecution as part of a concerted effort to undermine

States' administration of federal elections within their respective jurisdictions. As illustrated by

the examples here, that effort unlawfully intrudes upon powers the Constitution primarily assigns

to States, and then to Congress—not to the Executive Branch.

The Constitution grants States the primary authority to regulate federal elections in their

jurisdictions. States have the power "to provide a complete code for congressional elections"

including "notices, registration, . . . protection of voters, [and] prevention of fraud and corrupt

practices." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Watson v. Republican Nat'l Comm.*,

609 U.S. ----, 2026 WL 1855462, at *3 (2026); U.S. Const. Art. I, § 4, cl. 1. In presidential

elections, States have the authority to decide the "Manner" in which their electors to the Electoral

College are chosen. *Watson*, 2026 WL 1855462 at *3 (quoting U.S. Const. art. II, § 1, cl. 2).

Congress—and Congress alone—may preempt the States' authority to administer federal

elections, though its modern interventions have been relatively limited, *see*, *e.g.*, 52 U.S.C. §§

20301 *et seq.*; 20501 *et seq.*; 20921 *et seq.*, and, for the past several years, it has repeatedly chosen

not to substantially alter federal elections processes. *See, e.g.*, SAVE Act, H.R. 8281, 118th Cong.

(2024); SAVE Act, H.R. 22, 119th Cong. (2025); SAVE America Act, H.R. 7296, 119th Cong.

(2026). It is therefore the States, not the Executive Branch, that possess the constitutional authority

to tailor election rules to their residents' needs, from requirements for registration to decisions

about whether and how to count mail-in ballots.

Since taking office, however, President Trump has repeatedly sought to coerce States into adopting election rules *he* favors, despite having "no constitutional power over election regulation that would support this unilateral exercise of authority." *LULAC v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 197 (D.D.C. 2025), *aff'd*, No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026). For example, early in 2025, President Trump issued Executive Order No. 14,248 ("*Preserving and Protecting the Integrity of American Elections*"), which, among other things, required States to demand documentary proof of citizenship from every voter. *California v. Trump*, __ F.Supp.3d __, 2026 WL 1826535, at *1 (D. Mass. June 24, 2026). It also required the U.S. Attorney General to use federal law enforcement authority to prosecute officials in thirteen States that accept mail-in ballots after Election Day. *Id.* Those requirements have been permanently enjoined because, among other things, they "violate the vertical separation of powers and the States' sovereignty and elections power." *Id.* at *22, 25.

Also in 2025, the U.S. Department of Justice began demanding unredacted voter data from States, including sensitive personal information such as social security numbers and driver's license numbers, for use in immigration enforcement. *See, e.g.*, *United States v. Weber*, 816 F. Supp. 3d 1168, 1184-86 (C.D. Cal. 2026). The Trump Administration then sued States that refused to accede to that unlawful demand, though each one of those cases that has reached a ruling has been dismissed. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1196; *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026), *affirmed by United States v. Benson*, __ F.4th __, 2026 WL 1815425 (6th Cir. June 24, 2026); *United States v. Amore*, __ F . Supp. 3d __, 2026 WL 1040637 (D.R.I Apr. 17, 2026); *United States v. Scanlan*, __ F. Supp. 3d __, 2026 WL 1864054 (D.N.H. June 29, 2026). One court concluded, for example, that the Administration failed to legally justify "the deep level of intrusive digging DOJ is proposing in its request for line-by-line voter roll data."

5

*Weber*, 816 F. Supp. 3d at 1188.

Earlier this year, the President issued Executive Order No. 14,399 ("*Ensuring Citizenship Verification and Integrity in Federal Elections*"), which attempted to insert the federal government into state-run elections in unprecedented and unconstitutional ways. *California v. Trump*, __ F. Supp. 3d __, 2026 WL 1826490, at *3 (D. Mass. Jun. 25, 2026). The executive order directs federal officials to create "State Citizenship Lists" of every adult U.S. citizen residing in each State and transmit those lists to state elections officials. It then threatens prosecution of state officials who do not use the lists to verify citizenship. The executive order also directs the United States Postal Service ("USPS") to create lists of individuals in each State who are "enrolled" with USPS for mail voting and orders USPS to refuse to transmit mail ballots for any voters not on those lists. These efforts have been enjoined as applied to the upcoming elections in November 2026. *Id.* at *17. As the U.S. District Court of Massachusetts concluded, "the President lacks any authority to compile voter lists for each State" and the Administration's efforts to "intimidate local officials" were unconstitutional. *Id.* at *14-15.

And just last month, the Administration, through the Department of Homeland Security ("DHS"), informed States that DHS would require them to comply with several new election-security measures. *Illinois v. FEMA*, 1:26-cv-00485, Dkt. No. 1 [Complaint] (D.R.I. July 23, 2026) (*FEMA II*); U.S. Dept. of Homeland Security, "Fiscal Year 2026 Homeland Security Grant Program," Grants.gov, at https://tinyurl.com/mv5bhajk (June 24, 2026), last accessed July 23, 2026. According to DHS, States must, among other things, verify the citizenship of all persons in their voter registration databases and of "any person working at a polling place in any capacity." *FEMA II*, Dkt. No. 1 at 40. Failure to do so would cost the States their ability to receive funds under the federal Homeland Security Grant Program, which provides billions of dollars to States

6

to respond to terrorist threats and natural disasters. *Id.*

These coercive and retributive actions against the *Amici* States underscore the ways in which similar actions were taken by this Administration to punish Colorado for exercising its sovereign authority to regulate elections, including its regulation of mail-in ballots and its prosecution of individuals (such as Tina Peters) who violate Colorado's election laws. Dkt. No. 89. Such retributive actions impose grave harm on States, their communities, and residents. Indeed, as Colorado alleges here, the Administration's retributive actions against that State included canceling $109 million in transportation grants already awarded to the State for environmentally focused projects, including $66.4 million intended to improve rail infrastructure and train safety. *See* Compl., ¶ 6; *see also* Jesse Paul and Taylor Dolven, "Trump administration cancels $109M in environmentally focused transportation grants for Colorado," The Colorado Sun, at https://tinyurl.com/muynb3fp (December 16, 2025), last accessed July 8, 2026. And the Federal Emergency Management Agency ("FEMA") denied Colorado disaster relief funding following fires that burned over 150,000 acres and after flooding that led to evacuations and an estimated $13 million in infrastructure damage.  *See* Maggie Bryan, "Colorado counties disappointed after FEMA denies funding for wildfire, flood recovery," Denver7.com, at https://tinyurl.com/2b8jy9fn (December 22, 2025), last accessed July 8, 2026. As described by Colorado Governor Jared Polis, "Pulling critical transportation infrastructure funding makes our freight rail corridors, which are critical to commerce, less safe." *Id.*  As *Amici* States also know from their experience, pulling critical transportation infrastructure funding and refusing needed disaster relief indeed makes our transportation corridors less safe, hurts state and local economics, and harms state residents who lost their homes or livelihoods in natural disasters.

7

### B. THE TRUMP ADMINISTRATION HAS RETALIATED AGAINST STATES THAT REFUSE TO ALTER THEIR TREATMENT OF IMMIGRANTS.

The Administration has similarly sought to punish many of the *Amici* States for declining to engage in federal immigration enforcement activities. In an effort to coerce States into helping to enforce the Trump Administration's immigration policies, the Administration has withheld or threatened to withhold massive amounts of unrelated federal funding from those States for refusing to allow the federal government to commandeer State resources for immigration enforcement purposes. These coercive and retributive actions imposed or threatened to impose sweeping and devastating harms on the targeted States and their residents.

For example, in January 2025, the President issued Executive Orders 14,159 ("*Protecting the American People Against Invasion*") and 14,218 ("*Ending Taxpayer Subsidization of Open Borders*"), and threatened to withhold *all* federal funding from States containing "sanctuary jurisdictions" for refusing to "adapt their policies and practices to conform with the Trump administration's preference." *City and Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO, 2025 WL 2426858, at *2 (N.D. Cal. Aug. 22, 2025) (deeming this "coercive threat" "unconstitutional"). In implementing Executive Order 14,159, DHS revised the standard terms and conditions governing *all* federal grants it oversees, requiring State and local recipients to certify that they would assist in enforcing federal immigration law, a decision that was soon challenged in federal court by twenty States and the District of Columbia. *See Illinois v. FEMA*, 801 F. Supp. 3d 75, 81-82 (D.R.I. 2025) (*FEMA I*). The revised grant terms required States receiving federal funds through DHS to comply with conditions related to "coordination and cooperation" with federal immigration officials, and to certify that they do not and would not "operate any program that benefits illegal immigrants or incentivizes illegal immigration." *Id.* at 82.

8

In September 2025, the court in *FEMA I* found that denying States billions of dollars in disaster relief and public safety funding for refusing to comply with "vague" policy requirements "leaves them with no meaningful choice" and amounts to "coercion," which is even "more pronounced" when the threatened funds involve "essential public safety responsibilities." *FEMA I*, 801 F. Supp. at 96; *see also Illinois v. Vought*, 825 F. Supp. 721, 729 (N.D. Ill. 2026) (reasoning that "[a]gencies cannot pursue the policy objectives of the executive branch through the power of the purse," as such is "an improper use of legislative power by the executive"); *Martin Luther King, Jr. Cnty v. Turner*, 798 F. Supp. 3d 1224, 1251 (W.D. Wash. Aug. 12, 2025) (finding that the federal government was "leveraging" grant recipients' "dependence on federal funding to coerce them into replacing their own local policies with the Trump Administration's political agenda"). Despite the ruling in *FEMA I*, however, DHS has included a set of immigration conditions in its Fiscal Year 2026 Standard Terms and Conditions that are essentially identical to those already vacated and enjoined in that case. *FEMA II*, Dkt. No. 1 at 3.

As another example, last year, the Administration reallocated millions of dollars of antiterrorism funding based on States' treatment of immigrants within their jurisdictions. The Administration had previously released estimates for how much funding each State could expect to receive from the Homeland Security Grants Program. *See Illinois v. Noem*, 813 F. Supp. 3d 282, 291-94 (D.R.I. 2025). However, in late September 2025, the States received notices from FEMA pursuant to which certain States were "obviously and deliberately targeted for funding cuts" totaling over $240 million. *Illinois v. Noem*, 813 F. Supp. 3d at 293. The affected States were "either on DHS's list of sanctuary jurisdictions or contained cities that were on that list." *Id.* Those States' officials stated that "these extreme cuts pose an existential threat to their ability to engage in critical, life-saving counterterrorism programming." *Id.* As the court in *Illinois v. Noem*

found, the diversion of such antiterrorism funding constituted "irreparable harm" because "the effect of the loss of emergency and disaster funds cannot be recovered later, and the downstream effect on disaster response and public safety are real and not compensable." 813 F. Supp. 3d at 311.

Moreover, this year, the Trump Administration continued to slash funding to certain States as retribution for refusing to change their policies regarding how state or local officials treat immigrants living within their jurisdictions. For example, in January 2026, the federal government froze nearly $10 billion in funding for five States to support childcare subsidies, social services, and cash support for low-income families. *See New York v. Administration for Children and Families*, No. 1:26-cv-00172, Dkt. No. 121 [First Amended Complaint] (S.D.N.Y. Jul. 14, 2026). Specifically, the Department of Health and Human Services announced that California, Colorado, Illinois, Minnesota, and New York would lose access to approximately $7.3 billion to fund cash assistance to households with children, $2.4 billion in funding support for child care for working parents, and $870 million for social services grants benefitting children at risk, *irreparably harming families. Id.*; *see, e.g.*, *New York v. Trump*, 171 F.4th 1, 24-25 (1st Cir. 2026) (categorical freezing of federal funds would cause "catastrophic disruption" to student instruction, closures of childcare programs and "significant impediments" to the delivery of basic health care services to vulnerable populations") (cleaned up).

Then, in February 2026, the Department of Health and Human Services and the Centers for Disease Control and Prevention notified Congress that they intended to terminate more than $600 million in funding to four States containing "sanctuary cities"—California, Illinois, Colorado, and Minnesota. *See Vought*, 825 F. Supp. 3d at 728 ("[T]he reasonable inference is that the Office of Management and Budget directed HHS to cut funding for plaintiffs by February 1

10

because plaintiffs were on a list of states with sanctuary jurisdictions"). As the *Illinois v. Vought* court concluded, "the harm to plaintiffs from OMB's effort is irreparable and intangible. . . . The loss of capacity to fund and maintain public health infrastructure puts the health of plaintiffs' residents in jeopardy. For example, losing 25 lead poisoning prevent programs [citation omitted] risks generational harm to people that cannot be repaired after-the-fact with contract payments." 825 F. Supp. 3d at 730.

The Trump Administration's efforts to compel States to change the exercise of their sovereign police power have not been limited to funding cuts. Last year, in response to widespread lawful protests regarding DHS's immigration enforcement tactics in Los Angeles, Chicago, Portland (Or.), and Memphis, the Administration federalized and deployed the National Guard in those cities.[1] *See Newsom v. Trump*, 786 F. Supp. 3d 1235, 1263 (N.D. Cal. 2025) (granting temporary restraining order); *Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at *24 (N.D. Ill. Oct. 10, 2025) (granting temporary restraining order); *Oregon v. Trump*, 809 F. Supp. 3d 1193, 1260 (D. Or. 2025) (granting permanent injunction).[2] Those cities and the three States in which they are located incurred significant harm from the Administration's coercive tactics, which inflamed tensions and potential violence in large civilian population centers and diverted limited state resources from activities like fighting wildfires and drug trafficking enforcement. *See Newsom*, 786 F. Supp. 3d at 1261-62 ("local law enforcement arrests jumped after the National

---

[1] The Supreme Court ultimately ruled that the federal government's federalization and deployment of Illinois's National Guard was likely unlawful. *See Trump v. Illinois*, 146 S. Ct. 432, 434 (2025) (federal government had "failed to identify a source of authority that would allow the military to execute the laws in Illinois").

[2] Although the temporary restraining order obtained by California was stayed pending appeal, *see Newsom v. Trump*, 141 F. 4th 1032 (9th Cir. 2025), the judicial decisions arising from this case reflect the Administration's retaliatory practices. The November 7, 2025 permanent injunction obtained by Oregon was initially administratively stayed pending hearing of the substantive motion for a stay pending appeal, and the administrative stay was later vacated when the troops were demobilized. *Oregon v. Trump*, 163 F. 4th 1309 (9th Cir. 2026).

Guard was deployed"); *Oregon*, 809 F. Supp. 3d at 1235 ("Oregon has suffered irreparable injury from the unlawful federalization and deployment of both its own National Guard and the National Guards of other states").

And in several States, including Illinois and Minnesota, the Administration initiated sweeping  immigration-enforcement operations that targeted certain States to punish them for their treatment of immigrants and coerce them into furthering the Administration's immigration policies. *Illinois v. Noem*, 26-cv-00321, Dkt. No. 1 (N.D. Ill. Jan. 12, 2026); *Minnesota v. Noem*, 26-cv-00190, Dkt. No. 167 (D. Minn Apr. 20, 2026).  Indeed, the U.S. Department of Justice stated that it would withdraw the surge in Minnesota only if the State agreed to change its immigration and elections policies.  In a letter to Governor Tim Walz, then-Attorney General Pamela Bondi explicitly conditioned "restor[ation of] the rule of law" and "an end to the chaos in Minnesota" on Minnesota's agreement to share with the federal government its records on Medicaid and Food and Nutrition Service programs, repeal its "sanctuary policies," and give the Department of Justice access to its voter rolls.  *In re Grand Jury Subpoenas*, No. 26-MC-43 PJS, 2026 WL 1783899, at *4 (D. Minn. June 22, 2026).

The U.S. District Court of Minnesota later granted Minnesota officials' motions to quash federal subpoenas seeking records related to officials' purported refusal to enforce federal immigration laws.  The court concluded that the subpoenas "were issued as part of an unconstitutional effort to coerce Minnesota officials into assisting the federal government with enforcing civil immigration laws and to harass and retaliate against them for failing to do so." *Id.* at *5.  As the court noted, "the public record . . . is replete with direct evidence of the Trump administration . . . threatening and attempting to punish states and localities that have adopted 'sanctuary' policies, as well as attempting to coerce those states and localities to devote resources

12

to assist federal immigration enforcement." *Id.* at *6.

As these examples show, the Administration's coercive tactics against Colorado here do not reflect mere politics, but rather were undertaken in retaliation for that State's exercise of its own sovereign policy authority—just as the Administration's actions described above were undertaken in retaliation for many of the *Amici* States' sovereign policy choices.

## II. THE TRUMP ADMINISTRATION'S WEAPONIZATION OF THE FEDERAL GOVERNMENT AGAINST THE STATES IS ANTITHETICAL TO A REPUBLICAN FORM OF GOVERNMENT AND THE FOUNDERS' VISION OF DUAL SOVEREIGNTY.

The President's weaponization of the federal government against States for exercising their own sovereign authorities is antithetical to a republican form of government. As constitutional scholars have explained, the "core" of a republican government is "one in which the people control their rulers." *See* Deborah Jones Merritt, "The Guarantee Clause and State Autonomy: Federalism for a Third Century," 88 Colum. L. Rev. 1, 22-25 (1988); *see also* Robert G. Natelson, "A Republic, Not a Democracy—Initiative, Referendum, and the Constitution's Guarantee Clause," 80 Tex. L. Rev. 807, 814-15 (2002) ( "a republican form of government" refers to "three core features: majority rule, the absence of monarchy, and the rule of law"). The use of the federal government to withhold billions in necessary public safety funding and to otherwise punish States for exercising their sovereign power, reserved to them under the Tenth Amendment, deeply undermines our Nation's system of dual sovereignty.

The Founders envisioned a Nation where the States operated as sovereigns, and where no one government would have "complete jurisdiction over all concerns of public life," "protect[ing] the liberty of the individual from arbitrary power." *Bond v. United States*, 564 U.S. 211, 222, 224 (2011) (injury under the Tenth Amendment occurs where "[t]he public policy of the [State], enacted in its capacity as sovereign, has been displaced by that of the National Government"). As explained in the Federalist Papers, dual sovereignty allows for the States to "afford complete

security against invasions of the public liberty by the National authority." *The Federalist No. 28*, at 177 (Alexander Hamilton) (Clinton Rossiter ed., 1961). *Amici* States urge the Court to uphold these foundational principles here.

### CONCLUSION

For the foregoing reasons, *Amici* States respectfully request that the Court deny Defendants' Partial Motion to Dismiss.

Dated:  July 29, 2026

Respectfully submitted,

**ROB BONTA**
*Attorney General of California*

LARA HADDAD
MATTHEW WISE
Supervising Deputy Attorneys General
CHRISTOPHER KISSEL
Deputy Attorney General

 /s/ *Vanessa Ing*
VANESSA ING*
Deputy Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
Vanessa.Ing@doj.ca.gov
(415) 510-3464

*Admitted to practice in the District Court for the District of Colorado*

*Attorneys for Amici State of California*

**LETITIA JAMES**
*Attorney General of New York*
BARBARA D. UNDERWOOD
 *Solicitor General*
JUDITH VALE
 *Deputy Solicitor General*
MORENIKE FAJANA
 *Special Counsel*
28 Liberty Street
New York, NY 10005

**KEITH ELLISON**
*Attorney General of Minnesota*
BRIAN S. CARTER
*Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, MN 55101-2125

14

**WILLIAM TONG**
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

**KATHLEEN JENNINGS**
*Attorney General of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

**ANNE E. LOPEZ**
*Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

**KWAME RAOUL**
*Attorney General of Illinois*
115 S. LaSalle St.
Chicago, IL 60603

**AARON M. FREY**
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333-0006

**ANTHONY G. BROWN**
*Attorney General of Maryland*
200 Saint Paul Place
20th Floor
Baltimore, MD 21202

**ANDREA JOY CAMPBELL**
*Attorney General of Massachusetts*
One Ashburton Place
Boston, MA 02108

**DANA NESSEL**
*Attorney General of Michigan*
P.O. Box 30212
Lansing, MI 48909

**AARON D. FORD**
*Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

**JENNIFER DAVENPORT**
*Attorney General of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

**RAÚL TORREZ**
*Attorney General of New Mexico*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501

**DAN RAYFIELD**
*Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

**PETER F. NERONHA**
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

**CHARITY R. CLARK**
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

**NICHOLAS W. BROWN**
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

**BRIAN L. SCHWALB**
*Attorney General of the District of Columbia*
400 6th Street NW
Washington, DC 20001